**ALICIA LEDUC MONTGOMERY, OSB 173963**
Email: alicia@leducmontgomery.com
**LEDUC MONTGOMERY LLC**
2210 W Main Street, Suite 107 #328
Battle Ground, Washington 98604
Telephone: (503) 500-5695

**MICHELLE R. BURROWS, OSB 861606**
Email: michelle.r.burrows@gmail.com
**LAW OFFICE OF MICHELLE R. BURROWS P.C.**
16869 SW 65th Ave. #367
Lake Oswego, Oregon 97035
Telephone: (503) 241-1955

Attorneys for Plaintiff John Malaer

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| JOHN LEE MALAER, <br><br> Plaintiff, <br><br> v. <br><br> GEOFFREY KIRKPATRICK, an individual; MICHAEL WULFF, an individual; OMAR ESQUEDA, an individual; ASHLEY MCFALL, an individual; CITY OF MEDFORD, a government agency; JACKSON COUNTY, a government agency; NATHAN SICKLER, in his individual and official capacity; and BRIAN KOLKEMO, an individual, <br><br> Defendants. | Case No. 1:20-cv-00049-CL <br><br> **DECLARATION OF ALICAI LEDUC MONTGOMERY IN SUPPORT OF PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER** |

I, Alicia J. LeDuc Montgomery, declare:

1.  I am over the age of 18 years and I make this declaration based on my personal knowledge

of the facts contained herein.

PAGE 1 – **DECLARATION OF ALICIA LEDUC MONTGOMERY ISO PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER**

2.  I am an attorney for Plaintiff in this case.

3.  In conferral in late January 2023 before the close of discovery, I advised Plaintiff would seek to compel production of the IA File from the third party subpoena respondents who held it. In turn, counsel for the City Defendants advised they would move to quash the subpoenas.  The parties agreed the City Defendants would first file their singular motion to quash and Plaintiff would respond, to obtain the Court's ruling on the IA File to determine if filing multiple motions to compel against third parties would be necessary.

4.  Plaintiff produced documents in discovery that were attorney work product or attorney-client privileged communications, but because Malaer had inadvertently destroyed the privilege by forwarding the documents to third-party friends interested in his case, Plaintiff's counsel abided by the rules governing federal court discovery and produced the documents to the City because the documents had lost their privilege status after being given to third parties.  Plaintiff asks that the City be held to this same, basic standard of producing non-privileged documents that are relevant to the claims and defenses at issue.

5.  Plaintiff issued subpoenas to third parties requesting records relevant to Malaer's arrest and jailing in July 2019, which encompassed the City's Internal Affairs File regarding Malaer's complaints.  Subpoenas to Oregon State Police and Klamath County were served on or about November 7, 2022, and subpoenas to Jackson County District Attorney's Office and Oregon Department of Justice were served on or about December 29, 2022.  Through depositions, communications with opposing counsel and counsel for subpoena respondents, Plaintiff's counsel learned that counsel for the City Defendants had contacted the Oregon State Police, Jackson

PAGE 2 – **DECLARATION OF ALICIA LEDUC MONTGOMERY ISO PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER**

County Sheriff's Office, and Jackson County District Attorney's Office and requested those entities not produce the City IA File to Plaintiff.

6.  Attached as **Exhibit A** is a true and correct copy of Malaer's administrative complaint filed with the City of Medford Police Department on or about July 25, 2019, which was attached as Exhibit 3 to the Deposition of Geoffrey Kirkpatrick in this matter.

7.  Attached as **Exhibit B** is a true and correct copy of excerpts from the transcript of the deposition of Defendant Geoffrey Kirkpatrick in this matter from January 4, 2023, with highlighting applied to the excerpts.

8.  Attached as **Exhibit C** is a true and correct copy of Defendant Kirkpatrick's Internal Affairs Disposition Letter issued by MPD to Malaer on or about July 27, 2019.

9.  Attached as **Exhibit D** is a true and correct copy of excerpts from the transcript of the deposition of Oregon State Police Sergeant Jeff Proulx in this matter from December 13, 2022, with highlighting applied to the excerpts.

10.  Attached as **Exhibit E** is a true and correct copy of the Oregon State Police Report SP19289625 prepared by Sgt. Proulx regarding his investigation of misconduct against Malaer in the Jackson County jail, obtained from OSP.

11. Attached as **Exhibit F** is a true and correct copy of excerpts from the transcript of the deposition of Jackson County Sheriff's Office Lieutenant Jeremy Whipple in this matter from January 16, 2023, with highlighting applied to the excerpts.

12. Attached as **Exhibit G** is a true and correct copy of the Redacted ███████████████

████████████████████████████████████████████████

████████████████ , produced by County Defendants.

PAGE 3 – **DECLARATION OF ALICIA LEDUC MONTGOMERY ISO PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER**

13. **Exhibit H** is a true and correct copy of the Medford Police Department body camera video recording MPD Sgt. K. Budreau's interaction with Malaer on July 18, 2019 documenting bruising to Malaer's body, produced by the City Defendants in this case, available at https://www.dropbox.com/scl/fo/d3eupy9e7uzsrpdmtredc/h?dl=0&rlkey=2cny9sa4h1qsgivipw1 3zzh9m.  Plaintiff will also mail a copy of this Exhibit to the Court on a thumb drive.

14. **Exhibit I** are true and correct copies of photographs taken by MPD Sgt. K. Budreau on July 18, 2019 of bruising to Malaer's body, produced by City Defendants in this case, available at https://www.dropbox.com/scl/fo/d3eupy9e7uzsrpdmtredc/h?dl=0&rlkey=2cny9sa4h1qsgivipw1 3zzh9m.  Plaintiff will also mail a copy of this Exhibit to the Court on a thumb drive.

15. Attached as **Exhibit J** is a true and correct copy of email correspondence from Medford City Attorney Eric Mitton to Plaintiff's Counsel on January 24, 2023 listing documents that were referenced in, or listed as exhibits to, the City IA File regarding Malaer's July 2019 arrest incident.

16. Attached as **Exhibit K** is a true and correct copy of excerpts from the transcript of the deposition of Medford Police Officer Omar Esqueda in this matter from January 5, 2023, with highlighting applied to the excerpts.

17. Attached as **Exhibit L** is a true and correct copy of excerpts from the transcript of the deposition of Medford Police Officer Michael Wulff in this matter from January 5, 2023, with highlighting applied to the excerpts.

18. **Exhibit M** is a true and correct copy of an audio recording of a phone call between MPD Sgt. Mak and Malaer on or about July 16, 2019, produced as file "071619 #499.wav" by City Defendants in this case, available at

PAGE 4 – **DECLARATION OF ALICIA LEDUC MONTGOMERY ISO PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER**

https://www.dropbox.com/scl/fo/d3eupy9e7uzsrpdmtredc/h?dl=0&rlkey=2cny9sa4h1qsgivipw1 3zzh9m.  Plaintiff will also mail a copy of this Exhibit to the Court on a thumb drive.

19. Attached as **Exhibit N** is a true and correct copy of an email complaint Malaer sent Medford City Manager Brian Sjothun on July 27, 2019 titled "4th Amendment and ADA rights conflict with the City" which was forwarded to Police Chief Scott Clauson.

20. Attached as **Exhibit O** is a true and correct copy of excerpts from the transcript of the deposition of Medford City Manager Brian Sjothun in this matter from January 6, 2023, with highlighting applied to the excerpts.

21. Attached as **Exhibit P** is a true and correct copy of a November 2022 email exchange between counsel for the Parties and the Court in advance of the Rule 16 conference concerning the City's Internal Affairs file.

22. Attached as **Exhibit Q** is a true and correct copy of a January 24, 2023 email from Jackson County counsel confirming that on September 18, 2019, the Jackson County District Attorney's Office emailed a copy of the City IA File to Klamath County District Attorney Eve Costello.


*Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*


DATED: February 14, 2023

                                                   __*s/ Alicia J. LeDuc Montgomery*__
                                                   Alicia J. LeDuc Montgomery

                                                   Attorney for Plaintiff John Lee Malaer


PAGE 5 – **DECLARATION OF ALICIA LEDUC MONTGOMERY ISO PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION TO QUASH AND MOTION FOR PROTECTIVE ORDER**

# EXHIBIT A

# LEDUC MONTGOMERY DECLARATION



# MEDFORD POLICE DEPARTMENT
# COMMENDATION/COMPLAINT FORM



NAME: John Malaer   ADDRESS: 100 N. Grape St   PHONE: 541-414-7470

INVOLVED OFFICER(S): Ofc Wulf / Sgt. Kirkpatric

LOCATION OF INCIDENT: ~~the City~~ In front of Lumps on Sidewalk

DATE/TIME OF INCIDENT: 7/10/19  6:00pm   RELATED CASE #: _____

WITNESS: _____   ADDRESS: _____   PHONE: _____

DESCRIPTION OF INCIDENT: (ATTACH ADDITIONAL SHEETS AS NECESSARY)

My Power Wheel chair ran out of power in front
of Lumps on Riverside. I ask Someone to Call a
Cab and they called the police. When they arrived they
arrested me ~~throw~~ my on the ground and stepped in
my arms & Legs damaging my left elbow. While
handcuffed in the back of the unit I was punched
in the Left Eye by a hispanic officer & Officer
Wulf witness. I was then takin to jail put on
Suicide watch and not allowed a phone call until
I was released 24 hours later

THE AFOREMENTIONED STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE:

SIGNED: _____   DATE/TIME: 7/25/19  3:00 pm

RECEIVED BY: _____   DATE/TIME: _____

INQUIRY____ ALLEGATION____ COMMENDATION____

RESOLVED BY: _____   DATE/TIME: _____

COMPLAINANT NOTIFIED BY: _____   DATE/TIME: _____

NOTIFIED: IN-PERSON____ PHONE____ LETTER____ OTHER____ IA#: _____

FINDING: SUSTAINED___ NON-SUSTAINED___ EXONERATED___ UNFOUNDED___

PENDING____ OTHER____

DIVISION COMMANDER: _____   DATE/TIME: _____

# EXHIBIT B

# LEDUC MONTGOMERY DECLARATION

# Deposition of:
# **Geoffrey Kirkpatrick**

### January 4, 2023

### John Lee Malaer
### vs.
### Geoffrey Kirkpatrick; et al.

### Case No.: 1:20-cv-00049-CL



SYNERGY

LEGAL

LITIGATION SUPPORT SERVICES

Geoffrey Kirkpatrick

```
 1   Fleischer.  Madame Court Reporter, will you please
 2   swear in the witness.
 3                (Reporter clarification)
 4                MS. MONTGOMERY:  Alicia LeDuc Montgomery
 5   for plaintiff.
 6                MR. PIETILA:  And Johan Pietila for
 7   Jackson County and the county defendants.
 8                THE REPORTER:  Thank you.
 9
10   GEOFFREY KIRKPATRICK,
11   having been first duly sworn, was examined and
12   testified as follows:
13
14                      EXAMINATION
15   BY MS. BURROWS:
16        Q    Lieutenant Kirkpatrick, my name is
17   Michelle Burrows.  I'm an attorney for Mr. John
18   Malaer, and this is the time set for your deposition
19   in his federal civil rights lawsuit.  Have you ever
20   had your deposition taken before?
21        A    I believe so, but it's been a very long
22   time ago.  Probably in the early 2000s.
23        Q    Do you remember what kind of case that
24   was?
25        A    I don't recall.
```

Geoffrey Kirkpatrick

```
 1   the years.
 2        Q    And at any of these various community
 3   and/or government groups that you attended, meetings
 4   that you've attended, have you ever seen Mr. Malaer?
 5        A    I have not.
 6        Q    Have you ever heard him speak at any of
 7   these meetings?
 8        A    Not in my recollection.
 9        Q    Were you aware of any of his outreach or
10   volunteer work with homeless folks in the community
11   prior to 2019?
12        A    No.
13        Q    Since then are you aware of any?
14        A    No.
15        Q    Did you -- you had mentioned that you had
16   a call for service to address Mr. Malaer's issues in
17   February of 2018 and then were talking about the
18   July 2019 arrest.  Have you ever had any other contact
19   with Mr. Malaer in an official capacity as a police
20   officer other than those two incidents that I
21   mentioned?
22        A    The only other thing that I can recollect
23   is -- would have been contact with him during that
24   internal affairs investigation sometime after the
25   July 2019 incident.
```

Geoffrey Kirkpatrick

```
 1        Q     Okay.  How many are in your division?
 2        A     An estimate of about 36 to 40.
 3        Q     36 to 40.  How many sergeants?
 4        A     Two.  Three.
 5        Q     Three sergeants?
 6        A     I'm sorry.
 7        Q     Okay.  When you were a sergeant, who were
 8   you responsible to supervise?
 9        A     When?
10        Q     In 2019 as a sergeant, do you remember how
11   many folks you were responsible for supervising?
12        A     It depends on when in 2019 you're asking.
13        Q     Well, let's focus on July of 2019.  I know
14   that these are just arbitrary dates and time, but
15   that's when the incident took place.
16        A     At that time in July of 2019 I would have
17   been the patrol sergeant of patrol Team 7, I believe,
18   which was a -- which would have been similar in the
19   area of six officers and a corporal.
20        Q     And when you were made the sergeant of the
21   livability team in September of 2019, did your
22   supervisory role change at all?
23        A     Yes.
24        Q     And were you still supervising patrol
25   Team 7 or had that changed as well?
```

Geoffrey Kirkpatrick

```
 1         Q      Okay.  Let me start over.  Before
 2    Mr. Malaer was arrested in 2019, did you know who he
 3    was?
 4         A      I didn't know who Mr. Malaer was until I
 5    read that -- prior to the 2019 incident.  I don't
 6    recall the 2018 incident.  I have no recollection of
 7    that incident whatsoever.
 8         Q      And I think I asked you about whether or
 9    not you remember him testifying or participating in
10    any community based forums that we talked about.  You
11    don't remember him?
12         A      I do not.
13         Q      Do you remember seeing him out there with
14    other homeless folks at all while you were working on
15    the livability team?
16         A      I do not.
17         Q      Have you ever been to Mr. Malaer's home?
18         A      I do not recall.
19         Q      Mr. Malaer filed a complaint as we've
20    talked about.  So this is Exhibit 3.  Can you take a
21    look at this and see if you recognize this document?
22    Do you recognize that document?
23         A      I do.
24         Q      Is this a document you reviewed in
25    preparation for today's deposition?
```

Geoffrey Kirkpatrick

```
 1        A     No.
 2        Q     Okay.  Is there any handwriting on here
 3   that is yours?
 4        A     Not to my knowledge.
 5        Q     And this appears to be dated July 25 of
 6   2019 shortly after the arrest of Mr. Malaer in July of
 7   2019.  Do you have any estimation of when you might
 8   have received this complaint to investigate?
 9        A     I don't recall.
10        Q     And then this document the next in order
11   which is four, do you recognize this document?
12        A     I do.
13        Q     What is this document?
14        A     A complaint disposition letter.
15        Q     This disposition is dated July 27, 2019,
16   two days after the complaint letter; is that correct?
17        A     Correct.
18        Q     And so that's two days that you did the
19   investigation and sent out this letter?
20              MS. WILSON:  Object to the form of the
21   question.
22   BY MS. BURROWS:
23        Q     Is that correct?
24        A     I don't know.  I don't know when this was
25   actually submitted.  In the disposition letter it says
```

Geoffrey Kirkpatrick

```
 1   that I received the complaint on July 16, and this
 2   letter is dated July 27.
 3        Q    Well, that's kind of weird because the
 4   complaint letter is dated July 25.  How did you get it
 5   on the 16th?  Do you know?
 6             MS. WILSON:  Object to the form of the
 7   question.  Answer if you can.
 8             THE WITNESS:  I don't know that this is a
 9   correct date.
10   BY MS. BURROWS:
11        Q    Which one?
12        A    The July 25.
13        Q    All right.  Is there any -- well, if you
14   know, when a document comes in from a citizen to the
15   police department, is it entered into the system or
16   date stamped or some kind of notice that we received
17   this on this date?
18        A    Not to my knowledge.  I don't know.
19        Q    You don't know?
20        A    Yeah, I don't know what records does with
21   those.
22        Q    And, again, whatever period of time we're
23   talking about whether it's two weeks or two days, in
24   order to reach this finding of exonerated of the
25   officers that were being complained about in
```

Geoffrey Kirkpatrick

```
 1    Mr. Malaer's complaint concerns you and Wulff?
 2               MS. WILSON:   Object to the form of the
 3    question.
 4    BY MS. BURROWS:
 5         Q     It involves officers -- Officer Wulff and
 6    Sergeant Kirkpatrick; is that correct?  Is that what
 7    he is complaining about in his letter?
 8         A     The involved officers are listed on the
 9    complaint form as Officer Wulff and
10    Sergeant Kirkpatrick.
11         Q     And you were asked to investigate
12    yourself?
13         A     I was not provided this letter.  It went
14    to a different sergeant.
15         Q     What information did you receive then?
16         A     Like I previously told you, it went to a
17    different sergeant.  That sergeant looked at it and
18    then provided it to me.
19         Q     To investigate?
20         A     To investigate that.
21         Q     And you're listed as one of the involved
22    officers?
23         A     If you look down below, I'm not listed as
24    an allegation in the description of the incident.
25         Q     Okay.
```

Geoffrey Kirkpatrick

```
 1        A     It lists other people.
 2        Q     Did you ask anyone else to look at your
 3   conduct separately from what you were doing?
 4        A     I don't recall.
 5        Q     And I think you testified earlier that you
 6   looked at the body cam footage prior to reaching your
 7   conclusion in this July 27 letter; is that correct?
 8        A     I believe I would have.
 9        Q     And there were body cams from
10   Officer Esqueda and Officer McFall and Officer Wulff.
11   Did you look at all three of them?
12        A     I don't recall.
13        Q     Did you talk to the percipient civilian
14   witness at the scene?  I don't remember her name right
15   now.
16        A     I don't recall.
17        Q     And you did say you looked at the CAD
18   report?
19        A     I did look at the CAD report.
20             MS. BURROWS:  Do you need to take a break?
21             THE WITNESS:  If we want to do it now.  If
22   it's a good time, let's do it now.
23             MS. BURROWS:  Let's take a ten-minute
24   break.
25             THE VIDEOGRAPHER:  We are going off the
```

Geoffrey Kirkpatrick

```
 1   what we talked about, what did you know about
 2   Mr. Malaer before that incident?  Anything?
 3        A    Nothing.
 4        Q    And how did you become aware of
 5   Mr. Malaer's arrest?
 6        A    So though I had no idea the name of the
 7   person that was arrested, I became aware of the
 8   incident when I received a phone call from one of the
 9   officers on scene asking me if I could facilitate the
10   transport of a motorized wheelchair to jail.
11        Q    Do you remember which officer called you?
12        A    I believe that it was Officer Wulff.
13        Q    But that was -- was that called in after
14   Mr. Malaer was in custody?
15             MS. WILSON:  Object to the form of the
16   question.  Answer if you can.
17             THE WITNESS:  I don't know when that call
18   was placed.
19   BY MS. BURROWS:
20        Q    Did you review anything other than --
21   anything prior to going out to assist Mr. or
22   Officer Wulff?
23        A    I don't understand the question.
24        Q    Well, did you review any kind of CAD
25   records that may be coming up on the screen?  Did you
```

Geoffrey Kirkpatrick

1      Q    And they weren't saying it in a nice way.
2  So you don't remember that?
3      A    Again, I haven't looked at those body
4  camera videos since sometime in 2019.
5      Q    After the incident with Mr. Malaer or I
6  mean the arrest of Mr. Malaer, did you have occasion
7  to speak to any of the officers who were present at
8  the scene about the arrest?
9      A    I don't recall.
10     Q    Now, I apologize, but I did not read your
11  policy on the training, officer training program.  Are
12  there stages of training that an officer goes through?
13  Like she's with a coach.  Then she eventually works up
14  to doing solo rides.  Is there something like that in
15  the policy?
16     A    I believe that there is a continuum, yes,
17  but I'm not sure in 2019 what program was in place.
18     Q    Okay.  And if Wulff was her coach, were
19  they riding together in the same car?
20     A    I believe so.
21     Q    Okay.  So was she allowed to make any
22  arrests on her own, or did she have to do it as part
23  of that team?
24          MS. WILSON:  Object to the form of the
25  question.  Answer if you can.

