**ALICIA LEDUC MONTGOMERY, OSB 173963**
Email: alicia@leducmontgomery.com
**LEDUC MONTGOMERY LLC**
2210 W Main Street, Suite 107 #328
Battle Ground, Washington 98604
Telephone: (503) 500-5695
www.leducmontgomery.com

**MICHELLE R. BURROWS, OSB 861606**
Email: michelle.r.burrows@gmail.com
**LAW OFFICE OF MICHELLE R. BURROWS P.C.**
16869 SW 65th Ave. #367
Lake Oswego, Oregon 97035
Telephone: (503) 241-1955
www.oregoncivilrights.com

Attorneys for Plaintiff John Malaer

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| JOHN LEE MALAER,<br><br>    Plaintiff,<br><br>v.<br><br>GEOFFREY KIRKPATRICK, an individual;<br>MICHAEL WULFF, an individual; OMAR<br>ESQUEDA, an individual; ASHLEY MCFALL,<br>an individual; CITY OF MEDFORD, a<br>government agency; JACKSON COUNTY, a<br>government agency; NATHAN SICKLER, in<br>his individual and official capacity; and BRIAN<br>KOLKEMO, an individual,<br><br>    Defendants. | Case No. 1:20-cv-00049-CL<br><br>**SECOND AMENDED COMPLAINT**<br><br>4th Amendment Violations: No Probable<br>Cause Arrest, Excessive Force; 14th<br>Amendment Violations: Failure to Protect,<br>Excessive Force; Americans with Disabilities<br>Act and Rehabilitation Act Violations;<br>Battery; Negligence<br><br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

I.      INTRODUCTION …………………………………………………………..1

II.     JURISDICTION …………………………………………………….……2

III.    VENUE ……………………………………………………………….....2

IV.     PARTIES ……………………………………………………………2

        A.  City of Medford Defendants …………………………………………………2

        B.  Jackson County Defendants ………………………………………………3

V.      FACT BACKGROUND ………………………………………………….....4

        A.  Background of the Parties …………………………………………………4

        B.  Plaintiff's Life Experience and Advocacy …………………………………...7

        C.  Medford Police Arrest and Exclude Plaintiff After His Public Advocacy…….10

        D.  The Medford Police "Livability Team" to Provide Alternatives to Arrest ……12

        E.  City Defendants' July 11, 2019 Detention, Arrest, and Transport of Plaintiff ..15

        F.  County Defendants' July 11-12, 2019 Jailing and Abuse of Plaintiff…………27

VI.     CLAIMS FOR RELIEF AGAINST CITY OF MEDFORD DEFENDANTS ……39

VII.    CLAIMS FOR RELIEF AGAINST JACKSON COUNTY DEFENDANTS ……47

VIII.   PRAYER FOR RELIEF …………………………………………………..59

## I.    INTRODUCTION

1.      This case involves claims against the City of Medford Defendants, and separate claims against the Jackson County Defendants, for the detention, arrest, transport, and jailing of Plaintiff John Malaer on July 11, 2019.  Mr. Malaer is an elderly, permanently disabled, wheelchair-bound civilian known for advocating for disabled and at-risk individuals.

2.      On July 11, 2019, Mr. Malaer was detained and arrested by City Defendants without probable cause.  During their detention and transport to the Jackson County jail, City Defendants failed to use safe methods of transportation for an arrestee.  City Defendants failed to provide community caretaking services contrary to existing custom, policy, and practice, and in violation of the Americans with Disabilities Act, Rehabilitation Act, and City policy.

3.      In the jail, Jackson County Defendants used excessive force against Malaer by slapping him, dragging his feet under the wheelchair, repeatedly using painful "compliance holds" and inflicting physical abuse which threatened Plaintiff's life.  Defendant Jackson County left Plaintiff naked on a concrete floor with no accommodations, including no wheelchair, medical catheters, bladder and pain medications, or access to water for hours.

4.      Mr. Malaer was subsequently hospitalized after release from the jail with a life-threatening urinary tract infection, had documented bruising on his face and body, damage to his toe and arm, and severe pain and suffering.  He faced prosecution under the unlawful arrest, although the charges against him were later dropped by the prosecution.  He resigned from his public service out of fear of further abuse by law enforcement, and ultimately moved to another county to escape retaliation.

//

//

1 – **SECOND AMENDED COMPLAINT**

## II.    JURISDICTION

5.      This Court has jurisdiction over the subject matter of this Complaint under 42

U.S.C. §§ 1983 and 12101 *et seq*., 29 U.S.C. § 794, and 28 U.S.C. §§ 1331, 1343(a)(3), and

1343(a)(4). This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect

to all causes of action based on Oregon law because the state claims arise from the same

nucleus of operative facts and incident as the federal claims.

## III.    VENUE

6.      Venue is proper in the District of Oregon because all of the events giving rise to

this claim occurred in this judicial district, and all Defendants reside in this district.  28 U.S.C.

§1391(b).  All of the acts and practices alleged herein occurred in Jackson County, Oregon.

## IV.    PARTIES

7.      Plaintiff John Malaer is an adult who, at all times relevant, was a resident of

City of Medford, Jackson County, in the District of Oregon.  At all times relevant, Plaintiff was

and remains a permanently disabled paraplegic confined to a wheelchair as result of a spinal

injury. All of the events giving rise to the claims in this case occurred while Plaintiff was living

in Jackson County.

### A. City of Medford Defendants

8.      Defendant Geoffrey Kirkpatrick is a Medford police officer and employee of the

City of Medford in the District of Oregon. At all times relevant Defendant Kirkpatrick was

acting under color of law.

9.      Defendant Michael Wulff is a Medford police officer and employee of the City

of Medford in the District of Oregon. At all times relevant Defendant Wulff was acting under

color of law.

10.     Defendant Omar Esqueda is a Medford police officer and employee of the City of Medford in the District of Oregon and is sued.  At all times relevant, Defendant Esqueda was acting under color of law.

11.     Defendant Ashlee McFall ("Scottow") is a Medford police officer and employee of the City of Medford in the District of Oregon. McFall was previously a Jackson County Sheriff's Department corrections officer. At all times relevant, Defendant Scottow was acting under color of law.

12.     Defendant City of Medford is a municipality in the State of Oregon. At all times relevant, Defendant City of Medford was a public entity within the meaning of Title II of the Americans with Disabilities Act and, upon information and belief, received federal financial assistance within the meaning of the Rehabilitation Act. The City of Medford is a "person" for purposes of 42 U.S.C. 1983.

## B. Jackson County Defendants

13.     Defendant Brian Kolkemo is a Jackson County Sheriff's Deputy and employee of Jackson County in the District of Oregon. At all times relevant, Defendant Kolkemo was acting under color of state law.

14.     Defendant Nathan Sickler is the Jackson County Sheriff and a policymaker for purposes of 42 U.S.C. 1983. At all times relevant, Defendant Sickler was acting under color of law.

15.     Defendant Jackson County is a county in the State of Oregon. At all times relevant, Defendant Jackson County was a public entity within the meaning of Title II of the Americans with Disabilities Act and, upon information and belief, received federal financial

assistance within the meaning of the Rehabilitation Act.  Jackson County is a "person" for

purposes of 42 U.S.C. 1983.

## V.    FACT BACKGROUND

### A. Background of the Parties

16.      Mr. Malaer is paraplegic with permanent loss of use of his lower extremities due

to a prior spinal injury.  Mr. Malaer must use prescribed medical devices and procedures to

preform basic body functions.  Mr. Malaer uses a wheelchair for mobility and to perform daily

functions including using the toilet, sink, bed, and getting off the floor.  Mr. Malaer uses a

doctor-prescribed electric motorized wheelchair run via a rechargeable battery.

17.      As a result of his spinal injury Mr. Malaer suffers from a condition known as

neurogenic bladder. He must use medical catheters to facilitate urination emptying his bladder

completely every 4 to 6 hours. This ICP method reduces the risk of infections by reducing the

amount of time bacteria remains in the bladder. Without catheterization, Mr. Malaer

experiences incontinence resulting in uncontrollable bladder functions. Prolonged incontinence

without catheterization places Mr. Malaer at increased risk of bacterial infections which can

become life-threatening if left untreated.

18.      In July 2019, Mr. Malaer carried a medical catheter with him in a backpack

attached to his wheelchair.  He took daily prescribed medications to control painful leg and

bladder spasms, and carried those in his backpack. He takes prophylactic antibiotics.

19.      Between approximately 2017 to 2019, Mr. Malaer was active in the Medford

community and known for advocating on behalf of disabled, homeless, and at-risk individuals

in Jackson County. He served, by invitation from other community members, on the Jackson

County Continuum of Care Board, City of Medford ADA Task Force, Disability Services

Advisory Council, and participated in the Rogue Valley Council of Governments

Homelessness Task Force.

20.     In July 2019, Defendant Geoffrey Kirkpatrick was a Sergeant employed by the

City of Medford.  Defendant Kirkpatrick oversaw the transport of Mr. Malaer to the jail on July

11, 2019. Defendant Kirkpatrick had previously been to Mr. Malaer's home, was known to him

personally, and was aware Mr. Malaer used a motorized wheelchair.  Defendant Kirkpatrick

was the supervising sergeant of the Medford police department Team 7 and the Livability

Team.

21.     In July 2019, Defendant Michael Wulff was a police officer employed by the

City of Medford.  Defendant Wulff was the Field Training Officer for Defendant Scottow, who

was a new recruit. Defendant Wulff was directly involved in Mr. Malaer's detention, arrest, and

transport to the Jackson County jail, and supervised Defendant Scottow's conduct during the

arrest. Defendant Wulff was present when Jackson County Sheriff's Deputies exerted use of

force against Mr. Malaer by forcing his head between his legs and yanking on his arms, while

Mr. Malaer was already handcuffed and restrained and in a wheelchair. Defendant Wulff heard

Plaintiff screaming "Take me to a hospital! Take me to a hospital!" while Jackson County

Sheriff's Deputies exerted force against Malaer inside the jail.  Defendant Wulff did not

intervene or report the use of force conduct.  Defendant Wulff was a member of the Medford

police department Livability Team.

22.     In July 2019, Defendant Omar Esqueda was a police officer employed by the

City of Medford.  Defendant Esqueda was directly involved in Plaintiff's detention and arrest

on July 11, 2019. In December 2018, Defendant Esqueda arrested Mr. Malaer while Mr.

Malaer was in the hospital for emergency care.

23.    In July 2019, Defendant Ashlee McFall (at the time known as Ashlee "Scottow") was a police officer employed by the City of Medford. Defendant Scottow was directly involved in Plaintiff's detention, arrest, and transport to the Jackson County jail on July 11, 2019. Defendant Scottow was present when Jackson County Sheriff's Deputies exerted use of force against Mr. Malaer by forcing his head between his legs and yanking on his arms, while Mr. Malaer was already handcuffed and restrained and in a wheelchair. Defendant Scottow was present when Mr. Malaer screamed "Take me to a hospital! Take me to a hospital!" while Jackson County Sheriff's Deputies exerted force against Malaer inside the jail. Defendant Scottow did not intervene or report the use of force conduct.

24.    In July 2019, Defendant City of Medford was responsible for running the Medford police department including Team 7 and the Livability Team program. Defendant City of Medford representatives and employees participated in the Jackson County Continuum of Care (COC) Board. In July 2019, Medford City Manager Brian Sjothun was the Chair of the Jackson County COC Board, serving on the Board with Mr. Malaer.

25.    In July 2019, Defendant Brian Kolkemo was a Sheriff's Deputy employed by Jackson County. Defendant Kolkemo was directly involved in Plaintiff's intake and detention in the Jackson County Jail on July 11, 2019. Most of Defendant Kolkemo's treatment of Mr. Malaer was recorded on jail video cameras. Defendant Kolkemo was directly involved in multiple uses of force against Mr. Malaer inside the jail.

