**ALICIA LEDUC MONTGOMERY, OSB 173963**
Email: alicia@leducmontgomery.com
**LEDUC MONTGOMERY LLC**
2210 W Main Street, Suite 107 #328
Battle Ground, Washington 98604
Telephone: (503) 500-5695
www.leducmontgomery.com

**MICHELLE R. BURROWS, OSB 861606**
Email: michelle.r.burrows@gmail.com
**LAW OFFICE OF MICHELLE R. BURROWS P.C.**
16869 SW 65th Avenue #367
Lake Oswego, Oregon 97035
Telephone: (503) 241-1955
www.oregoncivilrights.com

Attorneys for Plaintiff John Malaer

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| JOHN LEE MALAER,<br><br>  Plaintiff,<br><br>v.<br><br>GEOFFREY KIRKPATRICK, an individual;<br>MICHAEL WULFF, an individual; OMAR<br>ESQUEDA, an individual; ASHLEY MCFALL,<br>an individual; CITY OF MEDFORD, a<br>government agency; JACKSON COUNTY, a<br>government agency; NATHAN SICKLER, in<br>his individual and official capacity; and BRIAN<br>KOLKEMO, an individual,<br><br>  Defendants. | Case No. 1:20-cv-00049-CL<br><br>**PLAINTIFF'S RESPONSE TO CITY<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT**<br><br>**Oral Argument Requested** |

**LR 7-1 CERTIFICATION**

Counsel for Plaintiff and the City Defendants conferred regarding the City's prior motion

for summary judgment but could not resolve the issues presented in the City's motion.

**CERTIFICATION**

Counsel certifies that this brief meets the 47-page limit allowed by the Court.  ECF 224.

# TABLE OF CONTENTS

I.      JUDICIAL NOTICE ............................................................................................ 1

II.     INTRODUCTION ............................................................................................... 1

III.    FACT BACKGROUND ...................................................................................... 1

   A.    MPD Were Dispatched to Lumpy's with Limited Information ............................ 1

   B.    Esqueda Confirms There Was No Damage and Observed No Crime ................................ 2

   C.    Esqueda Confronted Malaer from Behind, Escalated the Situation, and Prevented Him from Boarding a Bus ............................................................................ 2

   D.    Esqueda Interviewed Cole and Learned of Malaer's Need for Accommodation ............. 3

   E.    Esqueda Told Malaer He Was Free to Leave and Would Not Be Arrested ..................... 4

   F.    Esqueda Refuses to Help Malaer After Releasing Him ........................................ 5

   G.    Wulff and McFall Arrest Malaer for Disorderly Conduct *After* Esqueda's Release ......... 5

   H.    McFall's Interview of Cole Confirmed No One Was Afraid of Malaer, He Was Stuck .... 7

   I.    Wulff and Esqueda Demean Malaer For His Disability and Refuse to Accommodate ...... 7

   J.    Wulff Tells McFall to Call the Jail After Malaer Threatens to Expose Misconduct .......... 8

   K.    Officers Handcuff and Drag Malaer From His Wheelchair In Unsafe Manner ................ 8

   L.    McFall Labels Malaer "Transient" On Citations Despite Knowing His Address ............. 9

   M.    Kirkpatrick Leads Malaer's Transport to the Jail ............................................. 9

   N.    Wulff and McFall Allow Malaer to be Physically Abused by Jail Deputies ..................... 9

   O.    McFall's Documents about the Arrest Contain Contradictory Information ..................... 10

   P.    Kirkpatrick and Esqueda Knew Malaer From the Recent Past ................................. 12

   Q.    Kirkpatrick Covers Up Malaer's Complaints and City Neglects Any ADA Inquiry ....... 12

IV.     CLAIMS ........................................................................................................... 12

V.      STANDARD OF REVIEW ................................................................................ 13

VI.     LEGAL ARGUMENT ....................................................................................... 14

   A.    Fourth Amendment Unreasonable Seizure ...................................................... 14

      1.    Civil Rights Act: 42 U.S.C. § 1983 ........................................................... 14

      2.    Definition of Seizure ............................................................................ 14

      3.    Probable Cause Required ....................................................................... 15

         a.    Federal Standard ......................................................................... 15

         b.    Oregon State Standard .................................................................. 16

      4.    Oregon Constitution Art. I, Sec. 9 ............................................................ 16

         a.    Scope of Art. I, Sec. 9 .................................................................. 16

       b.      Rejection of Federal 4th Amendment Analysis ....................................................... 17

       c.      Must Defer to Art. I, Sec. 9 in Probable Cause Analysis........................................ 18

    5.      Disputed Facts on Probable Cause Must Go Before the Trier of Fact ....................... 18

    6.      The Collective Knowledge Doctrine Defeats Defendants' Own Motion.................. 19

    7.      Analysis of 4th Amendment Unreasonable Seizure Claim ......................................... 20

       a.      Disputes of Material Fact Preclude Summary Judgment on This Claim............... 20

       b.      Even On Undisputed Facts Defendants Cannot Meet the Required Elements ....... 21

    8.      Defendants are not entitled to qualified immunity. .................................................. 24

       a.      Burden of Proof........................................................................................................ 24

       b.      No foundation for Qualified Immunity Exists as a Matter of Law........................ 24

       c.      Clearly Established Rights ........................................................................................ 26

    9.      Analysis .................................................................................................................... 27

  B.   Plaintiff's ADA/RA Claim ............................................................................................ 29

    1.      Plaintiff is a "Qualified Individual" under the ADA and RA.................................... 30

    2.      City of Medford is a "Public Entity" Subject to ADA and RA Liability ................. 30

    3.      City Offers Community Caretaking Services Including Transit Assistance ............. 30

    4.      Fact Disputes Precludes Summary Judgment on ADA/RA Claim............................ 32

    5.      The City Excluded Malaer from Participating In or Receiving Benefits of Public
    Services or Otherwise Discriminated Against Him ...................................................... 33

       a.      City agents denied or failed to assist Malaer in boarding a public bus.................. 33

       b.      City agents demeaned Malaer then used his response as pretext for arrest. .......... 34

       c.      City failed to ensure Malaer's medical catheter devices, medications, and
       wheelchair were available to Malaer. ...................................................................... 38

       d.      City denied Malaer community caretaking services by arresting rather than
       providing non-enforcement services........................................................................ 39

       e.      City denied Malaer medically safe and appropriate transport to the jail. .............. 40

       f.      City failed to adequately train the individual Defendants. ...................................... 41

    6.      City's Denial of Benefits and Discrimination was "By Reason of Disability".......... 43

    7.      The City Was Deliberately Indifferent, Entitling Plaintiff to Damages, Because It
    Failed to Accommodate Plaintiff................................................................................... 44

    8.      Plaintiff Provided Evidence of Economic Damages ................................................. 46

    9.      Plaintiff's ADA and RA Claims are Timely ............................................................. 46

VII.    CONCLUSION............................................................................................................... 47

## TABLE OF AUTHORITIES

**Cases**

*Act Up!/Portland v. Bagley,* 988 F.2d 828 (9th Cir. 1993) ................................ 18
*Adle v. Maine Police Dep't,* 279 F. Supp. 3d 337 (D. Me. 2017) ........................ 39
*Anderson v. Creighton,* 483 U.S. 635 (1987) ................................................ 27
*Balistreri v. Pacifica Police Dep't,* 901 F.2d 696 (9th Cir. 1988) .................... 46
*Beck v. Ohio,* 379 U.S. 89 (1964) .............................................................. 15
*Bergstralh v. Lowe,* 504 F.3d 1276 (9th Cir. 1974) ....................................... 16
*Bivens v. 6 FBI Agents,* 403 U.S. 388 (1999) ............................................... 25
*Blankenhorn v. City of Orange,* 485 F.3d 463 (9th Cir. 2007) ......................... 19
*Borunda v. Richmond,* 885 F.2d 1384 (9th Cir. 1988) ................................... 18
*Brinegar v. United States,* 338 U.S. 160 (1949) ........................................... 15
*Brower v. County of Inyo,* 489 U.S. 593 (1989) ............................................ 15
*Cady v. Dombrowski,* 413 U.S. 433 (1973) .................................................. 30
*California v. Hodari,* 499 U.S. 621 (1991) ................................................... 15
*Carroll v. United States,* 267 U.S. 132, (1925), ........................................... 15
*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................. 13
*Child v. City of Portland,* 547 F. Supp. 2d 1161 (D. Or 2009) ........................ 19
*City & Cnty. of San Francisco, Calif. v. Sheehan,* 575 U.S. 600 (2015) ............. 29
Crowder v. Kitagawa, 81 F.3d 1480 (9th Cir. 1996) ...................................... 43
*Del Monte Dunes v. City of Monterey,* 920 F.2d 1496 (9th Cir. 1990) ............... 14
*Devenpeck v. Alford,* 543 U.S. 146 (2004) ................................................... 15
*Duvall v. Cnty. of Kitsap,* 260 F.3d 1124 (9th Cir. 2001) ........................... 29, 30
*Edd v. County of Placer,* No. 2:14-cv-02739-JAM-AC (E.D. Cal. Apr. 16, 2015) ...... 33, 40
*Edgerly v. City & County of San Francisco,* 599 F.3d 946 (9th Cir. 2010) ........... 16
*EEOC v. UPS Supply Chain Solutions,* 620 F.3d 1103 (9th Cir.2010) ................. 14
*Eminence Capital, LLC v. Aspeon, Inc.,* 316 F .3d 1048 (9th Cir. 2003) .............. 47
*Ewbank v. Emrick,* No. 18-35873 (9th Cir. 2021) ......................................... 30
*Freedom Child v. City of Portland,* 547 F.Supp.2d 1161 (D.Or. 2009) ............... 18
*Gilker v. Baker,* 576 F.2d 245 (9th Cir. 1978) .............................................. 18
Gohier v. Enright, 186 F.3d 1216 (10th Cir. 1999) ........................................ 39
Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998) ....................................... 39, 41
*Gustafson v. Payless Drug Stores,* 269 Or. 354 (1974) ................................... 16
*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ............................................. 25, 26
*Harper v. City of L.A.* 533 F.3d 1010 (9th Cir. 2008) .................................... 19
*Henry v. United States,* 361 U.S. 98 (1959) ................................................. 16
*Hryciuk v. Robinson,* 213 Or. 542 (1958) ................................................... 16
*Hunter v. Bryant,* 502 U.S. 224 (1991) ...................................................... 24
*Kisela v. Hughes,* 138 S. Ct. 1148 (2018) .............................................. 24, 26
Knox v. Sw Airlines, 124 F.3d 1103 (9th Cir1997) ........................................ 22
*Libby v. City of Medford,* 2017 WL 2219995 (D. Or. Mar. 17, 2017) ................. 15
*Maine v. Thiboutot,* 448 U.S. 1 (1980) ...................................................... 14
*Malley v. Briggs,* 475 U.S. 335 (1986) ...................................................... 26
*Mark H. v. Hamamoto,* 620 F.3d 1090 (9th Cir. 2010) ................................. 30
*Mark H. v. Lemahieu,* 513 F.3d 922 (9th Cir. 2008) .................................... 44

*Martin v. PGA Tour, Inc.*, 204 F.3d 994 (9th Cir. 2000) *aff'd*, 532 U.S. 661 (2001) .................. 41

*McGary v. City of Portland*, 386 F.3d 12597 (9th Cir. 2004) .................................... 30, 40, 41, 43

*McGrath v. Liberty Mut. Fire Ins. Co.*, 836 Fed.Appx. 551 (9th Cir. 2020) ............................. 13

*McKenzie v. Lamb*, 738 F.2d 1005 (9th Cir. 1984).......................................... 16, 18, 19

*McWilliams v. Dinapoli*, 40 F.4th 1118 (10th Cir. 2022) ................................................. 28

*Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250 (2016) ........................... 47

*Michigan v. Chesternut*, 486 U.S. 567 (1988) ....................................................... 15

*Michigan v. Long*, 463 U.S. 1032 (1983) ........................................................... 17

*Midgett v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 74 F. Supp. 2d 1008 (D. Or. 1999), *aff'd*, 254 F.3d 846 (9th Cir. 2001) ................................................................... 33

*Momox-Caselis v. Donohue*, 987 F.3d 835 (9th Cir. 2021).............................................. 13

*Monell v. Department of Social Service*, 436 U.S. 658 (1978)......................................... 14

*Mustafa v. Clark County School District*, 157 F.3d 1169 (9th Cir. 1998)............................... 30

*Namisnak v. Uber Techs., Inc.*, 444 F.Supp.3d 1136 (N.D. Cal. 2020).................................. 46

*Parrott v. Taylor*, 451 U.S. 527 (1981).............................................................. 14

*Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008) ........................................... 44

*Pierson v. Ray*, 386 US. 548 (1967) ................................................................ 24

*Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175 (9th Cir. 2007)................... 20

*Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 150 (2000).................................. 13

*Rogers v. Jarrett et al*, 63 F.4th 971 (5th Cir. 2023) .............................................. 25

*Saucier v. Katz*, 533 U.S. 194 (2001) ...................................................... 14, 24, 26

*Schmerber v. California*, 384 U.S. 757, (1966) ...................................................... 14

*Sheehan v. City of S.F.*, 743 F.3d 1211 (9th Cir. 2014)............................... 14, 34, 39, 47

*Silbaugh v. Chao*, 942 F.3d 911 (9th Cir. 2019)..................................................... 47

*Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981) .................................................... 18