Geoffrey Kirkpatrick

```
1                    REPORTER'S CERTIFICATE
         I, DEBORAH FLEISCHER, Certified Shorthand
2   Reporter and Registered Professional Reporter for the
3   State of Oregon and California, hereby certify that,
4   pursuant to Oregon Rules of Civil Procedure, GEOFFREY
5   KITKPATRICK, appeared before me remotely through
6   videoconference at the time set forth in the caption
7   hereof; that at said time I remotely reported in
8   stenotype all testimony adduced and other oral
9   proceedings had in the foregoing matter; that
10  thereafter my notes were transcribed through
11  computer-aided transcription, under my direction, and
12  constitutes a full, true and accurate record of all
13  such testimony adduced and oral proceedings had, and
14  of the whole thereof.  Further, that I am a
15  disinterested person to said action.
                WITNESS my hand at Bend, Oregon, this 16th day
16  of January 2023.
17
18
19
20  _____
21            DEBORAH FLEISCHER, CSR, RPR
22            Oregon CSR No. 20-0461
23            Expiration March 30, 2023
24            California CSR No. 7498
25            Expiration September 30, 2023
```

# EXHIBIT C

# LEDUC MONTGOMERY DECLARATION



**CITY OF MEDFORD**
**219 S IVY ST**
**MEDFORD, OR   97501**



Medford Police Department

PHONE:   (541) 774-2200
Web Page: police@ci.medford.or.us

July 27th, 2019

John Malaer
100 N. Grape St. #405
Medford, OR 97501

Dear Mr. Malaer

This letter is in response to the officer complaint you filed on July 16th, 2019 with the Medford
Police Department.

I have thoroughly reviewed the complaint, interviewed all parties involved, reviewed video
footage and complied documents of the incident in question.  As a result of this investigation, I
have concluded the following:  The complaint filed in regards to unreasonable force being used
during the arrest is **Exonerated.**

I would like to thank you for contacting the Medford Police Department regarding your concerns
in this matter. The Medford Police Department takes every complaint seriously and we are
committed to providing excellent service to the citizens we serve. Furthermore, we are
committed to continuous improvement and customer service which can only be accomplished
when issues such as this are brought to our attention.


Sincerely,


G. Kirkpatrick #728
Patrol Sergeant
Medford Police Department

*Your Police – Our Community*

# EXHIBIT D

# LEDUC MONTGOMERY DECLARATION

UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF OREGON


                                    )
JOHN LEE MALAER,                    )
                                    )
                  Plaintiff,        )
                                    )
            v.                      )   No.
                                    )   1:20-cv-00049-CL
GEOFFREY KIRKPATRICK, et al.,       )
                                    )
                  Defendants.       )
                                    )


VIDEOCONFERENCE VIDEOTAPED DEPOSITION OF

SERGEANT JEFF A. PROULX

Taken in behalf of Plaintiff

*   *   *

December 13, 2022

Eagle Point, Oregon










Shannon K. Krska, CSR, CCR

Court Reporter

6

1       MR. PIETILA:  Johan Pietila, Jackson County
2  Counsel's office for the county defendants.
3       MR. BAUMANN:  Brett Baumann, Jackson County
4  Counsel's office.
5       MR. THOMPSON:  Eliot Thompson from the
6  Oregon Department of Justice here on behalf of the
7  deponent, Sergeant Jeff Proulx.
8       VIDEO TECHNICIAN:  That it?  Okay.
9       Will the court reporter please swear in the
10  witness.
11           SGT. JEFF A. PROULX,
12     called as a witness in behalf of the Plaintiff,
13       having first been sworn by the Reporter,
14            testifies as follows:
15               EXAMINATION
16  BY MS. LEDUC MONTGOMERY:
17     Q.  Thank you, Mr. Proulx.
18       Have you had your deposition taken before?
19     A.  Yes, I have.
20     Q.  So you know there's a few ground rules.
21  I'll go through those quickly.  And then let me
22  know if any of them are not clear.
23       First, we need to receive an audible answer
24  to each question.  And as the court reporter stated
25  earlier, one person to speak at a time and try not

7

1  to talk over each other.  Do not answer a question
2  until it is asked completely.
3       Do not guess at questions.  But you can
4  give your best estimate.
5       If you need a break, please ask for one.
6       If you don't understand the question,
7  please say so.  If you need a question repeated,
8  please say so.
9       You must answer the question pending before
10  we take a break.
11       And from time to time your attorney may
12  object.  But unless they instruct you not to
13  answer, you must still answer the question.
14       Do you understand these rules?
15     A.  Yes, I do.
16     Q.  And do you agree to abide by them to the
17  best you can?
18     A.  Yes, I do.
19     Q.  Thank you.
20       And I'll do my best to abide by them as
21  well.
22       Now, Mr. Proulx, I'll just let you know,
23  I'm fairly new to law enforcement litigation, and
24  so if I ask maybe some obvious questions or more
25  questions than you might be used to, it's nothing

8

1  personal.  Just wanted to kind of prepare you for
2  that.
3       Now, what did you do to prepare for today's
4  deposition?
5     A.  I reviewed the report that I authored
6  regarding this incident and also reviewed the
7  documents that were provided to me.
8     Q.  And when you say documents provided to you,
9  which documents were those?
10     A.  It was the subpoena, notes, some emails.
11     Q.  And when you say "notes," were they your
12  own notes or notes from someone else?
13     A.  The notes were I believe -- yeah, they were
14  my notes that I wrote from the statements.
15     Q.  Okay.  And it looks like you've got some
16  documents there with you.  What all documents do
17  you have with you today?
18     A.  I have the original incident report that I
19  authored and the PDF file that had all the emails
20  and notes and other documents that you provided.
21     Q.  Okay.  And I'll -- I'll ask your counsel.
22       Mr. Thompson, can you please provide a copy
23  of those documents that he has with him today?
24       MR. THOMPSON:  I can do that.  My
25  understanding is they are all documents that I

9

1  forwarded to Sergeant Proulx that I received from
2  you in response to the subpoena that you issued to
3  OSP.
4       MS. LEDUC MONTGOMERY:  Okay.  And then
5  those would be the documents that OSP sent me in
6  response to Mr. Proulx's subpoena for today's
7  deposition?
8       MR. THOMPSON:  Yeah.  I mean, you can
9  confirm with Sergeant Proulx, but I believe all he
10  reviewed were the documents I forwarded to him that
11  I received from you in response to your subpoena.
12     Q.  (By Ms. LeDuc Montgomery)  And is that
13  correct, Mr. Proulx?  Did you review anything else?
14     A.  No, ma'am.
15     Q.  (Inaudible.)
16       THE REPORTER:  I'm sorry, you're breaking
17  up.
18     Q.  (By Ms. LeDuc Montgomery)  Are those the
19  only documents that you reviewed, the ones
20  forwarded to you by Mr. Thompson that were from me?
21     A.  Yes, ma'am.
22     Q.  Thank you.
23       Have you spoken with anyone else regarding
24  your deposition today?
25     A.  I spoke with my lieutenant, provided him

MALAER v. KIRKPATRICK, et al.                                    1:20-cv-00049-CL
SERGEANT JEFF A. PROULX                                              12/13/2022

54

1    A.  I -- I don't know.  I don't recall.
2    Q.  Have you conducted any law enforcement
3  officer criminal investigations of Jackson County
4  Sheriff's Office employees since the Kolkemo
5  investigation?
6    A.  I don't believe so.
7        But I could have.
8    Q.  You don't -- you don't recall if you have
9  or not?
10    A.  I -- I don't recall.  I don't know.
11    Q.  I'd like to turn to the specific -- the
12  Kolkemo investigation from 2019.
13        How did the investigation start or come to
14  be at your office?
15    A.  I learned of it through the Jackson County
16  Sheriff's Office.
17    Q.  And I saw you sort of looking down.  Were
18  you looking at some of those documents that you
19  were sent?
20    A.  I was referring to my report, yes.
21    Q.  Okay.  And so the Jackson County Sheriff's
22  Office contacted Oregon State Police to conduct the
23  investigation?
24    A.  Yes.
25    Q.  Is that normal or typical for how a law

55

1  enforcement officer criminal investigation starts?
2    A.  Yes.
3    Q.  Okay.  And what did you do first when you
4  received this inquiry to do an investigation?
5    A.  Spoke with my lieutenant.  We have to
6  complete a form, and it has to be sent up to
7  headquarters and get the approval to do the
8  investigation.
9    Q.  And what form is that?
10    A.  It's a public official investigation form.
11    Q.  Do you know if that form would be in the
12  investigation file?
13    A.  I don't believe it is.  It's an internal
14  document.
15    Q.  And what do you do after that form is
16  submitted?
17    A.  I wait for the approval.  And then once I
18  get the approval, start the investigation.
19    Q.  And what did you do in this Kolkemo
20  investigation first, after getting the approval?
21    A.  I contacted -- I contacted Lieutenant
22  Aldrich at the jail, and received a thumb drive of
23  the video, and reviewed the video.
24    Q.  Just one moment, I'm going to look at some
25  of these emails here.

56

1        Can we please pull up and mark as an
2  exhibit the document titled OSP subpoena response
3  supplemental production Bates stamped, please.
4        VIDEO TECHNICIAN:  One moment, please.
5        Here you go.
6        MS. LEDUC MONTGOMERY:  And if we could
7  scroll down to the bottom.
8    Q.  (By Ms. LeDuc Montgomery)  Are you seeing
9  where it's been Bates Stamped Malaer 0004608?
10        Sir?
11    A.  Is that for me?
12    Q.  Yes.
13    A.  On the document on the computer screen,
14  yes, I see that.
15    Q.  Okay.
16        And if we could turn to page 4612, please.
17        VIDEO TECHNICIAN:  Sure.
18        There you go.
19        MS. LEDUC MONTGOMERY:  And if we could
20  scroll down to the bottom of the page.  Scroll up a
21  little bit so we can see that email header.
22    Q.  (By Ms. LeDuc Montgomery)  Is this document
23  one of the documents that OSP produced in response
24  to your subpoena?  Does that look familiar?
25    A.  Not specifically, no.

57

1    Q.  Okay.  Did you review the documents that
2  OSP produced in response to your subpoena before
3  they were produced?
4    A.  Well, I may have seen some of these
5  documents when I did the investigation, so yes, I
6  did see them.
7    Q.  Did you specifically look at them like
8  within the past month, before they were produced in
9  response to your subpoena?
10    A.  I believe initially when you sent that
11  response for the records, I started looking for the
12  report.  And I believe in there you said emails, so
13  I -- I did start to do that.  And then that's when
14  I reached out to our records -- some of the
15  requests, I just had a issue with releasing
16  records, so I contacted our records people and then
17  Matt McCauley.
18    Q.  Okay.  So looking at this document, it
19  shows it's an email from Nathan Sickler to Jess
20  Elzy.  Is Jess Elzy your supervisor/lieutenant?
21    A.  Yes.
22    Q.  And is Nathan Sickler the Jackson County
23  sheriff?
24    A.  Yes.
25    Q.  And so this looks like an -- originally a

86

1  six pieces of evidence from the Kolkemo case?
2      **A.  Because the DA declined to prosecute the**
3  **case, and I believed at the time, and still do,**
4  **that Shelley Warne does a very good job and is very**
5  **familiar with retention, and since we had the**
6  **decline and the timeframe had elapsed on**
7  **misdemeanor charges, that we could destroy the**
8  **evidence.**
9      Q.  Were you aware whether there was a civil
10  rights lawsuit filed regarding Kolkemo's --
11  regarding the Jackson County Sheriff's Office at
12  this time that you approved the request for
13  destruction of evidence?
14      **A.  I don't recall anything about that.**
15      Q.  Are you aware that Mr. Malaer had filed a
16  complaint with the City of Medford regarding his
17  July 11th, 2019, arrest and stay inside the Jackson
18  County Jail?
19      **A.  I'm not sure how to answer that.  I -- was**
20  **I aware that he filed a complaint?  Yes.**
21      Q.  A complaint with the -- with City of
22  Medford Police Department?
23      **A.  About the -- about Medford Police**
24  **Department's arrest, yes.**
25      MS. LEDUC MONTGOMERY:  We can take this

87

1  exhibit down, please, and return back to the
2  report, SP 19289625.
3      Q.  (By Ms. LeDuc Montgomery)  So to your
4  knowledge then, these six items of evidence, the
5  four interview recordings and the two videos, have
6  been destroyed after that approval in April 2020;
7  is that your understanding?
8      **A.  Yes.**
9      Q.  Going to the next page, please.
10      So it talks about distribution -- well, I
11  guess I'll back up here.
12      At the top it says report time August 27th,
13  '19, entered time August 27th, 2019.
14      Do you know what that date means?
15      **A.  No.**
16      Q.  And where it says distribution: Jackson
17  County District Attorney's Office, what does that
18  mean?
19      **A.  That means that they would get a report.**
20      Q.  I think you had testified earlier that
21  Jackson County Sheriff's Office may also have
22  received a copy.
23      Do you know why the Jackson County
24  Sheriff's Office isn't listed under distribution?
25      **A.  An error on my part.**

88

1      Q.  And where it says refer, and then it says
2  to DVD of jail video, which videos is -- is that
3  referring to?
4      **A.  Both of them.**
5      Q.  Is it referring to the two videos that were
6  listed on page 3 of your report under the involved
7  property section?
8      **A.  Yes.**
9      Q.  So it states here DVDs of jail video.  And
10  I think you had testified earlier Lieutenant
11  Aldrich had looked at videos with you on a thumb
12  drive.  Are they the same videos that you looked at
13  from the thumb drive?
14      **A.  I would assume they were.  And the thumb**
15  **drive was actually placed into evidence, 'cause it**
16  **was the original video I received from the jail,**
17  **and I made a copy for the DA's office.**
18      Q.  Okay.  Just so I'm understanding you
19  correctly, you took the thumb drive with the videos
20  that Lieutenant Aldrich provided and placed it into
21  evidence for the Kolkemo investigation?
22      **A.  I'm assuming.  I would have to look at the**
23  **form 65 to see exactly what I placed in there, but**
24  **I'm assuming that's what it is.**
25      Q.  What is the form 65?

89

1      **A.  It's an OSP internal document that we list**
2  **evidence on when we submit our evidence to our**
3  **evidence tech.**
4      Q.  Okay.  To your knowledge, does that thumb
5  drive still exist?
6      **A.  No.  That would have been on the other**
7  **report you shared with me, where it was disposed**
8  **of.**
9      Q.  And so then these -- where it refers to
10  DVDs, how, again, do you think the -- the DVDs were
11  created or where they came from?
12      **A.  I created them.**
13      Q.  And what happened or where did they go
14  after you created them?
15      **A.  I recorded on a digital recorder, and I**
16  **made a copy for evidence, and then I made a copy**
17  **for the DA's office.**
18      Q.  And just so I'm understanding you
19  correctly, you recorded the interviews, you know,
20  it lists here Malaer, Fuhrman, Bondhus, Kolkemo,
21  with the digital recorder, audio only; is that
22  correct?
23      **A.  Yes.**
24      Q.  And then --
25      **A.  I believe so.**

MALAER v. KIRKPATRICK, et al.                           1:20-cv-00049-CL
SERGEANT JEFF A. PROULX                                      12/13/2022

90

1    Q.  Okay.  And then you made DVD copies of
2  those audio interviews, and placed one in the
3  evidence file at OSP and sent one to Jackson County
4  district attorney's office; is that correct?
5    A.  I believe that's correct, yes.
6    Q.  And so what then happened to the DVDs of
7  the interviews?
8    A.  Well, they -- the ones that were in
9  evidence were disposed of.  Refer to the -- the
10  email.  And I don't know what happened to the ones
11  at the DA's office.
12    Q.  Okay.  And then underneath that it lists
13  Medford Police Department report slash
14  investigation.  What does that mean?
15    A.  That is the report that I received from the
16  Medford Police Department regarding the inci -- the
17  arrest.
18    Q.  Okay.
19    And could we please pull up the document
20  titled OSP subpoena response production Bate
21  Stamped.  I'm forgetting which exhibit number that
22  is.
23    VIDEO TECHNICIAN:  That was 11, okay.
24    MS. LEDUC MONTGOMERY:  And if we could
25  please turn to the page marked Malaer 0004592.

91

1    And, again, I apologize, it's a little bit
2  crooked.  If we scroll to the top.
3    Q.  (By Ms. LeDuc Montgomery)  Does this
4  document look familiar to you?
5    A.  Yes.
6    Q.  And what is it?
7    A.  It's a -- it's our form 65.
8    Q.  Okay.  And is -- can you just explain - and
9  we can scroll down if you need to see more of it -
10  but what this document is?
11    A.  Can you scroll down a moment, just a touch?
12    So -- okay, that's far enough.
13    Yeah, that's the -- the form 65 that I
14  completed, has, looks like, six items of evidence.
15    Q.  And we see listed there for the six items,
16  you know, DVD video-audio from Jackson County Jail,
17  DVD video from Jackson County Jail, DVD recording
18  interview John Malaer, DVD recording interview
19  Keyan Bondhus, DVD recording interview Cody
20  Fuhrman, and DVD recording interview Brian Kolkemo.
21  Is that correct?
22    A.  Yes, that's what it says.
23    Q.  And then if we scroll down to the bottom.
24  Is that your signature there next to your name?
25    A.  It is, yes.

92

1    Q.  And just so I'm understanding correctly,
2  this form 65 was what you filled out to put these
3  six DVDs into the OSP evidence file?
4    A.  Yes.
5    Q.  And these six pieces of evidence from the
6  Kolkemo matter are the same six pieces of evidence
7  that were on the property destruction list; is that
8  correct?
9    A.  It appears to be, yes.
10    Q.  Okay.  Thanks.
11    And if we could please go back to the
12  investigation report, SP 19289625.
13    So just moving through this report here.
14  Have you had a chance to read your report in full
15  prior to your deposition today?
16    A.  Yes.
17    Q.  And having read through it, is there
18  anything, to your knowledge, in this report that is
19  inaccurate or incorrect, to your knowledge?
20    A.  No, not that I'm aware of.
21    Q.  Okay.  So if we start looking in the -- on
22  the first paragraph, it talks about on August 13th,
23  2019, you were assigned to investigate an incident
24  that occurred July 11th, 2019, in the Jackson
25  County Jail.