26.    In July 2019, Defendant Nathan Sickler was the Jackson County Sheriff responsible for overseeing the conduct of the Jackson County Sheriff's Office employees, including Defendant Kolkemo. Defendant Sickler is a policymaker and endorsed or ratified

many of the actions by his deputies against Mr. Malaer.  Defendant Sickler served on the COC

Board with Mr. Malaer and Mr. Sjothun, and knew Mr. Malaer from his Board service.

27.     In July 2019, Defendant Jackson County was responsible for running the

Jackson County jail where Plaintiff was held as a pre-trial detainee following his arrest on July

11, 2019.

### B. Plaintiff's Life Experience and Advocacy

28.     Mr. Malaer has lived in Southern Oregon for much of his adult life. He has

experienced intermittent homelessness and battled alcoholism in the past.

29.     Mr. Malaer suffered a significant amount of abuse and trauma in his lifetime,

beginning when he was a small child. Living on the street after becoming paralyzed, he has

developed skills to survive incidents of violence against him, find ways to keep himself safe,

cope with daily difficulties, and obtain the resources he needs to live. As a vulnerable, handicap

adult in a wheelchair, Mr. Malaer has experienced prejudice and predation from people

attempting to take advantage of him because he is perceived as weak or defenseless. He feels

extremely threatened when people try to take physical control or power over him.

30.     Mr. Malaer's primary defense mechanism he has developed to prevent harm to

himself or others is his words. He often yells, swears vividly, and says "the most harmful words

he can think of" in order to create distance from those who appear threatening or harmful. He

resorts to verbal displays of anger or engaging in defensive verbal exchanges when he feels

powerless in a situation.

31.     In July 2019, Mr. Malaer was not homeless. He had achieved stability in his life

and was actively working as an advocate and spokesman for homeless individuals in Jackson

County and doing direct outreach to connect people on the street with resources and support.

7 – **SECOND AMENDED COMPLAINT**

He worked actively in the community with homeless and addicted individuals in Medford, and also served on several political boards and with many community outreach programs. He was making a difference with his life, and in the lives of others.

32.    In July 2019, Mr. Malaer was serving on the Jackson County COC Board. The Jackson County COC Board is a HUD-mandated, community-wide effort to end homelessness in Jackson County, Oregon by providing stable housing to those experiencing homelessness and offering preventative services to those at risk of becoming homeless. The Jackson County COC Board seeks to end homelessness in Jackson County through collaborative efforts and resources across all sectors of the community.  In 2019, the Jackson County COC Board was comprised of representatives from leadership positions from major jurisdictions and organizations in Jackson County.  These board members report back to their jurisdictions, agencies, and departments regarding information, news, or action items occurring or to be taken as a result of the meetings of the COC Board.

33.    In 2017, Mr. Malaer was asked by Connie Saldana, a member of the Jackson County COC Board and the Rogue Valley Council of Governments, to join the Jackson County COC Board as someone with "lived experience" being homeless. Ms. Saldana knew Mr. Malaer from his advocacy on other community boards. He participated in this COC Board role until the July 2019  incidents described in this complaint. In his role, Mr. Malaer made statements at public meetings critical of the way the City of Medford and Jackson County were handling the issue of housing insecurity and the policing of homeless persons in Jackson County. Plaintiff is passionate about these issues. His perspectives are informed by real-life experience and working directly with homeless people and victims of abuse.

8 – **SECOND AMENDED COMPLAINT**

34.     Defendant Jackson County Sheriff Nathan Sickler and Medford City Manager Brian Sjothun were also Board Members on the Jackson County COC with Plaintiff.  They were aware of Mr. Malaer's participation on the Board and heard his statements critical of the City of Medford and Jackson County's policing of homeless individuals, including himself, in Jackson County.

35.     The Jackson County COC Board is a committee of the Jackson County Community Services Consortium.  The City of Medford Police Department is a Member of the Jackson County Community Services Consortium.  A representative of the City of Medford Police Department, Lilia Caballero, served on the Board of Directors of the Jackson County Community Services Consortium overseeing the Jackson County COC in 2017-2018, during Mr. Malaer's participation on the Jackson County COC Board, and he made statements critical of the Medford Police Department and Jackson County Sheriff's Office.  The City of Medford Police Department had representatives participating in the Jackson County COC's 11 sub-workgroups.  The City of Medford Chief of Police attended COC meetings and gave presentations to the COC while Plaintiff served on the Board.  Defendant Kirkpatrick attended COC Board meetings, giving at least one presentation to the COC Board.  These City of Medford Police Department representatives participating in these boards, workgroups, and meetings were aware of Plaintiff's participation in the COC Board and aware of Plaintiff's critical statements about City and County law enforcement.

36.     Annually, the Jackson County COC Board assesses the state of homeless in Jackson County through a point in time ("PIT") Count to document the number of homeless individuals in Jackson County as of January 31st each year.  Both the City of Medford Police Department and Jackson County Sheriff's Office participate in the COC Board's PIT Count.

9 – **SECOND AMENDED COMPLAINT**

Both the City of Medford Police Department and its Livability Team, and the Jackson County Sheriff's Office, also participate in policing homeless residents in Jackson County, including engaging in greenway sweeps, clearing encampments, and forcing homeless residents to relocate. The Jackson County Sheriff's Office also coordinates with other agencies, including the City of Medford, to support homeless sweeps and process and receive residents who are arrested and transported to the Jackson County Jail for pre-trial detention.

37.    Through Mr. Malaer's personal experience and direct outreach and listening sessions with homeless people, Plaintiff learned that members of the Medford Police Department and Sheriff's Office, including Defendants Kirkpatrick and Wulff, had reputations for using unwarranted violence and aggression in policing unhoused citizens.  One person told Mr. Malaer that Defendant Wulff punched them in the face, smashing in their nose, and they were denied any medical care when taken to the Jackson County jail. Another person told Mr. Malaer that Defendant Wulff woke them up by kicking them in the head. Mr. Malaer also witnessed Defendant Wulff threatening to arrest a disabled man who was missing his prosthetic leg unless that man would stand up. Mr. Malaer intervened, and used his wheelchair to help the man stand up and told Defendant Wulff to leave the man alone.

38.    Mr. Malaer raised concerns and gave critical feedback about these types of experiences and issues, among others, at the Jackson County COC Board meetings and other community meetings. He criticized the Medford and Jackson County law enforcement for how they were treating unhoused residents.

C. *Medford Police Arrest and Exclude Plaintiff After His Public Advocacy*

39.    After Mr. Malaer joined the COC Board and community groups around 2017, he began making public comments critical of law enforcement, including allegations law

10 – **SECOND AMENDED COMPLAINT**

enforcement was being unjustifiably violent against homeless people, he was repeatedly subject to enforcement action by the City of Medford Police and Jackson County Sheriff's Office.

40.    In February 2018, City of Medford police officers arrested Plaintiff for Disorderly Conduct when a pedestrian engaged in a verbal altercation with Plaintiff while Plaintiff was attempting to enter a restaurant with his wheelchair. At first the officers drove Mr. Malaer home, but then they decided to transport Mr. Malaer to the Jackson County jail, where he was held by the Jackson County Sheriff's Office for several hours. Upon release, and without having a lawyer, Mr. Malaer accepted a plea offer on the Disorderly Conduct charge in exchange for paying the City of Medford a $100 fine.

41.    In December 2018, City of Medford police officers, including Defendant Esqueda, again arrested Plaintiff for Disorderly Conduct *while Plaintiff was in the hospital*. Plaintiff had broken his leg and new medications caused him to pass out in his apartment building's elevator. Plaintiff was unconscious and taken to the hospital in an ambulance without his wheelchair. Plaintiff was placed in a hospital bed and injected with IVs without his consent. Upon awaking in the hospital, Plaintiff was confused, scared, panicked, and while still under the influence of his prescribed medications, began yelling, and ripped the IVs out of his arms.  Plaintiff did not have a wheelchair or a way to move about. Plaintiff did not want to leave the hospital, but Medford police arrested Plaintiff inside the hospital for Disorderly and forcibly took Plaintiff from the hospital to the Jackson County jail while Plaintiff was still covered in blood and without his wheelchair.

42.    While in the Jackson County jail in December 2018, Plaintiff lacked access to his catheters and experienced problems not being able to safely pass bodily fluids, exacerbating his medical condition, of which he made the Sheriff's Office jail staff aware.  When it came

11 – **SECOND AMENDED COMPLAINT**

time for Plaintiff's release, he had no wheelchair and law enforcement could not release him without a wheelchair. Defendant Kirkpatrick transported Plaintiff back to Plaintiff's Grape Street apartment in Medford. Plaintiff explained that he had a wheelchair inside his apartment and allowed Kirkpatrick to access Plaintiff's apartment and retrieve his wheelchair for Plaintiff to exit the patrol vehicle. Again, without an attorney, Plaintiff agreed to a plea bargain on the Disorderly Conduct charge in exchange for paying the City a monetary fine.

43.     On July 11, 2019, Mr. Malaer was again arrested and taken the Jackson County jail by Medford Police, including the City Defendants. The police again cited him for Disorderly Conduct. The City could have used community care resources to help Malaer charge his wheelchair, obtain a ride home, or catch the next bus, or even simply left Mr. Malaer alone, but they chose to arrest him and take him to jail instead. This July 2019 arrest and jailing was so severe it prompted Mr. Malaer to resign from the Jackson County COC. Board.

44.     In January 2020, Mr. Malaer filed this lawsuit regarding his July 2019 arrest and treatment by law enforcement in Jackson County, which is the focus of this case.

45.     Later in 2020, after Mr. Malaer had filed his lawsuit, the Medford Police cited Mr. Malaer for "theft of services" because he was charging his cell phone in an outdoor outlet attached to a building. Medford police could have used community care resources to help Malaer charge his phone or gain services, but they chose to issue a formal citation instead. The police trespassed Mr. Malaer from downtown Medford for three months and placed Mr. Malaer on an "exclusion list."

### D.  The Medford Police "Livability Team" to Provide Alternatives to Arrest

46.     Prior to Mr. Malaer's arrest in July 2019, the Medford Police Department had a Neighborhood Livability Team to address homelessness and nuisance property issues. Part of

the Neighborhood Livability Team's role included working with property owners to clean up nuisance properties, and pressured property owners to report suspicious people or activities to the police and to not provide short-term rentals to local residents. The City of Medford received a COP Grant expanding the program to address further homelessness issues. The COP Grant expansion created the present Livability Team and expanded its mission. In June 2019, the City of Medford obtained additional funding and created the Community Engagement Division to improve livability issues in the City of Medford.  This Division is comprised of one police Lieutenant, one Sergeant and one Corporal who oversee the "Livability Team," among others. The Medford Chief of Police stated the City of Medford "handpicked each of our livability team members to have that personality and to be able to have compassion and to get to know these folks.

47.    At a time, the City of Medford sought to develop Medford into a recreation destination. The City viewed homelessness issues as an impediment to downtown and greenway development.

48.    Defendant Kirkpatrick was chosen as the Sergeant overseeing the Livability Team, and Defendant Wulff was chosen as a member of the Livability Team. Defendant Wulff had been involved with the Neighborhood Livability Team prior to June 2019.  According to Defendants Kirkpatrick and Wulff, the purpose of the Livability Team was for the City to address homelessness as part of the Homeless Action Plan, a specific team of police officers to deal with "drinking in public" and "disorderly things" in the downtown areas in a new way, which included an "outreach piece," as it "was not always enforcement." According to Wulff, "Kirkpatrick's directive" was "go forth and conquer….let's find solutions that are creative" because "we realized really quickly 'enforcement always' is never going to solve this issue,

13 – **SECOND AMENDED COMPLAINT**

there is a human element to it, there is to this illness … we need to address these in a different fashion …we know due to the logistical problems at our jail, if enforcement is the only avenue we are taking, we are solving a problem for maybe a few hours, but if have somebody we can help them …get them in shelter, give them a chance, you can not only solve a livability issue for the City for a lifetime, you can also change a life in the process and impact people." According to Defendant Kirkpatrick, "we work with a lot of community organizations, and one in particular, the majority of their staff are all folks Mike [Wulff] and I have chased around for years … folks we thought were career lifetime criminals … and now they are part of the solution."