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir.) (*en banc*), *cert. denied* 125 S. Cit 2983 (2005) 14

*Smith v. City of Medford*, 2020 WL 8910898 (D. Or. 2020) ............................................ 30

*Soranno's Gasco Inc. v. Morgan*, 874 F.2d 1310 (9th Cir. 1984)....................................... 19

*State v. Backstrand*, 354 Or. 392 (2013)............................................................ 31

*State v. Barnthhouse*, 360 Or. 403 (2016) .......................................................... 17

*State v. Cantwell,* 66 Or. App. 848 (1984)........................................................... 22

*State v. Caraher*, 293 Or. 741 (1982) .............................................................. 17

*State v. Fair*, 353 Or. 588 (2013) ................................................................. 17

*State v. Howard/Dawson*, 342 Or. 635 (2007)......................................................... 17

*State v. Lanier*, 520 U.S. 259 (1997) .............................................................. 27

*State v. Love*, 271 Or.App. 545 (2015) ............................................................. 23

*State v. McCarthy*, 369 Or. 129 (2021).............................................................. 17

*State v. Owens*, 302 Or 196 (1986)............................................................. 16, 17

*State v. Schell*, 282 Or. App. 364 (2016) .......................................................... 22

*State v. Sierra*, 349 Or 506 (2010)................................................................. 22

*State v. Stevens*, 311 Or. 119 (1991) .............................................................. 15

*State v. Wade*, 278 Or. App 669 (2016) ............................................................. 22

*Tabares v. City of Huntington Beach,* 988 F.3d 1119 (9th Cir. 2021).................................. 18

*Terry v. Ohio*, 392 U.S. 1 (1968) ............................................................ 15, 27, 29

*Torres v. Madrid*, 141 S. Ct. 989 (2020) ........................................................... 15

*U.S. v. Diebold, Inc.*, 369 U.S. 654 (1962) ........................................................ 13

*Union Pac. R. Co. v. Botsford*, 141 U.S. 250 (1891) ................................................... 15
*United States v. Greene*, 783 F.2d 1364 (9th Cir. 1986) ............................................. 18
*United States v. Maybusher*, 735 F.2d 366 (9th Cir. 1984) ....................................... 18
*United States v. Ramirez*, 473 F.3d 1026 (9th Cir. 2007) .......................................... 19
*United States v. Smith*, 790 F.2d 789 (9th Cir. 1986) ................................................ 15
*Vinson v. Thomas*, 288 F.3d 1145 (9th Cir. 2002) .................................................... 44
*Wilson v. Garcia*, 471 U.S. 261 (1985) .................................................................... 26
Wong v. Regents of Univ. of Cal., 192 F.3d 807 (9th Cir.1999) .................................. 14
*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ......................................................... 25, 27

## Statutes

42 U.S.C. § 12132 ...................................................................................................... 29
42 U.S.C. § 12188 ...................................................................................................... 46
42 U.S.C. § 1983 .................................................................................................. passim
42 U.S.C. § 1988 ...................................................................................................... 26
Fed. R. Civ. P. 15 ...................................................................................................... 47
Fed. R. Civ. P. 56(c) ................................................................................................. 13
Fed. R. Civ. P. 56(e) ................................................................................................. 13
ORS 131.005 ............................................................................................................. 16
The Civil Rights Act of 1871 (1871) .......................................................................... 25

## Treatises

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 CAL. L. REV. 201 (2023) ......................................................................................................... 25, 26
Elliot Oberholtzer, *Police, Courts, Jails, and Prisons All Fail Disabled People*, PRISON POL'Y' INITIATIVE, (Aug. 23, 2017) ......................................................................... 37
Erin Murphy, *Manufacturing Crime: Process, Pretext, and Criminal Justice*, 97 GEO. L.J. 1435 (2009) ................................................................................................... 35
Joanna Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018). 25
Reed Collins, *Strolling While Poor: How Broken Windows Policing Created a New Crime in Baltimore*, 14 GEO. J. ON POVERTY L. & POL'Y 419 (2007) ....................................... 35
William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018) .......................... 25

## Regulations

28 C.F.R. § 35.130 ...................................................................................................... 30

## Constitutional Provisions

Oregon Constitution, Art. I, Sec. 9 ....................................................................... 16, 17
U.S. Const. Amend. IV ...................................................................................... 14, 17, 27

## I.    JUDICIAL NOTICE

Plaintiff incorporates in this brief those documents it requested the Court take judicial notice of in the concurrently filed ECF 225.  The documents are attached to the Declaration of Alicia LeDuc Montgomery ("LeDuc Decl.") filed in support of this brief.

## II.    INTRODUCTION

Plaintiff John Malaer[1], a wheelchair-bound paraplegic, was arrested on July 11, 2019 at a bus stop by City of Medford Police Department ("MPD") Officers Omar Esqueda, Michael Wulff, and Ashlee McFall (formerly Scottow). Sgt. Geoffrey Kirkpatrick was supervising the officers and arrived to transport Malaer.  Malaer was arrested for disorderly conduct and menacing. Esqueda arrived, interviewed the complainant, then told Malaer he was free to leave. Other officers had no information beyond a vague dispatch description about the incident, yet arrived and arrested Malaer with no change in circumstance. During a short 12-minute interrogation the officers prevented Malaer to board a bus, called him an asshole, and escalated the situation. Defendants knew Malaer did not damage any property.  No one was afraid of Malaer. All charges were voluntarily dismissed by the prosecution for lack of evidence. Officers lacked probable cause to arrest Malaer. They damaged his wheelchair and violated his ADA/RA rights in the process.

## III.    FACT BACKGROUND

### A.  MPD Were Dispatched to Lumpy's with Limited Information

On July 11, 2019, at 7:29 p.m. police were dispatched to Lumpy's at 801 S. Riverside Ave. for a "MALE IN A WHEELCHAIR IN THE P[arking]LOT THROWING ROCKS AT THE WINDOWS[2] AND THREATENING THE COMP[lainant]" and that the "MALE IS NOT

---

[1] Mr. Malaer was a public advocate for unhoused and disable people in Medford serving on multiple boards.
[2] Malaer's wheelchair ran low on battery and became stuck in potholes on his way to the bus stop. He threw pebbles at the nearby building to get attention. Ex. 5 (12:16-24; 14:6-17:25).

1 – **PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

KNOWN TO THE EMPLOYEE." The incident was labeled "Disorderly Conduct." Exs.1-2.

This is the totality of information provided to the Defendants before they arrived on scene.

Wulff and McFall were dispatched at 7:39 PM. Esqueda was called as backup and arrived first at

19:40 (7:40 PM). Ex. 3 (21:22-25:21). There were no further communication before Esqueda

arrived. Ex. 3 (25:22-25; 30:5-12). His bodycam recorded much of the interaction at the scene.[3]

*See* ECF 84 (Esqueda Video); Ex. 4 (Esqueda Bodycam Transcript).

## B. Esqueda Confirms There Was No Damage and Observed No Crime

As Esqueda approached, Malaer was in his electric wheelchair on the sidewalk trying to

board the bus. The bus ramp was down and Malaer was negotiating with the driver to get help

loading his wheelchair. The caller, Kelly Cole, was in the doorway of Lumpy's. Esqueda asked

"Did he damage anything?" and Cole confirmed "No." Ex. 4 (0:03-06); ECF 84 (Esqueda Video,

2:40:44-2:40:51).

## C. Esqueda Confronted Malaer from Behind, Escalated the Situation, and Prevented Him from Boarding a Bus

Malaer is paraplegic and confined to a wheelchair. The battery for the wheelchair was dying,

rendering the wheelchair useless. Esqueda walked toward Malaer, who was unaware of

Esqueda's presence. Esqueda commands "Hey! Do you have a bus pass? Do you have a bus

pass? Then get on the bus." Ex. 4 (00:14-38); ECF 84 (Esqueda Video). Startled, Malaer turned,

asking "Do I even know you? Why do I even have to talk to you?" Esqueda responded, "Because

you're being an asshole. Go away." Esqueda described Malaer's "behavior" as "yelling" and

"using curse words." But Esqueda initiated the encounter and called Malaer "an asshole" twice

within the first 30 seconds of speaking to him. *Id.* Esqueda called Malaer an "asshole" because

---

[3] Esqueda's bodycam video gives incorrect information about the event – the recording lists the date as July 12, 2019 when it was actually July 11, 2019, and the time begins at 2:40:44 AM when the incident began at 7:40 PM.

he attempted to "speak to him on his level" and "use the similar language," but does not believe calling Malaer an "asshole" was "aggressive" language. Esqueda admitted it was "possible" calling Malaer an asshole would "escalate the situation." Ex. 3 (35:1-37:8). It did.

Esqueda ended Plaintiff's dialogue with the bus driver, preventing Malaer from boarding the bus. Esqueda admitted he knew Malaer was trying to board the bus. Ex. 3 (31:25-34:11). Esqueda did nothing to hold the bus or assist Malaer in boarding. The bus left. ECF 84.

Esqueda continued escalating: "You think just because you're in a wheelchair you can't go to jail?" Ex. 4 (00:41-46); ECF 84 (Esqueda Video, 2:41:20). Esqueda put his gloves on stating, "beat[ing] up a guy in a wheelchair" was a "possible" outcome, although he preferred to avoid it. Ex. 4 (1:22-1:34); ECF 84 (Esqueda Video, 2:42:06). In Malaer's experience when officers "glove up" it means he is getting arrested and likely hurt. Ex. 6 (83:9-24).

Malaer experiences medical incontinence. He had not evacuated his bladder for several hours, urinating himself.[4] Ex. 6 (79:23-80:5). Esqueda mocked Malaer's medical incontinence telling bystanders that Plaintiff "pissed in his wheelchair." Ex. 4 (01:49-01:52); ECF 84 (Esqueda Video, 2:42:37). Esqueda's comments provoked an angry response from Malaer. Esqueda responded "you're just a sad, pathetic man who needs to go away." Ex. 4 (02:08-02:28); ECF 84 (Esqueda Video, 2:43:00-12). Esqueda then called Malaer "an idiot." *Id*. Esqueda testified "No," it was not disrespectful to call Malaer "sad" and "pathetic" in public. Esqueda confirmed "Yes," he believed "it was appropriate to call a man in a wheelchair in distress sad and pathetic" in response to racists comments. Ex. 3 (51:18-52:17).[5]

**D. Esqueda Interviewed Cole and Learned of Malaer's Need for Accommodation**

---

[4] Mr. Malaer's paraplegia resulted in a neurogenic bladder controlled by medication. Ex. 6 (14:16-`6:18).
[5] Many of Malaer's comments are racist and angry.

Esqueda interviewed Kelly Cole who called MPD.  Esqueda "wanted to get a brief statement to know whether or not I could allow Mr. Malaer to leave or whether he was not free to leave pending Officer Scottow's investigation at the time" so was ***"conducting interviews with people at the scene to determine whether Mr. Malaer should be detained."*** Ex. 3 (44:16-45:17) (emphasis added).

Cole told Esqueda she did not know Malaer. She said Malaer "Got himself stuck in a hole. Couple of guys helped him out. As soon as they left he turned his motor back on made them think it was a dead battery. Put himself back in the hole. Two other people helped him out. When I came out here he started this. And calling me names, threaten my life."  Ex. 4 (01:02-01:38). Esqueda did not ask Cole about what names or what threat to life she alleged. Esqueda did not investigate why Malaer's wheelchair was malfunctioning.  Ex. 3 (46:16-21; 47:8-48:7).

During the interview, Cole yelled at Malaer and said "I'll beat him up."  Ex. 4 (01:22-01:27). Esqueda testified he did not think it was concerning that the caller was threatening to beat up a man in a wheelchair in his presence.  Ex. 3 (50:2-52:17).

**E.  Esqueda Told Malaer He Was Free to Leave and Would Not Be Arrested**

Esqueda testified Malaer was free to leave after the Cole interview.  Ex. 3 (53:9-18). Esqueda's bodycam shows he commanded Malaer to leave several times. According to Exhibit 4 transcript (based on ECF 84 Esqueda Video):

> 0:18 Esqueda: "Do you have a bus pass? …. Then get on the bus."
> 0:34 Esqueda: "So leave these people alone. Go away."
> 0:38 Esqueda: "Go away."
> 0:46 Esqueda: "So go away."
> 0:53 Esqueda: "Go away. Go."
> 2:04 Esqueda: "[J]ust go away."
> 2:16 Esqueda: "I'm not going to put you in jail, OK, because you're just a sad, pathetic man who needs to go away. Alright, just go away. Just go away."
> 2:22 Esqueda: "Just go away."
> 2:24 Esqueda: "Just go away."
> 3:02 Esqueda: "I want you to leave me alone right now, to be honest."

Ex. 4; ECF 84 (Esqueda Bodycam). Esqueda confirmed "Malaer was free to leave at that point" because "At that point, I was asking him to leave." Ex. 3 (53:9-18; 54:1-9). Esqueda released Malaer *after* he interviewed Cole. "I was giving Mr. Malaer the opportunity to leave. Yes." And "Yes," "this was after Ms. Cole had told you or the caller had told you that Mr. Malaer had been throwing rocks or making threatening statements before you arrived, correct?" *Id*. (53:9-54:9). "[B]ased on [my] initial interviews with Mr. Malaer, he was free to go." *Id*. (45:10-17).