93

1    Is that the -- is the incident you were
2  asked to investigate Brian Kolkemo slapping
3  Mr. Malaer in the face in the jail?
4    A.  I believe that would be correct, yes.
5    Q.  Okay.  And a little further down it states,
6  "Malaer had filed a complaint with Medford Police
7  Department regarding his arrest, parentheses, refer
8  to report by Sergeant G. Kirkpatrick," and then --
9  and then it says "in the report made a complaint
10  about how he was treated at the jail."
11    Did you read Mr. Malaer's complaint as part
12  of the investigation?
13    A.  Yes.
14    Q.  And do you have a copy of that complaint in
15  the documents that you were sent in advance of this
16  investigation?
17    A.  No.
18    Q.  Okay.  Would that complaint have been
19  placed in your investigation file?
20    A.  I believe it was, yes.
21    Q.  And then when it says "refer to report by
22  Sergeant G. Kirkpatrick," what is that in reference
23  to?
24    A.  The report that he authored.
25    Q.  Which -- do you know which report that is?

24 (Pages 90 to 93)

94

1   A.  That's the report that you did not receive,
2  Alicia.
3   Q.  Okay.  So are you referring to the -- the
4  Medford PD internal affairs investigation report
5  that Kirkpatrick wrote, but that the judge did not
6  allow plaintiff to receive?  Is that what you're
7  referring to?
8   A.  I believe that is it, yeah.
9   Q.  Okay.
10   A.  Yes.
11   Q.  So just to clarify, you received a copy and
12  read it as part of the investigation?
13   A.  Yes.
14   Q.  And did it inform your investigation in
15  this matter?
16   A.  Did it inform me?
17   Q.  Yes.
18      Did it impact your investigation of the
19  matter?
20   A.  It was part of my investigation.  I
21  reviewed it, yes.
22   Q.  Okay.  And I'm just looking through the
23  documents that we received in response to your
24  subpoena to double-check if we have a copy of
25  Mr. Malaer's complaint that you had reviewed.

95

1      I know we don't have the copy of the IA
2  report from Kirkpatrick.
3      And if plaintiff did not receive a copy of
4  the documents from -- like Mr. Malaer's complaint
5  that you say you reviewed, do you know the reason
6  why we wouldn't have received a copy of that in
7  response to your subpoena?
8   A.  Of the Kirkpatrick's report?
9   Q.  No, I know -- I understand what happened
10  with Kirkpatrick's report.
11      I'm -- I asked earlier if you had reviewed
12  Mr. Malaer's complaint that he filed with City of
13  Medford that's referred to in your report, and I
14  believe you testified you had read that.  Is that
15  correct?
16   A.  Yes.  So I read the internal investigation
17  report authored by Sergeant Kirkpatrick.
18   Q.  Okay.  Did you read the actual complaint
19  Mr. Malaer submitted to Medford Police Department?
20   A.  I don't recall.
21   Q.  Okay.  Do you recall if you reviewed any of
22  the photographs Sergeant Budreau from Medford
23  Police Department took as part of the City of
24  Medford investigation?
25   A.  I don't recall any pictures.

96

1   Q.  Do you recall of body cam footage Sergeant
2  Budreau took while she was with Mr. Malaer, taking
3  photographs of bruising as part of the Medford
4  Police Department?
5   A.  I don't recall.
6   Q.  Okay.  Were there any other documents
7  relating to the Medford Police Department
8  investigation you reviewed other than Kirkpatrick's
9  report?
10   A.  I don't recall.
11   Q.  So, you know, the first paragraph and then
12  on to your second paragraph here you talk about
13  the video of cell 2 where Mr. Malaer was lodged, and
14  where the use of force by Deputy Kolkemo slapping
15  Mr. Malaer across the face occurred.
16      Can we please pull up the video file titled
17  holding 2 underscore 1 underscore 2019.
18      VIDEO TECHNICIAN:  Oh.  How come that's not
19  doing it?  Hold on a moment.
20      MS. LEDUC MONTGOMERY:  Okay.  Okay.
21      VIDEO TECHNICIAN:  Is this an exhibit?
22      MS. LEDUC MONTGOMERY:  It is.  Please mark
23  it as an exhibit.  And can we go all the way back
24  to the beginning --
25      VIDEO TECHNICIAN:  Yeah.

97

1      MS. LEDUC MONTGOMERY:  -- please.
2      And we can start playing.
3      (Deposition Exhibit Number 12 marked for
4      identification.)
5      (Video playing.)
6      MS. LEDUC MONTGOMERY:  And we can pause the
7  video.  And take it back to the beginning, please.
8   Q.  (By Ms. LeDuc Montgomery)  So is this video
9  that we just watched, and I know we only watched
10  part of it, it's over two hours long, but to your
11  knowledge, is this the same video clip that you
12  watched with Lieutenant Josh Aldrich from the thumb
13  drive, and the same video clip that was entered
14  into evidence as part of your investigation?
15   A.  I believe it is.
16   Q.  Okay.  And did you see in this video Deputy
17  Kolkemo slap Mr. Malaer across the face?
18   A.  I didn't.  I have a black box --
19      VIDEO TECHNICIAN:  Yeah, I don't know what
20  it is.
21      THE WITNESS:  -- in the middle of my
22  screen.
23   Q.  (By Ms. LeDuc Montgomery)  Okay.  You --
24  you weren't able to see the officers interacting
25  with Mr. Malaer or --

MALAER v. KIRKPATRICK, et al.                        1:20-cv-00049-CL
SERGEANT JEFF A. PROULX                                    12/13/2022

114

1    That would have been 2019.
2        Q.   Okay.  I just want to clarify.
3        So then back down to the next paragraph.
4    "On August 27th, 2019, I met with Deputy Chad
5    Miller at a local coffee shop.  I explained the
6    incident I needed to talk about, and he remembered
7    it.  The interview was not recorded as the noise
8    level was too high.  The following" summary is a
9    "summary of the information he provided me."
10       Do you see that?
11       A.   Yes.
12       Q.   Do you recall which coffee shop you met him
13   at?
14       A.   I think it was Starbucks.
15       Q.   Do you know why you met at Starbucks
16   instead of, say, like a -- an office or something?
17       A.   I don't recall exactly why.  It would have
18   been his option, probably.
19       Q.   Okay.  So if we scroll down the remainder
20   of page 5 and then to, I think, the bottom of page
21   6, this is the section of your report -- and there
22   it says, on the very top of page 7, "This ended my
23   interview with ... Miller."
24       So is this a section of your report that
25   summarizes your interview with Deputy Miller?

115

1        A.   I wouldn't call it a summary, no.  It was
2    just a statement that he made at the -- towards the
3    end of the interview.
4        Q.   Okay.  Can we scroll back up a little bit,
5    please, to page 5, at the bottom.
6        You agree there there's a sentence in the
7    second to last paragraph, "The following ...
8    summary of the information he provided me"?
9        A.   Yeah.  The entire statement he gave me is
10   his summary.  But that particular paragraph, the
11   way I understood the question was, you were asking
12   me if that was a summary of what he said.  That's
13   why I said no.  But the entire statement is a
14   summary of what he said.
15       Q.   Okay.  Just to make it maybe a little bit
16   clearer.
17       The statements about what Mr. told you --
18   or, excuse me, Mr. Miller told you from pages 5
19   through 6, that is not verbatim how the
20   conversation went, it's a summary of the overall
21   conversation; is that correct?
22       A.   Yes, it was written from my notes.
23       Q.   And similar to what we did with
24   Mr. Malaer's testimony, could you please review
25   these pages, 5 through 6, and let me know if

116

1    there's anything in them that's incorrect?
2        A.   Yes, I've read the report earlier, and I
3    did not see anything that was incorrect.
4        Q.   Okay.  And which portions of your interview
5    with Mr. Miller supported your decision to refer
6    harassment and assault IV charges to the DA's
7    office regarding Kolkemo?
8        A.   There's -- there's nothing specific.  He
9    heard a slap.  He didn't know if it was a clap or a
10   slap.
11       But it wasn't just his interview that made
12   my decision.
13       It was a culmination of everything in my
14   investigation.
15       Q.   Okay.  So you relied on, I guess, all of
16   your interviews, documents, videos in coming to
17   your decision on the charges to be referred?
18       A.   Yes.
19       Q.   I'll just look at a couple of his specific
20   statements here.
21       So the statement where it says Miller -- on
22   page 6, near the top, "Miller said he was dealing
23   with Malaer's feet and looking down at his feet
24   when he heard a loud smack.  He was not sure if it
25   was hands clapping or if" it was -- "or if someone

117

1    was slapped."
2        Did that affect or, I guess, somehow impact
3    your charging decision?
4        A.   No.  As I stated before, it's not one
5    particular statement, it was everyone's interviews,
6    their statements, the video, everything together is
7    what I made my decision.
8        Q.   Would that statement tend to support your
9    charging recommendation that a assault or
10   harassment had occurred?
11       MS. WILSON:  Objection, asked and answered.
12       THE WITNESS:  As -- as I said, it's not one
13   specific statement, it's everyone's statements,
14   interviews, and video, and that's how I made my
15   decision.
16       Q.   (By Ms. LeDuc Montgomery)  I -- I
17   understand that response.
18       I'm trying to understand what -- what in
19   these statements led to those conclusions.  And I'm
20   pointing to some particular pieces and asking if
21   that supported your charging decision.
22       MS. WILSON:  Objection to the form of the
23   question.  He doesn't -- he didn't have the
24   charging decision.  Misstates testimony.  Misstates
25   facts in evidence.  Is confusing, is compound.

Aufdermauer Pearce Court Reporting, Inc.
503-545-7365

MALAER v. KIRKPATRICK, et al.                          1:20-cv-00049-CL
SERGEANT JEFF A. PROULX                                     12/13/2022

118

1    Q. (By Ms. LeDuc Montgomery) So I guess I'll
2  just ask it a different way then.
3       You relied on Miller's statement that he
4  had heard a loud smack, but was not sure if it was
5  hands clapping or someone was slapped at the time
6  you were making your decision to refer charges to
7  the DA as to Kolkemo?
8    **A. I -- I didn't base my decision on one**
9  **statement.**
10   Q. I -- and I'm not asking you to say there's
11  only one statement that made your entire opinion.
12  I understand that you testified you relied on your
13  entire -- you know, all the evidence in your
14  investigation and made a decision.
15      I'm just asking if this particular
16  statement supported your decision to refer charges
17  for these two particular crimes, assault IV and
18  harassment?
19   **A. I -- I wouldn't say -- how do I phrase**
20  **this?**
21      **Deputy Miller did not see the deputy slap**
22  **Mr. Malaer. So did he hear something? Yes. He**
23  **doesn't know if it was a slap or hands clapping.**
24  **So there wasn't a lot of weight to it because he**
25  **didn't actually see it, he heard something.**

119

1    Q. M-hm. Okay.
2       Then further down it states, "Miller is a
3  defensive tactics instructor and in his opinion,
4  Malaer was a very low level threat."
5       Did that, you know, support your decision
6  to refer harassment and assault charges?
7    **A. Again, it's not one statement, it's the**
8  **entire investigation that I made my decision to**
9  **refer charges.**
10   Q. And I do understand that. And I -- again,
11  I'm not asking you to, like, say one specific
12  statement was the entirety of what led you to your
13  conclusion.
14      Where I'm coming from, just so maybe it's a
15  little bit more clear, is you referred two specific
16  crimes that have different elements, and there's
17  many other crimes out there that have different
18  elements as well.
19      So I'm trying to understand which of these
20  facts or statements that were made supported the
21  specific elements of the crimes you referred to the
22  DA's office.
23   **A. I -- I'm not understanding your question.**
24  **I -- I've been very clear that the report, in its**
25  **entirety, is what I base it on.**

120

1    Q. Okay. Why -- why did you choose to refer
2  assault instead of a different crime?
3    **A. What other -- because based on the entire**
4  **investigation, that met the criteria for that**
5  **statute.**
6    Q. And what in the investigation met the
7  criteria for the statute?
8    **A. Well, when we reviewed the statute, to**
9  **use -- to hit some -- basically, in general terms,**
10  **to -- when he slapped him, that's -- would fall**
11  **under assault IV, when he slapped him across the**
12  **face, because he made physical contact with the**
13  **person.**
14   Q. Okay. And what evidence or interviews did
15  you hear or see that supported the idea that, you
16  know, he had -- that Kolkemo had slapped Mr. Malaer
17  in the face to meet that standard for assault IV?
18   **A. Well, I had the video that showed him doing**
19  **it. And then I interviewed several people that**
20  **said he did. And they saw it. And I believe in**
21  **Mr. -- in Deputy Kolkemo's statement, he said he**
22  **did that, to get his attention.**
23   Q. Okay.
24      Was there anything else you can recall that
25  was some of the evidence that stands out as

121

1  supporting the assault IV charge specifically?
2       I know you've mentioned the video of the
3  slap and then Kolkemo's admission of the slap. Was
4  there anything else?
5    **A. And I also said the other deputies. I'd**
6  **have to go back and look at each one, but I believe**
7  **there were one or two other deputies that actually**
8  **saw it.**
9    Q. Okay. Let's go to that portion then now.
10      If we can please scroll down to page 7 of
11  this report.
12      Do you see at the top there it says, "On
13  August 30th, 2019, I met with Deputy Cody Fuhrman
14  at the Oregon State Police office in Central
15  Point"?
16      Do you see that?
17   **A. Yes. Yes.**
18   Q. Okay. And so it looks like page 7 and 8,
19  part of 8, are the interview you had with Deputy
20  Fuhrman?
21   **A. Yes.**
22   Q. Okay. And so then near the end of page 7
23  there's a paragraph that states, "Fuhrman told me
24  when they got Malaer in the holding cell he did
25  observe Kolkemo slap Malaer across the face one

MALAER v. KIRKPATRICK, et al.                     1:20-cv-00049-CL
SERGEANT JEFF A. PROULX                            12/13/2022

---

126

1    Q.  (By Ms. LeDuc Montgomery) Okay.  And then
2    going down, it says, "I told them there was another
3    incident that was brought to my attention from
4    earlier interviews.  I explained it was similar as
5    in I was told Kolkemo slapped Malaer across the
6    face when they took him out of the exchange room."
7         Do you see that?
8         It's just the next sentence down.
9    **A.  On which page?**
10   Q.  It's the same paragraph on page 9, the
11   paragraph that starts with, "On September 12th,
12   2019."
13   **A.  Okay.**
14   Q.  So just so I'm understanding your report
15   directly, you spoke to Deputy Kolkemo about both
16   the slap that occurred on video in the holding cell
17   as well as the slap that Deputy Bondhus had told
18   you about occurring near the exchange room during
19   your interview with Kolkemo.  Is that correct?
20   **A.  I believe so.**
21   Q.  Okay.  So then what from the rest of this
22   interview with Kolkemo, I guess, supported your
23   referral for -- we'll start with the assault IV
24   charge?
25   **A.  Well, again, nothing specific.  He does**

---

127

1    **admit to slapping Mr. Malaer.  He explains why he**
2    **did.  That it wasn't anything specific, it was the**
3    **entire report.**
4    Q.  Okay.  And when you say he admitted to
5    slapping Malaer, I see on the -- near the top of
6    page 10 there's a statement that says, "Kolkemo
7    told me he does remember slapping Malaer on the
8    face in the exchange room."
9         Is that one of the statements you're
10   talking about that you relied on for the assault IV
11   charge?
12   **A.  Yes.  Yes.**
13   Q.  And then the next paragraph down, it says,
14   "While transporting Malaer to the holding cell he
15   was very grabby with his hands.  He told me," I
16   think meaning Kolkemo told you, "either he or
17   Deputy Fuhrman told Malaer to stop grabbing at
18   them.  Once in the cell, Kolkemo says he slapped
19   Malaer." Parentheses, "this is the incident on the
20   video."
21        So is that the second slap incident then
22   that Kolkemo admitted to?
23   **A.  Yes.**
24   Q.  Okay.  And to your knowledge, is the video
25   it's referring to here, where in parenthesis it

---

128

1    says, "this is the incident on the video," that's
2    the Exhibit 12 holding cell video we reviewed
3    earlier?
4    **A.  I would agree with that, yes.**
5    Q.  Okay.
6         Okay.  And then that sort of appears to be
7    the end of the report, aside from on page 11 you
8    write, "Refer to Jackson County District Attorney's
9    office for consideration of charges ... assault IV
10   and harassment."
11   **A.  Yes.**
12   Q.  So was there any other particular evidence
13   or statements that you can think of that supported
14   the assault IV or harassment charges specifically?
15   **A.  No.**
16   Q.  Okay.
17        Going back briefly.  I know you had talked
18   about reviewing the internal affairs memo by
19   Sergeant Kirkpatrick.  But OSP did not produce that
20   particular memo.
21        Do you recall what was stated in that memo?
22        MS. WILSON:  Objection, this is privileged
23   matters, and you can't get a witness to testify
24   about something the judge has said you don't have
25   access to in discovery in this case.