49.    The Livability Team is "a group of officers that are selected based on certain characteristics of compassion, hard work, outside the box thinking, and really with aim to address some of the issues, both behaviorally and societally, that we see with a burgeoning homeless population here in Medford. When the team was formed, we looked at "what are we trying affect" … "how are we trying to work with the homeless" … and what we found was that the most effective way for us to interact int that community is to be that broker of resources, to be the boots on the ground … creating relationships [with homeless citizens and service providers] and trying to marry the two."

50.    The Livability Team directly "Work[s] with [the Jackson County] Continuum of Care Coordinator to refer individuals to programs" and that the "[t]ypes of crimes the team would help address [include]: drinking in public, disorderly conduct, criminal mischief, occupied RVs, accumulation of junk, stored vehicles in the right-of- way."

51.    The Livability Team is "tasked with providing services and help assisting people in the community that have a lot of calls for service" and that "jail isn't always the answer to

every offense … that is where the Medford Police Department's Livability Team seeks to help … It's a group of officers … targeting a lot of their needs around those calls for service to help kind of reduce the future need for the law enforcement realm… and providing them the services they need to get off the streets or stop having problems within the community that have risen to the calls for service that Medford has received" and noting that "Jackson County community justice is involved with a lot of the individuals, and so the Livability team is "kind of partnered with them in the services we offer … to provide a wrap around plan of services."

52.     The City of Medford promotes its Livability Team program as a positive human-centric approach to community policing of homeless people in Jackson County.  But as Plaintiff alleges the City of Medford policies regulating homeless people and the police officers involved in the Livability Team were well known among unhoused people in Jackson County as quick to violently retaliate against people who spoke out against City and County law enforcement in Jackson County.  In one incident, Defendant Kirkpatrick was caught on video telling a homelessness advocate that he would be the first to be arrested under the homeless enforcement policies.

### E.  City Defendants' July 11, 2019 Detention, Arrest, and Transport of Plaintiff

53.     On July 11, 2019, Mr. Malaer was in his electric wheelchair traveling on the sidewalk near  801 S Riverside going home to his apartment on Grape Street in downtown Medford when his wheelchair ran out of battery.

54.     His wheelchair twice became stuck in potholes in front of Lumpy's store on the sidewalk near the bus stop. The wheelchair could move forward on flat ground, but the battery did not have enough power to make it over the lip in the concrete and out of the pothole.  Mr. Malaer picked up small pebbles and threw them at the Lumpy's building to try and get

someone's attention to help him out of the pothole. He also called to people in the store to come

help him. Eventually, passersby did come help him out of the potholes.

55.     Kelly Cole, an assistant manager of Lumpy's, came out of the store yelling

angrily at Mr. Malaer.  Cole accused Mr. Malaer of faking being stuck in the potholes and

faking his wheelchair being out of battery.  Cole was angry Mr. Malaer had thrown pebbles at

the building, and wanted him to leave the area.  Mr. Malaer could not move because his

wheelchair batteries were dying, which Cole was made aware of.

56.     Cole's hostile confrontation escalated the situation causing Mr. Malaer to

become defensive. Due to Mr. Malaer's Post-traumatic Stress Disorder he used aggressive

words and verbal sparring to defend himself Ms. Cole. A verbal argument ensued in which both

Cole and Mr. Malaer yelled and cursed at each other. No physical contact occurred between

them and the two remained several yards apart during the encounter. Ms. Cole was a physically

able woman. Mr. Malaer was a 60-year old paraplegic man, stuck in a wheelchair with a dying

battery.

57.     Cole was angry, and said she was not going to help Plaintiff. And furthermore,

Cole told Mr. Malaer she was going to call the police. This caused Mr. Malaer more frustration

and distress.  He was just trying to get home.

58.     Other passersby felt comfortable helping Mr. Malaer, and pushed his wheelchair

out of the hole. He disengaged his motor to avoid damage to the wheelchair while the helpers

pushed his wheelchair out of the hole, then turned the motor back on and rolled slowly to the

#10 bus stop. The bus arrived and the bus driver lowered the ramp for Mr. Malaer to board, but

his wheelchair battery was dead and the wheelchair would not go up onto the platform. Mr.

Malaer asked the bus driver if he could help Plaintiff by pushing the wheelchair onto the

loading platform. Cole yelled to the bus driver that she had called the police and told the bus driver not to let Mr. Malaer board the public bus because the police were coming. The bus driver did nothing.

59.    In response to Cole's call, Defendant Omar Esqueda arrived at approximately 7:29 PM while Mr. Malaer was trying to board the bus. Upon arrival Defendant Esqueda knew from dispatch only that a disorderly male was "throwing rocks" at Lumpy's and being disruptive. Esqueda spoke briefly with Ms. Cole upon arrival then engaged Mr. Malaer almost immediately.

60.    Defendant Esqueda's body camera footage shows Defendant Esqueda asking Cole if Mr. Malaer had damaged anything. Cole responded "No." He had not damaged anything in tossing pebbles.

61.    Cole admitted she was the employee who called the Medford Police.  Cole told Defendant Esqueda she did not know who Mr. Malaer was and had "never seen him before."

62.    Cole admitted that Mr. Malaer only began yelling after Cole came outside to confront him, during which she told him she was calling the police.  Cole told Defendant Esqueda she would "beat him up," referring to Mr. Malaer.  Cole called Mr. Malaer "sad" and laughed at him in front of Defendant Esqueda.

63.    Cole admitted her motivation for having Mr. Malaer arrested was not fear, but because she was angry that his wheelchair was stuck in front of Lumpy's. She accused Mr. Malaer of intentionally "put[ting the wheelchair] back in the hole for a second time, how many times is he going to do that today" and that "He didn't scare me, he just pissed me off. And he thought he was going to get away with it."

64.    Bodycam footage shows Mr. Malaer was initially stopped and detained by Defendant Esqueda before Defendants Wulff and Scottow arrived. Defendant Esqueda engaged

17 – **SECOND AMENDED COMPLAINT**

Mr. Malaer while he attempted to board the bus, stating "Hey! Hey! Do you have a bus pass? Do you have a bus pass?! Then just get on the bus!" Mr. Malaer responded "Do I even know you? Why do I even have to talk to you?" Mr. Malaer had not seen Defendant Esqueda approach and was startled by Defendant Esqueda's sudden presence and immediate demands. Becoming increasingly frustrated and angry, Mr. Malaer shouted a number of invectives at Defendant Esqueda but did not approach him.  Defendant Esqueda stated, "Because you're being an asshole. Go away." Mr. Malaer had consumed alcohol and shouted racially charged comments at Esqueda. The two engaged in a verbal exchange.

65.     Defendant Esqueda called Mr. Malaer "an asshole" twice within the first 30 seconds of engaging him and stopped Mr. Malaer from boarding the bus. Mr. Malaer directed several taunts and comments to Defendant Esqueda during the exchange.  Plaintiff taunted the officer "you going to arrest me?" "For what?" Defendant Esqueda stated "You think just because you're in a wheelchair you can't go to jail?" Plaintiff began to yell for the officer to leave him alone and tried to move away.

66.     Bodycam footage shows as Defendant Esqueda approached Mr. Malaer, the bus was stopped with the wheelchair ramp lowered so Mr. Malaer could board. Defendant Esqueda told Mr. Malaer he could leave, "just go home." But Mr. Malaer could not move the wheelchair. Defendant Esqueda specifically told Mr. Malaer he was not going to arrest Mr. Malaer, and Defendant Esqueda advised Mr. Malaer to leave more than once. During the exchange Mr. Malaer yelled and argued but made no movement to approach the officer.

67.     Defendant Esqueda failed to assist Mr. Malaer in accessing the bus.  The bus drove off without him on board, leaving Mr. Malaer stuck on the sidewalk in an inoperable wheelchair.

18 – **SECOND AMENDED COMPLAINT**

68.    Defendant Esqueda put on his protective gloves. In Mr. Malaer's experience, the action of "gloving up" means an arrest is forthcoming and likely physical force will be used. Mr. Malaer became worried and afraid at that point.

69.    Defendant Esqueda spoke to Cole a second time, stating he didn't want to "beat up a guy in a wheelchair." Defendant Esqueda was aware of Plaintiff's medical incontinence issue, making comments to Cole about Mr. Malaer having, "pissed in his wheelchair."  Despite the deteriorating verbal exchanges, Defendant Esqueda never detained Mr. Malaer and told Mr. Malaer multiple times to leave, just get out of here.

70.    When Defendant Esqueda's behavior and comments provoked more frustration and anger from Mr. Malaer, Defendant Esqueda stated, "you're just a sad, pathetic man who needs to go away."  Defendant Esqueda then called Mr. Malaer "an idiot."

71.    Defendant Esqueda told Plaintiff to "go away" several times, despite having already stopped him from boarding the bus, and having been informed by the Lumpy's employee Cole that Mr. Malaer said his wheelchair was out of power and that it had become stuck in potholes. Video shows Mr. Malaer asked Defendant Esqueda "What are you going to do?" to which Esqueda answered "Nothing." Mr. Malaer asked, "Are you going to help me?" and Defendant Esqueda responded, "No, I'm not going to help you."

72.    Defendants Wulff and Scottow arrived, detaining Mr. Malaer based only on the dispatch information.  Defendant Scottow asked Plaintiff "What's going on?"  Plaintiff calmly replied he was "just trying to get home."

73.    Although Defendant Scottow was not the first to arrive on scene, she was considered the "arresting officer" and "lead" on the investigation. Defendant Esqueda noted to Defendant Wulff "this one would be good" for Scottow to handle in her training. At the time,

Scottow and Wulff were considered a single officer with Defendant Wulff's role to supervise and counsel Defendant Scottow.

74.     Defendant Scottow never asked Defendant Esqueda about any of the events which occurred prior to her arrival, including Defendant Esqueda's interview with Cole or interactions with Mr. Malaer. Defendant Scottow never fully interviewed Mr. Malaer about the situation or incident. Defendant Scottow did not interview Cole until *after* Mr. Malaer was detained.  Defendant Scottow reviewed only her body camera footage prior to writing her report on the incident. Defendant Scottow's body camera footage does not contain any of the exchanges between Defendant Esqueda and Mr. Malaer prior to her arrival. Defendant Scottow had the ability to review Esqueda's video before drafting her report and probable cause affidavit, but she chose not to.

75.     Defendant Esqueda rejected Mr. Malaer's first request for help. Defendant Esqueda later asked, "do you require assistance right now?" and Mr. Malaer responded, "I require you guys to leave, leave me alone."  Defendant Wulff stated, "We can't leave because you're acting like this."  Mr. Malaer was sitting in his wheelchair only verbally commenting on the events, he was not physically resisting or attacking.  Mr. Malaer stated, "If my wheelchair could roll I would be outa here! You guys can't stop!" Mr. Malaer states, "I just want to go home."

76.     But instead of getting transportation for Plaintiff, as Medford Police Department had done in the past, and in accord with the mandates of the Livability Team to avoid jailing people who just need alternative support or services, the Defendants spent nearly 13 minutes antagonizing, demeaning, insulting, and inciting Mr. Malaer before finally Mirandizing him and placing him in handcuffs.

77.    The officers circled Mr. Malaer, all with functioning operating body cameras. Three officers in full protective gear circled Mr. Malaer sitting in his inoperable wheelchair with his back up against the street. This show of force frightened Mr. Malaer even further.