### F.  Esqueda Refuses to Help Malaer After Releasing Him

Esqueda admitted that after he released Malaer, Malaer asked Esqueda: "Are you going to help me?" Esqueda answered: "No, I'm not going to help you." Ex. 3 (41:1-4); Ex. 4 (02:35-03:02); (ECF 84 (Esqueda Video, 2:43:31). Malaer's wheelchair battery had no power, he was stuck. Esqueda did nothing to assist Malaer. Malaer then asked Esqueda to simply leave him alone, but Esqueda refused to do that either. *Id*.

### G.  Wulff and McFall Arrest Malaer for Disorderly Conduct *After* Esqueda's Release

At 7:43 PM, Officers Wulff and McFall arrived with no additional information beyond the dispatch call-out. Ex. 7 (88:9-90:22); Ex. 8 (18:12-22). Wulff saw "Esqueda talking with a man sitting in a wheelchair." Ex. 7 (95:22-96:2). Within 1 minute of arrival, McFall and Wulff[6] arrested Malaer for disorderly conduct:

| | |
|---|---|
| Officer McFall (03:49): | What's Going on? |
| Malaer (03:50): | Trying to get home dog. |
| Officer McFall (03:52): | Trying to get home? |
| Officer McFall (03:55): | What's your name? |
| Malaer (03:57): | It doesn't matter what my name is. |
| Officer McFall (03:59): | It does matter. |
| Malaer (03:59): | No it doesn't. No it doesn't. |
| Malaer (04:01): | What you gonna arrest me cuz I don't give you my name? Is that what you're gonna do? |
| Officer McFall (04:05): | Well, I got called here for a reason, so. |
| Malaer (04:07): | Doesn't matter what you got called for. It doesn't matter what all these idiots have fucking said. Are you gonna arrest me? Because I fucking want to go |

---

[6] McFall was a recruit working in a team with Wulff. Ex. 3 (44:4-15).

| | |
|---|---|
| | home? Is that what you're gonna arrest me for? Then, you do that. |
| Officer McFall (04:20): | What's going on? |
| Malaer (04:21): | You're an idiot. That's what's going on. He's an idiot. You're an idiot. You guys need to leave me the fuck alone. That's what is going on. |
| Officer McFall (04:29): | Do you, do you mind standing by with him so I can get a… |
| **Malaer (04:32):** | Step off bitch. Step off mother fucker. That's what they're asking you. Step off. Mother fucker. Fuck all you mother fuckers. **What you guys gonna do? Arrest me?** |
| **Officer McFall (4:42):** | **Yeah.** |
| **Officer Wulff (4:42):** | **Probably.** |
| **Malaer (4:44):** | **You gonna throw me on the ground and put me in jail? For what?** |
| **Officer McFall (04:45):** | **We're not going to throw you on the ground. But we'll put you in.** |
| **Malaer (04:46):** | **What you gonna put me in jail for?** |
| **Officer Wulff (04:49):** | **On its nose right now, I'd say disorderly contact.** |
| Malaer (04:49): | Because these idiots right here. Fuck you. Fuck you. Then you do that. Arrest me. That's what you do. That's your next fucking job. |
| Officer Wulff (04:58): | We're assuming you're okay. <laugh>. |
| Officer Esqueda (5:01): | <laugh> Yeah. |

Ex. 4 (emphasis added); ECF 84 (Esqueda Video).  Wulff testified Malaer "wasn't free to leave"

at this point. Ex. 7 (100:6-101:12).  Neither McFall nor Wulff had obtained Esqueda's

information or any information from Cole at the time Malaer was arrested. Ex. 7 (99:20-100:5);

Ex. 3 (57:8-15).

The totality of the information McFall had at arrest was the dispatched information, Malaer's

refusal to give his name, and his angry response to their interview. Wulff admitted none of this

constitutes even reasonable suspicion of a crime. Ex. 7 (101:23-102:14).  Officers admitted they

are not authorized to arrest someone "solely for not giving their name." Ex. 7 (99:3-19); Ex. 6

(59:18-21).  Wulff testified Malaer was not free to leave based solely on the dispatched

information and "because Corporal Esqueda was talking to him and engaged with him, and he

had arrived before us, and I trust him to know that he's talking to the right person." Ex. 7

(100:19-25). Wulff did not know what information Esqueda had obtained prior to Wulff's

arrival. Wulff never saw Malaer throw rocks or threaten the complainant. *Id.* (101:23-102:14).

## H. McFall's Interview of Cole Confirmed No One Was Afraid of Malaer, He Was Stuck

McFall interviewed Cole *after* Malaer was arrested for disorderly conduct, and again *after*

officers handcuffed and put Malaer in the patrol vehicle. ECF 84 (Scottow Video). McFall

never obtained Esqueda's summary of his earlier interview with Cole. Ex. 3 (57:8-15). During

the interviews Esqueda told Cole "I don't think he has the means–he's just a talker." Ex. 28

(17:53-18:26). Cole said "He didn't scare me, he just pissed me off when he put it back in the

hole the second time." *Id.* Cole's motivation for calling MPD about Malaer was not fear, but

because she was angry Malaer's wheelchair was stuck in front of Lumpy's. Cole claimed Malaer

got "stuck in the hole purposely," and was making people "believe" he had a dead battery. She

repeatedly told officers "the motor's good, if you guys have to load him up, the [wheelchair]

motor's good." *Id.* (2:56-3:01). McFall tried to move the wheelchair after arrest and said the

battery "is dead." *Id.* (26:27-27:00). Officers were not afraid of Malaer and never searched him

for weapons. Ex. 8 (37:9-17; 38:12-39:9). McFall testified he was not enough of a threat for a

pat down. *Id.* (38:21-39:1). He was not armed. Ex. 7 (130:6-10). He never touched anyone. *Id.*

(120:17-121:14).

## I. Wulff and Esqueda Demean Malaer For His Disability and Refuse to Accommodate

Wulff and Esqueda remained with Malaer for 12 minutes escalating the situation while

McFall interviewed Cole. Wulff stated Plaintiff was "the pot calling the kettle black" in

reference to being a "piece of shit." Defendant Esqueda laughed "that is how the saying goes."

Wulff confirmed "that is exactly what I said." Wulff tells Malaer "You're talking a lot of trash

for being in a wheelchair" and "Your mouth's writing checks your body can't cash," to which Esqueda laughs.  Ex. 4 (05:29-7:01); ECF 84 (Esqueda Video).  Wulff believed these comments were funny and did not constitute "commenting on his disability." Wulff did not care whether Malaer was offended or whether Wulff was being intimidating. Ex. 7 (119:18-138:12).  Wulff expected his derogatory comments about Malaer's disability to cause Malaer "to cuss and scream at me and call myself and Corporal Esqueda names and yell and be angry. I had no indication that no matter what the question I asked I was going to get any different response than I was getting." *Id*. (137:5-138:12). Wulff admitted he incited Malaer, but doesn't consider it "bullying." *Id*. (134:10-135:6).  Esqueda believed it appropriate to call Malaer "sad" and "pathetic."  Ex. 3 (51:10-52:13).

Malaer repeatedly told the officers to leave him alone. Ex. 4 (02:58-3:02; 04:21-28; 08:26-8:31).  Malaer told Wulff and Esqueda his wheelchair couldn't move and he wanted to leave: "Let me get the fuck out of here. If my wheelchair could role, I would be out of here." Ex. 4 (09:16). Wulff admitted MPD should have asked Malaer if he needed help getting home and helped him. Ex. 7 (115:15-118:2-16).

**J.  Wulff Tells McFall to Call the Jail After Malaer Threatens to Expose Misconduct**

Malaer was a homelessness advocate on the Jackson County Continuum of Care Board with City Manager Brian Sjothun.  Malaer said he was going to tell Sjothun "the truth" about Wulff and that "You guys don't give a fuck about a dude in a wheelchair." Wulff responded by telling McFall "Actually go call the jail and tell them we're bringing in a guy in a wheelchair[.]" Malaer told Defendants they were incorrectly applying disorderly conduct law, and that he was going to inform the City and file a lawsuit. The officers proceeded with arrest. Ex. 4 (07:31-08:31).

**K.  Officers Handcuff and Drag Malaer From His Wheelchair In Unsafe Manner**

McFall handcuffed Malaer and told him to "Stand up!" Wulff responded "I don't think he

can, so we're going to have to move him." Ex. 4 (15:11-15:17:01). Officers pulled Malaer out

of his wheelchair, bent him forward handcuffing him behind his back. Officers dragged Malaer

by his elbows, dropped his body down toward the ground, then pulled him up again. They slowly

drug Malaer in sideways across the back seat of the SUV. Officers belted Malaer into the

backseat with his arms still handcuffed behind his back, without any support. This is a

particularly dangerous position to leave a paraplegic man in. Malaer exclaimed "you guys don't

even know how to do this." *Id*.; Ex. 25. The Defendants' actions caused Malaer pain as he was

handcuffed behind his back while his body was being shoved and contorted. Malaer tried to

stabilize with his hands. McFall said Malaer was resisting arrest, but the video shows no

resistance and Esqueda testified Malaer did not resist arrest. Ex. 3 (53:5-8); Ex. 25.

**L. McFall Labels Malaer "Transient" On Citations Despite Knowing His Address**

Malaer told McFall he was just "trying to get home." Ex. 4 (03:49). McFall obtained

Malaer's ID with his name and address. McFall conducted a search locating Malaer's address.

Ex. 3 (99:5-101:25). McFall asked Malaer "You're living off Grape Street?" Ex. 28 (21:07).

Yet McFall wrote "transient" as Malaer's address on both criminal citations. Ex. 11. McFall

admitted she had no reason to believe Malaer was transient. Ex. 8 (80:13-81:24; 84:4-16).

**M. Kirkpatrick Leads Malaer's Transport to the Jail**

Kirkpatrick was the Sergeant in charge of MDP Team 7. Ex. 10 (33:10-19). Kirkpatrick

gave instruction to Wulff by phone regarding Malaer's arrest and transport. Ex. 7 (151:20-

152:13). He arrived with a community resource truck, loaded the wheelchair in, and transported

it to the jail. Ex. 10 (102:7-23). Kirkpatrick dragged the wheelchair, damaging it. Ex. 14.

**N. Wulff and McFall Allow Malaer to be Physically Abused by Jail Deputies**

Malaer was transported in a police SUV which was not ADA equipped for a paraplegic

arrestee. Ex. 7 (152:9-22).  Malaer was dropped to the ground as he was dragged from McFall's

MPD vehicle at the jail. Wulff and McFall were present and took no action. Exs. 13-14. Jail

deputies used multiple acts of force on Malaer while Wulff and McFall stood by failing to

intercede.  Ex. 15.  Wulff admitted he heard Plaintiff scream "Take me to a hospital!" while

being assaulted.  Ex. 7 (163:3-165:12).  Kirkpatrick expected all MPD officers to intervene if

they witness excessive use of force by law enforcement.  Ex. 10 (121:18-123:7); Ex. 16 (Use of

Force Policy).  Oregon State Police Sgt. Jeff Proulx agreed law requires "an officer, if you see

someone using excessive force, that you are required to report it to a supervisor."  ECF 168-1 at

30, Ex. D.

## O.  McFall's Documents about the Arrest Contain Contradictory Information

McFall wrote citations, an incident report, and a Probable Cause Affidavit for the arrest.  Ex.

11.  The citations state Malaer is "transient," despite officers knowing Malaer's home address

from the prior 2018 incident, Malaer's ID, and the police vehicle computer report.  *Id.*

McFall's[7] incident report states McFall interviewed Cole "[a]fter taking Malaer into

custody."  Cole told McFall that Malaer threw rocks at the building causing no damage and had

yelled profanities threatening her life.  *Id*. at 7.  The report states "It should be noted Malaer's

wheelchair battery was dead" and listed Malaer's Grape Street address. Ex. 11 at 7.

Cole's statements to McFall contradict information previously made to Esqueda which is

not noted in McFall's report or the probable cause affidavit. Importantly missing from

McFall's report are Cole's statements Malaer was not a threat, that she was not afraid of him,

and that Cole's assertion Malaer's wheelchair batteries were "good" was false.  There is

---

[7] McFall is the only officer to write a report. Esqueda never gave a written or oral report on his contact at the scene.

nothing in the report about Esqueda sharing a similar view that he found Malaer harmless. The information known to officers was that Malaer wanted to go home, his wheelchair battery died, and he needed help. He did not harm anyone and did not intend to cause disturbance nor harm. Ex. 5 (36:25-37:25); Ex. 7 (120:25-121:14).

McFall's probable cause affidavit states "Upon contacting Malaer he was yelling profanities and threatening the employee, Kelly Cole," describing what the officer saw. Ex. 11 at 8.  This is false.  Malaer never interacted with Cole after McFall arrived, and she never saw Malaer do so. ECF 84 (Scottow Video).  The affidavit also states "Malaer stated several times that he was going to put a bullet in Officer Wulff and my head" to support probable cause to arrest. Ex. 11 at 8. But McFall omits the key fact that Malaer made these verbal statements *after* he was already arrested and not free to leave, including after being handcuffed and in custody in the back of her patrol car.  Ex. 28 (22:15-23:31).  The affidavit further states the arrest was made based on statements by Cole, but McFall had not interviewed Cole when she arrested Malaer.  Ex. 11 at 8.  Most of Cole's statements to McFall were made during interviews occurring *after* Malaer was handcuffed and in the patrol vehicle.  Ex. 28 (13:23-15:26); ECF 84 (Scottow Video). Officers knew Cole's statements were incorrect, but transported Plaintiff to the jail.