---

129

1         So the city is lodging the privilege
2    objection, and requesting the witness not answer
3    that.
4         MR. THOMPSON:  And I'll -- I'll ask the
5    witness also not to answer that question on the
6    same basis.
7         MS. LEDUC MONTGOMERY:  And I'd like to pull
8    up what's been marked -- or, excuse me, what is
9    labeled ECF -- Exhibit titled ECF 159 court IA
10   narrative report opinion and order.
11        VIDEO TECHNICIAN:  So this will be 15?
12        MS. LEDUC MONTGOMERY:  Yes, please, mark it
13   as Exhibit 15.
14        (Deposition Exhibit Number 15 marked for
15   identification.)
16   Q.  (By Ms. LeDuc Montgomery) Sergeant Proulx,
17   have you, by chance, seen this document before?
18        We can scroll --
19   **A.  I can't say specifically I have or not.  I**
20   **don't recall.**
21   Q.  Okay.  I'll just --
22   **A.  I may have -- I may have seen it.**
23   Q.  Sorry, what was that last bit?
24   **A.  They -- when all this was going down,**
25   **someone may have forwarded it to me in an email and**

---

130

1  I looked at it, but I don't -- I don't remember.
2      Q.  Okay.  And I'll represent to you this is
3  the judge's ruling in this case on whether or not
4  plaintiff had access to Sergeant Kirkpatrick's
5  internal affairs memo, which we established, and as
6  -- as is listed in his opinion, he declined to
7  produce that document to the plaintiffs.
8      But if we scroll down a little bit, please.
9      Okay.  Just one moment, please.  I'm trying
10  to find the specific section of this.
11      Do you see -- can we please scroll to the
12  bottom of page 3.
13      MS. WILSON:  So I'm going to object to the
14  line of questioning about this document.  This
15  witness has no personal knowledge, it's not
16  relevant for anything.
17      I mean, what are you -- you want him to
18  read a document from the court?
19      MS. LEDUC MONTGOMERY:  I would like to
20  continue my questioning, please, but your
21  objection's been noted on the record.
22      Q.  (By Ms. LeDuc Montgomery)  Do you see here
23  where it states at the very end, "Particularly
24  because all of the information contained within the
25  document is available to plaintiff by other means,

131

1  the needs of the litigation do not outweigh the
2  city's interest in confidentiality in this
3  instance"?
4      Do you just see -- I'm just asking --
5      A.  Are you asking me?
6      Q.  -- do you see that?
7      I'm just asking if you see the statement
8  here.
9      A.  Yes.
10      Q.  Okay.  So plaintiff understands the court
11  saying plaintiff is able to obtain the information
12  about what's in this internal affairs report by
13  other means.
14      So we are asking in a deposition, someone
15  who read the report, if they know the contents of
16  the report and what they are.
17      MS. WILSON:  So the city objects.  Again,
18  asks the witness not to answer.  This is a
19  privileged matter that the court has already
20  decided.
21      The court has said that the information was
22  already provided to plaintiff in the discovery
23  process.  That's the first line in that paragraph
24  that you're reporting.  Meaning the information for
25  which you seek, what happened during the arrest

132

1  with Medford police officers, is already available
2  to you and has been provided to you.
3      It does not say that you can ask a witness
4  about a privileged document that you've already
5  been told by the court you don't have access to.
6      So the city's going to again raise the
7  privilege.  I informed you that I was raising the
8  privilege a week ago.  You could have asked the
9  court for a further clarification of the order, and
10  you did not.
11      And I am -- and you can get the judge on
12  the phone if you would like.  But we're not going
13  there.
14      MS. LEDUC MONTGOMERY:  I understand your
15  very long narrative speaking objection.
16      Is DOJ counsel instructing the witness not
17  to answer?
18      MR. THOMPSON:  I am.  I -- I think we would
19  need further clarification from the court on that.
20      MS. LEDUC MONTGOMERY:  Okay.  And we can
21  take this exhibit down.  That's what I needed.
22      I think we've actually made a lot more
23  progress than I anticipated.  If you don't mind,
24  I'd like to just take a ten-minute break to sort of
25  collect some of my thoughts, and I think we will be

133

1  able to conclude hopefully by one o'clock, so you
2  can leave for your appointment.
3      THE WITNESS:  Okay.  I appreciate that.
4  Thank you.
5      VIDEO TECHNICIAN:  We're off the record at
6  12:19.
7      (Recess:  12:19 p.m. to 12:30 p.m.)
8      VIDEO TECHNICIAN:  We are back on the
9  record at 12:30.
10      MS. LEDUC MONTGOMERY:  Thank you.
11      Can we please pull up the exhibit that was
12  titled OSP subpoena response production Bates
13  Stamped.
14      VIDEO TECHNICIAN:  Yeah, one moment,
15  please.
16      Oops.  Okay.
17      It's acting up here a second.  There we go.
18      MS. LEDUC MONTGOMERY:  And which exhibit
19  number was this, again?
20      VIDEO TECHNICIAN:  11.
21      MS. LEDUC MONTGOMERY:  Thank you.
22      Can we please turn to the page marked
23  Malaer 0004586.
24      Thank you.
25      Q.  (By Ms. LeDuc Montgomery)  Mr. Proulx, we

MALAER v. KIRKPATRICK, et al.                          1:20-cv-00049-CL
SERGEANT JEFF A. PROULX                                      12/13/2022

138

1  the page in this document that was marked Malaer
2  0004602.
3      VIDEO TECHNICIAN: 4602? Okay.
4      Q. (By Ms. LeDuc Montgomery) There it is.
5      You'll see at the top here it's a document
6  marked Medford Police Department. And it continues
7  on for one, two, three, four, five pages, to the
8  end of the document, basically.
9      Do these documents from the Medford Police
10 Department look familiar to you?
11     **A. Yes.**
12     Q. And what are they?
13     **A. That would be the police report that the**
14 **officers authored when they arrested Mr. Malaer.**
15     Q. And recalling in your OSP report, we talked
16 about the report mentioning a couple categories of
17 evidence you reviewed, such as the videos, the
18 witness interviews, and then it referred to Medford
19 police report documents.
20     Are these the --
21     **A. Yes.**
22     Q. -- what you're referring to on page --
23     **A. It's one of them, yes.**
24     Q. Okay. I'd like to just go through these
25 very quickly.

139

1      So there's this page, the -- I think you
2  said this is the police report.
3      Can we scroll down to the next page,
4  please.
5      And what does this document appear to you
6  to be?
7      **A. Part of the police report.**
8      Q. Okay. And we can scroll to the next page.
9      And this document?
10     **A. Is the -- part of the police report where**
11 **the officers authored their -- their -- their**
12 **statement.**
13     Q. Okay. And the next page.
14     What document does this appear to be?
15     **A. That's a probable cause affidavit that the**
16 **officer who arrested Mr. Malaer completed at the**
17 **jail, I'm assuming.**
18     Q. And did you receive this document, the
19 probable cause affidavit, from Medford Police
20 Department?
21     **A. I don't recall if that was in the report or**
22 **not.**
23     Q. Okay. This -- and this is part of the
24 documents OSP produced to plaintiff in response to
25 your subpoena. So do you know how OSP came to have

140

1  this document?
2      **A. If that's -- if that was attached to the**
3  **original report by Medford Police Department, then**
4  **that -- that was in there. I -- I just said I**
5  **don't recall if it was in there.**
6      Q. Okay. Can we scroll down to the next page,
7  please.
8      And do you know what this document is?
9      **A. It's the booking application. It's a**
10 **different form that you fill out at the jail with**
11 **the charges and the information on -- on the -- on**
12 **Mr. Malaer.**
13     Q. And do you know where OSP obtained this
14 document from?
15     **A. Again, I would have to assume it was all**
16 **with the report that was sent over to me.**
17     Q. Okay. And then the next page, if there is
18 one.
19     So how did you receive the documents from
20 Medford Police Department that you reviewed for
21 this case?
22     **A. Again, I believe I stated earlier, I don't**
23 **recall. I may have gone over to the police**
24 **department, picked it up, or they may have emailed**
25 **it to me. I don't remember.**

141

1      Q. And then same thing with Jackson County
2  Sheriff's Department. And do you recall how you
3  received the documents, other than the thumb drive
4  that I think you already talked about?
5      **A. What other documents?**
6      Q. Like -- well, like this document, the
7  Jackson County Sheriff's Department booking
8  document.
9      Or did this come from Medford Police
10 Department?
11     **A. I'm assuming it came from Medford Police**
12 **Department, and it was attached to the original**
13 **report as all part of one report, but I don't re --**
14 **I don't recall.**
15     Q. Okay. I'd like to turn now to I think --
16 is it Exhibit 10, the -- document titled OSP
17 subpoena response supplemental production Bates
18 Stamped? Or --
19     VIDEO TECHNICIAN: That was 11.
20     MS. LEDUC MONTGOMERY: Well, I thought 11,
21 we were just looking at, was --
22     VIDEO TECHNICIAN: Oh, yeah, that's right.
23     10 was a property list.
24     MS. LEDUC MONTGOMERY: Okay. Do we know
25 which one was the supplemental --

MALAER v. KIRKPATRICK, et al.                    1:20-cv-00049-CL
SERGEANT JEFF A. PROULX                          12/13/2022

154

1  investigations does sort of the -- the rules or a
2  law about use of force by a law enforcement affect,
3  if at all, your decision to refer a charge for
4  assault?
5      **A.  Well, it -- it was a criminal**
6  **investigation, therefore, I referred the charges.**
7  **The use of force, whether it be a low level or**
8  **officer-involved shooting, would be referred to the**
9  **district attorney's office.**
10     Q.  So do you take into account any of the use
11 of force standards or case law that you know, or
12 things like that, when you're conducting a criminal
13 investigation of a law enforcement officer for
14 assault charges?
15     **A.  Yeah.  The -- I mean, you have to follow**
16 **case law.  You have to follow the statute.  Does it**
17 **apply?**
18     Q.  Okay.  So -- okay.
19         So would you consider like the Graham v
20 Conner case law and factors when you're evaluating
21 a potential assault case for referral regarding a
22 law enforcement officer?
23     **A.  Yes, it's -- it's considered during that**
24 **investigation.**
25     Q.  And how would they -- how would those

155

1  factors affect your decision to refer assault
2  charges for a law enforcement officer?
3      **A.  It -- it doesn't factor into my decision to**
4  **refer it.  It -- it's a criminal investigation.  I**
5  **refer to the DA to decide whether or not they want**
6  **to file charges.  I only collect the facts and**
7  **present it to the DA.  The DA decides whether or**
8  **not there's enough evidence to move forward in the**
9  **case.**
10     Q.  So then in which way do the kind of use of
11 force factors influence your investigation?  Is it
12 in the types of questions you ask or -- like where
13 does that come into play in your investigation?
14     **A.  Well, basically it's the -- the**
15 **justification for the use of force.  It -- again,**
16 **whether it be a low level misdemeanor crime or, you**
17 **know, an officer-involved shooting, it -- it has to**
18 **be justified.**
19         **And that's up to the district attorney's**
20 **office to decide whether or not that officer's**
21 **level of force was appropriate for the actions that**
22 **he took.**
23     Q.  So is it fair to say - and this is just my
24 understanding, but correct me if this isn't true -
25 when you are conducting a law enforcement officer

156

1  criminal investigation for a potential assault
2  charge, you will inquire or seek out information
3  that goes to use of force standards or factors and
4  present all evidence that you receive and gather to
5  the DA for a prosecution decision about whether
6  it's justified or not?
7      **A.  I would agree.**
8      Q.  Based on your, you know, years of
9  experience and training, if a use of force occurs
10 that was not justified and other officers were
11 standing by, would they have an obligation to
12 intervene?
13     MR. PIETILA:  Object to form, outside of
14 scope of personal knowledge, as well as calls for
15 legal conclusions.
16     THE WITNESS:  Well, with current case law
17 you are required to, as an officer, if you see
18 someone using excessive force, that you are
19 required to report it to a supervisor.
20         Prior to that law, it's more of an ethical/
21 moral obligation to report that or stop it.
22     Q.  (By Ms. LeDuc Montgomery)  Okay.  I think
23 those are the primary questions I had today.
24         I'm going to leave the deposition open
25 solely because of some of the dispute that arose

157

1  about the Kirkpatrick IA file.  And to the extent
2  something gets resolved regarding that at a later
3  date, I'd like to be able to come back for
4  questioning.
5          Otherwise, you know, I feel like we're done
6  here.  And, you know, I thank you very much for
7  your -- your time today.
8      MS. WILSON:  And I just want to say for the
9  record --
10     THE WITNESS:  Thank you.
11     MS. WILSON:  -- on behalf of the city,
12 that, you know, we object to leaving this
13 deposition open.
14         The de -- neither defendant had an
15 opportunity to ask questions of this particular
16 witness, given the length of time and witness
17 unavailability for this deposition, and I think we
18 could have been a lot more efficient with the use
19 of the time, and it's pretty disproportional for
20 the impacts and needs of this case.
21         But that's just -- I wanted to make a
22 record of that.
23     MS. LEDUC MONTGOMERY:  I guess, in
24 response, do defendants want to ask questions?
25         I didn't realize you had noticed it or had

158

1  planned on taking any questions.
2      MS. WILSON: Well, generally the rule is
3  that any party can ask questions of a witness. You
4  subpoenaed the witness here today. Apparently
5  didn't get a good sense of his availability for the
6  remainder of the day, and there's no opportunity
7  for the defendants to ask questions.
8      I don't know about the county's position,
9  but I just wanted to state, for the record, that we
10 do object to leaving it open for the IA result,
11 which -- or the IA issue, which has been resolved
12 by the court, and there's no need to take further
13 testimony on that issue.
14     MS. LEDUC MONTGOMERY: So just so I'm
15 clear, do you want to take questions of this
16 witness and you're objecting?
17     MS. WILSON: He doesn't have time, he needs
18 to leave in one minute.
19     MS. LEDUC MONTGOMERY: I understand. And
20 we're -- I'm saying there's -- I'm willing to hold
21 it open, but you seem to be objecting to that. So
22 I just want to --
23     MS. WILSON: I'm objecting to it to being
24 held open for the purpose of getting more answers
25 from him about the IA of Medford, which is

159

1  privileged, and for which the court has already --
2  already determined.
3      And so, you know, if that's the reason you
4  want to ask more questions, then no, the -- the
5  defendant objects to this deposition being held
6  open for that reason.
7      MS. LEDUC MONTGOMERY: Does the county have
8  any concerns?
9      I mean, I'm willing to be flexible in
10 holding this open so others have a chance for
11 questioning.
12     MR. PIETILA: Yeah, I mean, I had a handful
13 of follow-up questions just based on my
14 understanding of how everything goes.
15     I think I could help just clarify. Having
16 been a prosecutor for five years, I got some, I
17 think, simple questions that could resolve some of
18 the ambiguities there. But I -- honestly, I think
19 I could do it through interrogatories.
20     I thank Sergeant Proulx for his time. I
21 might send you a couple interrogatories, but I
22 think it can be -- we can hammer this out.
23     MS. LEDUC MONTGOMERY: Okay. So -- yeah,
24 I'll just conclude. I understand everybody's
25 objections. We'd like to hold it open for the

160

1  purpose stated. And I'm -- no further questioning
2  today.
3      Thank you very much, Sergeant Proulx, for
4  your time.
5      THE WITNESS: All right. Thank you.
6      MR. THOMPSON: Thank you, sergeant.
7      VIDEO TECHNICIAN: We're off the record at
8  1:11.
9      (The following was held off videotape:)
10     THE REPORTER: Did you want to order the
11 original?
12     MS. LEDUC MONTGOMERY: Yes, I'd like a
13 transcript, please. You know, the video and the
14 transcripts.
15     MS. WILSON: And the city will take a copy.
16     MR. PIETILA: And I would take a copy, too,
17 please.
18     MR. THOMPSON: And nothing for me, thank
19 you.
20     (The deposition adjourned at 1:11 p.m.)
21
22
23
24
25

161

1               C E R T I F I C A T E
2
3
4      I, Shannon K. Krska, a Certified Shorthand
5  Reporter for Oregon, do hereby certify that,
6  pursuant to stipulation of counsel for the
7  respective parties hereinbefore set forth, SERGEANT
8  JEFF A. PROULX appeared before me via
9  videoconference at the time and place set forth in
10 the caption hereof; that at said time and place I
11 reported in Stenotype all testimony adduced and
12 other oral proceedings had in the foregoing matter;
13 that thereafter my notes were reduced to
14 typewriting under my direction; and that the
15 foregoing transcript, pages 1 to 161, both
16 inclusive, constitutes a full, true and accurate
17 record of all such testimony adduced and oral
18 proceedings had, and of the whole thereof.
19     Witness my hand and CSR stamp at Clackamas,
20 Oregon, this 22nd day of December, 2022.
21
22     _____
       SHANNON K. KRSKA
23     Certified Shorthand Reporter
       Certificate No. 90-0216
24     Expiration Date: 12-31-23
25

# EXHIBIT E

# LEDUC MONTGOMERY DECLARATION



# Oregon State Police

# Incident: SP19289625

## Incident Details:

| | |
|---|---|
| Incident Type: | Assault |
| Incident Time: | 07/11/2019 15:14 - 07/11/2019 15:15 |
| Reported Time: | 08/13/2019 09:15 |
| Incident Location: | 787 W 8TH ST, MEDFORD, JACKSON OR USA 97501 (JACKSON COUNTY JAIL) (Beat: MPO, Region: SWR) |
| Incident Status: | Cleared Exceptional - Prosecution Declined |
| Summary: | OSP was asked to conduct a criminal investigation regarding the conduct of a Jackson County Jail deputy. Potential criminal charges will be referrred to the Jackson County District Attorney's Office. |

## Involved Offenders - Persons

| | | | |
|---|---|---|---|
| **Name:** | **KOLKEMO, BRIAN** | Gender: | Male |
| Classification: | Arrested; Charged; Police Officer - outside agency; Suspect | DOB: | ████████ |
| DL: | | | |

### Arrest Report:

| | | | |
|---|---|---|---|
| Author: | #31613 PROULX, JEFF | Report Time: | 09/13/2019 13:49 |
| Entered By: | #31613 PROULX, JEFF | Entered Time: | 09/13/2019 13:49 |
| Arrest Date/Time: | | Arresting Officer: | #31613 PROULX, JEFF |
| Place Of Arrest: | | | |
| Apprehension Type: | | | |
| Warrant #: | | Warrant Agency: | |
| Remarks: | Referred to DA | | |

### Charges/Pending Charges:

- **166.065 Harassment** (Misd, B); Status: Referred to DA for consideration; Offense Date: 07/11/2019
- **163.160 Assault IV** (Misd, A); Status: Referred to DA for consideration; Offense Date: 07/11/2019

## Involved Victims - Persons

| | | | |
|---|---|---|---|
| **Name:** | **MALAER, JOHN L** | Gender: | Male |
| Classification: | Mentioned; Victim | DOB: | 10/22/1958 |
| DL: | | | |

## Other Involved Persons

| | | | |
|---|---|---|---|
| **Name:** | **BONDHUS, KEYAN JOSEPH** | Gender: | Male |
| Classification: | Police Officer - outside agency; Witness | DOB: | █████ |
| DL: | █████ | | |
| Height: | 6'2" | Weight: 200lb | Build: |
| Race: | White | Hair Color: | Eye Color: |

| | | | |
|---|---|---|---|
| **Name:** | **FUHRMAN, CODY L** | Gender: | Male |
| Classification: | Police Officer - outside agency; Witness | DOB: | █████ |
| DL: | | | |

| | | | |
|---|---|---|---|
| **Name:** | **MILLER, CHAD E** | Gender: | Male |
| Classification: | Police Officer - outside agency; Witness | DOB: | █████ |
| DL: | | | |

## Involved Property:

- Police recording / Evidence / INTERVIEW
- Police recording / Evidence / INTERVIEW
- Police recording / Evidence / INTERVIEW
- Police recording / Evidence / INTERVIEW
- Police recording / Evidence / VIDEO
- Police recording / Evidence / JAIL VIDEO/AUDIO

## Involved Addresses:

- 787 W 8TH ST / Dispatch address; Incident address / MEDFORD, JACKSON, Oregon, USA 97501 (JACKSON COUNTY JAIL) (Beat: MPO, Region: SWR)

## Involved Officers:

- Dispatcher/TC2; Reporting Officer/Case Lead: PROULX, JEFF A / #31613 — SW REGION CRIMINAL COMMAND
- : CENTRAL POINT DETECTIVES / #OSP154 —

## General Report:

| | | | |
|---|---|---|---|
| Author: | #31613 PROULX, JEFF | Report Time: | 08/27/2019 15:23 |
| Entered By: | #31613 PROULX, JEFF | Entered Time: | 08/27/2019 15:23 |
| Narrative: | | | |

DISTRIBUTION: Jackson County District Attorney's office

REFER: To DVD of Jail Video

        DVD of Interview of Malaer, Fuhrman, Bondhus and Kolkemo

        Medford Police Department Report/Investigation

On August 13, 2019, I was assigned to investigate an incident that occurred on July 11, 2019 in the Jackson County Jail. Medford Police Department arrested John Lee Malaer for Disorderly Conduct and Menacing (refer to attached report). Malaer was transported to the Jackson County Jail and lodged. Malaer is a paraplegic and his electric chair had a dead battery. Malaer had filed a complaint with Medford Police Department regarding his arrest (refer to report by Sergeant G. Kirkpatrick) and in the report made a complaint about how he was treated at the jail. This information was forwarded to the Jackson County Sheriff's office and in turn to the Oregon State Police with a request to investigate potential criminal conduct. When the Jackson County Sheriff's office reviewed the video of Cell #2 where Malaer was lodged, they noted that Deputy Brian Kolkemo slapped Malaer across the face.