78.    Defendant Wulff told Mr. Malaer "You're talking a lot of trash for being in a wheelchair." Defendant Wulff told Mr. Malaer he was "the pot calling the kettle black" in reference to being a "piece of shit." Defendant Esqueda chimed in laughing "that is how the saying goes" and Defendant Wulff confirms "that is exactly what I said."

79.    Defendant Wulff admitted under oath that he expected Mr. Malaer to continue to react negatively to Defendant Wulff's comments.  Defendant Wulff admitted he chose to make additional comments targeting Mr. Malaer's disability, for the purpose of drawing a negative verbal reaction from Mr. Malaer. The officers were purposely escalating the situation.

80.    Mr. Malaer continuously responded angrily to the officers' taunting and treatment of him. Defendant Wulff further told Mr. Malaer "Your mouth's writing checks your body can't cash," to which Esqueda laughed.

81.    Mr. Malaer was not free to leave, and in fact, *could not leave* because his electric wheelchair battery was dead. Defendant Esqueda then mocked him "What happened on the bus? You never made it on the bus." Defendant Esqueda had stopped Mr. Malaer from accessing the bus.

82.    Mr. Malaer told the officers he was going to advise Medford City Manager Brian Sjothun of Defendants' conduct. Defendant Wulff appeared to understand who Mr. Malaer was referring to and mocked his pronouncement of Mr. Sjothun's surname, then inquired "What? What are you gonna tell him?" Mr. Malaer responded "God forbid I tell him what the truth is … you guys don't give a fuck about a dude in a wheelchair." Defendant Wulff instantly

instructs Defendant Scottow to "Go call the jail and tell them we have a gentleman in a wheelchair and we want to know if we're clear to lodge him."

83.    Defendant Wulff immediately placed Mr. Malaer under arrest "for disorderly" and the officers commenced handcuffing him. Defendant Esqueda intentionally failed to advise the other officers of his investigation prior to their arrival, including: the reasons for Mr. Malaer's inability to move, Mr. Malaer's prior difficulties getting stuck, the information Defendant Esqueda obtained from his prior interview with Cole, the prior exchange Defendant Esqueda had with Mr. Malaer, or the fact Defendant Esqueda had released Mr. Malaer and told him he could leave. Defendant Esqueda's failure to inform the other officers of this information was intended to provide justification for their arrest of Mr. Malaer. He was deceptive to justify probable cause.

84.    Mr. Malaer's behavior had not substantially changed throughout the encounter, except that the officers were baiting and taunting Mr. Malaer to elevate the situation.

85.    At no time did any officer de-escalate the situation or listen to Mr. Malaer when he said what he needed was "help" or to be left alone to "just try[] to get home."

86.    Mr. Malaer felt threatened, targeted, and bullied by the officers, and that this was the third time in just two years Medford police officers were trying to arrest him for "disorderly conduct" after beginning his public homelessness advocacy.

87.    During this encounter, Mr. Malaer never touched anyone. He never tried to evade, and in the video, was very nervous trapped in his wheelchair. Nor did the officers ever pat down Plaintiff for weapons upon placing him in handcuffs and in the patrol car. Defendant Esqueda told Cole at the scene before Malaer's arrest "I don't think he has the means–he's just a talker." Cole responded "He didn't scare me, he just pissed me off[.]" Defendants Esqueda,

Wulff, and Scottow's words and conduct made clear they did not believe Plaintiff posed any real threat but was simply an annoyance.

88.    The officers arrested Mr. Malaer approximately 13 minutes into the encounter, handcuffed him and placed him in a patrol vehicle. The handcuffs were so tight his hands turned purple. The police officers separated Mr. Malaer from his wheelchair, despite it being his only means of movement. Defendant Scottow drug Mr. Malaer's wheelchair backwards without disengaging the motor, damaging it. Defendant Scottow is heard on video acknowledging the wheelchair battery "is dead" as she dragged it.

89.    Video shows the officers at the scene communicated with Defendant Kirkpatrick, who was aware Mr. Malaer used a wheelchair and knew he was not homeless. Body camera video also shows the officer Defendants communicated with the Jackson County jail employees to lodge Mr. Malaer and advised that Mr. Malaer needed a wheelchair. The City Defendant officers told the Jackson County jail staff that Mr. Malaer was "He's yelling a lot and threatening us …I don't know if he is capable of standing and walking."  This statement was made to bias the jail deputies against Mr. Malaer.

90.    On scene, Cole repeatedly suggested to officers that Mr. Malaer was faking needing help and that his wheelchair was not actually out of battery.  Cole told officers that Mr. Malaer got "stuck in the hole purposely," and was making people "believe" he had a dead battery. She repeatedly told officers "the motor's good, if you guys have to load him up, the [wheelchair] motor's good." Cole's statements were false and unreliable. Defendant Scottow admits on camera that "the battery is dead."

91.    Defendant Scottow did not obtain these facts until *after* she arrested Mr. Malaer because she failed to conduct a constitutionally sound and reasonable investigation. She did not

23 – **SECOND AMENDED COMPLAINT**

interview Cole or Defendant Esqueda first. She ignored Cole's unreliability. She ignored the

escalating conduct from Defendants Wulff and Esqueda. She did not fully interview Plaintiff.

She knew or should have known Cole was lying or unreliable. Defendant Scottow, by omission

or commission, lacked probable cause to arrest Mr. Malaer.

92.    It was well established law in 2019 that officers were required to have probable

cause prior to detaining or arresting an individual. All officers were well aware of this

constitutional threshold.

93.    Defendant Scottow knew Mr. Malaer lived on Grape Street prior to writing a

citation.  But despite having this information, she issued citations to Mr. Malaer labeling him

"Transient."  This was false.

94.    Defendant Scottow wrote and submitted criminal citations, a police incident

report, and a probable cause affidavit regarding Mr. Malaer's arrest containing inconsistent

information or information she knew or should have known was false and misleading.

Defendant Scottow's incident report states officers were dispatched to Lumpy's for a "male in a

wheelchair throwing rocks at the business window."  The officers' body camera footage never

showed Mr. Malaer throwing any rocks.

95.    Defendant Scottow's incident report and probable cause affidavit are

inconsistent with each other and the actual evidence obtained in the investigation, including

body camera footage.

96.    Defendant Wulff reviewed Defendant Scottow's citations, incident report, and

probable cause affidavit, and approved them without ever talking to Defendant Esqueda about

the incident.  Defendant Scottow and the officer Defendants then knowingly gave the citations,

incident report, and probable cause affidavit to the Medford City Prosecutor to initiate criminal

prosecution against Mr. Malaer.  The City Prosecutor agreed to press charges against Mr.

Malaer before ever watching the body camera footage, relying on Defendant Scottow's

documents alone.

97.    Defendant Scottow did learn these facts before the officers left the scene to take

Mr. Malaer to the jail.  Upon learning this new information after having loaded Mr. Malaer into

the patrol vehicle, the City Defendants could have driven Mr. Malaer home, just 2 minutes

away, as the police had done in 2018.  But they chose to take Mr. Malaer to jail instead.

98.    The officers were unable to provide a clear explanation for what they believed

Mr. Malaer was doing that was "disorderly" or "menacing." The officers all admit that simple

verbal resistance is constitutionally protected conduct.

99.    The Medford Police cited Mr. Malaer for Disorderly Conduct and Menacing and

transported Mr. Malaer, his backpack, and his wheelchair to the Jackson County jail in

Medford.  The officer Defendants discussed zipping up his backpack, where his red medical

catheter was visible on body camera video, and leaving it on his wheelchair at the jail.

100.    While in the jail, Mr. Malaer experienced physical abuse and neglect.

101.    None of the officers asked about Mr. Malaer's medical condition before roughly

loading him into the vehicle. They did not know if Mr. Malaer was even stable enough to sit in

the patrol vehicle, or whether certain positions or holds could cause further damage to his

spine.  Video shows the officers nearly dropped Mr. Malaer on the ground while dragging him

from his wheelchair and into the patrol car.

102.    Mr. Malaer was charged with misdemeanor disorderly conduct and menacing

after the 2019 arrest in *City of Medford v. John Lee Malaer*, Docket Nos. 19E11500-01. He

disputed the charges. Cole passed away in 2020. The City Prosecutor dismissed all charges

against Mr. Malaer pre-trial for lack of evidence and Mr. Malaer was not convicted of any charge.

103.    Immediately after being released from jail, Mr. Malaer made multiple complaints to the City of Medford about abuse and rights violations he suffered during the course of his arrest, transport, and jailing on July 11, 2019.  He had a phone call with a Medford Police sergeant, a face-to-face video recorded interview with another Medford Police sergeant who took photos of bruising to his body, and he submitted a formal administrative complaint form to the City of Medford Police Department in writing.

104.    Mr. Malaer was scheduled to give a presentation to the Jackson County COC Board at the meeting on July 16, 2019. The Jackson County COC Board meetings were held inside the Medford police station. After his arrest and abuse on July 11, 2019, he was too scared and ill to give the presentation. Out of fear as a result of the abuse by Jackson County and Medford Police, Mr. Malaer resigned from the Jackson County COC Board on July 27, 2019. Mr. Malaer sent an email to the Jackson County COC Board Chair, Medford City Manager Sjothun, with his resignation from the Board. The resignation email advised Mr. Sjothun that Mr. Malaer had been physically abused by law enforcement and that the officer's behavior during the arrest "conflicted" with his ADA rights and constitutional rights. Mr. Sjothun forwarded Mr. Malaer's email to the Medford Chief of Police with the expectation the incident would be investigated.

105.    The City of Medford Police Department assigned Defendant Kirkpatrick to investigate Mr. Malaer's complaints of law enforcement abuse. Defendant Kirkpatrick was named in the complaint as one of the involved officers. Defendant Kirkpatrick issued a letter

that "exonerated" himself and the other officers. Defendant Kirkpatrick sent the "exoneration"

letter on July 27, 2019, the same day Mr. Malaer emailed the City Manager about abuse.

106.    Meanwhile, the Jackson County COC Board was in the process of reapplying to

HUD for more funding. As a federal requirement the COC Board had to have at least one

Board Member with lived experience with homelessness. When Mr. Malaer resigned from the

board in July, the Jackson County COC Board no longer had a "lived experience" qualifying

Board Member on the Board. The Jackson County COC Board Chair, the City Manager, knew

Mr. Malaer had resigned in July 2019.  The City Manager did not email or notify the other

Board members of Mr. Malaer's resignation. The COC Board minutes continued to list Mr.

Malaer as still on the Board and did not reflect Mr. Malaer's resignation for nearly six months,

until after the HUD funding application process was complete.

### F.  County Defendants' July 11, 2019 Jailing and Abuse of Plaintiff

107.    Mr. Malaer arrived at the Jackson County jail in the Medford Police cruiser. His

electric wheelchair with the dead battery was delivered by Defendant Kirkpatrick. Medford

Police officers told Jackson County deputies that Mr. Malaer was "actively resistant." This was

false. Mr. Malaer was only being verbal. Mr. Malaer was pulled from the cruiser and dropped

near the ground by Jackson County jail deputies. He was placed in a jail wheelchair while

handcuffed and taken to the pat down room.

108.    Jackson County Jail video recordings show that during intake pat down while in

custody at Jackson County Jail, Mr. Malaer was confined to a wheelchair, was handcuffed with

his hands behind his back, his handcuffed hands were then looped over the handles on the wheelchair

behind him, and was being held in the wheelchair by one, and sometimes two, Sheriff's Deputies

forcing his head forward down between his legs while Plaintiff was stripped.