Malaer was arrested for Disorderly Conduct and Menacing, which require inflicting injury and risk to others.  Exs. 17-18.  But as noted above, Cole and officers all stated they were not afraid of Malaer and he had not harmed anyone or caused damage.  Esqueda testified there was no evidence to determine the "intent" element of disorderly conduct. Ex. 3 (95:13-96:1). Esqueda also testified there was insufficient evidence for menacing. *Id.* (94:15-95:3).

McFall contradicted herself in three sworn declarations about the arrest.  ECF 87, 90, 149. Her declarations at ECF 87 and 90 declare under penalty of perjury she reviewed bodycam video

and fleet video and "Once Plaintiff was secured in my patrol vehicle, I activated the vehicle's Axon Fleet Camera, which was on until we arrived at the jail." But this testimony is directly controverted by bodycam footage showing Wulff activated the fleet video, and McFall was inside Lumpy's at the time. ECF 84 (Scottow Video, Wulff Video, Fleet Video).

## P. Kirkpatrick and Esqueda Knew Malaer From the Recent Past

In December 2018, Esqueda arrested Malaer at the hospital while Malaer was being treated for complications from a broken femur. Esqueda removed Malaer from the hospital while Malaer was naked, covered in blood, without his wheelchair, and not wanting to leave medical care. Ex. 3 (13:13-14:25; 16:20-17:1; 20:4-22); Ex. 6 (34:9-20; 74:3-75:6). Because MPD arrested and took Malaer to the jail without a wheelchair, Kirkpatrick drove Malaer home from jail and entered his Grape Street house to get a manual wheelchair for him. Ex. 6 (54:7-55:12).

## Q. Kirkpatrick Covers Up Malaer's Complaints and City Neglects Any ADA Inquiry

Malaer filed complaints with the City regarding the July 11, 2019 arrest. Exs. 19-21. The complaint to the City Manager titled "4th Amendment and ADA rights conflict with the City" stated Malaer's wheelchair was dead and he was thrown on the ground by law enforcement, and left without a wheelchair. Ex. 21. Kirkpatrick was a named officer to be investigated. Ex. 20.

MPD appointed Kirkpatrick to investigate himself. He conducted an internal affairs ("IA") investigation solely regarding use of force and exonerated all officers involved. Ex. 32. However, Kirkpatrick's IA Report conflicts with other evidence and testimony regarding the arrest. ECFs 196, 198 (Ex. 6). Kirkpatrick's IA investigation was the City's only investigation of Malaer's complaints. The City never addressed any ADA violations.

## IV.    CLAIMS

Plaintiff alleges two claims against City Defendants: (1) a Civil Rights Act claim against the individual Defendants for Fourth Amendment violations of unreasonable seizure and arrest,[8] and (2) an ADA/RA claim against the City for violations occurring during arrest and transport of Malaer.  ECF 209.  The City moved for summary judgment against all claims.  ECFs 183, 210.

## V.    STANDARD OF REVIEW

Summary judgment is appropriate if the evidence, read in the light most favorable to the non-moving party, demonstrates there is *no genuine issue of material fact* entitling the moving party to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  The moving party bears the initial burden of showing that no genuine issue of material fact exists.  *Celotex*, 477 U.S. at 323; *McGrath v. Liberty Mut. Fire Ins. Co.*, 836 Fed.Appx. 551, 552 (9th Cir. 2020).  The responding party need not produce evidence in a "form that would be admissible at trial," but rather may simply support the response by the type of evidence listed in Rule 56(c). *Celotex* at 324; Fed. R. Civ. P. 56(c), (e).

A genuine issue of material fact occurs when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  The court must view the evidence in the light most favorable to the non-moving party, but may not make a credibility determination or weigh the evidence.  *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 150 (2000); *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021).  The court's role is not to determine the truth but to determine whether there is a genuine issue of fact for trial. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002).

---

[8] Plaintiff concedes Kirkpatrick is not a proper defendant on the Fourth Amendment claim as currently alleged.

Summary judgment motions are generally unsuitable and unsuccessful in cases involving constitutional rights and ADA/RA issues because of the import of the facts and circumstances of each specific case and necessity for making reasonableness determinations. *Del Monte Dunes v. City of Monterey*, 920 F.2d 1496, 1508-09 (9th Cir. 1990); *Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir.) (*en banc*), *cert. denied* 125 S. Ct 2983 (2005); *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir.1999); *Sheehan v. City of S.F.*, 743 F.3d 1211, 1233 (9th Cir. 2014); *EEOC v. UPS Supply Chain Solutions,* 620 F.3d 1103, 1110 (9th Cir.2010); *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

## VI.    LEGAL ARGUMENT

### A. Fourth Amendment Unreasonable Seizure

#### 1.   <u>Civil Rights Act: 42 U.S.C. § 1983</u>

The Civil Rights Act, 42 U.S.C. § 1983, does not create rights but provides the vehicle by which federal rights can be enforced.  This section is used to enforce rights given under any federal statute or the federal constitution.  *Monroe v. Pape*, 365 U.S. 167 (1961); *Monell v. Department of Social Service*, 436 U.S. 658 (1978); *Maine v. Thiboutot*, 448 U.S. 1 (1980).  A claim under § 1983 must show (1) a deprivation (2) of some protected federal right (3) under color of state law.  *Parrott v. Taylor*, 451 U.S. 527, 536-37 (1981); *Monroe*, 365 U.S. 167.

The heart of this case is an unreasonable arrest and detention by City Defendants. The Fourth Amendment protects personal privacy and dignity against unwarranted intrusion by the State.  *Schmerber v. California*, 384 U.S. 757, 770 (1966).  Searches and seizures conducted in violation of the 4th and 14th Amendment are actionable.  *Monroe v. Pape*, 365 U.S. 167 (1961); U.S. Const. Amend. IV.

#### 2.   <u>Definition of Seizure</u>

A seizure occurs when police objectively manifest an intent to restrain. *California v. Hodari,* 499 U.S. 621, 626 (1991); *Brower v. County of Inyo*, 489 U.S. 593, 596-597 (1989); *Terry v. Ohio,* 392 U.S. 1, 15 (1968); *Torres v. Madrid*, 141 S. Ct. 989, 992 (2020) (*citing Michigan v. Chesternut*, 486 U.S. 567, 574 (1988)).

> No right is held more sacred, or is more carefully guarded, by the common law than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Terry v. Ohio*, 392 U.S. at 9 (*citing Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

### 3.  <u>Probable Cause Required</u>

A constitutionally valid seizure must have probable cause to believe a crime has been committed; the officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrants that intrusion." *Id. at.* 21.

#### *a.  Federal Standard*

Federal law contains no definition of probable cause.  Probable cause exists when "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the person being arrested] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986); *Carroll v. United States*, 267 U.S. 132 (1925);  *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949); *Beck v. Ohio*, 379 U.S. 89, 91 (1964).  It is a purely objective standard ignoring subjective intent of the officers.

"Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Libby v. City of Medford*, 2017 WL 2219995 (D. Or. Mar. 17, 2017) (assessment of "all the information" possessed) (citing, *State v. Stevens*, 311 Or. 119, 129 (1991)). Mere suspicion, common rumor, or even strong reason to suspect are not enough. *McKenzie v. Lamb*,

738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. United States*, 361 U.S. 98, 101 (1959). If specific intent is an element of the offense, the arresting officer must have probable cause for that element. *Edgerly v. City & County of San Francisco,* 599 F.3d 946, 953 (9th Cir. 2010).

### b. *Oregon State Standard*

Oregon defines probable cause as "there is substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." ORS 131.005. The Oregon Supreme Court held the Oregon Constitution, Art. I, Sec. 9 mandates a subjective component to a probable cause analysis.

> Probable cause under the Oregon Constitution *has both a subjective and an objective component*. An officer must subjectively believe that a crime has been committed and thus that a person or thing is subject to seizure, this belief must be objectively reasonably in the circumstances. The test is not simply what a reasonable officer could have believed when he conducted a warrantless search or seizure, but it is what this officer actually believed, based on the underlying facts of which he was cognizant together with his own training and experience.

*State v. Owens*, 302 Or 196, 204, 729 P.2d 524 (1986) (Defendants were bound by the Oregon probable cause of Art. I, Sec. 9, OR. CONST. when they arrested Plaintiff)[9]; *Bergstralh v. Lowe*, 504 F.3d 1276, 1277 (9th Cir. 1974). The Oregon standard is bifurcated in that the officers must have both a reasonable belief of the guilt of the accused as well as a subjective belief. *Gustafson v. Payless Drug Stores*, 269 Or. 354, 356, 525 P.2d 118, 120 (1974) (citing *Hryciuk v. Robinson,* 213 Or. 542, 561, 326 P.2d 424 (1958)); *State v. Owens*, 302 Or. at 204.

### 4. <u>Oregon Constitution Art. I, Sec. 9</u>

### a. *Scope of Art. I, Sec. 9*

---

[9] Justice Linde's analysis of the State Law First Methodology of Judicial Review places great emphasis on state constitutions. "Many state constitutions contain explicit textual guarantees of certain personal liberties that the Federal Constitution is much more vague about." Interview, Hans Linde, NY TIMES, Dec. 21, 1990. Courts should look first to state law and state constitutions and address federal constitutional questions only after a determination that neither state law nor the state constitution provides the protection claimed. Linde, *Without "Due Process": Unconstitutional Law in Oregon*, 49 OR L. REV. 125, 135 (1970). The Oregon Supreme Court adopted State Law First analysis in *Sterling v. Cupp*, 290 Or 611, 614, 625 P.2d 123 (1981).

Article I, Sec. 9, OR. CONST. guarantees individuals the right "to be secure in their persons, houses, papers and effects against unreasonable search or seizure. *State v. McCarthy*, 369 Or. 129, 140, 502 P.3d 478 (2021); *State v. Howard/Dawson*, 342 Or. 635, 639-40, 157 P.3d 1189 (2007). The Oregon Constitution protects both possessory and privacy interests mandating both an objective and subjective analysis by the arresting/seizing officer. *State v. Owens* at 200. The Oregon Constitution only protects against searches/seizure "that are arbitrary, oppressive, or otherwise unreasonable." *State v. Fair*, 353 Or. 588, 602, 302 P.3d 417 (2013); *State v. Barnthhouse*, 360 Or. 403, 412-414, 380 P.3d 952 (2016).

### b. *Rejection of Federal 4th Amendment Analysis*

The Oregon Supreme Court "return[ed] Oregon search and seizure to the traditional rule" rejecting earlier decisions "which had adopted the federal rule" in searches and seizures. *State v. Caraher*, 293 Or. 741, 653 P.2d 942 (1982) (adopting a stricter Oregon rule); *State v. Owens* at 201. In reasserting this court's duty to interpret the protections afforded Oregonians by our state constitution independently from the federal constitution, we eschewed the federal practice" of search/arrests. *Id.*; *State v. Barnhouse*, 360 Or. at 413-418.

The Oregon Constitutional Art. I, Sec. 9 analysis "differs from Fourth Amendment analysis" compelling the Oregon Supreme Court to afford primacy to the Oregon Constitution in search and seizure arena. *State v. McCarthy*, 369 Or. at 153; *State v. Caraher*, 293 Or. 741, 756, (1982). This position was adopted by the United States Supreme Court. *Michigan v. Long,* 463 U.S. 1032, 1038 (1983). "It is fundamental that state courts be left free and unfettered by us in interpreting their state constitutions." *Id*. at 1041.

This court must defer to the Oregon Constitutional interpretations of Art. I, Sec. 9 in its probable cause determination. The cited authorities herein discuss the Oregon Constitutional

treatment of stops, searches, automobile searches, searches incident to arrest, among others in a manner which differs from, and is more protective than, the Fourth Amendment.

### c.   *Must Defer to Art. I, Sec. 9 in Probable Cause Analysis*

Defendants argue the federal standard of objective probable cause governs the assessment in this case. There is a footnote in which defense counsel claims Plaintiff counsel agrees. That is incorrect. Plaintiff's counsel has obtained rulings from District Court judges that the Oregon bifurcated standard applies because that is the standard legally applicable to certified Oregon police officers in the commission of their duties.  Furthermore, the Oregon Constitution provides the minimum standard of the bifurcated standard which this court has no jurisdiction to modify or change.

The concept of federalism rests on the principle that the United States Constitution provides the *minimum standard* for government actions. States are permitted to go beyond that standard without interference by the federal courts.

### 5.   <u>Disputed Facts on Probable Cause Must Go Before the Trier of Fact</u>

The determination of the existence of probable cause is a disputed fact which must be resolved by the trier of fact. *Gilker v. Baker*, 576 F.2d 245, 247 (9th Cir. 1978) (factual determination and existence of probable cause is issue for the jury); *Smiddy v. Varney*, 665 F.2d 261, 265 (9th Cir. 1981); *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (§ 1983 actions on probable cause are for the jury); *Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1988) (if facts of arrest are disputed, probable cause is a question for the jury); *Act Up!/Portland v. Bagley,* 988 F.2d 828, 873 (9th Cir. 1993) (same); *United States v. Maybusher*, 735 F.2d 366, 371 (9th Cir. 1984); *United States v. Greene*, 783 F.2d 1364, 1367 (9th Cir. 1986); *Freedom Child v. City of Portland*, 547 F.Supp.2d 1161, 1167 (D.Or.  2009) (probable cause to arrest is a

jury question). Many of the "factual matters underlying the judgment of reasonableness" can turn on credibility determinations, motive, and intent which must only be decided by the trier of fact. *Anderson v. Liberty Lobby,* 477 U.S. at 255; *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007) *Soranno's Gasco Inc. v. Morgan,* 874 F.2d 1310, 1315-1316 (9th Cir. 1984); *Child v. City of Portland*, 547 F. Supp. 2d 1161, 1167 (D. Or 2009).