On August 13, 2019, I met with Lt. Josh Aldrich and retrieved a thumb drive of the video. While there, we viewed the video and it clearly shows Deputy Kolkemo slap Malaer across the face one time. I listened to the audio of cell 2, but I am not able to see the video and play the audio at the same time. In reviewing the audio you can hear Malaer calling deputies names and then I heard Malaler tell a deputy to hit him again. I can assume he is talking to Kolkemo. I am not able to hear the slap to Malaer, but he does recognize that he was hit.

In reviewing the audio in the vestibule I can hear Malaer calling the deputies names and telling them he will snap their necks. He was belligerent and uncooperative throughout the encounter.

On August 21, 2019, I met with Malaer at his residence for an interview. The following is a summary of the interview which was recorded in its entirety. The following summary had been condensed for ease of the reader and is not

necessarily in the order in which it was discussed. For a verbatim account, the reader should refer to the recording.

-Malaer told me he is a paraplegic and the battery on his electric wheelchair had died.

-He was lodged in the jail by Medford Police Department for what he claims are bogus charge.

- He told me he was put in a green jacket and was on suicide watch in a cell.

- Malaer was provided a mattress and was placed on the floor.

- Malaer needs a catheter and is able to self-cath.

- He alleges he was on the floor between 18 and 24 hours. Was denied his medications, catheter and wheel chair.

- He told me he was ignored and left to crawl about in his own urine.

- Malaer told me he was denied water and had to drink out of the toilet because he could not reach the sink. He did get a cup hours later.

- He told me the jail staff conducted cell checks on him about every hour and the cell has a camera.

- I asked him on at least two occasions if he was ever physically abused or hit. He told me no, not in the jail.

- Malaer told me his only complaint with the Jackson County Jail staff was they were neglectful and abusive in the treatment they provided, and or failed to provide him.


On August 27, 2017, I emailed Lt. Aldrich and inquired if Deputy Kolkemo completed a Use of Force report regarding the incident with Malaer and was told no report was completed.

On August 27, 2019, I met with Deputy Chad Miller at a local coffee shop. I explained the incident I needed to talk about and he remembered it. The interview was not recorded as the noise level was too high. The following is summary of the information he provided me.

- Miller told me he did not remember the subject's name but remembered him. He told me Malaer was belligerent and would not listen to orders.

- Jail staff used their wheel chair as Malaer's electric wheel chair had a dead battery.

- He told me they patted him down, but does not remember if it was in the cell or outside the cell.

- Miller was not sure if they put him on the breathalyzer.

- Miller told me they put him in holding cell #2.

- Miller said he was dealing with Malaer's feet and looking down at his feet when he heard a loud smack. He was not sure if it was hands clapping or if someone was slapped.

- Miller said he looked up and Malaer's eyes were wide open and he stopped complaining.

- He heard Kolkemo say something similar to....do I have your attention now?

- Miller has worked for the Jackson County Sheriff's office since 2009, with a brief break in service in 2013 when he went to work for Ashland Police Department. He was hired back with the Sheriff's office in the fall of 2013.

- Miller told me when he heard the slap, he was hoping it was a clap.

- Miller said that after they put Malaer in the cell, he exited and dealt with Malaer's electric wheel chair. He said they had to store it in the sally port.

- Miller told me the on duty Sergeant started a log.

- Miller did not ask if anyone hit Malaer, but said if he would have seen it he would have asked the Deputy if he was doing a Use of Force report and then notifiy a supervisor.

- Miller is a Defensive Tactics instructor and in his opinion, Malaer was a very low threat level.

- At the end of shifts they perform a "shift pass down". This is where the deputies that are terminating their shift share important information with the deputies coming on duty. Miller told me that someone, not sure who, said something to similar to "that was the funniest thing I have seen - what happened to that guy or slapping that guy. When I interviewed Miller he told me Tony Rhein (sp) had made the comment but he was not listed a being part of the incident. I called Miller on August 30, 2019 to clarify who actually made this comment. He said he thought it was Tony, but not sure how he would know since he was not there. He felt that it must have been someone else but he was not sure who made the comment.

This ended my interview with Chad Miller.

On August 30, 2019, I met with Deputy Cody Fuhrman at the Oregon State Police office in Central Point. The interview was recorded.

The following is a summary of the interview which was recorded in its entirety. The following summary has been condensed for ease of the reader and is not necessarily in the order in which it was discussed. For a verbatim account, the reader should refer to the recording.

- Fuhrman told me Malaer was brought to the jail by MPD and he was resistant, combative and verbally abusive throughout the contact.

- Malaer acted this way from the time they got him out of the police car in the sally port to the time they put him in his holding cell.

- Malaer threatened to kill the deputies and said he would snap their necks.

- Fuhrman said they had to remove Malaer from the car as he would not assist them. From the car they took him to the BAC room, but he does not remember if Malaer provided a breath sample.

- From the BAC room they took him to the exchange room where they removed his clothes and put him in a gown.

- During this time, Malaer was still combative and verbally abusive.

- From the exchange room they took him to his cell. He was moved by a wheel chair provided by the jail.

- Fuhrman told me when they got Malaer in the holding cell he did observe Kolkemo slap Malaer across the face one time. Fuhrman described it as trying to get Malaer's attention and stop the current behavior, not to harm him. As stated before, Malaer was continuing to be verbally abusive and threatening to the deputies.

- After Kolkemo slapped Malaer, you can see Malaer continue to chip away at the deputies. Fuhrman said they then placed him on the floor and provided him with at mat to lay on. He told me they didn't put him on the bench for fear of him falling off. Once Malaer was on the floor all deputies exited the room.

- Fuhrman told me he has seen other deputies use this technique before. He told me if they did, it would be considered a Use of Force which would mean completing a DT 1 and notifying a supervisor.

- When asked if this incident was ever discussed amongst the deputies, Fuhrman told me he has not discussed it with anyone.

- I asked Fuhrman about the comment that was made during pass down. He told me he does not remember it being said and was not sure if he was even present during the pass down following this incident.

This ended my interview with Cody Fuhrman.

On September 10, 2019 at approximately 8:45am I met with Deputy Keyan Bondhus at the Oregon State Police office in Central Point. I briefly explained to him what I needed to talk to him about and then reviewed the video several times. During the review of the video, Bondhus told me about a different incident with Malaer that occurred that evening near the exchange room. I discussed this later in the interview.

The following is a summary of the interview which was recorded in its entirety. The following summary has been condensed for ease of the reader and is not necessarily in the order in which it was discussed. For a verbatim account, the reader should refer to the recording.

- Bondhus told me Malaer came into the jail, was verbally abusive, hostile and was calling deputies derogatory names.

- He said Malaer was not cooperating with their commands.

- They dressed him in a smock. They do this to suicidal inmates. He said that Malaer may have stated he was suicidal but does not remember.

- Bondhus said from the moment Malaer was introduced to the jail until the time he was placed in the cell he was un-cooperative and verbally abusive.

- I asked him if he observed Kolkemo slap Malaer while in the jail cell and he had no knowledge of it and did not hear Malaer get slapped.

- I asked him if slapping inmates is normal practice and he told me it was not.

- I asked him if this was considered a Use of Force and he said it was.

- Further, that a DT 1 should have been completed, a Use of Force report should have been completed and the supervisor or OIC notified.

- I asked Bondhus to tell me about the incident earlier near the exchange room. He told me they took Malaer to the exchange room to put him in a smock. Malaer was in the wheel chair and was not cooperating with deputies.

- Deputies were moving Malaer from the exchange room to the cell. He told me Kolkemo had ahold of Malaer's right arm and Malaer pulled it away from Kolkemo. Bondhus told me that Kolkemo then open hand slapped Malaer across the face. He explained that he considered this a diversionary strike, but still a Use of Force.

- I asked Bondhus if the strike across Malaer's face near the exchange room was the same type of slap that Kolkemo used in the jail cell and he said it was.

This ended my interview with Keyan Bondhus.

On September 12, 2019 at approximately 10:15am I met with Deputy Brian Kolkemo and his attorney, Don Scales at the Central Point Oregon State Police office. We reviewed the video several time so they were familiar with the incident I was going to be talking to them about. I told them there was another incident that was brought to my attention from my earlier interviews. I explained it was similar as in I was told Kolkemo slapped Malaer across the face when they took him out of the exchange room.

The following is a summary of the interview which was recorded in its entirety. The following summary has been condensed for ease of the reader and is not necessarily in the order in which it was discussed. For a verbatim account, the reader should refer to the recording.

- I asked Kolkemo to walk me through the time Malaer arrived at the jail to him being placed in the cell.

- Kolkemo told me Medford Police Department (MPD) notified them that the subject (Malaer) they were bringing in was uncooperative.

- Malaer was upset about the arrest by MPD.

- Malaer was brought into the vestibule for a pat down; he was not following commands and he was moving around a lot. Malaer was in an agitated state.

- Most of the pat down was completed and the deputies took him to the BAC room to determine his intoxication level. During this, Kolkemo controlled his head because Malaer was moving his head around a lot and Kolkemo didn't want himself or another deputy to get head-butted. Kolkemo did not remember the BAC.

- They then transported Malaer to the exchange room.

- In the exchange room Malaer was not cooperative and very resistive. Kolkemo told me this is why they put him in a smock. This was because Malaer resisted them putting on the pants and shirt.

- Kolkemo told me he does remember slapping Malaer on the face in the exchange room . He told me they were able to get Malaer in the wheel chair and were going to take him to cell #2. During this time Malaer was flailing his arms about and grabbing at deputies...possibly their duty belts. During this interaction, Malaer did pull away from one of the deputies, he was not sure if it was him or Deputy Fuhrman. This is when Kolkemo slapped Malaer across the face, on the cheek.

- While transporting Malaer to the holding cell, he was very grabby with his hands. He told me either he or Deputy Fuhrman told Malaer to stop grabbing at them. Once in the cell, Kolkemo says he slapped Malaer. (This is the incident on the video). Kolkemo said he did this to get his attention to stop his behavior. Kolkemo told me that because of Malaer actions (grabbing at them) he chose to slap him opposed to dumping him. Dumping would be a forceful take down to the ground.

- Deputies were able to control him, placed him on the floor of the cell and exited the cell.

- I asked Kolkemo if the action (slapping) he took is considered a Use of Force. He explained that it was not a focused blow, but a diversionary strike to get his attention.

- Kolkemo said his intention was not to hurt Malaer, but to de-escalate the situation the best he could.

- Kolkemo said he did not believe the action he took worked on Malaer, that he was just too amped up. Malaer was still making threats and belligerent to all the deputies.

- I asked if there was any medical treatment provided to Malaer. Kolkemo was not aware of any treatment provided. I asked if anyone checked to see if there were any injuries and he was not aware.

- Kolkemo told me Sgt Tlascala then dealt with Malaer and may have checked on Malaer. I asked if Sgt. Tlascala was aware of the strike and Kolkemo did not think he was.

- I asked if this type of technique has been used before and Kolkemo told me diversionary tactics have been used before. In this case, he used it to get him to stop his behavior so they didn't have to use greater force on Malaer.

On September 12, 2019, I contacted Lt. Aldrich at the Jackson County Jail and asked if there was any video of the exchange room. He shared there is no video in the exchange room.


Referred to Jackson County District Attorney's office for consideration of charges...Assualt 4 and Harassment.

# EXHIBIT F

# LEDUC MONTGOMERY DECLARATION

*** CONFIDENTIAL PORTIONS***
ATTORNEY EYES ONLY

Deposition of :
**Jeremy Whipple**

January 16, 2023

John Lee Malaer
vs.
Geoffrey Kirkpatrick; et al.

Case No.: 1:20-cv-00049-CL



S Y N E R G Y

L E G A L

LITIGATION SUPPORT SERVICES

Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 6

```
 1  JEREMY WHIPPLE,
 2  having been first duly sworn to testify the truth,
 3  the whole truth, and nothing but the truth, was
 4  examined and testified as follows:
 5
 6                       EXAMINATION
 7  BY MS. LeDUC MONTGOMERY:
 8      Q.    Thank you.  Good morning, Mr. Whipple.
 9  What is your current position with Jackson County?
10      A.    I'm the administrative lieutenant.
11             MR. BAUMANN:  Before we go any
12  further, I'd just like to put something on the
13  record.  For this deposition and all the depositions
14  this week we would request not to waive the 30-day.
15  We do want review of both the video and the
16  transcript.  Thank you.
17             MS. LeDUC MONTGOMERY:  Okay.
18  BY MS. LeDUC MONTGOMERY:
19      Q.    Lieutenant Whipple, have you had your
20  deposition taken before?
21      A.    Yes.
22      Q.    About how many times?
23      A.    Three.
24      Q.    Okay.  And do you know when the most
25  recent one was?
```

Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 33

1          Our main concern is if they are a danger
2     to anyone else in the facility or out on the road.
3     So you don't -- if you think somebody did a bad use
4     of force, you don't want them to do that again, and
5     so we restrict their access to, say, the adults in
6     custody or the people on the road.
7                    THE REPORTER:  On the what?
8                    THE WITNESS:  People on the road --
9     sorry -- the community.
10    BY MS. LeDUC MONTGOMERY:
11        Q.    Okay.
12        A.    The next step would then be for me to
13    assign an investigator to the case.  So I would give
14    them everything and I would -- I have an initial
15    idea of what policies they violated, just from --
16    in my head, from doing it a while, and I would give
17    the -- all of the information I have to an
18    investigator and say, "These are the policies that I
19    think they have violated.  There could be others.
20    Please advise me if you find anything else along the
21    way."  And they would do the interviews of the
22    parties involved.
23    BY MS. LeDUC MONTGOMERY:
24        Q.    And who are the investigators?
25        A.    I have several.  So Mike Moran is -- I

Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 34

```
 1   believe Mike Moran is the investigator that did this
 2   case.  We don't use him anymore, but we used him in
 3   '19.  It is slipping my mind.  I'm sorry.  He was
 4   the chief of police in Grants Pass.  He's retired.
 5        Q.    That's who Mike Moran was?
 6        A.    No.  I'm sorry.  There's another.  I was
 7   trying to make sure I got -- I'm remembering in '19
 8   who we had.  Mike Moran is the person that I use
 9   currently and did use back then also.
10        Q.    Is he a Jackson County employee?  Or,
11   like, who is?
12        A.    Yes.  He's a -- he's a extra-help employee
13   with us.
14        Q.    Okay.  So is -- then I'm just trying to
15   understand.  Is he, for example, like a sheriff's
16   deputy who then will also help with these
17   investigations?  Or what is sort of Mike Moran's
18   role?
19        A.    Mike Moran is a -- what we call a special
20   investigator.  He's a retired lieutenant from
21   Medford PD and chief of police of Talent.  He has a
22   extensive law enforcement background.
23        Q.    And is he like full-time or he's, like,
24   called on when needed?
25        A.    He's part-time, yeah, called on when
```

**Jeremy Whipple**
**CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY**

Page 61

1   this, on the back of it.

2              MR. BAUMANN:  Thank you.

3              MS. LeDUC MONTGOMERY:   Redacted



Jeremy Whipple
**CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY**

Page 62

1              MR. BAUMANN:  I'll try to remember.

2              MS. BURROWS:  Okay.

3              MR. BAUMANN:  Thank you.

4    BY MS. LeDUC MONTGOMERY:



Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 63



**Jeremy Whipple**
**CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY**

1



Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 91

1      Q.    So was there a concern in this case that
2  Deputy Kolkemo was not potentially safe to be around
3  inmates and that's why he was on paid administrative
4  leave during the investigation?
5      A.    Yes.  That's standard.  For a use of
6  force we normally put them on -- put them on
7  administrative leave, that they don't have any
8  contact with adults in custody.
9



Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 92



Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 100



Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 101



1    Redacted

Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 102

1    Redacted

8         Q.    Okay.  I want to show you what's going to

9    be marked as Exhibit --

10                  MS. LeDUC MONTGOMERY:  Are we at

11   Exhibit 14?

12                  THE REPORTER:  Yes.

13                  (Deposition Exhibit Number 14 marked

14                   for identification.)

15   BY MS. LeDUC MONTGOMERY:

16        Q.    So Exhibit 14 is a copy of -- it's an

17   email chain.  It's between yourself and Mr. Moran in

18   October of 2022.  Do you see that?

19        A.    Yes.

20        Q.    Do you recall this email conversation?

21        A.    I don't.

22        Q.    Okay.

23        A.    I mean --

24                  MR. BAUMANN:  Take your time to review

25   it.

Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 103

```
 1              THE WITNESS:  Okay.  Yeah.  Let me --
 2      A.    I believe I do recall this, yes.
 3  BY MS. LeDUC MONTGOMERY:
 4      Q.    Okay.  So this email is referring to
 5  Redacted             So that's this
 6  investigation.  Correct?
 7      A.    Yes.
 8      Q.    Okay.  And then it talks about Mr. Moran
 9  somehow having obtained a copy of MPD's IA on their
10  actions in the arrest leading up to this lodging.
11  Do you see that part?
12      A.    It says released the internal MPD memo to
13  me.  I don't know if that's the IA investigation.
14      Q.    All right.  I'll clarify.
15            So on Mr. Moran's October 31, 8:54
16  email -- we're on JC4051, the second paragraph,
17  where it says (reading):  This is regarding
18       Redacted
19            And then the next line it talks about
20  (reading):  Sergeant Ernie Whiteman called and
21      asked me how we obtained a copy of MPD's IA
22      on their actions.
23      A.    Oh, okay.
24      Q.    Do you see that?
25      A.    I see that now.
```

Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 104

1      Q.    Okay.  And then, you know, a couple lines

2  down Moran writes (reading):  I found a copy of ███

       Redacted

4

5          Do you see that?

6      A.    Yes, I see that.

7      Q.    Okay.  So then if we go back and look at

8  Redacted

10

11

12      A.    Yes.

13      Q.    Is that Redacted        what you

14  believe Mr. Moran is referring to in his email where

15  he's saying a copy of MPD's IA on their actions and

16  having the narrative report?

17              MR. BAUMANN:  Object to form.  Calls

18  for speculation.