27 – **SECOND AMENDED COMPLAINT**

109.    Video and audio recordings show Deputy Cody Fuhrman forced Mr. Malaer's head forward down between his legs, pinning him in that position for over a minute, while simultaneously holding Mr. Malaer's handcuffed arms behind his back. Defendant Kolkemo and Deputy Fuhrman also used pain compliance holds to bend Mr. Malaer's wrist at a painful angle and rapidly poke the veins in Mr. Malaer's wrist. Mr. Malaer was not physically resisting but was quite verbal and angry, often yelling at the deputies.  The deputies responded by taunting Mr. Malaer.  Deputy Furhman stated "I'm right here sir, snap my neck" while holding Mr. Malaer's neck down to his knees.  At one point, a deputy is seen striking Mr. Malaer's handcuffed arm and jerking it violently backwards and up causing more stress on the spine and shoulder. There appears to be no reason for this violent action. Mr. Malaer screamed "Take me to the hospital!" and "You guys abuse me!" but the deputies proceed with intake.

110.    The deputies claimed Mr. Malaer was "resisting" and had "significant upper body strength." They also expressed concern about what Mr. Malaer "*could do*." These deputies also commented Mr. Malaer was 6'0 and weighed 200 pounds.

111.    Mr. Malaer was 60 years old at the time, barely 5'7, weighed 150 pounds, and had absolutely no use of his lower body. During the pat down process Mr. Malaer's pants were pulled down by deputies, his hands were handcuffed and then secured behind the handlebars of the wheelchair.  Deputy Bondhus told Mr. Malaer he was "really tough for a pissy pants" while marking Mr. Malaer's pants a "biohazard" because of his medical incontinence.

112.    Jail deputies removed Mr. Malaer's shoes and allowed his feet to drag backwards underneath the wheelchair as they pushed the wheelchair forward. Mr. Malaer has no feeling in his lower extremities and did not realize the extent of his feet being cut, but did

see blood on the ground and told Deputies this. Wounds are especially dangerous for paralyzed

individuals who may not know of the injury while they become infected.



*Caption: Clockwise – A. Deputy Furhman, holding Mr. Malaer's head down, B. Deputy
Bondhus holding Mr. Malaer's pants, C. Mr. Malaer in wheelchair, D. Deputy Kolkemo
applying pain compliance hold to Mr. Malaer's hand, F. Deputy/City Councilman Miller
holding Mr. Malaer's hands.*

113.    The position the deputies held Mr. Malaer in with his head bent to his knees and

secured by at least one deputy was a dangerous, potentially fatal positioning for someone with

the type of spinal injury suffered by Mr. Malaer.

114.    Video shows Defendants Wulff and Scottow were present inside the jail pat

down area witnessing the abuse by Jackson County jail deputies, but stood by without

intervening while Mr. Malaer's head was being forced between his legs despite his spinal injury.



*Caption: Defendants Wulff and Scottow (in dark blue uniforms) present observing mistreatment of Mr. Malaer in the jail.*

115.    The Deputies then took Mr. Malaer into a clothing disrobing room and stripped him naked. In the disrobing room Defendant Kolkemo struck Mr. Malaer in the face. There were no cameras present. Defendant Kolkemo admitted he slapped Mr. Malaer in the face. Other deputies were present. No one stopped Defendant Kolkemo and none of the deputies reported this strike to a supervisor. No Use of Force report was filed. None of the deputies stopped the use of unnecessary pain compliance holds and or reported them to any supervisor.

30 – **SECOND AMENDED COMPLAINT**

116.    Video recordings show that after the pat down and disrobing, while four Jackson County Sheriff Deputies were pushing Mr. Malaer naked in a wheelchair into a concrete holding cell, Defendant Kolkemo hit Mr. Malaer again in the face near his left eye. Mr. Malaer was seated in the wheelchair, with his hands held behind his back, restrained by two other Sheriff Deputies at the time Defendant Kolkemo hit Mr. Malaer in the face.



*Caption: Clockwise: A. Deputy/City Councilman Miller holding Mr. Malaer's leg, B. Defendant Kolkemo striking Mr. Malaer in the face, C. Deputy Bondhus entering the holding cell, D. Deputy Furhman holding Mr. Malaer while Defendant Kolkemo slaps him, E. Mr. Malaer being slapped by Defendant Kolkemo while in a wheelchair.*

117.    Jackson County deputies standing nearby did nothing to intervene in the abuse or prevent further harm. All deputies testified it was a "diversionary strike" to control Plaintiff, who was already in the deputies' control. Plaintiff was not physically resisting but was quite verbal and angry.

118.    Defendant Kolkemo's conduct caused Mr. Malaer physical pain, severe discomfort, and made him afraid for his safety. The use of force was unnecessary because Mr.

31 – **SECOND AMENDED COMPLAINT**

Malaer was already restrained, injured, paralyzed, and being held down in the wheelchair by multiple deputies.

119.     Video shows the deputies pulled Mr. Malaer from transport wheelchair by lifting him by his wrists and ankle, then placed him naked on the concrete the floor leg. None of the deputies asked if this from of transport was safe for Mr. Malaer given his broken spine.

120.     A deputy tossed a "suicide smock" on top of Mr. Malaer. Two deputies grabbed Mr. Malaer and twisted him sideways then drug him forward to his belly, then Defendant Kolkemo and Fuhrman knelt on Mr. Malaer's back.



*Caption: Clockwise: A. Deputy/City Councilman Miller watching Mr. Malaer being twisted at the waist, B. Deputy Furhman twisting Mr. Malaer by his arm, C. Mr. Malaer being twisted at the waist while on the ground as a paraplegic person with an existing spinal injury, D. Defendant Kolkemo twisting Mr. Malaer by his arm, F. Deputy Bondhus removing the wheelchair.*

121.     Fuhrman appeared to place almost his entire body weight pressing down on Mr. Malaer's lungs. Defendant Kolkemo leaned against a concrete bench with a knee pressed

against Mr. Malaer's shoulder. The officers then leave Mr. Malaer lying on the concrete floor

with a matt nearby.



*Caption: Clockwise: A. Deputy Furhman kneeling into Mr. Malaer's back, B. Mr. Malaer
being kneeled upon by two deputies while face down on concrete floor, C. Defendant Kolkemo
kneeling into Mr. Malar's back.*

122.    Deputies left Mr. Malaer in the holding cell naked on the concrete floor. Mr.

Malaer was put on "suicide watch." One sergeant claimed he was told Mr. Malaer made

suicidal statements. All four of the Jackson County Sheriff Deputies involved in Mr. Malaer's

intake and placement into the holding cell denied hearing any suicidal statements from Mr.

Malaer. The "suicide" designation also conflicts with the jail's own intake paperwork for Mr.

Malaer. Mr. Malaer alleges his placement on "suicide watch" was contrived.

123.    Jackson County employees, including Defendant Kolkemo, left Mr. Malaer in

that condition on the floor for approximately five hours without access to a wheelchair, despite

the transport wheelchair being available. Mr. Malaer was therefore without ADA access to a

toilet or water for over five hours. The deputies did not give Mr. Malaer his catheter, or any catheter, which prevented Mr. Malaer from hygienically emptying his bladder. The videos show Mr. Malaer's legs repeatedly spasmed uncontrollably and he urinated on himself multiple times from untreated medical incontinence. Mr. Malaer called for assistance to get water and banged on the cell door but was ignored.

124.    Without his catheters Plaintiff urinated on himself multiple times, lay on the floor in his own urine, and *could only access water from a toilet.* He also was deprived access to his medications during this time. Based on Mr. Malaer's prior stays in the jail there were some notations that Mr. Malaer was paraplegic and used a "cathider" but later investigations revealed that Jackson County had no medical records for Mr. Malaer.

125.    Mr. Malaer asked Sheriff's Deputies for medical attention and to take him to a hospital. The Sheriff Deputies failed to either undertake a sufficient medical evaluation or to place Mr. Malaer in medical care. Deputies left Mr. Malaer to have to crawl on the floor in his own urine, without access to medications, a catheter, or clean drinking water for several hours, causing his medical condition to worsen and his leg and bladder to repeatedly spasm. Only after 5 hours into Mr. Malaer's approximate 20 hour detention in the jail was he given a wheelchair.

126.    Despite Mr. Malaer asking to be taken to a hospital, the Sheriff Deputies never looked in Mr. Malaer's backpack for his medications or catheter.

127.    Mr. Malaer was released from the jail on July 12, 2019 after 20 hours without access to his prescribed medications and or ability to hygienically evacuate his bladder.

128.    Mr. Malaer was hospitalized shortly after being released from the Jackson County jail due to complications from a urinary tract infection that caused him to become nearly septic, a life-threatening condition.

34 – **SECOND AMENDED COMPLAINT**

129.    Following the July 11, 2019 arrest, Mr. Malaer filed a complaint challenging the Department's conduct during the stop, interrogation, arrest, and transport to the jail. Mr. Malaer's complaint also challenged the Jackson County Sheriff's Office's treatment of Mr. Malaer inside the Jackson County Jail.  Mr. Malaer's complaint was forwarded to the Jackson County Sheriff's Office.

130.    Shortly after Deputy Kolkemo slapped Mr. Malaer in the holding cell, Deputy Miller suggested to a jail sergeant that he review the videos of Mr. Malaer's holding cell. The sergeant observed the slap in the videos and immediately referred that sole use of force to the Sheriff and for further investigation. Jackson County launched an internal investigation of Deputy Kolkemo, but the investigation only concerned the single slap in the holding cell, and did not include the compliance holds, the neglect of Mr. Malaer in his cell, or the positional holds, nor any of Mr. Malaer's allegations of medical neglect and abuse. Jackson County's Internal Affairs investigation of the incident in the jail was conducted by a former Medford Police officer.

131.    On July 18, 2019, Medford Police Sergeant Budreau went to Mr. Malaer's home and took photos of his body. The photos show swelling and bruising of Mr. Malaer's left eye where Defendant Kolkemo struck him in the face while in custody. The photos and video also showed bruising to Mr. Malaer's shoulder and arm. Mr. Malaer had suffered multiple blows to the head and was traumatized. He believed this abuse was caused by the Medford police officers who arrested him, as he remembered being arrested, being hit in the face by a law enforcement officer, being dropped to the ground and stepped on, and he remembered seeing Defendant Wulff's face. The videos cameras do not record any such blow by Medford Police Department, but much of the violence inflicted upon Mr. Malaer in the jail is recorded.

35 – **SECOND AMENDED COMPLAINT**

132.    Defendant Jackson County Sheriff Sickler contacted the Oregon State Police ("OSP") and requested a criminal investigation into Deputy Kolkemo based on Deputy Kolkemo's conduct toward Mr. Malaer in the jail. The City of Medford's internal affairs file, Sgt. Budreau's photos, and other information was forwarded to the Oregon State Police investigator, Sergeant Jeff Proulx. Defendant Sickler testified he was aware at the time that Sgt. Proulx had been named as a defendant in a lawsuit by other senior Oregon State Police troopers alleging that Sgt. Proulx covered up law enforcement misconduct during investigations.

133.    OSP investigator Sgt. Proulx met with Defendant Kolkemo and all the other officers involved in the intake of Malaer. Defendant Kolkemo admitted during his interview to hitting Mr. Malaer in the face as shown on jail video. Defendant Kolkemo further admitted he hit Plaintiff in the face a second time inside the disrobing exchange room, which was not recorded on video. Defendant Kolkemo admitted this tactic of hitting jail detainees in the face as a "diversionary strike" was taught and used in the Jackson County jail. Other jail deputies testified this was the case. Defendant Kolkemo did not believe either slap to Mr. Malaer or the other uses of force against Mr. Malaer in the pat down room constituted a "use of force."

134.    The OSP investigator also interviewed Jackson County Sheriff Deputies Chad Miller, Cody Fuhrman, and Keyan Bondhus who were present and participated in Mr. Malaer's intake at the jail. Deputy Miller also serves on the Medford City Council.