### 6.  The Collective Knowledge Doctrine Defeats Defendants' Own Motion

All the police officers who arrested Malaer are bound by the collectively held knowledge of all other officers, even if all of the information known to law enforcement is not communicated to the officer who actually undertakes the action. *United States v. Ramirez*, 473 F.3d 1026 (9th Cir. 2007); *Harper v. City of L.A.* 533 F.3d 1010, 1022 (9th Cir. 2008). This attributes all the knowledge held by Officer Esqueda - including statements by percipient witnesses, admissions by those witnesses, and his own instructions to Malaer to leave - to Wulff, McFall, and Kirkpatrick at the time of their actions. Defendants concede this.  ECF 183 at 15.

All Defendants knew Malaer had not injured anyone, did not damage property, his wheelchair had malfunctioned, he had required mobility assistance, he had urinated himself, he had asked for help but was denied assistance, no one believed he was a threat, and he was released to go home. "Where the facts or circumstances surrounding an individual's arrest are disputed, the existence of probable cause is a question for the jury". *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir. 1984) (*cited in Harper v. City of L.A.* 533 F.3d at 1022. There is no dispute the arrest occurred after the arrival of Wulff and Scottow, prior to that Malaer was free to leave. But nothing had changed from the time of Esqueda's contact until the arrest. What is apparent is that McFall failed at multiple levels to ascertain essential facts which actually negated her proposed probable cause to arrest for Menacing and Disorderly Conduct.

7. <u>**Analysis of 4th Amendment Unreasonable Seizure Claim**</u>

    a. ***Disputes of Material Fact Preclude Summary Judgment on This Claim***

        i. <u>**McFall's Own Testimony, Declarations, and Reports Conflict**</u>

McFall as the arresting officer is responsible for Malaer's arrest.  It is undisputed at the time of arrest she only knew the information in the dispatched call, that Esqueda was speaking to a gentleman in a wheelchair, and Malaer would not provide his name and was being verbally uncooperative. She had no information whether Malaer had been fighting, engaged in threatening behavior, making unreasonable noise, obstructed a public way, failed to comply with a lawful order, or created a hazard. She did not have any information whether Malaer *intended* to create a public inconvenience or annoyance. She did not even know why Malaer was at the bus stop.

But what Scottow failed to do is even as critical. Fourth Amendment violations can be based on action or inaction by state actors. *Preschooler II v. Clark Cnty. Sch. Bd. of Trustees*, 479 F.3d 1175 (9th Cir. 2007).  McFall failed to interview witnesses prior to arrest, failed to interview Esqueda, failed to obtain any information at all about what had transpired before her arrival. She never asked Esqueda about his prior interaction and did not know Malaer had been released.  Ex. 8 (40:16-41:22); Ex. 7 (179:16-25); Ex. 3 (63:5-18). Equally important is that during her interview with Cole, she learned information that would lead a reasonable officer to conclude Cole was an unreliable witness who made inconsistent statements. If Scottow had interviewed Esqueda she would have learned no one was afraid of or threatened by Malaer.

All officers manifested bias toward Malaer. The conduct by all officers was taunting, inciting and escalated an already upset vulnerable man in a wheelchair. McFall arrested Malaer immediately after Malaer said he was filing a complaint with the City Manager. A reasonable

jury could conclude that not only was there no probable cause, but the arrest was a retaliatory move when Malaer failed the attitude test.

### b. Even On Undisputed Facts Defendants Cannot Meet the Required Elements

Mr. Malaer was cited under the Medford City Code ("MCC") for Menacing and Disorderly Conduct. Ex. 11.  A person commits the crime of Menacing if they "intentionally attempt, by word or conduct, to place another person in fear of imminent physical injury." Ex. 17 (MCC 5.110).  A person commits the crime of Disorderly Conduct if: with *intent to cause public* inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:

> (a)  Engages in fighting or violent, tumultuous, or threatening behavior; or
> (b)  Makes unreasonable noise; or
> (c)  Obstructs vehicular or pedestrian traffic on a public way; or
> (d)  Fails or refuses to comply with a lawful order of the police to disperse from a public place; or
> (e)  Creates a hazard to person or property by any act which the actor is not licensed or privileged to do.

Ex. 18 (MMC 5.120) (emphasis added).

Mr. Malaer is a paraplegic using a motorized wheelchair. He cannot walk, run, or use his legs in any capacity. Menacing requires **an intent** to create a fear of *imminent* physical injury. There is no evidence in the City's motion to show that Malaer *intended* to create fear of imminent physical injury. In fact, there is nothing in the City's record addressing Malaer's intent at all.  Malaer needed to get home, was incontinent, and his wheelchair battery was dead. Ex. 5 (37:2-25); Ex. 24 (4:24-5:15).  He lives in constant fear of being assaulted or harmed by others, including police. He uses his words to create a distance between himself and others.  *Id.*  He has no physical ability to shoot, stab, punch or otherwise harm anyone. None of the officers nor Cole felt threatened by Malaer but were annoyed with his behavior.  Ex. 28; ECF 84 (Scottow Video); Ex. 8 (37:9-17; 38:12-39:9).   There are genuine issues of fact as to whether or not the officers

had probable cause to detain, let alone arrest Malaer for menacing. Without any evidence of "intent" the officers had no probable cause to detain or arrest. *State v. Sierra*, 349 Or 506, 520, n. 9, 254 P.3d 149 (2010).

Disorderly Conduct also requires scienter. The crime requires an *intent to cause public* inconvenience, annoyance or alarm, or recklessly creating a risk thereof. There is nothing in the City's record to show or establish intent. Officer Esqueda released Mr. Malaer several times, telling him to go home creating a dispute as to *any* public inconvenience. He and Cole indicated Malaer was just a sad pathetic old man.  Ex. 4 (2:16-21).  A public inconvenience is like public nuisance requiring factual assertions that the behavior was creating a nuisance to the public at large.  *State v. Wade*, 278 Or. App 669, 673 (2016) (ability to cause harm is defined by factual circumstances, namely physical ability to carry out the elements of the crime); *State v. Schell,* 282 Or. App. 364 (2016) (conduct must evince conscious disregard towards the public rather than specific person). Cole admitted other people felt comfortable approaching and helping Malaer; it was only she who got "pissed off."

Esqueda testified there was no evidence to determine the "intent" element of disorderly conduct. Ex. 3 (95:13-96:1).  Esqueda likewise testified there was insufficient evidence for menacing. *Id.* (94:15-95:3).  There is nothing in the City's record to show that anyone other than Wulff was inconvenienced; and his reaction seems to be based on the officer's view of Malaer's "bad" attitude and strong words rather than real criminal conduct. Words alone cannot be grounds for disorderly conduct. *State v. Cantwell,* 66 Or. App. 848, 852, 676 P.2d 353, 356 (1984).  It is equally clear that the First Amendment protects a significant amount of criticism against police. *Knox v. Sw Airlines,* 124 F.3d 1103, 1107–08 (citations omitted) (9th Cir1997)

But a bad motive by the officer can affect probable cause and is of the type of factual assertion which must be assessed by the jury. What the record does show is that Malaer tried to get a bus home and his battery died. He was intoxicated but he was clearly communicating his need to get home and his difficulties with the wheelchair. Cole told the police Malaer was "intentionally" running his wheelchair into holes and getting stuck, but these statements were made without any information on Malaer's condition. She wanted Malaer to get arrested because "He didn't scare me. He just pissed me off… and then he thought he was gonna get away with it." Ex. 29 (17:29).  Malaer tried to disengage with Cole, but she told the bus driver not to let Malaer leave.  *Id.* (14:51-15:20). Cole laughed when she told McFall this.  Cole said Malaer was yelling at customers, then later told McFall actually, Malaer had yelled at Cole.  *Id.* (2:07-11; 14:22-32).  McFall ignored these contradictory statements in her report and her probable cause affidavit. Cole made up information to get Malaer removed. Esqueda did not see a public inconvenience when he released Malaer, felt it safe for Malaer to leave, and told Malaer to go away, though refused to help him get on the bus.  A reasonable jury could conclude Malaer was arrested not because his conduct violated any statute, but "because they didn't like the words coming out of my mouth." Ex. 5 (36:10-11).

In Oregon, in order to obtain a conviction for Disorderly Conduct the State is "required to adduce evidence that defendant consciously disregarded an unjustifiable risk that his behavior would affect not just specific individuals, but the public in general." *State v. Love*, 271 Or.App. 545, 553–55, 351 P.3d 780 (2015). The City must show undisputedly Malaer consciously disregarded the risk his behavior had on the *public*, in general. There is nothing in the record to support that claim.  Indeed, the record shows multiple members of the public felt comfortable

and willing to stop and help Malaer before his interaction with Cole.  Ex. 29 (1:25-1:41). And that the officers could not differentiate a public versus private matter. Ex. 3 (92:10-19).

**8.  <u>Defendants are not entitled to qualified immunity.</u>**

Defendants claim they are entitled to qualified immunity and immune from suit. Their briefing is woefully thin.[10]  Even if an action is unreasonable and a violation of the Constitution, the officer may be immune from liability by qualified immunity. The application of qualified immunity is a test of objective reasonableness. *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

### a.  *Burden of Proof*

The inquiry on qualified immunity is twofold: was a constitutional right violated on the facts alleged; and, secondly, if the answer is yes, the question turns to whether the right was clearly established.  *Saucier*, 522 U.S. at 201, citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). The initial inquiry is whether the facts show a constitutional violation.  Plaintiff bears the burden to establish a violation occurred.  Once Plaintiff meets his burden, it shifts to Defendants.  They are nonetheless immune from suit if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (summarizing doctrine).

### b.  *No foundation for Qualified Immunity Exists as a Matter of Law*

Qualified immunity is a doctrine wholly created by the Supreme Court. *Pierson v. Ray*, 386 US. 548, 550-52 (1967) (creating a good faith immunity for officers). *Pierson* eventually led to *Harlow v. Fitzgerald* rejecting the good faith immunity fashioning a "freewheeling policy choice" by the creation of "an objective test focused on the reasonableness of the officer's

---

[10] Defendants' Supplemental Brief, ECF 210, does not address qualified immunity at all. The Second Motion for Summary Judgment, ECF 183, provides a misstatement of the law of qualified immunity, especially *Scott v. Harris*, 550 U.S. 372 (2007).

behavior in light of "clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982);

*Ziglar v. Abbassi*, 137 S. Ct. 1843, 1869, 1871-72 (2017) (Justice Thomas concurring in part).

 A newly analyzed theory questions the legitimacy of Qualified Immunity. *Rogers v.

Jarrett et al*, 63 F.4th 971, 979 (5th Cir. 2023) (Justice Don Willett *concurring*) (analyzing the

"game-changing arguments" in Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*,

111 CAL. L. REV. 201 (2023)).[11]  Ex. 36.  What *Rogers* and Dr. Reinert advance is that judicial

adoption of qualified immunity contradicts the text of 42 U.S. §. 1983 "[it] is not just *a*textual

but *counter*textual. That is, the doctrine does not merely complement the text—it brazenly

contradicts it". *Rogers v. Jarret,* 63 F.4th at 980-981 (emphasis in the original).

 Dr. Reinert's argument is deceptively simple. The original version of the Civil Rights Act

adopted in 1871 specifically incorporated language exempting any state immunities[12] attempting

to shield officers violating the Constitution.  *Ziglar v. Abbassi*, 137 S. Ct. 1843, 1869, 1871-72

(2017). The Civil Rights Act of 1871, ch. 22, Sec 1, 17 (1871) was amended by Congress who

removed all immunities from the text of the statute.  "Those sixteen lost words, by presumably

encompassing state common-law principles, undermine the doctrine's long professed foundation

and underscore that what the 1871 Congress meant for state actors who violate American's

federal rights is not immunity, but liability."  *Rogers v. Jarrett*, 63 F.4h at 980-981. Modern

interpretations of any immunities in the Civil Rights Act are based on assumptions that common

law defenses in 1871 should be interpreted *sub silencio* into the statute. When, in fact, all other

contexts, such as statute of limitations, are based on state statutory law because of specific

---

[11] *See also* William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45, 49 (2018); Joanna Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018).  Dr. Reinert's article is viewed as a "game changer" by the Fifth Circuit.
[12] 42 U.S.C. § 1983 only applies to "persons" who violate the constitutional rights of others. This includes individuals, municipalities and states but not the federal government.  *Bivens v. 6 FBI Agents*, 403 U.S. 388 (1999).

authorizing language in The Civil Rights Act of 1871.  42 U.S.C. § 1988(a); *Wilson v. Garcia*, 471 U.S. 261, 268-70 (1985) (may look to state law if it is not inconsistent with federal law).