19              Go ahead and answer if you can.

20      A.    I would -- I would speculate that that's

21  the memo.  I'm thinking there's a difference between

22  the memo and an internal affairs report.  I mean, we

23  differentiate that.  But I don't remember even

24  seeing that when I reviewed anything, so --

25  BY MS. LeDUC MONTGOMERY:

Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 105

```
 1        Q.    Okay.  And so then at the top of this
 2   JC4051 Mike Moran writes back to you again and says
 3   (reading):  FYI, I called Ernie and told him I did
 4      not recall how I got a copy of their memo.
 5            Do you see that?
 6        A.    Yes, I do.
 7        Q.    And do you -- is it your understanding
 8   this memo he's referring to is Redacted          , the
 9   Medford PD internal memo re Malaer's complaint?
10                MR. BAUMANN:  Same objection.
11        A.    Yeah.  Yes.
12   BY MS. LeDUC MONTGOMERY:
13        Q.    Okay.  And do -- just so I'm clear, do you
14   recall reviewing that memo?
15        A.    I don't.  I don't recall reviewing it.
16        Q.    Okay.  So just, you know, looking at
17   the -- Redacted           Redacted
         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20        A.    Yes.
21        Q.    -- if there was such a memo, this MPD
22   internal memo, would it have been in the files or
23   materials from Mr. Moran that you then would have
24   reviewed to make your own report?
25        A.    Yes, it should be.  It looks like he
```

Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

```
 1   documented it there, that it was in there.  And I
 2   actually don't remember reviewing it.
 3        Q.    In terms of the process of conducting
 4   these IA investigations, would everything that had
 5   been in -- you know, where it says Redacted ████████
     █████████████████████████████████████████ would
 7   all those documents have been kept together in
 8   JC's -- in Jackson County's files for this
 9   investigation?
10        A.    Yes.
11        Q.    Would the -- does the County, to your
12   knowledge, still have these documents somewhere in a
13   file?
14        A.    Yes.  We keep all IAs in files all
15   together in a locked cabinet.
16        Q.    Okay.  To your knowledge, do you know if
17   this internal memo regarding Malaer's complaint has
18   been produced to the plaintiffs in this case, if you
19   know?
20        A.    No.  I -- I don't know.
21             MS. LeDUC MONTGOMERY:  I'd like to
22   take just a few minutes to confer, but I think we're
23   almost done.
24             THE VIDEOGRAPHER:  We are going off
25   the record at 11:39.
```

Jeremy Whipple
CONFIDENTIAL PORTIONS   ATTORNEY EYES ONLY

Page 107

```
 1                    (A recess was taken.)
 2                    THE VIDEOGRAPHER:  We are back on the
 3       record at 11:40.
 4                    MS. LeDUC MONTGOMERY:  Thank you,
 5       Lieutenant Whipple.  I don't have any further
 6       questions, so thank you for your time.
 7                    THE WITNESS:  Thank you.
 8                    THE VIDEOGRAPHER:  We are going off
 9       the record at 11:40.
10                    (The videotaped deposition was
11                     concluded at 11:40 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   State of Oregon     )
 2                       )          ss.
 3   County of Douglas   )
 4
 5       I, Deana R. Mead, CSR, Certified Shorthand
 6   Reporter for the State of Oregon, certify that the
 7   witness was sworn and the transcript is a true
 8   record of the testimony given by the witness; that
 9   at said time and place I reported by stenotype all
10   testimony and other oral proceedings had in the
11   foregoing matter; that the foregoing transcript
12   consisting of 107 pages contains a full, true and
13   correct transcript of said proceedings reported by
14   me to the best of my ability on said date.
15       If any of the parties or the witness requested
16   review of the transcript at the time of the
17   proceedings, correction pages are included.
18       IN WITNESS WHEREOF, I have set my hand this
19   30th day of January 2023, in the City of Roseburg,
20   County of Douglas, State of Oregon.
21
22    _signature_
23   Deana R. Mead, CSR
24   CSR No. 98-0350
25   Expiration Date:  June 30, 2023
```

# EXHIBIT G

# LEDUC MONTGOMERY DECLARATION

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

Redacted

# EXHIBIT H

# LEDUC MONTGOMERY DECLARATION

**EXHIBIT I**

**LEDUC MONTGOMERY DECLARATION**













# EXHIBIT J

# LEDUC MONTGOMERY DECLARATION

**Subject:** RE: Malaer - Supplemental Production

**Date:**    Tuesday, January 24, 2023 at 4:09:10 PM Pacific Standard Time

**From:**    Eric B. Mitton

Michelle and Alicia,

The following documents that were referenced in, or listed as exhibits to, the IA file.  As Michelle stipulated during our call, we are not waiving any IA-related privilege by sharing this.

- ·    Report 19-12984
- ·    Officer Wulff's BWC videos from this incident (Evidence.com)
- ·    Officer Esqueda's BWC video from this incident (Evidence.com)
- ·    In car video of the transport of Mr. Malaer (Evidence.com)
- ·    Written complaint form from 07/25/19
- ·    Photos taken by Sgt K. Budreau on 7/18/19 (labeled #1 - #6)
- ·    Photos provided by Mr. Malaer via email on 7/18/19 (labeled #7 - #9)
- ·    Audio recording of phone call between Sgt Mak and Mr. Malaer

All of these documents have already been produced in discovery; the phone call's file name is "071619 #499.wav".

Eric B. Mitton | *City Attorney*
City of Medford, Oregon | City Attorney's Office
411 W 8th Street, Medford, OR 97501
Ph: 541-774-2020 | Fax: 541-774-2567

**From:** Michelle Burrows <michelle.r.burrows@gmail.com>
**Sent:** Tuesday, January 24, 2023 3:44 PM
**To:** Alicia M. Wilson <Alicia.Wilson@cityofmedford.org>
**Cc:** Alicia LeDuc <alicia@leducmontgomery.com>; Eric B. Mitton <Eric.Mitton@cityofmedford.org>; Johan Pietila <pietiljr@jacksoncounty.org>; Brett Baumann <BaumanBA@jacksoncounty.org>
**Subject:** Re: Malaer - Supplemental Production

**<EXTERNAL EMAIL \*\*Click Responsibly!\*\*>**

Thank you so much.

Michelle
Michelle R. Burrows (she/her)
Attorney at Law
16869 SW 65th Ave. # 367
Lake Oswego, OR 97035
503/241-1955
www.oregoncivilrights.com



https://www.publicjustice.net/

On Tue, Jan 24, 2023 at 3:34 PM Alicia M. Wilson <Alicia.Wilson@cityofmedford.org> wrote:

Attached please find the audit log for all four videos (3 body cam videos and one fleet camera video) from the

City Attorney's Office. Kimberly Boutiette is our office's Legal Assistant.

Alicia M. Wilson | *Senior Assistant City Attorney*
City of Medford, Oregon | City Attorney's Office
411 W 8th Street, Medford, OR 97501
Ph: 541-774-2020 | Fax: 541-774-2567

# EXHIBIT K

# LEDUC MONTGOMERY DECLARATION

# Deposition of:
# **Corporal Omar Esqueda**

## January 5, 2023

## John Lee Malaer
## vs.
## Geoffrey Kirkpatrick; et al.

## Case No.: 1:20-cv-00049-CL



**Corporal Omar Esqueda**

```
 1              MEDFORD, OREGON; THURSDAY, JANUARY 5, 2023
 2                        8:30 A.M.
 3
 4              THE VIDEOGRAPHER:  We're on the record at
 5      8:30.  This is the video recorded deposition of Omar
 6      Esqueda in the matter of John Lee Malaer versus
 7      Goeffrey Kirkpatrick, et al. in the United States
 8      District Court for the District of Oregon, Medford
 9      division, Case Number 1:20-cv-00049CL.
10              Today is January 5th, 2023.  This deposition
11      is taking place at 411 West 8th Avenue, Medford with
12      the same representation as the previous depositions.
13      Madam -- the court reporter today is Chris Roemmich.
14      Madam court reporter, will you please swear in the
15      witness.
16
17      CORPORAL OMAR ESQUEDA,
18      having first been duly sworn, was examined and
19      testified as follows:
20
21                        EXAMINATION
22      BY MS. LEDUC MONTGOMERY:
23          Q.  Good morning, Mr. Esqueda.  Is it Esqueda or
24      Esqueda?
25          A.  Esqueda.
```

Corporal Omar Esqueda

1      Q.   So just looking at these documents, do these
2   look familiar to you?
3      A.   Yes.  They're my performance evaluations.
4      Q.   Okay.  Now, it says in these evaluations you
5   reviewed policies with your supervisor Kirkpatrick; is
6   that correct?
7      A.   Correct.
8      Q.   And so it's true that you reviewed the use of
9   force, officer response to calls, discriminatory
10   harassment and standards of conduct policies.  It also
11   mentions EVOC's.  What does that stand for?
12      A.   EVOC stands for emergency vehicle operations
13   course.  Describing skills instructing.
14      Q.   Were you an instructor?
15      A.   Correct.
16      Q.   And so what did that entail?
17      A.   I assisted or conducted department training
18   in driving skills.
19      Q.   It also seemed like you were a sounding board
20   for Kirkpatrick, and he felt, you know, comfortable
21   talking with you or kind of running ideas past you.
22   Is that correct?
23      A.   In a way, yes.  He is the sergeant.  It is
24   not required to pass things by me, subordinates, but
25   we often talked about other members of the team in

Corporal Omar Esqueda

1   that aspect.  Yes.
2        Q.   Did you ever talk to him about this
3   particular July 11, 2019 arrest involving Mr. Malaer
4   at any time?
5        A.   I do not remember doing that.  No.
6        Q.   Do you remember ever talking to him in any
7   capacity about Officer McFall?
8        A.   No.
9        Q.   Or Officer Wulff?
10       A.   No.
11       Q.   Did you ever give him like critical feedback
12   about an idea or, you know, like alternative thoughts
13   about an idea he had?
14       A.   No.
15       Q.   I think we're done with that exhibit.
16            MS. WILSON:  Keep those with you.  Yeah.
17            (Whereupon, DPSST Transcript, was marked
18   Exhibit No. 26 for identification.)
19   BY MS. LEDUC MONTGOMERY:
20       Q.   I'm going to hand you what's being marked as
21   Exhibit 26, a copy of a DPSST report transcript for
22   yourself.  And our understanding is that -- or my
23   understanding is that sometimes not all of an
24   officer's training makes it into this transcript, but
25   just looking through, like are you -- does this

Corporal Omar Esqueda

1      Q.   Now, if we look on the back side of this

2   report, it shows at 19:55 back ER, Elliott Jantzer?

3      A.   Jantzer.

4      Q.   Jantzer.  Did he arrive at the scene?

5      A.   It does not appear he did.

6      Q.   What does the back ER mean?

7      A.   Backup en route, ER, en route.

8      Q.   And so is there a place where -- I guess if

9   we look down at 20:03:57 it says 2420 clear.  What

10   does that mean?

11      A.   It means he has cleared the call for service.

12      Q.   And what does that mean?

13      A.   It means he's no longer responding.

14      Q.   Okay.  And then if we look down a little

15   farther, it says 20:01:51 back ER, and it lists Jeff

16   Kirkpatrick.  Did he arrive at the scene?

17      A.   Yeah.  It looks like he did.

18      Q.   Okay.  And how do you know that he arrived at

19   the scene?

20      A.   Never mind.  Disregard that.  It doesn't look

21   like he ever showed up.  I mean, I know that he showed

22   up, because he transported the wheelchair, but it

23   doesn't show on the CAD system that he showed up.

24      Q.   Okay.  Now, looking up a little bit further,

25   it says 20:00:43 LOGM and then lists John Malaer and

Corporal Omar Esqueda

1    about Officer Wulff needing to stay with her?

2        A.    No.

3        Q.    To your knowledge, is it typical for an

4    officer who is in training with a coach like that to

5    be doing witness interviews unsupervised?

6        A.    Yeah.  It's not uncommon for a recruit to be

7    given an opportunity to conduct an investigation on

8    their own and then come back and provide what answers

9    or responses they got to their training officer to

10   ensure accuracy and thoroughness in their

11   investigation at which point they can either accept

12   what they've gotten or send them back to answer -- or

13   ask more questions to get a little more clarification.

14       Q.    Okay.  So just so I'm clearly understanding

15   what you're saying, at this point with McFall being in

16   training and Wulff being her coach, it might have

17   been -- I forget the word you used, but normal for her

18   to go do an interview with the witness, come back,

19   tell Wulff this is what I've learned, and then he may

20   or may not give her further instruction or say go back

21   and do more interviews or something like that?

22       A.    Correct.  Yeah.

23       Q.    Okay.  Do you know if that occurred?

24       A.    I don't.

25       Q.    Do you recall if Scott -- McFall or Officer

Corporal Omar Esqueda

```
 1    Wulff ever spoke to Sergeant Kirkpatrick on the phone
 2    during the arrest incident?
 3         A.    No.
 4         Q.    Do you recall if anyone at the arrest scene
 5    ever called the Jackson County Jail?
 6         A.    No.
 7         Q.    Do you recall when you were standing outside
 8    with Mr. Malaer and Officer Wulff Mr. Malaer saying
 9    "Do you guys know Brian Sjothun?"
10         A.    No.
11         Q.    Do you know who Brian Sjothun is?
12         A.    Of course.
13         Q.    And who is he?
14         A.    He is the city manager.
15         Q.    And was he the city manager in 2019?
16         A.    I'm assuming if Mr. Malaer was bringing him
17    up that he was.
18         Q.    Do you recall Officer Wulff saying "You mean
19    Sjothun, the city, manager; you should probably know
20    how to say his name, you should probably know how to
21    say his name?"
22               Do you recall that?
23               MS. WILSON:  Object to the form of the
24    question.  Answer, if you can.
25               THE WITNESS:  No.
```

Corporal Omar Esqueda

| | |
|---|---|
| 1 | into a vehicle for transport? |
| 2 | A.   You just try to find the simplest solution. |
| 3 | Q.   Do you recall a time ever being, like, |
| 4 | specifically trained or told this is how we transport |
| 5 | people who are in wheelchairs, like we take them, put |
| 6 | them in the back seat and then, like, this two step |
| 7 | process you're describing? |
| 8 | A.   No. |
| 9 | Q.   Okay.  Do you recall whose idea it was to |
| 10 | place him out of the wheelchair into the patrol |
| 11 | vehicle? |
| 12 | A.   Whose idea it was? |
| 13 | Q.   Yeah.  Like who made that decision I guess is |
| 14 | what I'm saying? |
| 15 | A.   No. |
| 16 | Q.   Okay.  And do you recall -- I think you |
| 17 | testified earlier that Kirkpatrick did, in fact, |
| 18 | arrive to help transport the chair; is that correct? |
| 19 | A.   Yes. |
| 20 | Q.   And how did Kirkpatrick transport the chair? |
| 21 | A.   I believe in the back of what's called a |
| 22 | community service officer truck.  It's a small size |
| 23 | pickup truck with a hydraulic lift gate that helps |
| 24 | load heavy objects into the bed of the pickup truck. |
| 25 | Q.   And why was that truck called for the |

Corporal Omar Esqueda

```
 1         Q.   Did you ever go to the jail while Mr. Malaer
 2    was there July 11 or July 12?
 3         A.   No.
 4         Q.   Have you had any communications other than
 5    with your lawyers about this July 11 arrest with
 6    Mr. Malaer since it happened with anyone else?
 7         A.   No.  No.
 8         Q.   Have you spoken with Officer Wulff about it?
 9         A.   Just in scheduling.
10         Q.   Scheduling for what?
11         A.   Depositions.
12         Q.   Okay.  Have you spoken with Officer Scottow
13    about it?
14         A.   No.
15         Q.   Have you spoken with Sergeant Kirkpatrick
16    about it?
17         A.   No.
18         Q.   Are you aware whether or not Mr. Malaer filed
19    a complaint with the Department regarding the arrest?
20         A.   No.
21         Q.   Are you aware of whether or not the FBI
22    contacted Medford Police Department regarding this
23    arrest?
24         A.   No.
25         Q.   Are you aware whether or not the United
```

Corporal Omar Esqueda

```
 1   States Department of Justice received complaint about
 2   this arrest?
 3       A.   No.
 4       Q.   Are you aware whether or not this arrest was
 5   reported to the bias hotline at the Oregon Department
 6   of Justice?
 7       A.   No.
 8       Q.   Are you aware whether or not the Oregon State
 9   Patrol contacted Medford Police Department regarding
10   this July 11 and 12 incident with Mr. Malaer?
11       A.   No.
12       Q.   Are you aware of whether or not Medford
13   Police Department conducted an internal investigation
14   about this arrest?
15       A.   No.
16       Q.   So am I correct in hearing you that Sergeant
17   Kirkpatrick never talked to you as part of an
18   investigation as part of this incident in 2019; is
19   that correct?
20       A.   I'm sure we spoke when he arrived to the
21   call.  I guess I just want you to clarify.  I'm not
22   sure.
23       Q.   Let me break that up.  I agree.  So do you
24   recall speaking with Sergeant Kirkpatrick at the scene
25   during the July 11 arrest?
```

Corporal Omar Esqueda

```
 1    in a situation like this should be recorded in some
 2    capacity?
 3         A.   Yes.
 4         Q.   Did you consider your interaction with
 5    Mr. Malaer over after he was put into the vehicle?
 6         A.   Yes.
 7         Q.   And why is that?
 8         A.   Because I was no longer in contact with
 9    Mr. Malaer.
10         Q.   So it was after Mr. Malaer was put in the
11    vehicle that was the last contact you had with him?
12         A.   Yes.
13         Q.   Okay.  And just to confirm, did you have any
14    correspondences after leaving the scene with Sergeant
15    Kirkpatrick --
16         A.   None.  I'm sorry.  Go ahead and finish your
17    question.
18         Q.   -- as part of any investigation afterwards?
19         A.   Not that I remember.
20         Q.   Okay.  I think you testified, you know,
21    earlier about you thinking Mr. Malaer's -- the conduct
22    you learned with the witnesses outside Lumpy's fit the
23    description for disorderly conduct.  Do you remember
24    that?
25         A.   Correct.
```

**Corporal Omar Esqueda**

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, Chris Roemmich, a professional court reporter,

 4   do hereby certify:

 5        That the foregoing proceedings were taken before

 6   me at the time and place herein set forth; that any

 7   witnesses in the foregoing proceedings, prior to

 8   testifying were placed under oath; that a verbatim

 9   record of the proceedings was made by me using

10   machine shorthand which was thereafter transcribed

11   under my direction; further, that the foregoing is an

12   accurate transcription thereof.

13        I further certify that I am neither financially

14   interested in the action nor a relative or employee

15   of any attorney of any of the parties.

16      IN WITNESS HEREOF, I have hereunto subscribed my

17   name this 23th day of January, 2023.