135.    Deputy Miller told OSP that on July 11, 2019, while Miller, Fuhrman, and Defendant Kolkemo were moving Mr. Malaer in the jail, Miller heard a loud sound that sounded like hands clapping or someone being smacked and heard Defendant Kolkemo say something to the effect of "Do I have your attention now?" Miller saw Mr. Malaer's eyes were wide open and Mr. Malaer had stopped talking. Miller is a defensive tactics instructor and said

he believed Mr. Malaer was a very low-level threat at the time of the incident. Miller stated that

at the end of the shift, another Jackson County Sheriff's Office employee said "that was the

funniest thing I've seen – what happened to that guy or slapping that guy." Miller said that if he

had seen the slap he would have asked Deputy Kolkemo if he was filing a Use of Force report

and then notify a supervisor.

136.    Deputy Fuhrman told the OSP investigator that on July 11, 2019, while Miller,

Fuhrman, and Defendant Kolkemo were moving Plaintiff in the jail, Furhman saw Defendant

Kolkemo hit Mr. Malaer in the face. Furhman had seen other Jackson County Deputies use this

technique before. Furhman told the OSP investigator that if deputies used this technique, it is

considered a Use of Force which would mean the deputy must complete a DT 1 report and

notify a supervisor.

137.    Deputy Bondhus told the OSP investigator that on July 11, 2019, while

Bondhus, Deputy Kolkemo, and deputies were moving Mr. Malaer from the exchange room to

the holding cell, he saw Defendant Kolkemo slap Mr. Malaer across the face. Bondhus

considered Defendant Kolkemo's conduct a Use of Force. Bondhus stated that slapping

inmates constitutes a Use of Force, and that a DT 1 Use of Force report should have been

completed and the supervisor or officer in charge notified.

138.    Defendant Kolkemo did not complete a DT 1 Use of Force report regarding his

hitting Plaintiff in the face. Lieutenant Aldrich of the Jackson County Sheriff's Office

confirmed to the OSP investigator that Defendant Kolkemo had not completed a DT 1 Use of

Force report regarding the incident with Plaintiff on July 11, 2019.

139.    Most, but not all, the deputies who were deposed did not acknowledge that the

pain compliance holds, the positional holds nor the "diversionary strikes" were even uses of

force. They did acknowledge the holding and mandates of the case *Graham v. Connor* govern the use of force in the Jackson County jail.

140.    The command staff who made disciplinary decisions in the IA acknowledged that almost everything done by the deputies to Mr. Malaer was a "use of force" but did not agree that all the uses of force were "unreasonable."

141.    The OSP investigator filed a report based on his investigation into Defendant Kolkemo's conduct. Sgt. Proulx testified that he conferred with the Jackson County District Attorney's office about which charges to recommend before submitting his report. His report then referred the case to the Jackson County District Attorney's Office recommending criminal charges against Defendant Kolkemo under ORS 166.065 Harassment and ORS 163.160 Assault IV for his misconduct against Mr. Malaer in the jail.

142.    The Jackson County District Attorney cited a conflict of interest and referred the matter to the Klamath County District Attorney. The Klamath County District Attorney declined to prosecute citing Mr. Malaer's "active resistance." Mr. Malaer verbally resisted the jail staff conduct but never once tried to strike officers, could not physically remove himself, and did not try to grab at a utility belt. The Sheriff's Deputies involved in Mr. Malaer's intake at the jail claim that simple verbal resistance does not justify a use of force.

143.    The Jackson County Sheriff's Office has a history of allegations of misconduct and excessive use of force being used against inmates in the Jackson County jail.  The Jackson County Sheriff's Office has been sued many times for allegations of excessive use of force by Sheriff's Deputies against pre-trial detainees, showing a pattern and practice of such conduct, including at least the following cases: (1) *Sancho v. Jackson County et al.*, Case No. 1:20-cv-01232-CL; (2) *Alvarez v. Jackson County et al.,* Case No. 1:13–cv00641–PA; (3) *Rodrigues v.*

*Jackson County et al.,* Case No. 1:13–cv–1589–CL; (4) *Williams v. Jackson County et al.,* Case No. 1:13–cv–1190–CL; (5) *Evans v. Jackson County, et al, Case No.* 1:14–cv–145– CL; and (5) *LaDue v. City of Talent, et al*, Case No. 1:14-cv-1421.

144.    In the *Evans* case, a long-time Jackson County Sheriff's Office employee submitted a sworn declaration to the Court stating the Sheriff's Office had a culture of "roughing up" pretrial inmates.  Also in the *Evans* case, the Court wrote an opinion noting that the Jackson County Jail Commander "testifies that he does not remember the County disciplining any officer for the use of excessive force within the last 30 years" but that "there has not been a corresponding lack of complaints regarding the County's use of force." The Court, on its own volition, took judicial notice to point out the fact that multiple Use of Excessive Force lawsuits had been filed against Jackson County in the past.

145.    Plaintiff filed the instant lawsuit in early January 2020, within 180 days of July 11, 2019.  Therefore, under Oregon law no tort claim notice is required.

## VI.    CLAIMS FOR RELIEF AGAINST CITY OF MEDFORD DEFENDANTS

### FIRST CLAIM FOR RELIEF

**Violation of 42 U.S.C. § 1983 – 4th Amendment – Lack of Probable Cause Arrest**

**(Against Defendants Kirkpatrick, Wulff, Esqueda, Scottow)**

146.    Plaintiff re-alleges all previous paragraphs as if more fully set forth.

147.    Officers may not detain or arrest individuals unless the officers have sufficient probable cause to support an objective and subjective belief that a crime has been committed and that the individual before them has committed it. Probable cause must exist at the time of the detention or arrest. If the person does not believe they are free to leave, then they are, at minimum, being detained and the officer must be able to justify that detention.

39 – **SECOND AMENDED COMPLAINT**

148.    At the time of his arrest, Mr. Malaer had been questioned by Defendant Esqueda and Defendant Esqueda had released Mr. Malaer. Defendant Esqueda knew from dispatched information and an interview with a percipient witness that Mr. Malaer's wheelchair might have an inoperable battery, that Mr. Malaer had become stuck twice, that Mr. Malaer tossed pebbles against the window of Lumpy's, and that Mr. Malaer only became agitated when Cole confronted him and told him to leave and threatened to call the police. Defendant Esqueda also knew Mr. Malaer was trying to board the #10 bus but had not been able to board the access ramp before it was retracted.

149.    Ms. Cole gave contradictory statements and admitted she only called the police because Mr. Malaer "pissed" her off when he became stuck in a hole a second time. Ms. Cole was an unreliable witness.

150.    Defendant Esqueda did not arrest Mr. Malaer. Defendant Esqueda directly told Mr. Malaer that he was not going to arrest him. Defendant Esqueda told Mr. Malaer to just leave.

151.    Defendant Scottow took over the investigation when she and Defendant Wulff arrived. Defendant Scottow did not ask Defendant Esqueda for information about his interactions with Mr. Malaer or the witness, and Defendant Esqueda did not provide any of that information to Defendant Scottow.

152.    Officer Scottow had virtually no information about Mr. Malaer other than the dispatched information when she arrested him. Defendant Scottow never saw Mr. Malaer throw any rocks. Defendant Scottow never saw Mr. Malaer speak to Cole. Mr. Malaer responded calmly when Scottow asked him what was going on. Defendants Scottow and Wulff then told Plaintiff they were going to arrest him for "disorderly contact" upon arriving on scene.  Neither

Defendant Scottow or Wolff had spoken to a witness or learned further facts from Defendant Esqueda at the time they told Mr. Malaer they were going to arrest him.

153.    The City Defendant officers detained Mr. Malaer for several more minutes. He was not free to leave during this time.  The officers made repeated derogatory comments to Mr. Malaer targeting his physical and mental disabilities. Defendant Wulff testified he expected Mr. Malaer to respond negatively to any dialogue from Wulff, but chose to make further harassing comments to Mr. Malaer anyway.

154.    The officers' formal arrest of Mr. Malaer occurred immediately after Mr. Malaer told the officers he was going to call the City Manager to report them. Mr. Malaer had been quite vocal and loud, yelling throughout the encounter with the police but according to Cole had not been so before she threatened to call the police.

155.    During the encounter the Defendant officers made inappropriate comments to Mr. Malaer and other witnesses which were taunting, derogatory and designed to incite Mr. Malaer to greater levels of emotion. There was insufficient probable cause to detain or arrest Mr. Malaer for disorderly conduct, but more than that, the officers exacerbated the situation, causing a higher level of angry discourse.

156.    As a direct result of the encounter, Defendant Wulff told Mr. Malaer he was under arrest for "disorderly". All officers admitted that simple verbal resistance is not interfering with a police officer nor resistance to arrest. Officer admitted the basis for the disorderly conduct was the loud yelling and creating a 'public nuisance' with that yelling. All of the yelling occurred during the encounter with police and was conduct by Mr. Malaer expressing his disagreement with the officers' bullying conduct.

157.    Mr. Malaer  was transported to Jackson County jail in a non-ADA equipment vehicle, dropped to his knees by the Defendant police officers, unsafely pulled and shoved into the elevated backseat of a police cruiser, not provided with any secure means in the vehicle, and drug out and dropped to his knees on the ground at the jail before being placed in a broken wheelchair without operating foot stirrups after being separated from his personal wheelchair. His wheelchair was dragged by Defendants Kirkpatrick, Scottow, and others without disengaging the engine or brakes, damaging Mr. Malaer's primary source of personal mobility and transportation.

158.    As a result of the City Defendant officers' unconstitutional arrest, Mr. Malaer was detained in jail for over 20 hours, suffered bruising, unsanitary conditions, extreme pain and suffering from repeated leg and bladder spasms, exacerbation of infections and existing medical conditions, had to be hospitalized, was subjected to a two-year criminal prosecution, and suffered extreme embarrassment, anger, humiliation, disrespect, loss of dignity, physical immobility, and fear. Mr. Malaer's underlying trauma-based condition was so worsened Mr. Malaer felt he needed to flee Medford and give up his advocacy work in Jackson County.

159.    As a result of the Constitutional violations by Defendants Kirkpatrick, Wulff, Esqueda, and Scottow, Mr. Malaer suffered economic and non-economic damages to be more fully determined at trial.

## SECOND CLAIM FOR RELIEF

### Violation of Americans With Disabilities Act and § 504 of the Rehabilitation Act

### (Against Defendant City of Medford)

160.    Plaintiff re-alleges all previous paragraphs as if more fully set forth.

161.    The City of Medford is subject to § 504 Rehabilitation Act's mandate, requiring

recipients of federal funds to reasonably accommodate persons with disabilities inside their facilities, program activities, and services, and reasonably modify such facilities, services, and programs to accomplish this purpose.

162.    Defendant City of Medford is a public entity within the meaning of Title II of the Americans with Disabilities Act ("ADA"), provides programs, services, or activities to the general public.  These services and programs include public policing services and the Livability Team program. Title II of the ADA has essentially the same mandate as § 504 of the Rehabilitation Act.

163.    At all times relevant to this action, Mr. Malaer was a qualified individual within the meaning of Title II of the ADA and met the essential eligibility requirements for the receipt of the services, programs, or activities of the City of Medford, including receipt of public policing services and receipt of the Livability Team program.  Specifically, Mr. Malaer suffered from paraplegia and bladder conditions which "substantially limits one or more major life activities," including but not limited to general life activities such as "walking, standing … and working ..." 42 U.S.C. § 12102.

164.    Defendant City of Medford provides public safety and policing services, community care services, Livability Team program services, and public transit services to members of the public in Medford, which comprise programs and services for § 504 and Title II purposes.

165.    Under the ADA and Rehabilitation Act, the City of Medford and its employees and police officers are required to accommodate disabled citizens, including citizens requiring use of wheelchair-accessible facilities such as public transit, the same level of access to services as those who are not disabled.  They are also required to make reasonable modifications in

43 – **SECOND AMENDED COMPLAINT**

polices, practices, or procedures when the modifications are necessary to avoid discrimination on

the basis of disability.  The Medford Police Department also has a written policy requiring police

officers to assist disabled people in need of aid.