Plaintiff argues qualified immunity has no legal foundation and is not authorized by the actual text of the Civil Rights Act and asks this court to disregard it as a defense in this case.[13] Since *Harlow*, federal courts have come to emphasize almost exclusively protecting defendants from suit rather than adhering to the directive in *Harlow* "to protect society as a whole." *See* Ex. 36 at 211. This defendant-friendly trend is reflected in addressing what constitutes "clearly established law" as a precedent to Qualified Immunity. The courts have progressively and forcefully emphasized that, for the law to be "clearly established" prior cases must speak with such clarity that only a "plainly incompetent" official would fail to see the unlawfulness of their conduct."  *Malley v. Briggs*, 475 U.S. 335, 349 (1986); *Kisela v. Hughes* at 1152.

The concept of qualified immunity and nearly 40 years of interpretation are without any statutory authority.  The conclusion is Congress removed the immunities for a reason and chose not to include them to provide social protection benefits to citizens. "The Court's continued application of the defense has no basis in text, history or doctrine" but is instead an exercise of illegitimate judicial power in the face of contrary legislative text and intent. *Reinert* at 217.

### c.   *Clearly Established Rights*

The same evidence establishing Plaintiff's initial burden also supports the finding that the constitutional rights at issue were clearly established at the time of the violation.  Before a public actor is subjected to suit, they must be on notice that "their conduct is unlawful." *Hope*, 536 U.S. at 740 (citing *Saucier*, 533 U.S. at 206).  "If a reasonable officer 'could have believed' the

---

[13] Plaintiff is aware of the concept of *stare decisis* which may very well bind this court in any legal determination on qualified immunity.  However, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 662-63 (1978) (overruling 1961 decision interpreting Section 1983 in absence of legislative action).

conduct at issue comported with the constitution, the defendant is entitled to immunity."
*Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  For a Constitutional right to be sufficiently
established, "its contours must be sufficiently clear that a reasonable official would understand
that what he is doing violates that right. This is not to say that an official action is protected by
qualified immunity unless the very action in question has previously been held unlawful * * *
but it is to say that in the light of the pre-existing law the unlawfulness must be apparent." *Hope*,
536 U.S. at 740 (citing *Anderson*, 483 U.S. at 640) (internal citations omitted).  The rejection of
the "exact fact pattern" precedent to create clearly established law has been repeated several
times. *Hope at* 739; *Ziglar v. Abbassi*, 137 S. Ct. at 1869.

The concept of "clearly established right" is one embodying "fair notice" or "fair
warning" to the players it seeks to contain. Individuals sued in civil rights actions under 42
U.S.C. § 1983 "have the same right to fair notice as do defendants charged with crimes." *Hope* at
740 (citing *State v. Lanier*, 520 U.S. 259 (1997)) (criminal defendants entitled to fair warning of
scienter element of criminal statute).   "[T]he qualified immunity test is simply the adaptation of
the fair warning standard to give officials * * * and government the same protection for civil
liability and its consequences that individuals have traditionally possessed in the face of vague
criminal statutes." *Hope*, at 740, n. 10 (citing *Lanier*, 520 U.S. at 270-71).

### 9.  <u>Analysis</u>

Plaintiff has the "sacred right" to be free from unwarranted intrusion into his freedom by
law enforcement. US CONST., Amend. IV; *Terry v. Ohio*, 392 U.S. 1 (1968).  Plaintiff may not
be lawfully detained or arrested absent a specific set of articulated facts justifying the detention.

The probable cause analysis is based on the facts known, or reasonably known, to the
arresting officer. The arresting officer is imbued with the common knowledge of the other

officers present. In this case, the arresting officer McFall failed to take reasonable steps to ascertain the facts of the percipient witnesses, Esqueda, or review any information prior to making an arrest. She simply arrested Malaer almost upon arrival at the scene because Malaer made aggressive statements.[14]  Verbal resistance cannot be the basis for probable cause. *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995).  McFall's arrest is invalid under either the federal or the state probable cause standard.

Probable cause analysis is based on a reasonableness standard arising from the totality of facts present at the time of the arrest. Mr. Malaer made many inappropriate statements but those must be evaluated in the context of the entire arrest. He was confined to a wheelchair with no use of his legs. His wheelchair battery had died and so he had no ability to move. Witnesses told Esqueda that Malaer kept running his dying wheelchair into "holes" and getting stuck. At most Malaer was being "investigated" by McFall for a minor offense under the municipal code. The witness also told the officers she was not threatened by Malaer but simply thought he was annoying. Esqueda mimicked these sentiments as part of his evaluation. He felt there was no disturbance to the public or other citizens when he released Malaer to "go away". None of the officers at the scene felt threatened by Malaer and as can be observed Malaer was being egged on by the officers. This conduct by the officers is impermissible when trying to justify an arrest or the use of force. *McWilliams v. Dinapoli*, 40 F.4th 1118, 1126 (10th Cir. 2022). The question turns to whether or not the officers' own conduct created their probable cause to make the arrest.

Furthermore, the defendants have not set out any evidence supporting Malaer's intent which would justify the arrest for menacing and disorderly conduct. That absence creates an issue of fact necessitating denial of this motion. And it also raises a question of whether the

---

[14] Curiously, when the officers themselves used words like "asshole" and "idiot" against Malaer, they didn't think it constituted "aggressive" language.

detention by McFall and Wulff leading to the subsequent arrest was with probable cause or was it simply the arresting officers subjective bias and impatience with Malaer unrelated to any criminal activity. The comments of the officers on the videotapes indicate a strong inference that the officers arrested Malaer simply because he failed the "attitude test".

If there is no probable cause to justify the detention or arrest then the arrest itself is unconstitutional *per se*. The mandate of probable cause to arrest dates back to at least *Terry v. Ohio* and was so well established as to create no doubt. The officers all trained in the statutory basis of probable cause and well understood its scope and the duties it imposed on them. If there are factual disputes in the probable cause analysis this court must deny this motion until a jury ascertains the undisputed facts. All elements of qualified immunity have not been met and this court should deny the Motion.

### B. Plaintiff's ADA/RA Claim

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 608-10 (2015).  Plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.  *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001). There is no significant difference in the analysis of rights and obligations under the ADA and the RA, and they may be interpreted and applied together. *McGary v. City of Portland*, 386 F.3d

1259, 1265 n. 7 (9th Cir. 2004); *Duvall*, 260 F.3d at 1136.  Both Acts and regulations require public entities to provide reasonable accommodations and make "reasonable modifications" to practices to "avoid discrimination" on the basis of disabilities, unless an entity shows the modifications would fundamentally alter the nature of the "service, program or activity." 28 C.F.R. § 35.130(b)(7); *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010).

### 1.  Plaintiff is a "Qualified Individual" under the ADA and RA

The City agrees Malaer is a "qualified individual with a disability" with a "disability for the purpose of Plaintiff's ADA Claim." ECF 183 at 13. Malaer is permanently paralyzed with a neurogenic bladder, confined to a wheelchair, and experiences chronic "PTSD issues." Ex. 6 (14:10-15:6; 114:1-115:15; 174:7-11; 177:17-178:25).  These are qualifying conditions under the ADA and RA.  *Mustafa v. Clark County School District*, 157 F.3d 1169, 1174 (9th Cir. 1998); *Ewbank v. Emrick*, No. 18-35873 (9th Cir. 2021).  Malaer was a Medford resident and qualified to receive the benefit of City services.  Ex. 11.

### 2.  City of Medford is a "Public Entity" Subject to ADA and RA Liability

The City of Medford is a "public entity" and its agents are subject to the ADA and RA. *Smith v. City of Medford*, No. 1:17-CV-00931-CL, 2020 WL 8910898, at *1 (D. Or. 2020), *report and recommendation adopted,* No. 1:17-CV-00931-CL, 2021 WL 3277229 (D. Or. 2021) (ADA/RA claim against City); ECF 215 ¶ 57.; Ex. 12 (RFA Responses 1, 21, 22); Ex. 33.

### 3.  City Offers Community Caretaking Services Including Transit Assistance

The City of Medford offers "community caretaking" services by MPD, such as assisting stranded civilians and vulnerable individuals.  Courts recognize community caretaking functions as a service offered by municipal police departments. *Cady v. Dombrowski*, 413 U.S. 433, 441, (1973) ("Local police officers, unlike federal officers, frequently investigate vehicle accidents in

which there is no claim of criminal liability and engage in what, for want of a better term, may

be described as community caretaking functions, totally divorced from the detection,

investigation, or acquisition of evidence relating to the violation of a criminal statute.").  Further:

> The concept of a community caretaking or public safety function stems from a recognition that "[l]ocal police have multiple responsibilities, only one of which is the enforcement of criminal law[.]" *State v. Acrey,* 148 Wash.2d 738, 64 P.3d 594, 599 (2003); *see also Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The modern police officer is a "jack-of-all-emergencies" with "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses'; by default or design he [or she] is also expected 'to aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.' " LaFave, 3 *Search and Seizure* § 5.4(c) at 263 (citing Am Bar Ass'n, Standards for Criminal Justice §§ 11.1(b), 1–2.2 (2d ed 1980)); *see also Acrey,* 64 P.3d at 599 ("[M]any citizens look to the police to assist them in a variety of circumstances, including delivering emergency messages, giving directions, searching for lost children, assisting stranded motorists, and rendering first aid.")"

*State v. Backstrand*, 354 Or. 392, 436–37, 313 P.3d 1084, 1111–12 (2013).

The Defendant officers readily recognized their general community caretaker functions in

providing public police services as separate from their criminal investigation and enforcement

duties. Esqueda testified officers provide members of the public with transportation services,

including "we can assist with purchasing bus tickets for people," and "help people if they're

stuck in a broken down car," help someone "get a ride or call a cab if they didn't have a cell

phone," and "we help people when they ask for help." Ex. 3 (55:12-56:5).  Esqueda confirmed

"It's not uncommon to call a taxi for someone in Mr. Malaer's conditions if that situation were to

arise" and that "we could have asked for a handicapped accessible taxi. In extenuating

circumstances if we're able to, we could have grabbed a truck and offered Mr. Malaer a ride, if

possible." *Id.*  (69:7-70:11).  Wulff confirmed this. Ex. 7 (115:1-17).

The City leaned into its community caretaker role before and after Malaer's arrest. Ex. 10

(18:11-20:18).  By 2017, MPD created a "Livability Team" program to assist community

members with nuisance property and homeless encampment issues and interface with unstably

housed people. Wulff was on the Livability Team by 2018. Ex. 29. The Livability Team applied

a "multi-disciplinary approach" to address chronic housing and community "nuisance" issues,

with social service outreach as part of the model. The Livability Team program was already

created and approved by June 2019 and had been a "focus" of MPD since 2018. Ex. 34. The

City approved additional budget funding in June 2019 with funds arriving September 2019. Ex.

23. The Livability Team addressed "drinking in public" and "disorderly things" and included an

"outreach piece" because:

> "Jail isn't always the answer to every offense … that is where the Medford Police
> Department's Livability Team seeks to help … targeting a lot of their needs
> around those calls for service to help kind of reduce the future need for the law
> enforcement realm … and providing them the services they need to get off the
> streets or stop having problems within the community that have risen to the calls
> for service that Medford has received[.]"

City of Medford, *The Medford Police Livability Team* (2020), available at

https://jacksoncountyor.org/Whats-New/News/the-medford-police-livability-team; Ex. 9; Thief

Hunter Labs, *Medford Police Department Livability Team/Homeless*, Scanner Group Podcast

008 (2020), https://www.youtube.com/watch?v=xUY8qoH_xqc; Ex. 7 (71:14-74:23).

### 4.  Fact Disputes Precludes Summary Judgment on ADA/RA Claim

ADA/RA claims require determining then scrutinizing facts to perform a reasonableness

analysis. Here the officers dispute: (a) whether they knew or should have know that Malaer was

disabled or required reasonable accommodation, (b) whether they were obligated to provide a

reasonable accommodation to Malaer such as calling an ADA-accessible taxi or arranging other

methods of safe transport, (c) whether the Livability Team community caretaking program

existed as of July 11, 2019, (d) whether Malaer exhibited signs of a mental health crisis during

the arrest incident, (e) whether Malaer's disabilities include PTSD symptoms, (f) whether

Esqueda prevented Malaer from boarding the bus; (g) whether Plaintiff's wheelchair repair evidence entitles him to damages; and (f) whether the City failed to investigate Malaer's complaints of ADA discrimination.  Such fact disputes preclude summary judgment this claim. *See Edd v. County of Placer*, No. 2:14-cv-02739-JAM-AC, at *5-6 (E.D. Cal. Apr. 16, 2015).

### 5. The City Excluded Malaer from Participating In or Receiving Benefits of Public Services or Otherwise Discriminated Against Him

Although the disputes of material fact preclude summary judgment, the facts viewed in the light most favorable to Plaintiff shows Malaer was denied the City's community caretaking services available to other citizens and denied reasonable accommodations in multiple regards. The SAC alleges several aspects of ADA/RA violations by the City relating to Plaintiff's seizure, arrest, and transport on July 11, 2019, addressed below.  ECF 209, ¶¶ 160-168.

#### a.  *City agents denied or failed to assist Malaer in boarding a public bus.*

Defendants do not deny that preventing a disabled citizen from accessing public bus service is a basis for ADA/RA liability. *Midgett v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 74 F. Supp. 2d 1008, 1012 (D. Or. 1999), *aff'd,* 254 F.3d 846 (9th Cir. 2001).  Defendants only dispute whether evidence shows Esqueda's actions prevented Malaer from boarding and thus denied him the benefit of a public service.  Esqueda admitted he knew Malaer "was trying to get on the bus." Ex. 3 (6:3-15; 33:2-8); ECF 84 (Esqueda Bodycam).  Esqueda stopped Malaer by approaching him from behind and demanding his attention which ended Malaer's communication with the bus driver. Esqueda watched the bus leave and did nothing to stop it help Malaer board, despite standing in front of the open door near the driver. Esqueda admitted he could have asked the driver to let Malaer on the bus but chose not to. Ex. 3 (33:12-18).  Were

Malaer able-bodied, he could have walked on the bus, but due to Esqueda's interference without corresponding accommodation, Malaer's ability to access public transit was stymied.