18

19

20

21

22   _____

23   Chris Roemmich

24   Oregon Commission No. 1021058

25   Expires 01/19/2026
```

# EXHIBIT L

# LEDUC MONTGOMERY DECLARATION

Deposition of:
# Corporal Michael Wulff

January 5, 2023

John Lee Malaer
vs.
Geoffrey Kirkpatrick; et al.

Case No.: 1:20-cv-00049-CL



SYNERGY
LEGAL
LITIGATION SUPPORT SERVICES

Corporal Michael Wulff

```
 1            MEDFORD, OREGON; THURSDAY, JANUARY 5, 2023
 2                          1:03 P.M.
 3
 4            THE VIDEOGRAPHER:  The time is 1:03.  This is
 5    the video recorded deposition of Michael Wulff in the
 6    matter of John Lee Malaer versus Geoffrey Kirkpatrick,
 7    et al. in the United States District Court for the
 8    District of Oregon, Medford Division, Case Number,
 9    1:20-cv-00049-CL.
10            Today is January 5th, 2023.  This deposition
11    is taking place at 411 West 8th Avenue, Medford, with
12    the same representation in the room as previously.
13    The court reporter is Chris Roemmich.  Madam court
14    reporter, will you please swear in the Witness.
15
16    CORPORAL MICHAEL WULFF,
17    having first been duly sworn, was examined and
18    testified as follows:
19
20                          EXAMINATION
21    BY MS. LEDUC MONTGOMERY:
22        Q.    Thank you.
23              And I understand it's Corporal Wulff now?
24        A.    Yes.  Yup.
25        Q.    Thank you.
```

Corporal Michael Wulff

```
1      Q.   Do you recall if you suggested any changes or
2  edits to either of those documents?
3      A.   I don't recall if I did or not.
4      Q.   If you had noticed, like, any material facts
5  were missing or something that you thought should be
6  changed in the report, would you have told Officer
7  McFall that?
8      A.   Yes.
9      Q.   And that was part of the, like, training,
10 kind of coaching role?
11     A.   Correct.
12     Q.   So aside from what sounds like was either
13 July 11 and maybe July 12 in the morning, depending on
14 when these documents were finalized, did you have any
15 further conversation with anyone about this July 11
16 arrest?
17     A.   No.
18     Q.   Were you ever interviewed by Sergeant
19 Kirkpatrick as part of an internal affairs
20 investigation?
21     A.   Not to my knowledge.  No.
22     Q.   Are you aware of any action that's been taken
23 by Medford Police Department regarding this incident,
24 such as like an internal affairs investigation or some
25 other type of action?
```

Corporal Michael Wulff

```
 1      A.   I don't know.  I had heard maybe possibly a
 2 complaint was filed, but I didn't know the disposition
 3 of that.  I don't know of anything else.
 4      Q.   And by complaint, do you mean lawsuit or do
 5 you mean some other type of complaint or do you --
 6      A.   I'm not familiar with the nature of the exact
 7 complaint.  I don't think it ever rose to the level of
 8 a lawsuit, though.
 9      Q.   Okay.  When did you first learn of this
10 lawsuit?
11      A.   This lawsuit?
12      Q.   Uh-huh.
13      A.   When we -- whenever I was contacted by the
14 City Attorneys Office about the filing.
15      Q.   Okay.  Are you aware of whether or not the
16 FBI contacted Medford Police Department with an
17 inquiry about this arrest?
18      A.   No.
19      Q.   Are you aware of any complaints or contacts
20 from the US Department of Justice about this arrest?
21      A.   No.
22      Q.   Are you aware of whether or not this arrest
23 incident was submitted to the bias reporting hotline
24 for Oregon Department of Justice?
25      A.   No.
```

Corporal Michael Wulff

1   the car and who helped, I'm not exactly sure who was

2   -- I believe I was on the passenger side of the car,

3   but I'm not sure, but I know we had to find a way to

4   get him into the back of the patrol car.

5       **Q.   Okay.  And just a couple of details there.**

6   **Did you turn on the vehicle camera in the patrol car?**

7       A.   I don't remember who turned it on.  I know it

8   went on.  I don't know if it was Officer McFall or I.

9       **Q.   And I take it from your prior statement, you**

10  **called Sergeant, now Lieutenant, Kirkpatrick to the**

11  **scene?**

12      A.   Yes.  We needed a community service officer

13  truck for the wheelchair.

14      **Q.   So is this from -- based on your experience**

15  **so far the typical way MPD would transport people who**

16  **used a wheelchair; they'd take the person out of a**

17  **wheelchair and put them in a vehicle and use a CSO**

18  **truck to transport their wheelchair; is that --**

19      A.   That's really the only secure option we have.

20  We don't have like ADA transport cages, and we don't

21  have a transport -- any other transport vehicle other

22  than our patrol cars.

23      **Q.   So do you encounter a lot of people with**

24  **wheelchairs or scooters, like things that would need**

25  **to be transported with the CSO truck in this type of a**

Corporal Michael Wulff

1    think we tried to pick it up at one point and it was

2    extremely heavy, to try to see if we could carry it to

3    the truck was.  I think we had to shimmy, scoot it

4    over to where the truck was, and we got the truck over

5    as close as we could.

6         Q.   Okay.  And it was Kirkpatrick who went and

7    brought the CSO truck?

8         A.   He went and grabbed the CSO truck.  Yes.

9         Q.   Okay.  When in all this did you turn your

10   body camera off?

11        A.   I don't recall the exact moment.  Usually

12   when I get a suspect in the back of the car and the

13   car camera has taken over, I'll turn my body camera

14   off, because that camera is now doing that job.

15        Q.   Are you familiar with the body cam policies

16   for MPD?

17        A.   Yes.

18        Q.   And you were at that point in time, too?

19        A.   Yes.

20        Q.   Mr. Malaer was then transported in that

21   vehicle to the Jackson County Jail; is that correct?

22        A.   Yes.

23        Q.   And who was driving?

24        A.   That would have been Officer McFall.

25        Q.   And were you also in the vehicle?

Corporal Michael Wulff

```
 1      A.   I was in the front passenger seat.
 2      Q.   Okay.  And you did not have your body cam
 3  turned on; is that correct?
 4      A.   I don't believe so.  No.
 5      Q.   And what's the reason for that?
 6      A.   Because the car camera -- we have a fleet
 7  system that has a front facing camera out the
 8  windshield and a camera that is dedicated strictly to
 9  the transport compartment, and that camera was on as
10  required to be on when somebody is in the back of the
11  car.
12      Q.   At that point in time when you were driving
13  him to the jail, had you learned whether or not
14  Mr. Malaer had an address?
15      A.   I didn't know.
16      Q.   Do you know if anyone else had?
17      A.   I don't remember talking to him about his
18  address at all.
19      Q.   Do you know if McFall had?
20      A.   I'm unaware if she did or not.
21      Q.   Was there any possibility at that point in
22  time that you could have transported Mr. Malaer home
23  instead of to jail?
24      A.   Based on his behavior and what we had
25  observed during the investigation and the initial
```

**Corporal Michael Wulff**

```
 1   Are you going to give her the whole thing, Ms. LeDuc,
 2   or are you to give her a portion of it?
 3            MS. LEDUC MONTGOMERY:  It's the entire pat
 4   down video and audio, but they're actually short.  I
 5   think it's only three minutes long.
 6            MS. BURROWS:  Okay.  So for the record, we'll
 7   put that on a memory stick or something and ship it
 8   with the other exhibits.
 9            (Whereupon, Pat Down Video, was marked
10   Exhibit No. 37 for identification.)
11            MS. LEDUC MONTGOMERY:  Yes.  So I can hand
12   you this page, if you want, but it's just our personal
13   Bates number for that file.
14            THE WITNESS:  Do you want this or do you want
15   me --
16            MS. LEDUC MONTGOMERY:  Yes.  We keep all the
17   exhibits.  Thank you for asking.
18            Okay.  So the pat down video and audio are
19   separate files.  I'm going to attempt to play them at
20   the same time so that it's somewhat synchronized, and
21   I'd like to just have us watch this video and listen
22   to the audio in particular paying attention obviously
23   to your motions and conduct.
24            MS. BURROWS:  Chris, you don't need to record
25   this.
```

Corporal Michael Wulff

```
 1              (Video playing.)
 2    BY MS. LEDUC MONTGOMERY:
 3         Q.   Do you recall this happening?
 4         A.   I mean I'm there.  I don't remember every
 5    detail of the incident, but I just watched the video.
 6         Q.   And you agree you could see at least part of
 7    the time what was going on in that room?
 8         A.   I was standing out near where the gloves and
 9    the disinfectant are, and I could see in the room.
10    Yes.
11         Q.   And you saw during some of this video where
12    one of the Jackson County Jail employees was holding
13    Mr. Malaer's head down?
14              MS. WILSON:  Object to the form of the
15    question.  Answer, if you can.
16              THE WITNESS:  I mean, he was being held.  I
17    can't remember where from my vantage point exactly
18    what I saw in all those moments.
19    BY MS. LEDUC MONTGOMERY:
20         Q.   You could hear Mr. Malaer yelling "Take me to
21    the hospital, take me to the hospital," correct?
22         A.   I believe I heard that.  Yeah.  I mean, it's
23    very clear audibly, and I'm only five feet away.
24         Q.   Okay.  Did you recall hearing him saying
25    "You're breaking my finger"?
```

Corporal Michael Wulff

```
 1        A.    I don't remember hearing that.
 2        Q.    Did you hear him as they're wheeling him out
 3   close to you say "There's blood all over the floor"?
 4        A.    I heard him say about blood, and then I heard
 5   what some deputy say something it's from your finger.
 6   If he said you broke it, I didn't hear that at the
 7   end.
 8        Q.    Did you hear where one of the Jackson County
 9   Jail deputies said something to the effect of "Mark
10   this biohazard; he peed all over it"?
11        A.    Yeah.  I heard a statement about biohazard
12   and urine.
13        Q.    Okay.  Did any of that lead you to think that
14   Mr. Malaer might need to be taken to a hospital?
15              MS. WILSON:  Object to the form of the
16   question.  Answer, if you can.
17              THE WITNESS:  Yeah.  I had no idea at that
18   time, no clue what his medical issues were.
19   BY MS. LEDUC MONTGOMERY:
20        Q.    Did you think he might need to go to a
21   hospital?
22        A.    I don't know.
23              MS. WILSON:  Object to the form of the
24   question.  Answer, if you can.
25              THE WITNESS:  Yeah.  I don't know.  I can't
```

Corporal Michael Wulff

```
 1        Q.   Did you see anything in this video watching
 2   it just now that you thought was patently wrong on its
 3   face?
 4        A.   From this angle of up in a corner of a room,
 5   no.
 6        Q.   What about when you were standing like near
 7   that door looking into the room?
 8        A.   I don't remember -- you recalled it for me on
 9   video, but this whole interaction and what we did in
10   the intake vestibule at the jail, I don't remember it
11   from that night.
12        Q.   If there was a moment where you thought
13   Mr. Malaer should be taken to a hospital, would you
14   have said so to the Jackson County staff?
15             MS. WILSON:  Object to the form of the
16   question.  Answer, if you can.
17             THE WITNESS:  I mean, that's speculation.  I
18   don't -- I don't know.  I didn't see anything there.
19   They have transport vehicles that take people to the
20   hospital all the time.
21   BY MS. LEDUC MONTGOMERY:
22        Q.   Was your body camera on when you transported
23   Mr. Malaer out of the patrol vehicle into the jail?
24        A.   The jail has cameras.  We don't turn our body
25   cameras on at the jail.  They have cameras in the
```

Corporal Michael Wulff

```
 1   sally port and as you drive in as you can see in the
 2   intake vestibule.
 3        Q.   Does Medford Police Department have control
 4   over those videos?
 5        A.   No.  Not to my belief.
 6        Q.   Do you have any way of independently
 7   accessing those videos outside of having to go through
 8   the County?
 9        A.   Jail videos?
10        Q.   Uh-huh.
11        A.   No.
12        Q.   Okay.  I'd like to talk about -- going back
13   to the incident at Lumpy's, I think you had -- you
14   might have mentioned earlier, and correct me if I'm
15   not recalling your testimony properly, but I thought
16   you had mentioned earlier that you may have spoken
17   with McFall about the incident either later that day
18   or maybe early the next morning before she submitted
19   her reports; is that correct?
20        A.   What I meant was we would have discussed the
21   case and her conversation with witnesses and stuff at
22   the time.  Probably it would have occurred at the jail
23   before we filled out the PC affidavit and such.
24        Q.   Was the PC affidavit filled out at the jail?
25        A.   They have to be.  Yes.
```

**Corporal Michael Wulff**

```
 1                 REPORTER'S CERTIFICATE

 2

 3      I, Chris Roemmich, a professional court reporter,

 4   do hereby certify:

 5      That the foregoing proceedings were taken before

 6   me at the time and place herein set forth; that any

 7   witnesses in the foregoing proceedings, prior to

 8   testifying were placed under oath; that a verbatim

 9   record of the proceedings was made by me using

10   machine shorthand which was thereafter transcribed

11   under my direction; further, that the foregoing is an

12   accurate transcription thereof.

13        I further certify that I am neither financially

14   interested in the action nor a relative or employee

15   of any attorney of any of the parties.

16      IN WITNESS HEREOF, I have hereunto subscribed my

17   name this 23rd day of January, 2023.

18

19

20

21

22   _____

23   Chris Roemmich

24   Oregon Commission No. 1021058

25   Expires 01/19/2026
```

# EXHIBIT M

# LEDUC MONTGOMERY DECLARATION

# EXHIBIT N

# LEDUC MONTGOMERY DECLARATION

| | |
|---|---|
| **Message Key:** | 000314B14390816ABE40BE4D296E37A7D91E44E9 |

Cryoserver™

| | |
|---|---|
| **From:** | "Brian N. Sjothun" |
| **To:** | "Scott A. Clauson" |
| **Addressed To:** | scott.clauson@cityofmedford.org |
| **Subject:** | FW: 4th Amendment and ADA rights conflict with the City. |
| **Date:** | Monday, July 29, 2019 06:37 PDT |

Scott,

This individual is on the CoC Board and he sent this to myself and a couple of board members. I am sure that I'll be asked about this.

Thanks,
**Brian Sjothun | *City Manager***
City of Medford, Oregon | P: 541.774.2000 | F: 541.618.1700

**From:** JohnyM13@outlook.com [mailto:JohnyM13@outlook.com]
**Sent:** Saturday, July 27, 2019 5:15 PM
**To:** Brian N. Sjothun <Brian.Sjothun@cityofmedford.org>; Dee Anne Everson <DeeAnne@UnitedWayofJacksonCounty.org>; Jason Elzy <jason@hajc.net>
**Subject:** 4th Amendment and ADA rights conflict with the City.

<mark><EXTERNAL EMAIL></mark>

To Board Members,

Please be advised that on 7/11/19 I was stranded at a RVTD bus stop because of dead wheelchair. I asked a pedestrian to call a cab and they called the police instead. I was then thrown on the ground stepped on by 4 cops, handcuffed and put in the back of a patrol unit and seat belted in. I was then assaulted in my left eye by one of the officers. I was then jailed, put on suicide watch and left to urinate on the floor because of no wheelchair or catheters. This when on for 24 hours with being denied medical help, and was forced to drink water out of toilet because I couldn't reach the sink and was ignored by jail staff. I intend to sue the city and the Jail for violating my constitutional rights. I also resign as a ridiculous member of your do nothing board. I did have a presentation but I will let the law speak for me instead. Thanks for participating.

John Malaer
100 N. Grape st. Apt 405
Medford, Or. 97501
(541) 414-7470

**#21242.1**

# EXHIBIT O

# LEDUC MONTGOMERY DECLARATION

# Deposition of:
# **Brian Sjothun**

## January 6, 2023

## John Lee Malaer
## vs.
## Geoffrey Kirkpatrick; et al.

## Case No.: 1:20-cv-00049-CL



SYNERGY
LEGAL
LITIGATION SUPPORT SERVICES

**Brian Sjothun**

```
 1   BRIAN SJOTHUN,
 2   after having been first duly sworn by the
 3   Certified Shorthand Reporter, was examined and
 4   testified as follows:
 5
 6                         EXAMINATION
 7
 8   BY MS. BURROWS:
 9   Q.    Good morning.
10   A.    Afternoon.
11   Q.    Sjothun?
12   A.    Sjothun.
13   Q.    Sjothun.  Okay.
14         My name is Michelle Burrows.  I'm the attorney for
15   the plaintiff, Mr. Malaer, in this federal civil rights
16   action.  This is the time set for your deposition.
17         Have you ever had your deposition taken before?
18   A.    Yes.
19   Q.    How many times?
20   A.    Twice.
21   Q.    And could you tell me the purpose of your
22   deposition?
23   A.    The first deposition was for an injury to a young
24   girl at a summer camp in Woodburn, and the second
25   deposition now escapes me.  But there has been two.
```

Brian Sjothun

```
 1          MS. WILSON:  Object to the form of the
 2     question.
 3          Answer if you can.
 4  A.   I do not distinctly remember, other than reading
 5  the email, so.
 6  Q.   You sent that on -- you communicated -- let me find
 7  my copy of it so I sound semi articulate here.
 8       It appears from this email on Exhibit 30 dated July
 9  29, 2019, that you wrote to Scott Clauson.
10          MS. WILSON:  For the record, do you mean
11     Exhibit 40?
12  Q.   Excuse me.  40.
13  A.   Yes.  I sent that to Scott Clauson who was the
14  chief of police at that time.
15  Q.   And you write, "This individual is on the COC board
16  and he sent this to myself and a couple of board
17  members.  I'm sure that I'll be asked about this."
18       Do you remember who -- why you wrote, "I'm sure
19  I'll be asked about this"?  What were you talking
20  about, referencing there?
21  A.   Well, because Mr. Malaer sent this to Dee Anne
22  Everson and Jason Elzy that I'm sure that -- or should
23  have said assumed that I would be asked something
24  regarding Mr. Malaer's email.
25  Q.   And I'm taking you back in time to 2019.
```

Brian Sjothun

1          How did you know at that time that Mr. Malaer was
2    on the board?
3    A.    That I don't recall, other than if he was attending
4    meetings I would have known he was on the board.
5    Q.    And were you in fact asked about his email,
6    Mr. Malaer's email, at any point?
7    A.    That I don't recall.
8    Q.    Okay.  Do you remember if you asked anyone with the
9    police department to give you further information on
10   the allegations Mr. Malaer raises in his original July
11   27th email?
12   A.    I do not recall.
13   Q.    Do you remember at any point in time getting an
14   update from law enforcement about the allegations in
15   the July 27th email?
16   A.    That I don't recall.
17   Q.    And then if you could go a little bit deeper into
18   Exhibit 40.  I'm sorry there are no page numbers.  But
19   I'm looking at an email from you to Mr. Malaer, copied
20   to Mr. Mitton on here.  It's called Due Process, and
21   it's dated 12/28/2019.
22   A.    Okay.
23   Q.    And you write, "Mr. Malaer, Due to your pending
24   litigation with the City, I am unable to respond.  I
25   have included our interim city attorney as he is able

Brian Sjothun

```
 1   Q.   Okay.  All right.  So I'm thinking through how I'm
 2   going to ask the next round of questions of you.
 3        This email that you received on or about July 27th,
 4   2019, from Mr. Malaer, he advises you -- I'm just going
 5   to go down to the second line in his email -- his words
 6   to you, "I was then thrown on the ground, stepped on by
 7   four cops, handcuffed and put in the back of a patrol
 8   unit and seat belted in.  I was then assaulted in my
 9   left eye by one of the officers.  I was jailed, put on
10   suicide watch and left to urinate on the floor because
11   of no wheelchair or catheters."
12        Did any of this information that Mr. Malaer was
13   providing you in his email of concern to you?
14   A.   I guess I don't understand what you -- the line of
15   questioning of why it would concern me.
16   Q.   Well, the police, they were being accused of doing
17   something inappropriate, according to the writer's
18   words, to a citizen who was also a COC board member.
19        Was that concerning to you?
20   A.   It's concerning to me, and that's why I forwarded
21   it to Chief Clauson.
22   Q.   Okay.  Did you forward it to any other board
23   member?
24   A.   No, I do not.
25   Q.   And why not?
```

Brian Sjothun

```
1   employee, would there be a record of it in an email or
2   some document?
3   A.   If it was via email, yes.  It would be in our cryo
4   server.
5   Q.   Okay.  Is that a regular way you communicate is
6   through email?
7   A.   That's correct.
8   Q.   Okay.  You don't send memos or letters.  You
9   usually use emails?
10  A.   Well, if we do do letters or memos it's usually
11  sent electronically as well.
12  Q.   Did the continuum of care board have its own email
13  listserv or group?
14  A.   Yes.
15  Q.   And did anyone ever communicate to you about
16  Mr. Malaer's resignation?
17  A.   That I don't recall.
18  Q.   All right.  And I apologize if I've asked you this
19  question before.
20       Once you forwarded this email to the chief of
21  police, Chief Clauson, did he ever communicate back to
22  you any results of any investigation that he conducted?
23  A.   I don't recall specific information coming to me.
24  And the fact that there was no follow-up with our
25  internal affairs means that there was probably nothing
```

Brian Sjothun

1   there.
2   Q.   Okay.  So since there was no feedback from Clauson
3   you are assuming nothing happened.
4   A.   That's correct.
5   Q.   Okay.  Perfect.
6        Now, at the time of Mr. Malaer's resignation -- and
7   I know from looking at the materials that the grant
8   application for the COC grant in 2019 was due at the
9   end of September.  Does that comport with your
10  recollection?
11  A.   Well, that grant application is due at the end of
12  September annually.
13  Q.   Okay.  In 2019 that was also true.  It was due at
14  the end of September in 2019.
15  A.   Yes.
16  Q.   And in order to accurately complete that
17  application you have to meet all of the requirements
18  required by the HUD process; is that correct?
19  A.   I don't know the requirements from HUD.
20  Q.   Okay.  I know you probably don't know, but I'm just
21  going to ask you these questions and get your answer on
22  the record.
23  A.   Sure.
24  Q.   HUD requires two lived experience board members;
25  correct?

Brian Sjothun