166.    The City of Medford was deliberately indifferent in failing to provide Plaintiff

with reasonable accommodations, modify their programs and other services related to his

disability, and denied him the rights and benefits accorded to other citizens, by reason of his

disabilities in violation of the ADA and Rehabilitation Act in the following particulars:

    a.  City of Medford agents and employees including Defendant Esqueda failed to
        allow or assist Plaintiff in boarding a public transit bus;

    b.  City of Medford agents and employees, including Defendants Wulff and
        Esqueda, verbally assaulted and made overtly discriminatory and derogatory
        remarks to Plaintiff in the course of providing public policing services, detailed
        above, to Plaintiff and insisting on engaging with Plaintiff after he told them to
        leave him alone. Comments made by Defendants Wulff and Esqueda were
        primarily directed at Mr. Malaer's disabilities, indicating bias and prejudice.
        Defendants Wulff and Esqueda then used Mr. Malaer's angry reaction to justify
        arresting him instead of providing necessary community care services;

    c.  City of Medford agents and employees including Defendants Wulff, Esqueda,
        and Scottow failed to help Mr. Malaer in access an alternative form of
        transport.  The City Defendants refused to call a cab or use the police vehicle to
        transport Mr. Malaer home. Mr. Malaer was stranded, urinating in his pants
        from medical incontinence, on a public sidewalk because his wheelchair
        battery died and he could not make it home. The officers told Mr. Malaer

44 – **SECOND AMENDED COMPLAINT**

repeatedly to "leave" and "go away," even though they knew Mr. Malaer's wheelchair could not move. When Mr. Malaer asked for help, Defendant Esqueda responded "No I'm not going to help you." The officers had means available to transport Mr. Malaer, as Defendant Kirkpatrick had done in the past, and Defendant Kirkpatrick arrived quickly with a truck to move Mr. Malaer's wheelchair once the arrest had been made. The officers admitted in deposition that giving courtesy rides to stranded motorists or disabled people in need was a community care service they provided as police officers, and could have provided to Mr. Malaer, but chose not to.

d.  Defendants Wulff, Esqueda, Kirkpatrick, and Scottow, in the course of providing police services, failed to sufficiently communicate or coordinate with Jackson County about Mr. Malaer's disability and medical needs. Defendants knew or should have known Mr. Malaer required use of a wheelchair, medical devices, and medications for his disability. Defendants were aware Mr. Malaer was presently experiencing incontinence issues as a result of his disability. Defendant Scottow saw Mr. Malaer's bright red medical catheter in his backpack. The City officer Defendants took Mr. Malaer's backpack containing his catheter and medications with them to the police station instead of leaving it with Mr. Malaer at the jail;

e.  The ADA and Rehabilitation Act require that physically disabled detainees have access to City of Medford programs, services, activities, work, and educational opportunities.  As a result of the lack of accommodation in their provision of police services, and placing Mr. Malaer under arrest instead of assisting him

with transportation, Plaintiff was denied public services available to other people, including community care services of the type espoused by the City of Medford Livability Team Program which is intended to avoid and reduce the number of instances in which distressed citizens are sent to jail when another options is available;

f.  In violation of the ADA and Rehabilitation Act, the City failed to provide medically safe transport for Mr. Malaer;

g.  The City of Medford failed to train and supervise Defendants Kirkpatrick, Wulff, Esqueda, and Scottow to provide necessary accommodations, modifications, services and/or physical access to Plaintiff with disabilities, including failing to train Defendants in appropriate and safe methods of transporting and handling paraplegic detainees and people experiencing medical incontinence or mental health crises.

167.    As a direct and proximate result of Defendants' foregoing wrongful acts, Defendants discriminated against Plaintiff on the basis of his disability in violation of the Americans with Disabilities Act and Rehabilitation Act, causing him to suffer pain, humiliation, fear, frustration, painful leg and bladder spasms, criminal prosecution, a painful urinary tract infection requiring subsequent hospitalization and antibiotic treatment, physical assault, and deprivation of his wheelchair and catheter and medications as a result of being transported to the Jackson County jail, anxiety, stress, loss of dignity, and lack of access to programs and services of the City of Medford.

168.    Accordingly, Mr. Malaer is entitled to economic and non-economic damages in an amount to be determined at trial for the violations of 42 U.S.C. § 12101 et seq. (ADA), §

504 of the Rehabilitation Act, for punitive damages for Defendant's malicious conduct, and for Plaintiff's attorney fees and costs pursuant to 29 U.S.C. § 794(b) and 42 U.S.C. §§ 12205 and 1988.

## VII.    CLAIMS AGAINST JACKSON COUNTY DEFENDANTS

### THIRD CLAIM FOR RELIEF

### Violation of 42 U.S.C. § 1983 – 14th Amendment – Use of Force

### (Against Defendant Kolkemo)

169.    Plaintiff re-alleges all previous paragraphs as if more fully set forth.

170.    Mr. Malaer was a pre-trial detainee at the time he was placed in the Jackson County Jail on July 11, 2019. As such he is entitled to humane and safe conditions of confinement pursuant to the 14th Amendments Substantive Due Process clause. The conditions of confinement are also assessed under the 14th Amendment to the United States Constitution and include limitations and restrictions on the use of permissible force, protecting prisoners from abuse, harm and known threats, providing timely and adequate medical care.

171.    Jackson County has adopted the use of force mandates of the 4th Amendment as defined by *Graham v. Connor*. Jackson County deputies may only use the amount of force which is objectively reasonable under the circumstances present at the time of the use of force. When more than one officer engages in excessive use of force, all officers present are equally liable for the unreasonable force used by all the officers.

172.    The protections afforded to pre-trial detainees under *Farmers v. Brennan* include ensuring prisoners are kept safe from known threats or those which should have been known, providing safe and sanitary living conditions including access to potable water, clothing, food, and necessary heating. In the case of individuals with known physical

47 – **SECOND AMENDED COMPLAINT**

disabilities, Jackson County is mandated to provide such accommodations which allow those prisoners to access the basic needs inside their cell during the term of their incarceration.

173.    On July 11, 2019, Mr. Malaer was incarcerated in the Jackson County jail where he was met by several Jackson County deputies who immediately began to use extreme force against him, including forced pain compliance holds, body positioning which are potentially fatal to a paraplegic person, numerous strikes and blows to Mr. Malaer's body and face while he was restrained in his wheelchair and handcuffed. The deputies including Defendant Kolkemo proceeded to strip Malaer naked, pushing him through the public intake of the jail in an embarrassing, injurious, and degrading parade. Defendant Kolkemo repeatedly used force when unnecessary.  Defendant Kolkemo later defended his actions by claiming certain strikes and actions were not even a use of force.

174.    Defendant Kolkemo violated Mr. Malaer's protected Constitutional rights under the 14th Amendment in the following, non-exhaustive ways:

  a.  Defendant Kolkemo was part of a group of deputies engaged in excessive use of force by pulling Mr. Malaer's head down to his legs in spite of his spinal injury;

  b.  Defendant Kolkemo hit Mr. Malaer in the face twice while Mr. Malaer was already restrained in a wheelchair, resulting in physical damages to Mr. Malaer's face and arm and bruising, swelling and redness near his shoulder and left eye;

  c.  Defendant Kolkemo used unnecessary pain compliance holds to make Mr. Malaer stop yelling and protesting, including bending Plaintiff's wrists backwards, blows to the shoulder and head, painful and

unnecessary body positions, abusive threats and

    d.   Defendant Kolkemo was part of a group of deputies dragging

        Plaintiffs inert feet and legs on the floor of the jail when pushing his

        wheelchair; and

    e.   Defendant Kolkemo knelt on Mr. Malaer's back after aggressively

        twisting and pulling him to his stomach, naked on the urine covered

        concrete floor.

175.    None of the other officers involved in the physical abuse of Plaintiff felt Plaintiff was a serious threat, was restrained in his chair and handcuffed with no use of his legs. Each officer testified that the "diversionary strikes" used by Kolkemo were those of long-standing use in the jail and were condoned by all management staff.

176.    In July 2019, it was well established law that officers could only use reasonable force, defined as the amount of force reasonable under the totality of the circumstances then present. This includes, without limitation, consideration of the number of officers present, the physical differences between the officers and the suspect, whether the suspect was actively resisting, the seriousness of the crime, available alternatives to a use of force, among others. If no force is reasonable, no force is allowed.

177.    As a result of the Constitutional violations set out in this complaint Plaintiff suffered significant bruising, injury to his shoulder and arm, sores and cuts on his feet, fear, humiliation, an exacerbation of his underlying trauma based psychological disorder and felt he was going to die.

178.    Accordingly, Mr. Malaer is entitled to economic and non-economic damages in an amount to be determined at trial.

179.    Defendant Kolkemo's acts were willful and malicious and done with reckless disregard to Plaintiff's protected rights. Defendant Kolkemo should be assessed punitive damages in an amount as fixed by a jury to punish him and to deter such conduct in the future.

## FOURTH CLAIM FOR RELIEF

### 14th Amendment Violations – *Monell Liability*

### (Against Defendants Jackson County and Nathan Sickler)

180.    Plaintiff re-alleges all previous paragraphs as if more fully set forth.

181.    Defendant Nathan Sickler is the Sheriff of Jackson County and is a policymaker for purposes of *Monell* liability.  Sheriff Sickler has endorsed some, but not all, of the conduct shown in the videos of the treatment of Mr. Malaer. Sickler has officially noted that the "diversionary strikes" seen used by Defendant Kolkemo are not within policy and do not comply with the use of force standards mandated by the Constitution. The Sheriff has not acted to change policy within the jail on the use of "diversionary strikes," the use of pain compliance holds against verbally resistant prisoners, or use of positional holds against medically fragile inmates.

182.    Jackson County's policy or widespread or longstanding practice or custom was the moving force that caused the deprivation of Plaintiff's rights by Defendant Kolkemo. Defendant Sickler was aware of and ratified this policy and allowed the culture, practice, and custom to persist inside the Jackson County Sheriff's Office and jail.

183.    Defendant Jackson County's policy, custom, or practice, as ratified by Defendant Sickler, was the moving force in the violation of Mr. Malaer's constitutional rights in the following ways:

a.  Failing to implement and enforce adequate policies and procedures regarding the needs of disabled detainees in custody;

b.  Failing to train on what constitutes a use of force and the objective reasonableness needed prior to exercising force;

c.  Failing to implement and enforce adequate policies and procedures regarding reporting, documentation, investigation, and discipline of use of force incidents by Jackson County employees against detainees in custody;

d.  Having a policy or procedure at the jail that denies the physically disabled detainees from their own special needs items such as medication and catheters and a wheelchair;

e.  Failing to train employees regarding the needs of disabled detainees in custody;

f.  Failing to train Defendant Kolkemo and Jackson County employees in proper use of force, medical care, and treatment of disabled adults while in custody, including proper reporting when a use of force incident occurs;

g.  Having a widespread policy or procedure of pre-emptive strikes against prisoners;

h.  Failing to discipline Jackson County employees following documented misconduct including failure to report use of force incidents;

i.  Failing to train Jackson County employees that verbal resistance alone does not justify the use of force;

j.  Failing to monitor Defendant Kolkemo and Jackson County employees while interacting with and overseeing inmates, including not video recording all interactions and allowing Defendant Kolkemo to hit Plaintiff off camera;

k.  Failing to monitor and ignoring the signs and prior allegations of Jackson County employees engaging in alleged excessive use of force toward pre-trial detainees;

l.  Ratifying and approving of Jackson County agent and employees' mistreatment of pre-trial detainees and use of force against restrained detainees; and

m.  Failing to protect and provide adequate safety procedures to prevent use of force and retaliation, including allowing Defendant Kolkemo and other Sheriff's Office employees to have access to Plaintiff in circumstances where the conduct is not video recorded.