### b. City agents demeaned Malaer then used his response as pretext for arrest.

Wulff and Esqueda made overtly discriminatory and derogatory remarks directed at Malaer's disabilities in the course of providing public policing services. They also insisted on engaging with Malaer after he told them to leave him alone. These behaviors inflamed Malaer's pre-existing PTSD response to law enforcement abuse, drawing visceral remarks from Malaer, and exacerbated Malaer's emotional response to his existing transportation and medical crisis of being stranded in a non-functioning wheelchair without access to catheterization, urinary incontinence, and high levels of pain requiring medication. The officers then used Malaer's reaction to arrest him instead of providing community care services.

"Courts have recognized at least two types of Title II claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation, where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d at 1232 (internal citations omitted). For purposes of arrest, exigent circumstances inform the reasonableness analysis under the ADA, just as they inform the reasonableness analysis under the Fourth Amendment. *Id.*

A growing body of legal scholarship recognizes a link between low-level disorderly conduct arrests and officer interactions with persons with disabilities, particularly disabled people in distress or those whose vocal and behavioral reactions to officer contact deviate from

what society considers "respectful" without causing any actual harm. "Contempt of cop" is a

term for criminal arrests arising under circumstances "in which officers charge resisting arrest or

failure to obey or other minimal procedural offenses simply to punish or exact retribution on

disrespectful or non-submissive individuals." Erin Murphy, *Manufacturing Crime: Process,*

*Pretext, and Criminal Justice*, 97 GEO. L.J. 1435, 1507 (2009).  It is well-documented by legal

scholars that, "the act of questioning authority is a common element of many encounters that end

in legally dubious arrests." Reed Collins, *Strolling While Poor: How Broken Windows Policing*

*Created a New Crime in Baltimore*, 14 GEO. J. ON POVERTY L. & POL'Y 419, 435 (2007).

Disorderly conduct is considered a "contempt of cop" offense because of its frequent use

by law enforcement to arrest individuals in response to the constitutionally protected free speech

activity of cursing or speaking disrespectfully to the police. Disorderly conduct arrests have a

well-documented history of grossly disparate impact on people of color and marginalized groups

including physically disabled persons.  A legal scholar recently noted:

> Policing disorderly conduct reflects and reinforces deeply rooted discriminatory
> understandings about what behavior--and which persons--violate community
> norms. By relying on a false dichotomy between "order" and "disorder,"
> disorderly conduct laws construct and reinforce a hierarchy of normative
> behaviors that are imbued with racism, sexism, and ableism. Disorderly conduct
> laws "otherize" certain nonconforming behaviors, delegitimize them through the
> label of "disorderly," and in doing so exclude certain historically marginalized
> groups from normative conceptions of community. They do this in part by
> prohibiting a wide range of behaviors and conferring vast amounts of discretion
> upon law enforcement and private citizens to target individuals for behavior
> regulation, physical removal, and community exclusion. These laws often
> determine access to shared community spaces, resulting in the exclusion of
> historically marginalized groups from these purportedly "public" spaces.

Jamelia N. Morgan, *Rethinking Disorderly Conduct*, 109 CAL. L. REV. 1637 (2021). Ex. 35. See
also Morgan's related works, *Why Disability Studies in Criminal Law and Procedure?*,
69 Journal of Legal Education (2022); *Disability's Fourth Amendment*, 122 Columbia Law
Review 489 (2022); *Policing Under Disability Law*, 73 Stanford Law Review 1401
(2021); *Policing Marginality in Public Space*, 81 Ohio State Law Journal 1045 (2020).

The Federal Bureau of Investigation (FBI) hosts the Crime Data Explorer tool publishing national criminal arrest statistics based on data from law enforcement agencies across the country.[15]  The data shows that contemporaneous with the growth in proliferation of cell phone cameras, national disorderly conduct arrests have decreased almost every year, presumably due to increased ability for the public and individuals to record and witness police behavior. *Id.*; Ryan J. Reilly, Dubious '*Disorderly Conduct' Arrests Plummet As The Public Turns Cameras On Cops*, HuffPost (Sep. 26, 2016).

| Jurisdiction | 2019 Population* | Total Disorderly Conduct Arrests ** | | |
|---|---|---|---|---|
| | | 2017 | 2018 | 2019 |
| Washington | 7,614,893 | 2,485 | 2,583 | 2,751 |
| Percent of Population | | 0.03% | 0.03% | 0.04% |
| Oregon | 4,217,737 | 6,803 | 7,021 | 7,617 |
| Percent of Population | | 0.16% | 0.17% | 0.18% |
| Portland (Police Department) | 654,741 | 1,042 | 921 | 912 |
| Percent of Population | | 0.16% | 0.14% | 0.14% |
| Eugene (Police Department) | 172,622 | 559 | 555 | 571 |
| Percent of Population | | 0.32% | 0.32% | 0.33% |
| Bend (Police Department) | 100,421 | 87 | 113 | 118 |
| Percent of Population | | 0.09% | 0.11% | 0.12% |
| Medford (Police Department) | 83,075 | 300 | 378 | 450 |
| Percent of Population | | 0.36% | 0.46% | 0.54% |

\* https://www.census.gov/programs-surveys/popest/data/data-sets.2019.List_1725564412.html#list-tab-List_1725564412
\*\* https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/arrest

Contrary to this trend, the FBI data shows that for 2017-2019, MPD arrested individuals for Disorderly Conduct at *increasing* rates compared to the past. Compared to other Oregon jurisdictions, the Medford Police Department also arrested individuals for Disorderly Conduct at a rate more than 2x the Oregon statewide rate, more than 2x that of the Portland Police Department, and more than 4x the rate of the nearby Bend Police Department featuring a roughly similar population size. MPD arrested individuals for Disorderly Conduct at more than 10x the average rate in Washington.  Ex. 26 (Table 1); Ex. 27.

---

[15] *Available at* https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/arrest.

Research shows "disorderly conduct laws are deployed to enforce ableist norms that target behaviors linked to disability--or at public manifestations of disability--perceived as deviant or threatening," *Id*. at 1672-73, and that people with disabilities are also disproportionately represented where "atypical reactions" to social cues or to police officer commands are regarded as threatening, confrontational, or unduly disruptive in public places. *Id*.; Elliot Oberholtzer, *Police, Courts, Jails, and Prisons All Fail Disabled People*, PRISON POL'Y' INITIATIVE, (Aug. 23, 2017), https://www.prisonpolicy.org/blog/2017/08/23/disability/. Thus disorderly conduct laws facilitate the removal of people with disabilities with psychiatric, developmental, and intellectual disabilities from public places. *Id*.

Malaer testified at deposition he has been beaten by police and prison guards on multiple occasions in the past while he was in a wheelchair. He has suffered significant abuse by figures with physical authority over him. Ex. 5 (34:7-37:25). He testified that at this point in his life, he has recurring "PTSD issues" when confronted by law enforcement that cause him to "feel intimated, I feel scared, I feel that I want to react" and that "being around cops triggers me, and especially if they …. seem[] like they want to intimidate me or whatever. If I am around law enforcement I will – escalates my anger and my PTSD issues." Ex. 6 (114:1-115:15; 177:17-178:25). He sought treatment for PTSD multiple times in the past. *Id*. Malaer considers his "PTSD issues" a disability related to his claims against the City. *Id*. (174:7-11).

Malaer testified he was in distress, and the video evidence supports this. Wulff admitted that he expected Malaer to respond badly to Wulff's comments about Malaer's disability, yet kept making the comments anyway. He thought his comments to Malaer were a funny joke. McFall confirmed she would not have used the inciting words Wulff chose against Malaer. Ex. 8 (84:23-85:11). Wulff also testified in deposition he thought Malaer showed no signs of crisis.

But Wulff admitted the only other instance he could recall in which he perceived a potential arrestee as having a mental health crisis resulted in Wulff shooting and killing the person, and he could not apply the little training he received to the facts of Malaer's situation. Ex. 7 (28-40:23). Wulff failed to recognize a crisis reaction from a vulnerable person in distress and rather than de-escalate or provide aid, he chose to exacerbate the situation by demeaning Malaer's disability, drive Malaer's PTSD reaction up, and then used Malaer's reaction to the abuse as a basis for a disorderly conduct arrest.

Taken together, a reasonable jury could conclude that Mr. Malaer was not arrested because there was probable cause, but because the officers "didn't like the words coming out of [his] mouth" caused by his PTSD-like reactions to being in pain, broken down, incontinent, and confronted by police seeking to arrest him. Ex. 5 (36:10-11). Contrary to the City's brief, the rude comments of the officers in arresting Malaer are relevant because a reasonable juror could conclude the officers intended to inflame Malaer in order to create an adverse reaction and then use the adverse reaction they drew as pretext for a disorderly conduct arrest. Officers may not incite conduct to manufacture a predicate to an arrest, nor can they arrest for words alone, as they admit. *Winkler v. City of Phoenix*, 849 F. App'x 664, 667 (9th Cir. 2021) (noting Ninth Circuits "longstanding endorsement" of the consideration that an officer may not engage in unreasonable conduct to provoke a response that foreseeably creates the need for subsequent police enforcement); Ex. 7 (101:23-102:14); *State v. Cantwell,* 66 Or. App. 848 (1984).

### c. *City failed to ensure Malaer's medical catheter devices, medications, and wheelchair were available to Malaer.*

Defendants Wulff, Esqueda, Kirkpatrick, and Scottow, in the course of providing police services, failed to sufficiently investigate and communicate with Jackson County about Malaer's

disability and medical needs. Defendants knew or should have known Mr. Malaer required use of

a wheelchair, medical devices, and medications for his disability. Defendants were aware Malaer

was presently experiencing incontinence issues as a result of his disability. McFall saw Malaer's

bright red medical catheter in his backpack. Yet the City separated Malaer from his wheelchair, a

and further separated Malaer's backpack containing his catheter and medications and took it to

the police station instead of leaving it attached to Malaer's wheelchair at the jail. As a result,

Malaer was forced to experience nearly 20 hours of non-stop leg spasms, bladder spasms, level 8

pain, medical incontinence, and increased sepsis due to lack of access to his medical catheter and

medications. Ex. 5, Ex. 6; Ex. 24; Exs. 13-25.

> ### d.  City denied Malaer community caretaking services by arresting rather than providing non-enforcement services.

The City denied Malaer access to its community caretaking services intended to assist

civilians rather than arrest and punish them. "The second [arrest] theory supporting a disability

discrimination claim occurs where police effectuate a lawful arrest based on criminal

conduct unrelated to a person's disability, but they fail to accommodate the disability during the

investigation or arrest process, resulting in the individual suffering greater injury than other

arrestees.  *Adle v. Maine Police Dep't*, 279 F. Supp. 3d 337, 363 (D. Me. 2017); *Gohier v.*

*Enright,* 186 F.3d 1216, 1222 (10th Cir. 1999) (citing *Gorman v. Bartch*, 152 F.3d 907, 912–13

(8th Cir. 1998); *Sheehan v. City & Cnty. of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014),

cert. granted, 135 S. Ct. 702 (Nov. 25, 2014).  During the investigation the officers had ample

opportunity to take non-enforcement approaches such as call for medical assistance or de-

escalate by giving Malaer some space, but chose not to. The City had multiple existing

community caretaking programs and services it offered to distressed citizens in need of

transportation support.  At least one of these programs was specifically designed to reduce the number of instances in which enforcement was used in situations where the solution to the problem really required social services.  This program was in existence prior to Malaer's arrest. Ex. 29; 39.  And MPD's policies required officers to provide disabled civilians with help if requested.  Ex. 33.  Malaer was a citizen of Medford qualified to receive the benefit of these services, and he in fact asked for help, but was denied any of the above, even when Esqueda believed that in spite of Malaer's PTSD reactions, a "peaceful solution" was possible if Malaer would only be allowed to leave the scene.  As a result of placing Malaer under arrest instead of assisting him with transportation or aid, Malaer was denied public services available to others.

### e. City denied Malaer medically safe and appropriate transport to the jail.

The City's transport of Malaer to the jail was medically unsafe, inappropriate, and deliberately indifferent to his obvious mobility impairment.  Being "handled and transported in a safe and appropriate manner consistent with his disability" to the jail is a "service" under the ADA.  *McGary v. City of Portland*, 386 F.3d at 1268-69 (quoting *Gorman v. Bartch*, 152 F.3d 907, 912-13 (8th Cir.1998); *Edd v. County of Placer*, No. 2:14-cv-02739-JAM-AC, at *6 (E.D. Cal. Apr. 16, 2015) ("A plaintiff may base a reasonable accommodation claim on an officer's failure to accommodate his disability during post-arrest transportation to prison.").

As described in the Fact Background, Defendants' transfer of Malaer from the wheelchair to the patrol SUV was dangerous and caused Malaer physical pain and fright. It also contradicts Department of Justice guidance to law enforcement.  Ex. 2  An alternative, safe method of transport was available but the City chose not to use it.  Ex. 3 (69:7-70:11) ("we could have asked for a handicapped accessible taxi. In extenuating circumstances if we're able to, we could have grabbed a truck and offered Mr. Malaer a ride, if possible.").