```
 1   questions regarding.
 2   Q.   Okay.  That's fair.  Thank you for telling me that.
 3        And I hope I understood your answer earlier.  You
 4   don't believe that any Medford Police Department IA
 5   investigation was initiated as a result of the email
 6   you forwarded to City Chief Clauson.
 7             MS. WILSON:  Object to the form of the
 8        question.  Misstates prior testimony.
 9             Answer if you can.
10   A.   I do not recall if there was an investigation by
11   internal affairs or human resources department.
12   Q.   Do you recall yourself initiating contact with the
13   chief to find out if in fact there was an
14   investigation?
15   A.   I don't recall.
16   Q.   Is it a part of the COC board to review and approve
17   minutes of prior meetings?
18   A.   Yes, it is.
19   Q.   Did you miss any COC board meetings in 2019?
20   A.   That I don't recall.
21   Q.   Okay.  Do you remember seeing any minutes from a
22   COC board meeting in which Mr. Malaer's resignation was
23   on the agenda?
24   A.   I don't recall.
25   Q.   All right.  And the best evidence of that would be
```

**Brian Sjothun**

```
 1   A.    No.
 2   Q.    Okay.  And did you have a practice of reading COC
 3   emails when you were the chair of the COC?
 4   A.    Emails that I was a part of, yes.
 5         MS. BURROWS:  Okay.  Can you give me five
 6   minutes?
 7         (Recess taken.)
 8         MS. BURROWS:  I have no more questions.
 9   Thank you so much for your time.  I appreciate you
10   coming in.  And you won't be too late tonight.
11         (Deposition concluded at 3:32 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# EXHIBIT P

# LEDUC MONTGOMERY DECLARATION

**Subject:** RE: 1:20-cv-00049-CL Malaer v. Kirkpatrick et al: request for informal discovery conference with the Court

**Date:** Tuesday, November 22, 2022 at 11:52:37 AM Pacific Standard Time

**From:** Eric B. Mitton

**To:** 'Rebecca Moore', Alicia LeDuc

**CC:** Alicia M. Wilson, Johan Pietila, Brett Baumann

Ms. Moore,

Thank you.  The City will briefly respond, but primarily will just discuss these matters at the conference.

**I. Protective order regarding Plaintiff's deposition.**

> Deposition topics: Late on the last business day before Plaintiff's deposition, Plaintiff sought to prohibit any questions over 100 separate topics (see attachments to Ms. LeDuc's email).  However, the prior depositions were over a three-paragraph complaint; this deposition would be over a fundamentally-different 68-page amended complaint.  Defense counsel needs to explore these new factual and legal allegations with Plaintiff.

> Deposition length: The allegations of the 68-page amended complaint span several years instead of a single short transaction and raise new legal issues.  Limiting defense counsel to a half-day, when Plaintiff is seeking 14 depositions of various defense witnesses, would be imbalanced.

> Deposition place:  The City defendants attempted to work with Plaintiff, and in fact set up Plaintiff's deposition to occur in Brookings and noticed the deposition more than a month in advance.  Afterhours on Thursday before the Monday deposition with Friday being a federal holiday, Plaintiff unilaterally cancelled the deposition. The City and County defendants incurred costs with one of the City attorney's showing up at the duly noticed deposition in Brookings.

**II. Discovery extension.**  The City does not oppose an extension of time related to a family member's passing (i.e., two weeks).  The additional time related to discovery matters, however, are a separate matter.  The 90-day discovery window was supposed to be brief, narrow, and focused discovery.  Since then, Plaintiff has chosen to send many dozen discovery requests and seek to depose 14 individuals.  Defendants should be able to rely on the original intent that this discovery window be brief, narrow, and focused.  Finally, no discovery extension is needed for the Klamath County charging decision document; that was located and provided to Plaintiff the morning after Plaintiff's counsel conferred on the issue.

**III. Internal Affairs report.**  It is not correct that the City is relying on a "public records statute"; public records are governed by ORS Chapter 192, and the City cites ORS Chapter 181A, rules of general applicability regarding police matters.  Regardless, the records would also not lead to the discovery of admissible evidence, as the IA narrative report is about an alleged use of force that simply did not happen (as confirmed by video) and is no longer even within the scope of the pleadings.  Especially because this IA does not even relate to Plaintiff's current claims for relief, the City should be able to rely on the statute's intended confidentiality for these internal self-critical processes.

Thank you,

Eric B. Mitton I *City Attorney*
City of Medford, Oregon I City Attorney's Office
411 W 8th Street, Medford, OR 97501
Ph: 541-774-2020 I Fax: 541-774-2567

---

**From:** Rebecca Moore <Rebecca_Moore@ord.uscourts.gov>
**Sent:** Tuesday, November 22, 2022 9:49 AM
**To:** Alicia LeDuc <alicia@leducmontgomery.com>; Eric B. Mitton <Eric.Mitton@cityofmedford.org>
**Cc:** Alicia M. Wilson <Alicia.Wilson@cityofmedford.org>; Johan Pietila <PietilJR@jacksoncounty.org>; Brett Baumann <BaumanBA@jacksoncounty.org>

**Subject:** RE: 1:20-cv-00049-CL Malaer v. Kirkpatrick et al: request for informal discovery conference with the Court

Judge Clarke will resolve all three issues this afternoon, after hearing a response from the defendants. They may each submit a brief email in response, or they may present their concise response at the phone conference. The Court notes that 30 minutes has been set aside for the call this afternoon and expects that to be plenty of time for the parties to address and work through these issues.

---

**From:** Alicia LeDuc <alicia@leducmontgomery.com>
**Sent:** Tuesday, November 22, 2022 8:29 AM
**To:** Rebecca Moore <Rebecca_Moore@ord.uscourts.gov>; Eric B. Mitton <Eric.Mitton@cityofmedford.org>
**Cc:** Alicia M. Wilson <Alicia.Wilson@cityofmedford.org>; Johan Pietila <PietilJR@jacksoncounty.org>; Brett Baumann <BaumannBA@jacksoncounty.org>
**Subject:** Re: 1:20-cv-00049-CL Malaer v. Kirkpatrick et al: request for informal discovery conference with the Court

<mark>CAUTION - EXTERNAL:</mark>

Good Morning Ms. Moore,

Two additional discovery issues arose and the parties agreed yesterday to inquire whether Judge Clarke would be willing to hear these two additional issues during today's scheduled discovery conference at 2 PM. The issues regard a protective order for Plaintiff's third/fourth deposition in this case, and a request for extension of the discovery period until February 15, 2022. If Judge Clarke does not have time or prefers not to hear these two issues this afternoon, the parties are available to confer on additional dates/time for a discovery conference next week. Plaintiff also includes below an outline of its arguments on the Internal Affairs document production issue scheduled to be heard this afternoon.

### Issue 1:  A Protective Order Is Needed Regarding The Location, Length, Number, and Scope of Plaintiff's 3rd/4th Depositions In This Case

<u>Issue:</u> A protective order is needed for Judge Clarke to clearly define the scope, length, location, and number of depositions of Plaintiff going forward in this case. Plaintiff has already been deposed twice by Defendants without a lawyer present. Defendants now demand to take two additional depositions of Plaintiff for a full seven hours, and both the City and County noticed depositions requiring Plaintiff to attend in person in Medford. A protective order is needed because Defendants intend to re-tread topics and issues already covered in Plaintiff's prior 2 depositions, do not acknowledge that any prior deposition time (3 hours taken already) would count against the general 7 hour limit on federal court depositions, and seek to place an incredibly disproportionate burden on Plaintiff to expend 10 hours on a public bus trip and back from Brookings, two nights in a hotel, transport of his refrigerated medication, and the cost of food, transport, lodging, and discomfort on Plaintiff who is confined to a wheelchair and lives on ~$1,200 per month in disability income, merely to attend his third/fourth deposition in person, when Zoom was used for both of Plaintiff's prior depositions and the defendants' depositions, and an alternative in-person venue is available in Brookings where Plaintiff resides.  The attached two emails titled "Re-Malaer 11.14 Deposition" reflect the parties' dispute regarding the scope and number of depositions, and provides a list of the topics already covered in Mr. Malaer's prior 2 depositions. The attached email titled "Re-Malaer v. City of Medford" provides an itemized list of the burden issues involved in noticing Plaintiff's deposition for Medford rather than Zoom or Brookings. Resolving this issue now is important because Defendants insist on taking Mr. Malaer's deposition prior to the other defense depositions.

Current Status of Mr. Malaer's Deposition: The parties agreed to hold his deposition on Monday, December 19. Plaintiff's deposition was previously scheduled for Nov. 14th, but Plaintiff counsel advised he would not attend until the above issues were resolved and cancelled 4 days in advance. The parties rescheduled the deposition for Nov. 28th but then agreed to re-schedule as the above issue still were not resolved and Plaintiff's counsel experienced a death in the family two days ago. All other issues have not been resolved.

Trauma-Informed Deposition Practices: A further issue has arisen regarding extreme trauma reactions experienced by Mr. Malaer in response to having to re-watch the videos and audio files from the incidents, which Plaintiff's counsel has personally observed, heard, or learned of through interactions with Mr. Malaer in preparing for depositions and sitting through one defense deposition with Mr. Malaer in attendance. The parties are actively conferring in good faith on ways to reduce the re-traumatization and damage to Mr. Malaer while balancing the Defendants' entitlement to obtaining relevant information in discovery. The parties welcome the Court's thoughts or experience on this issue but do not yet have a particular proposal developed for the Court to specifically decide. The issue is extremely concerning to the point that Plaintiff's counsel has contacted the Bar ethics counsel and is attempting to find a licensed therapist or mental health professional who could attend Mr. Malaer's deposition and court proceedings with him to help him manage his trauma responses and still meaningfully and fully participate for extended lengths of time.

**Issue 2: Request for Extension of Discovery from December 31 to February 15 to Complete Necessary Discovery**
Plaintiff requests an extension of the discovery period to February 15, 2023 for the following reasons:
- Plaintiff had co-counsel ready to join the case and conduct the majority of discovery and depositions if the Court granted Plaintiff's motion to re-open discovery
- Plaintiff's co-counsel filed an NOA and began conducting document discovery and preparing for depositions, but then had to unexpectedly withdraw from the case for medical reasons
- Replacement co-counsel was found to help take depositions, but then he and his family all contracted COVID which prevented him from on-boarding the case last week
- Document production is still in process, with all parties expected to make additional productions and in turn need to review additional documents prior to depositions, and Plaintiff's counsel still reviewing approximately 4,000 emails for potential production
- Written discovery is ongoing, with RFA responses outstanding and additional RFPs made during deposition
- Based on documents reviewed to date, at least 14 depositions are needed once document production is complete
- Defendants have insisted on taking Plaintiff's deposition first before the majority of defense depositions
- There was a death in Plaintiff's family on Sunday which caused three of the depositions next week to be rescheduled or cancelled pending reschedule
- The holidays are likely to impact scheduling and availability of witnesses
- There are issues regarding specific documents that may require a motion to compel RFP or subpoena compliance regarding documents around the prosecution of Defendant Deputy Brian Kolkemo for his mistreatment of Plaintiff inside the jail, wherein Jackson County and Klamath County DA's office have stated they do not have the charging decision documents, yet Jackson County's own files and DOJ counsel confirmed the charging file exists and was in Jackson County and Klamath County's possession, and time is needed to resolve this issue if a motion to compel is necessary
- The City agrees to a 2 week extension of discovery, but not six weeks
- Plaintiff requests 6 weeks in order to set a realistic time frame to complete all document discovery, depositions, and any motions practice and third party discovery to avoid having to ask for a second extension
- Plaintiff continues actively seeking co-counsel to help speed up the discovery process and get this

case back into summary judgment on a complete and adequately developed record and evidence
- If co-counsel is not found, Plaintiff counsel is a solo practitioner with no support staff performing all document review, depositions, and briefing while managing other cases

**Issue 3: City's Production of the Malaer Internal Affairs Investigation File**
Plaintiff requests the Court compel the City to produce its internal affairs file regarding its investigation into Plaintiff's complaint regarding police conduct during his arrest for the following reasons:
- The statute cited by the City as allegedly preventing disclosure of the IA file is a state public records law, it has no bearing on a defendant's federal court discovery obligations
    - ○ This is not a public records request and the documents specifically concern Plaintiff's complaint and Defendants' response regarding the conduct at issue in the case
    - ○ Moreover, the statute contains an exception for disclosure in instances of public interest, which has been shown here by the wide media coverage and comment over Plaintiff's treatment in the jail as a disabled housing advocate serving on multiple government boards and councils in Jackson County, including the Jackson County Continuum of Care Board, City of Medford ADA Task Force, Homelessness Task Force, and Rogue Valley Council of Governments Disability Services Advisory Council
- The City has already waived any statutory privilege by producing portions of the IA file to Plaintiff, including the complaint, interview recordings taken by Sgt. Budreau as part of the investigation, photos taken by Sgt. Budreau as part of the investigation, and Sgt. Kirkpatrick's disposition letter concluding the IA investigation; the City has no grounds to produce part of the file but withhold the remaining part, and Sgt. Budreau is not available as a witness
- This is particularly true where a two-tiered protective order has been entered and abided by
- The documents to be produced raise significant concerns relating to the way the investigation was handled and the retaliation and misconduct claims asserted in the Amended Complaint, because the MPD Sgt. who conducted the investigation and exonerated the officers involved in Plaintiff's arrest was Sgt. Kirkpatrick, the Sgt. overseeing Plaintiff's arrest and who personally transported Plaintiff's wheelchair to the jail, thus it was not a neutral or impartial investigation of Plaintiff's misconduct complaints
- The requested documents are highly material as they appear to be the only investigation Medford conducted into Plaintiff's claims of mistreatment and police misconduct during the arrest in question in this case
- The City's representations about the contents of the files cannot be evaluated unless the documents are produced, which can be done under the protective order
- The County rightly produced its Internal Affairs file regarding Plaintiff's mistreatment, the City must do the same
- The City has advised that complete refusal to produce Internal Affairs files is the default position its takes pursuant to union pressure and it will not produce the file until compelled
- There is a protective order in place and no compelling reason to withhold the material information altogether

Thank you,

Alicia

**Alicia LeDuc Montgomery**
Attorney | LeDuc Montgomery LLC
www.leducmontgomery.com
LinkedIn: Alicia LeDuc Montgomery
+1.503.500.5695

CONFIDENTIALITY NOTICE: This e-mail message may contain confidential or privileged information. If you have received this message by mistake, please do not review, disclose, copy, or distribute the e-mail. Instead, please notify LeDuc Montgomery LLC immediately by replying to this message or calling 503-500-5695.

**From:** Rebecca Moore <Rebecca_Moore@ord.uscourts.gov>
**Date:** Thursday, November 10, 2022 at 2:22 PM
**To:** Eric B. Mitton <Eric.Mitton@cityofmedford.org>
**Cc:** Alicia LeDuc <alicia@leducmontgomery.com>, Alicia M. Wilson
<Alicia.Wilson@cityofmedford.org>, Johan Pietila <PietilJR@jacksoncounty.org>, Brett Baumann
<BaumanBA@jacksoncounty.org>
**Subject:** RE: 1:20-cv-00049-CL Malaer v. Kirkpatrick et al: request for informal discovery conference
with the Court

Yes, thank you.   I will set this for Tuesday at 2:00 PM.

---

**From:** Eric B. Mitton <Eric.Mitton@cityofmedford.org>
**Sent:** Thursday, November 10, 2022 1:25 PM
**To:** Rebecca Moore <Rebecca_Moore@ord.uscourts.gov>
**Cc:** Alicia LeDuc <alicia@leducmontgomery.com>; Alicia M. Wilson <Alicia.Wilson@cityofmedford.org>; Johan
Pietila <PietilJR@jacksoncounty.org>; Brett Baumann <BaumanBA@jacksoncounty.org>
**Subject:** 1:20-cv-00049-CL Malaer v. Kirkpatrick et al: request for informal discovery conference with the
Court

CAUTION - EXTERNAL:

Ms. Moore,

During our last conference with the Court, Judge Clarke encouraged the parties to reach out for an
informal discovery conference with the Court instead of formal discovery motions.

There is a particular issue that the parties have discussed at length and need the Court's guidance on
resolving.  Plaintiff is seeking the Medford Police Department Internal Affairs narrative report that was
generated as a result of Plaintiff's internal affairs complaint alleging that MPD officers threw Plaintiff
on the ground, stepped on him, and punched him during the course of his arrest in front of Lumpy's.
The City has already produced a copy of Plaintiff's IA complaint, the City's disposition letter to Plaintiff
exonerating the officers of those allegations, and photos and videos taken of Plaintiff during the course
of that investigation, so the informal hearing would just be about the Medford IA narrative report
itself.  The City asserts that the narrative report itself is statutorily protected by ORS 181A.674 and
regardless would not lead to the discovery of admissible evidence.  Plaintiff disagrees and is seeking
the narrative report from the City, as well as requesting that Jackson County and the State Police
produce copies of the Medford IA report that they may have in their possession.

Does the Court have any availability for a conference call to discuss this Monday November 21 (from
9am to 5pm) or Tuesday November 22 (from 1pm to 5pm)?

Thank you,

Eric B. Mitton | *City Attorney*
City of Medford, Oregon | City Attorney's Office
411 W 8th Street, Medford, OR 97501
Ph: 541-774-2020 | Fax: 541-774-2567

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# EXHIBIT Q

# LEDUC MONTGOMERY DECLARATION

**Subject:** Beth Heckert Response to DA Subpoena

**Date:** Tuesday, January 24, 2023 at 11:58:52 AM Pacific Standard Time

**From:** Johan R. Pietila

**To:** michelle.r.burrows@gmail.com, Alicia LeDuc, Alicia.Wilson@cityofmedford.org, Eric.Mitton@cityofmedford.org, BaumanBA@jacksoncounty.org

You have received access to a JacksonCounty File Share from Johan R. Pietila. The link to transfer your file(s) will expire on Tuesday, February 7, 2023 9:18 AM.

<span style="color:red">Redacted</span>

All,

I've enclosed documents responsive to your subpoena to District Attorney Beth Heckert. Please be advised that the enclosed documents do not include the following: (1) emails and attachments previously produced by the County (JC3906-JC4173); and (2) an MPD IA that was attached to an email that Tifini Bottoms sent to Eve Costello on 9/18/2019, titled "MFP Complaint – Sgt Kirkpatric.pdf." The latter document has been withheld pursuant to federal court order in 20CV00049CL, ECF 159.

Thank you,