184.  Defendant Kolkemo knew or should have known that Plaintiff was being incarcerated under conditions that exposed him to a substantial risk of harm.

185.  Defendants Jackson County and Sickler knew or should have known that Defendant Kolkemo and other deputies were engaging in inappropriate behavior which included excessive and undocumented use of force, medical care deprivation, and retaliation towards pre-trial detainees, and that failure to act would result in the violation of constitutional rights of pre-trial detainees, including Plaintiff.

186.  Defendants Jackson County and Sickler were deliberately indifferent to a known or obvious risk of harm to pre-trial detainees and knowingly and willfully violated Plaintiff's right to due process of law under the Fourteenth Amendments to the United States Constitution.

187.  As a result of Defendants' conduct violating Plaintiff's constitutional rights, Plaintiff suffered physical assault from Defendant Kolkemo, the disgust and fear of physical harassment, lived in fear of continued harassment, lived in fear of potentially life-

52 – **SECOND AMENDED COMPLAINT**

threatening retaliation in  the form of medical care deprivation and/or physical attack, was deprived of his personal property including medically prescribed catheters and necessary antibiotic medications, suffered physical pain, damage to his left eye area and arm, and was hospitalized as a result of complications from his urinary tract infection. Plaintiff continues to suffer and incur costs in treating his bladder condition, anxiety, fear, and loss of enjoyment of life, for which he is entitled to be compensated in an amount to be determined.

188.    As a result of Defendants' conduct, Plaintiff seeks an award of damages for his non-economic and economic losses, including future health expenses, in an amount to be determined at trial.

189.    Plaintiff seeks an award of his reasonable attorney's fees and costs pursuant to incurred in bringing this action pursuant to 42 U.S.C. § 1988(b).

## FIFTH CLAIM FOR RELIEF

## Violation of Americans with Disabilities Act and § 504 of the Rehabilitation Act
## (Against Defendant Jackson County)

190.    Plaintiff re-alleges all previous paragraphs as if more fully set forth.

191.    Upon information and belief, Jackson County is subject to the Rehabilitation Act § 504's mandate requiring recipients of federal funds to reasonably accommodate persons with disabilities inside their facilities, program activities, and services, and reasonably modify such facilities, services, and programs to accomplish this purpose.

192.    Jackson County is a public entity within the meaning of Title II of the Americans with Disabilities Act ("ADA"), and provides programs, services, or activities to the general public. Title II of the ADA has essentially the same mandate as § 504 of the Rehabilitation Act.

193.    At all times relevant to this action, Plaintiff was a qualified individual within the meaning of Title II of the ADA and met the essential eligibility requirements for the receipt of the services, programs, or activities of the Jackson County Jail.  Specifically, Plaintiff suffered from paraplegia and bladder conditions which "substantially limits one or more major life activities," including but not limited to general life activities such as "walking, standing … and working..." 42 U.S.C. § 12102.

194.    Jackson County provides housing, medical, and mental health treatment, and programs to pre-trial detainees at the Jackson County Jail, which comprise programs and services for § 504 and Title II purposes.

195.    Under the ADA and Rehabilitation Act, Jackson County is required to accommodate disabled pre-trial detainees, including providing pre-trial detainees with a wheelchair and wheelchair-accessible facilities such as clothing, a bed, toilet, sink, and water, to provide the same level of access to medical care to disabled pre-trial detainees, and allowing pre-trial detainees to participate in the same accommodations, programs and services as those who are not disabled.

196.    Jackson County was deliberately indifferent in failing to provide Plaintiff with reasonable accommodations and other services related to his disability, and denied him the rights and benefits accorded to other inmates, solely by reason of his disabilities in violation of the ADA and Rehabilitation Act in the following particulars:

a.    Jackson County agents and employees failed to provide Plaintiff with a wheelchair for approximately 5 hours, despite a wheelchair being available and used during Plaintiff's intake at the jail, resulting in Plaintiff having to sleep and

crawl on the concrete floor, urinate on himself on the floor, and Plaintiff being unable to access the toilet or sink for water inside the cell where he was placed;

b. Jackson County agents and employees stripped Plaintiff naked and failed to provide Plaintiff with adequate clothing for approximately 5 hours, resulting in Plaintiff being exposed to the elements without sufficient protection;

c. The ADA and Rehabilitation Act mandates physically disabled prisoners have access to adequate medical care. Jackson County agents and employees intentionally and maliciously denied Plaintiff adequate medical care. Specifically, Defendant Kolkemo and Jackson County jail staff failed to provide Plaintiff with access to his medications, and failed to provide Plaintiff with a medical catheter. Despite Plaintiff's requests to be taken to a hospital Jackson County refused;

d. The ADA and Rehabilitation Act mandates physically disabled detainees have access to Jackson County jail programs, services, activities, work and educational opportunities. As a result of the lack of accommodation, and placing Plaintiff in a suicide watch cell with no basis, Plaintiff was denied programs, services, accommodations, and activities available to other detainees and prisoners;

e. The Jackson County jail staff failed to adopt and/or enforce appropriate policies and procedures to ensure the provision of necessary accommodations, modifications, and/or programs and services to pre-trial detainees with disabilities; and

f. Jackson County failed to train and supervise the jail staff to provide necessary accommodations, modifications, services and/or physical access to pre-trial detainees with disabilities;

55 – **SECOND AMENDED COMPLAINT**

g.  Jackson County deputies failed to move Plaintiff to the pad on the floor
or even provide Plaintiff with clothing, blankets or any way to maintain
his privacy or dignity other than a "suicide smock". Mr. Malaer was
not suicidal, and this conduct was intended to be punitive;

h.  By forcing Plaintiff to lie and crawl on a concrete jail cell floor naked, urinate
on himself, drink water from a toilet, experience pain and suffering as a result
of leg spasms, and experience a worsening urinary tract infection as a result of
failing to properly evaluate and intake Plaintiff as a permanently disabled
individual with medical needs and not providing Plaintiff with a catheter,
medications, and available wheelchair and clothes; and

i.  By denying Plaintiff access to medical appropriate practitioners or procedures.

197.    As a direct and proximate result of Jackson County's foregoing wrongful acts,
Defendant Jackson County discriminated against Plaintiff on the basis of his disability in
violation of the Americans with Disabilities Act and Rehabilitation Act, causing him to suffer a
painful urinary tract infection requiring subsequent hospitalization and antibiotic treatment for
a kidney infection, painful leg and bladder spasms as result of not having his medications taken
for these two types of spasms every 8 hours, pain and discomfort in being left to lay and crawl
on a concrete floor for hours in his own urine, fear, anxiety, stress, and lack of access to
programs and services of the jail during his incarceration at the Jackson County jail.

198.    Plaintiff is entitled to economic and non-economic damages in an amount  to be
determined at trial against Defendants for the violations of 42 U.S.C. § 12101 et seq. (ADA), §
504 of the Rehabilitation Act, for punitive damages for Defendants' malicious conduct, and for
Plaintiff's attorney fees and costs pursuant to 29 U.S.C. § 794(b) and 42 U.S.C. §§ 12205 and
1988.

## SIXTH CLAIM FOR RELIEF

### Battery

### (Defendant Jackson County)

199.     Plaintiff re-alleges all previous paragraphs as if more fully set forth.

200.     Defendant Kolkemo and Deputy Furhman engaged in acts which caused harmful or offensive touching of Mr. Malaer, including but not limited to kneeling into Mr. Malaer's back, Defendant Kolkemo striking Mr. Malaer in the face twice and applying pain compliance holds while Mr. Malaer was already restrained, and Deputy Furhman pushing Mr. Malaer's head down and holding it to his legs as a paraplegic with a spine injury and yanking on Mr. Malaer's arms while Mr. Malaer was already restrained.

201.     Defendant Jackson County is liable under ORS 30.265 "for its torts and those of its officers, employees and agents acting within the scope of their employment or duties."

202.     As a direct and proximate cause of Defendant Jackson County's agents and employees' conduct, Mr. Malaer suffered battery by Defendant Kolkemo and Deputy Furhman, experienced physical, mental, and emotional pain and suffering, the disgust and fear of physical harassment, lived in fear of continued harassment, lived in fear of potentially life-threatening retaliation in the form of medical care deprivation and/or physical attack, was deprived of his personal property including medically necessary catheters and prescribed medications, suffered physical pain, head pain, damage and bruising to his face and body, cuts and damage to his feet, ongoing damage to his arm, was hospitalized as a result of complications from a near-septic urinary tract infection, and was deprived of his dignity and basic mobility in the way he was abused in the jail. Mr. Malaer continues to suffer and incur costs in treating anxiety, fear, loss of

sleep, and loss of enjoyment of life. All for which he is entitled to be compensated in an amount to be determined.

203.    As a result of Defendant's conduct, Mr. Malaer seeks an award of economic and non-economic damages, and to the extent available, for punitive damages for Defendant's malicious conduct.

## SEVENTH CLAIM FOR RELIEF

### Negligence

### (Defendant Jackson County)

204.    Plaintiff re-alleges all previous paragraphs as if more fully set forth.

205.    Defendant Jackson County was negligent in exposing Mr. Malaer to known dangers as alleged above.

206.    Defendant Jackson County knew or should have known that employing Defendant Kolkemo and Deputy Furhman and allowing them unrecorded access to pre-trial detainees would result in Mr. Malaer suffering harm and severe pain and suffering and economic damages.

207.    Defendant Jackson County failed to use reasonable care while detaining Mr. Malaer as alleged above. Defendant Jackson County's conduct was negligent. It was reasonably foreseeable that as a result of the conduct by deputies on July 11-12, 2019, Mr. Malaer would suffer physical harm, emotional damage, and economic damages.

208.    Defendant Jackson County owes Mr. Malaer a higher standard of care because of the special relationship between a jailor and prisoner. Further, as a pre-trial detainee, Defendant Jackson County managed all aspects of Mr. Malaer's care while he was kept in custody.

209.    Defendant Jackson County's conduct was unreasonable in light of the risk of harm to Mr. Malaer. Jackson County knew, or should have known of, the long-standing conduct by

58 – **SECOND AMENDED COMPLAINT**

deputies to harm and abuse inmates based on frequent litigation, several notices of tort claims from other prisoners, and a declaration from Jackson County's own employee filed with this Court. Despite the long-standing practice of ignoring medical claims, claims made by disabled prisoners, or claims of abuse by correction officers and staff, Jackson County took no substantive steps to change or redirect policy, and fired no correction officer for violations.

210.    Defendant Jackson County's conduct was a substantial factor in causing harm to Mr. Malaer.

211.    As a result of Defendant Jackson County's negligence, Mr. Malaer suffered harm and severe physical and mental pain and suffering, including but not limited to hospitalization from an exacerbated urinary tract infection, and medical costs. Mr. Maler suffered economic and non-economic damages in an amount to be proved at trial.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

A.  Findings that Defendants violated Plaintiff's protected Constitutional rights as set forth.

B.  For judgment in favor of Plaintiff and against Defendants for economic and non-economic losses.

C.  For punitive damages against Defendant Kolkemo.

D.  For an award of economic damages for his past and future medical and health expenses in an amount to be determined;

E.  For an award of economic damages for his past damages in an amount to be determined;

F.  For reasonable attorney fees and costs; and

G.  For such other and further relief as this Court finds just, equitable, and appropriate.

59 – **SECOND AMENDED COMPLAINT**

DATED: April 17, 2023                 Respectfully submitted,

                                          **LEDUC MONTGOMERY LLC**

                                          By: _/s/ Alicia LeDuc Montgomery_
                                          Alicia LeDuc Montgomery, OSB 173963
                                          alicia@leducmontgomery.com
                                          (503) 500-5695

                                          **MICHELLE R. BURROWS P.C.**
                                          Michelle R. Burrows, OSB 861606
                                          Michelle.r.burrows@gmail.com
                                          (503) 241-1955

                                          Attorneys for Plaintiff John Malaer