The City's only response is that "There is no allegation that Plaintiff's mode of transportation to the jail injured him in any way." ECF 210 at 6. This is factually false. *See* ECF 209, ¶¶ 2, 101, 107, 160-67. And a municipality is liable where the treatment "caus[es] the person to suffer greater injury or indignity . . . than other arrestees." *Sheehan*, 743 F.3d at 1232. Malaer was subject to physical pain, degradation, and the indignity of verbal abuse. The City's damage to his wheelchair necessitated repairs. He was further injured in the jail as a result of the MPD transport when the jail deputies pulled him from the City patrol SUV, and again dropped him to the ground. Wulff and McFall watched but did nothing to help or prevent harm. Ex. 13. Malaer told MPD's Sgt. Budreau about cuts and blood on his foot. There was actual injury, in addition to compensable indignity Malaer suffered. This would not have occurred had MPD allowed Malaer to remain in his wheelchair with the motor disengaged and simply called an ADA accessible taxi for the transport.

That the City attempts to justify its behavior by claiming it has transported disabled arrestees this way before on many occasions is insufficient to defeat liability. The ADA requires concessions or accommodation where a policy disparately affects a disabled individual. *McGary,* 386 F.3d at 1265 ("We have repeatedly recognized that facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced."); *Martin v. PGA Tour, Inc*., 204 F.3d 994, 999- 1000 (9th Cir. 2000) *aff'd*, 532 U.S. 661 (2001); *Gorman v. Bartch*, 152 F.3d at 913. It is significant cause for alarm and implicates the safety of disabled arrestees in MPD custody in the future, as the City frequently transports wheelchair users this way. Ex. 7 (152:14-22); ECF 210 at 8.

### f.  City failed to adequately train the individual Defendants.

The City is obligated to comply with the ADA and RA requires to provide access and reasonable accommodation in its public services. MPD also has a policy regarding providing aid to disabled individuals and communicating with disabled individuals during investigations, arrests, and transports. Ex. 33 (Policy 370).  Defendants were vaguely aware of the policy. But they did not comply with the policy, denying help to Malaer when he asked for it, exacerbating and inflaming communications instead of seeking understanding, failing to communicate on how to safety transport Malaer, and engaging in an extremely unsafe and inappropriate handling of Malaer into the patrol vehicle.  Ex. 3 (78:6-19).  Their conduct was directly contrary to the DOJ's guidance to law enforcement on safe transfers.  Ex. 2 (U.S. Department of Justice, Commonly Asked Questions About the Americans with Disabilities Act and Law Enforcement, Guidance Questions 6-7, available at https://archive.ada.gov/q%26a_law.htm).  The City claims that the officers received training beyond the basic requirements in crisis intervention and "MPD officers also receive additional training including regarding the ADA."  But the officers' own testimony contradicts this, showing they did not receive training on ADA-compliant transports. Ex. 3 (75:12-76:8).  When pressed in deposition about why he presumed Malaer was not having a mental health crisis at the time, Wulff was extremely evasive and demonstrated he was not adequately trained on the topic, testifying he could not apply his training regarding mental health crisis response or persons with disabilities to Malaer's situation. He refused to answer the questions. Ex. 7 (28-40:23). Because the officers did not comply with the ADA, did not comply with the City's own policy regarding disabled individuals, and at least one office testified he could not apply his MPD training to Malaer's scenario, the City clearly failed to adequately train its officers in responding to basic ADA issues to provide necessary accommodations, modifications, services and/or physical access to Plaintiff with disabilities, including failing to

train Defendants in appropriate and safe methods of transporting and handling paraplegic

detainees and people experiencing medical incontinence or mental health crises. This failure to

train resulted in actual harm.

### 6. City's Denial of Benefits and Discrimination was "By Reason of Disability"

In discussing "by reason of disability," the Ninth Circuit ruled "facially neutral policies

may violate the ADA when such policies unduly burden disabled persons, even when such

policies are consistently enforced." *McGary at* 1265.  A plaintiff need not allege "discriminatory

animus." *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996).  A plaintiff may instead

allege discrimination that is the result of "'thoughtlessness,' 'indifference,' or 'benign

neglect.'" *Id*.  A plaintiff can show he was discriminated against by reason of his disability where

a policy "burdened him in a manner different from and greater than it burdened non-disabled

[individuals], solely as a result of his disabling condition." *McGary* at 1265.

Esqueda directed Malaer to "leave" but Malaer was paraplegic, stranded in a wheelchair

that could not properly function, so he could not comply by reason of his disability. The City had

multiple avenues available to accommodate Malaer so could comply with orders to leave, but

instead chose to punish Malaer by arresting him when he could not leave in time.  Had Malaer

been able-bodied, he would have been able to comply with Esqueda's directive, walked away

from the scene, and there would have been no arrest.  A "City fail[ing] to reasonably

accommodate his disability by denying him additional time to … comply with the City's []

enforcement activities in a manner consistent with his disability" is grounds for an ADA

violation. *McGary at* 1259.  And more than mere indifference, the officers' derogatory language

targeting Malaer's disability showed affirmative discriminatory animus.

**7.    The City Was Deliberately Indifferent, Entitling Plaintiff to Damages, Because It Failed to Accommodate Plaintiff**

Malaer is entitled to damages on his ADA/RA claim. The Ninth Circuit applies the "deliberate indifference" standard to find intent for damages under Title II of the ADA or RA; this standard requires the defendant both (a) know that harm to a federally protected right is substantially likely and (b) fail to act upon that likelihood. *Id.* at 1138-39. When the public entity has knowledge of the risk of harm to an individual's federally protected right-either through a request for accommodation "or where the need for accommodation is obvious, [-] the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Id*. Once the first element has been met, a public entity which fails to act on that knowledge is "deliberately indifferent" such that a Plaintiff may recover compensatory damages. A public entity may be liable for damages for "intentional discrimination" if it intentionally or with deliberate indifference fails to provide a reasonable accommodation to disabled persons. *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008). Once a plaintiff shows that a reasonable accommodation was possible, *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002), the burden shifts to the defendant to show that the requested accommodation would require a fundamental alteration or would be unduly burdensome for defendant, *Pierce v. County of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008).

The City failed to provide Plaintiff a reasonable accommodation to obtain the benefit of City services or comply with City enforcement orders. Reasonable accommodations in the form of ADA-accessible taxi transports, public bus access, medically safe and appropriate officer transports from the wheelchair to the patrol vehicle, services in lieu of arrest, and other resources were available as part of the City's caretaking services. None of these options posed an undue

burden as they were already being offered, the City used resources to transport Malaer which it could have used to transport him home[16], and MPD policy required the police to help Malaer.

The need to accommodate Malaer was obvious, as Defendants could see that Malaer was in a wheelchair, experiencing medical incontinence urinating on himself, had been told by Cole that Plaintiff's wheelchair had become stuck in potholes and he required assistance getting out, saw Plaintiff trying to board a wheelchair access ramp on a public bus, and heard Plaintiff directly ask the officers for help, tell them his wheelchair couldn't roll, and tell them they weren't properly transferring him from the wheelchair into the patrol vehicle. Esqueda and Kirkpatrick had interacted with Malaer previously and knew he couldn't walk. Wulff stated on bodycam video he didn't think Malaer could stand up. Malaer repeatedly expressed that he wanted to leave the scene but was not able to move.

The officers were deliberately indifferent to Malaer's need for accommodation, refused to help him, denied him community caretaking services, and arrested him instead. This failure to act and failure to provide accommodation violated the ADA/RA and violated MPD policy that "Medford Police Department members shall never refuse to assist an individual with disabilities who is requesting assistance," a policy Defendants knew about. Ex. 33 (Policy 370.6); ECF 210 at 6; Ex. 7 (42:24:-44:2). The City further failed to conduct an ADA investigation of the incident after Malaer's complaints, again violating the ADA/RA and MPD policy. Ex. 33 (Policy 370.16).

The City argues Malaer never asked for a "reasonable accommodation," but Malaer's need for accommodation was obvious, and he did ask for help and was denied. Malaer knew by the officers' words and deeds they were not going to help him, and they did not. Ex. 5 (83:5-84:25). He was not required to keep asking for help. "A person with a disability is not required

---

[16] His apartment was a few minutes away from Lumpy's and it would not have been a burdensome trip. Ex. 11.

to 'engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions.'" *Namisnak v. Uber Techs., Inc.*, 444 F.Supp.3d 1136, 1140 (N.D. Cal. 2020); 42 U.S.C. § 12188(a)(1).

### 8. Plaintiff Provided Evidence of Economic Damages

Plaintiff's claim for economic damages is supported.  ECF 183 at 31.  Plaintiff testified about damage to his wheelchair and the costs of repair, there is video of three City officers dragging his electric wheelchair and damaging it, and Plaintiff produced invoices and communications from Nu-Motion wheelchair repair during discovery.  Ex. 5 (87:5-90:24); Ex. 25; Ex. 31; ECF 84 (McFall Video).  The City's motion should be denied.

### 9. Plaintiff's ADA and RA Claims are Timely

The Court rejected the City's statute of limitations arguments in allowing the FAC and SAC.  ECFs 120, 133-136, 141, 144, 170, 171, 192, 207, 209.  ***First,*** the original complaint included an ADA claim. Plaintiff named all officers involved in his arrest and transport, and articulated that he sought to hold the City accountable for violating his ADA rights.  ECF 1. The "court recognizes that it has a duty to ensure that pro se litigants do not lose their right to a hearing on the merits of their claim due to ignorance of technical procedural requirements. . . pro se pleadings are liberally construed, particularly where civil rights claims are involved." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988) (citations omitted).

***Second,*** the City knew since July 2019 Plaintiff intended to seek legal recourse for ADA violations. Ex. 21.  City Manager Sjothun confirmed in December 2019 that "Due to your pending litigation with the City, I am unable to respond" copying the City Attorney Eric Mitton. Ex. 22.  It is "the consideration of prejudice to the opposing party that carries the greatest

weight." *Eminence Capital, LLC v. Aspeon, Inc.,* 316 F .3d 1048, 1051 (9th Cir. 2003). There is no prejudice to the City in defending the ADA claim it has known about since July 2019.

**Third,** the claim relates back under Fed. R. Civ. P. 15(c)(1)(B)-(C). The claim arises from the same conduct, transaction, or occurrence as the original pleading (arrest, transport, jailing), the City received actual notice an ADA claim would be filed, and the City Attorney received the notice email so the City knew or should have known that but for Plaintiff's mistake in naming individuals rather than their employer, the action would have been brought against the City. *Silbaugh v. Chao*, 942 F.3d 911, 913 (9th Cir. 2019) ("Rule 15(c) [is] aimed at 'the elimination of unjust dismissals' resulting from pleading mistakes that cause no prejudice to the defendant.").

**Fourth,** the case was held in abatement during the COVID-19 pandemic pending the criminal case from February 2020 to July 2021. ECFs, 25, 25, 28, 31, 47, 52, 83. Plaintiff was homeless, during a pandemic, in a wheelchair. Under these circumstances, equitable tolling applies. *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016). The FAC was filed in September 2022 after obtaining counsel, and the SAC filed in February 2023 after close of discovery.  The Court properly allowed the SAC after briefing.  ECFs 141, 207.

The City's claim that new evidence is required is baseless.  An arrest can form an ADA violation.  *Sheehan*, 743 F.3d at 1232.  Plaintiff obtained the MPD policy manual, ADA policy, ADA training bulletins, correspondence from the City ADA coordinator, and deposition testimony about the officer's ADA training and conduct in discovery.  LeDuc Decl., ¶ 3.

## VII.    CONCLUSION

The Court should deny the City's Motion for Summary Judgment.


 DATED: May 24, 2023


47 – **PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

**LEDUC MONTGOMERY LLC**

By: *Isl Alicia LeDuc Montgomery*
Alicia LeDuc Montgomery, OSB 173963
alicia@leducmontgomery.com
(503) 500-5695


**MICHELLE R. BURROWS P.C.**

Michelle R. Burrows, OSB 861606
michelle.r.burrows@gmail.com
(503) 241-1955

Attorneys for Plaintiff John Malaer

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of **PLAINTIFF'S RESPONSE TO CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was served on the following parties on May 24, 2023 by email and electronic filing service to the following addresses:

Eric B. Mitton
Alicia M. Wilson
City Attorney
411 W 8th Street,
Medford, OR 97501
 Eric.Mitton@cityofmedford.org
Alicia.Wilson@cityofmedford.org
Attorneys for Defendants City of Medford, Geoffrey Kirkpatrick, Michael Wulff, Omar Esqueda, and Ashlee McFall

Johan Pietila
Brett Baumann
Jackson County Counsel
10 S. Oakdale Avenue Rm 214
Medford, OR 97501
 pietiljr@jacksoncounty.org
baumanba@jacksoncounty.org
Attorneys for Defendants Jackson County, Nathan Sickler, and Brian Kolkemo

DATED:  May 24, 2023            **LEDUC MONTGOMERY LLC**
                                By: */s/ Alicia LeDuc Montgomery*
                                    Alicia LeDuc Montgomery, OSB 173963
                                    alicia@leducmontgomery.com
                                    (503) 500-5695

                                    Attorney for Plaintiff John Malaer

**CERTIFICATE OF SERVICE**