IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| JOHN LEE MALAER, | Case No. 1:20-cv-00049-CL |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| GEOFFREY KIRKPATRICK, an individual; MICHAEL WULFF, an individual; OMAR ESQUEDA, an individual; CITY OF MEDFORD, a government agency; JACKSON COUNTY, a government agency; NATHAN SICKLER, in his individual and official capacity; and BRIAN KOLKEMO, an individual, | |
| Defendants. | |

CLARKE, Magistrate Judge.

This is a civil rights case arising out of Plaintiff's encounter with law enforcement on July 11, 2019. Full consent to magistrate jurisdiction was entered on August 16, 2021 (#56). Plaintiff's case against the City Defendants was severed from the case against the County Defendants on July 14, 2021 (#52). The case against the County defendants comes before the Court on the parties' cross-motions for summary judgment (##253, 255) and Plaintiff's motion for judicial notice (#256). Oral argument was heard on April 17, 2024.

For the reasons below, the County Defendants' motion for summary judgment (#253) is GRANTED in part and DENIED in part. Summary judgment is granted in favor of the County

as to Plaintiff's *Monell* claims, except as to the claim based on the County's alleged policy or custom regarding diversionary strikes. Defendant's motion for summary judgment is denied as to all other claims. Plaintiff's partial motion for summary judgment (#255) is DENIED. Plaintiff's motion for judicial notice (#256) is DENIED.

The case shall proceed to trial on all remaining claims.

## STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## BACKGROUND

The procedural history of this case has been well-documented and thoroughly discussed in prior opinions.

Plaintiff, John Lee Malaer, is permanently paralyzed from the waist down due to a partially severed spinal cord. As a result, he has a permanent neurogenic bladder condition. Plf. MSJ Ex. 25 (Malaer Dep., 13:7-16:8). Neurogenic bladder causes, among other issues, loss of bladder control and urinary incontinence. *Id.* If left untreated, neurogenic bladder causes damage and infections in the urinary tract, bladder, and kidneys, which can cause sepsis. *Id.* At the time of the events in this case, Plaintiff was prescribed medications to be taken every eight hours for paraplegic and neurogenic bladder, and he used intermittent catheters to evacuate his bladder four to six times per day. He kept doses of his medication and catheters in his backpack attached to his wheelchair. Ex. 25, Ex. 24.

This case arises out of Plaintiff's treatment at the Jackson County Jail in Medford, Oregon, on the night of July 11, 2019. An earlier case, bifurcated from the current case, addressed Plaintiff's arrest and treatment at the scene of arrest, and transport to the Jail, by Medford Police Officers ("MPD"). In that prior opinion, (#273), the Court determined that MPD had probable cause to arrest Plaintiff, eliminating his constitutional claims arising out of the arrest. However, Plaintiff was able to carry his burden and show a dispute of material fact as to three of his claims for lack of accommodation of a disability under the ADA during his arrest and transport. As with the prior case against MPD, here there are significant disputes of fact as to Plaintiff's treatment in the Jail. The Court will indicate where disputes exist, when relevant.

On July 11, 2019, Medford police called the Jackson County Jail and advised staff that MPD was lodging a man in a wheelchair at the Jail. Scottow Bodycam (#84). At the time of

Plaintiff's arrest and transport to the jail by MPD, Plaintiff was intoxicated, emotionally upset, and causing a disturbance. When MPD arrived at the Jail gate, they spoke with Jail staff who used the Jail radio to advise staff there was an inmate "at the back door and may need assistance, wheelchair." Ex. 8 (31:8-16).

Plaintiff alleges that the Jail surveillance video shows that deputies dragged Plaintiff out of the police vehicle by his arms without supporting his legs or spine. They dropped him to his knees on the ground, apparently stepped on him, dropped him again until his head was level with the wheelchair seat, then finally pulled him up by his arms facing the wheelchair, and placed him in the wheelchair, again without any support to his legs or spine. Ex. 15; Ex. 42. Plaintiff's legs were mangled as they shoved him across the garage. *Id.* A review of the video footage shows that this is a plausible interpretation of what happened on arrival.

Nurse Bosgieter was on duty while Plaintiff was taken into the custody of the Jail. At 8:40 p.m. she evaluated Plaintiff while he was in custody of the Jail. Decl. of Bosgieter at 4 (#79). Nurse Bosgieter's notes of her evaluation of Plaintiff provide that he "refused to answer any medical questions and stated he did not have any medical issues despite having an electronic wheelchair." *Id.* Plaintiff further was noted as being "uncooperative during pat down and refused to remove clothing or answer questions." *Id.*

During the initial intake procedure, Plaintiff shouted, "f*** [redacted] you. Take me to the hospital." Plaintiff First Depo. at 38. Defendants claim that Plaintiff provided no further medical explanation at that time. Plaintiff did not have in his possession any medications or catheters when he was lodged at the jail. However, it is undisputed that those items were contained in his backpack, which it appears was in the possession of Medford Police Officers at the time of Plaintiff's arrest.

Jail video shows Plaintiff was handcuffed behind his back and seated in the wheelchair, with at least one, and sometimes three, deputies restraining him, in addition to the handcuffs. Exs. 16, 18. Plaintiff contends that he yelled at the deputies but did not harm anyone, and this appears to be confirmed by the video. Exs. 17-18. Plaintiff alleges that multiple deputies used force on Plaintiff during the pat-down, and this also appears to be confirmed by the video. Deputy Fuhrman pushed Plaintiff's head down and forced Plaintiff to bend in half for nearly two minutes. Exs. 16, 18; 1. Deputy Fuhrman told Plaintiff, "My nurse is right there, tell her your medical issues." Ex. 18. The nurse does not appear to be present in the video, but she may be present just outside the room. *Id.* Plaintiff responded, "I'm calling my lawyer." *Id.* Deputies then pulled Plaintiff's shoes and pants off, calling them a "biohazard." Ex. 18. Plaintiff was experiencing stress and medical incontinence related to his neurogenic bladder condition and had involuntarily urinated on himself. Malaer Decl., ¶ 3. Plaintiff alleges that another deputy mocked Plaintiff's medical disability, calling him a "pissy pants" which can be heard on the Jail audio recording of the "Pat-down." Ex. 18.

Plaintiff alleges that he was handcuffed in a wheelchair, and Deputy Fuhrman was forcing him to bend in half, and Deputy Miller was holding him from behind, when Defendant Deputy Kolkemo walked over and began applying "pain compliance techniques" on Plaintiff's arm and hand. Plf. Ex. 16. This allegation is a plausible interpretation of the Jail video footage of the "Pat-down." The video shows Deputy Kolkemo pinching the veins in Plaintiff's arm, then grabbing and twisting Plaintiff's wrist and holding it in a twisted position. Exs. 16, 18. Plaintiff claims that the deputies looked down Plaintiff's back and noted that there is "blood all over." Plaintiff says, "You guys need to take me to the hospital." Plaintiff claims that Deputy Fuhrman responded by yelling at Plaintiff and forcing his head down further. Plaintiff repeatedly screamed

"Take me to a hospital!" He told deputies they were breaking his finger as Kolkemo inflicted a pain compliance hold. *Id*. The County admits that Plaintiff screamed to be taken to the hospital but was never taken to a hospital. Ex. 1 (RFA Responses Nos. 7, 8). Fuhrman finally let go of Plaintiff's head. Plaintiff said, "you guys abused me" and "there's blood on the [] floor!" Plaintiff claims that a deputy then responded, "Oh, it was just a finger." Ex. 18.

Based on video from the hallway, deputies pushed Plaintiff in the Jail wheelchair from the pat-down vestibule to the clothing exchange room. The wheelchair was broken with only one footrest, which deputies did not use. Video shows Plaintiff's legs and feet dragging underneath the wheelchair across the ground as the deputies pushed him. Ex. 19.

Deputies took Plaintiff into the clothing exchange room and removed the remainder of his clothing. The exchange room did not have any cameras. It is undisputed that, while in the clothing exchange room, Defendant Kolkemo hit Plaintiff in the face. Plf. Ex. 49; Ex. 3 (141:6-21); Ex. 1. Deputy Kolkemo claims that this was a "diversionary strike." Plaintiff disputes this, claiming that Plaintiff was seated in a wheelchair and restrained by other deputies at the time Kolkemo hit Plaintiff in the face, thus eliminating any need for such a tactic. Deputy Kolkemo also said that Plaintiff was not given any jail-issued clothing because he was uncooperative at this time, "swinging his head back, not following directions." Plf. Ex. 2 pg JC000105. "Kolkemo felt he would need to be put in a suicide smock as he wouldn't help with changing clothes." *Id*. Nothing in the record indicates that Plaintiff was a suicide risk at this time.

Video footage shows that Plaintiff was then placed, completely naked, in a cell by himself. The cell had a jail-issue mattress, a sink, toilet, and two bed areas. Deputy Miller entered the cell first, dragging Plaintiff by the legs, then Deputies Kolkemo and Fuhrman entered, one on either side of Plaintiff, holding his arms while he sat in the wheelchair. Ex. 21-

23. Plaintiff exclaimed, "You guys are trying to hurt me!" Deputy Kolkemo responded by reaching back and open-hand slapping Plaintiff across the face near his eye. *Id.* The hit made a loud clapping sound on the audio recording. He yelled at Plaintiff, "Knock it off!" *Id.* Deputies then pulled Plaintiff from his wheelchair by twisting and pulling on his arms and legs, put him on the concrete floor, then twisted his body around by the torso. Plaintiff alleges that this twisting motion was dangerous for him, as it could further damage his broken spinal cord. Malaer Decl., ¶ 4, 6. Deputies Fuhrman and Kolkemo twisted and forced Plaintiff facedown onto the concrete floor and both knelt on his back. Plaintiff claims he then started having a seizure, visible in the video, while deputies continued kneeling on his back. Exs. 21, 23, 53. After deputies left the cell, Plaintiff was forced to crawl around on the floor, maneuver his legs out of their awkward, twisted position, and drag himself onto the mattress to lie down. *Id.* His wheelchair was taken out of the room. *Id.*

Defendants claim that, as a part of the standard policy for administrative separation, Plaintiff was monitored in fifteen-minute intervals. Decl. of Baumann Exhibit 2 ("Ad. Sep. Log." JC 004707-4709). According to Jail video surveillance, Plaintiff slept on a mattress on the floor for about five hours, and then moved the mattress up onto the bed area. Decl. Tlascala at pg. 5 (#81). Without his wheelchair, Plaintiff claims he could not access the toilet or drinking water from the sink. Plaintiff's wheelchair had been out of battery power on a hot July day, and he had been stranded in the sun for several hours, which is part of what led to his arrest; Plaintiff claims that he was extremely dehydrated, making his lack of access to water more medically dangerous. This compounded his distress and his medical incontinence. Plaintiff asked for water, but jail staff ignored him. Ex. 24 at 87:2-13; Malaer Decl., ¶ 9. Plaintiff claims that he resorted to drinking water from the jail toilet because the County gave him no other option. Ex. 54 (1:00:00-

1:06:00); Ex. 24 at 87:2-13; Ex. 52. While in the custody of the Jail, Plaintiff urinated on the floor five or six times. Plaintiff claims that he crawled on the floor to the cell door, knocked several times, and called for help, but none was given. *See e.g.*, Ex. 54.

Plaintiff was denied clothing for almost his entire detention. He was not given clothing until late the next day after his arrest. Ex. 71. He claims that the "suicide smock" did not provide sufficient warmth nor coverage to protect his body while having to crawl and drag his body around on the concrete floor.

After Plaintiff was in the cell for approximately five hours, Jail deputies provided Plaintiff a Jail-issue wheelchair, a cup for water, and a second safety smock. Plaintiff First Depo. at 46-47. Plaintiff participated in a medical screening the following day, and he signed the Receiving Screening Questionnaire. Decl. of Lt. Tlascala, ECF #81 at 2. In doing so, Plaintiff answered "NO" to the following questions: "Currently on prescription medication?", "Currently have other medical/dental prob?", "Medications brought to jail with you?" Decl. Of Lt. Tlascala at pg. 3 (#81) at 3. However, Plaintiff claims that Jail staff knew he needed medical catheters for his disability. Plf. Ex. 14 (Receiving Screening Questionnaire noting "cathider"). Plaintiff had also been in the Jackson County jail before and requested medical catheters in the past. Plf. Ex. 24 (48:2-8). Plaintiff claims that he verbally asked for a catheter multiple times and was consistently denied or ignored. Plf. Ex. 52; Ex. 25; Ex. 55. By the next afternoon after his arrest, Plaintiff claims that he was still asking jail staff, "Do you have my catheters? I need to pee." Staff responded they "might be in property." Ex. 55 at 1:37:54-1:38:02.

Similarly, although Plaintiff marked "No" on the form for "currently prescribed medication," Plaintiff claims that he made verbal requests for his bladder medication, but they were denied. Ex. 52, 54. Plaintiff also claims that Jail videos show Plaintiff experienced at least

131 visible seizures of his legs and bladder from being denied his prescribed medications. Exs. 21, 23, 45, 53-55, 67-60, 68, 70-72.

Plaintiff claims that the suicide smock he was given became soaked in urine, which is apparent in the holding cell videos. *See, e.g.*, Exs. 65-66. Plaintiff asserts that the denial of a medical catheter resulted in urine on the floor, mattress, the smock, and Plaintiff's body with no way to clean himself or the area, creating unsanitary conditions, in addition to placing Plaintiff at heightened risk of infection and pain. *Id.* Video shows Plaintiff attempted to turn the smock over when one side became too soaked with urine, but eventually gave up. *Id.*

Plaintiff alleges that he suffered physical injuries from his time in the Jail. He claims that his level of dehydration and lack of his catheters led him to becoming septic and needing to be hospitalized a few days after he was released from the Jail. Plf. Ex. 25. Plaintiff claims that video taken six days after his release showed bruising to his arm, chest, face, and legs, and he gave testimony about cuts to his feet. Plf. Ex. 47. He also claims that he experiences nerve pain and damage in his arm that did not exist prior to his time at the Jail. Ex. 25. Plaintiff alleges that he was deeply traumatized by these events and the treatment by Jail staff.

## DISCUSSION

Plaintiff alleges the following claims based on the facts above: (1) under section 1983, violations of the Fourth and Fourteenth Amendments against Deputy Kolkemo based on an excessive use of force in striking Plaintiff, using pain compliance techniques, and aggressively manipulating Plaintiff's body in unnecessary and harmful ways; (2) under section 1983, *Monell* liability against the County for alleged unconstitutional policies and practices; (3) under the ADA and Rehabilitation Act (RHA), violations against the County based on the failure to provide Plaintiff with a wheelchair and wheelchair-accessible facilities, clothing, bed, toilet,

sink, and water, and access to medical care; (4) under Oregon law, battery against the County for

the acts of Deputies Kolkemo and Fuhrman; (5) under Oregon law, negligence against the

County for failure to use reasonable care in giving Deputies Kolkemo and Fuhrman access to

inmates such as Plaintiff.

Significant disputes of material fact exist in this case, particularly as to whether Jail staff

knew or should have known of Plaintiff's medical needs, whether Jail deputies used excessive

force in attempting to subdue Plaintiff's verbal combativeness during intake, especially

considering his disabilities and medical fragility, and whether Jail staff failed to accommodate

Plaintiff's disabilities in depriving him of his wheelchair in his cell, which in turn deprived him

of access to the toilet and clean drinking water. Both parties raise questions of fact, and they are

both entitled to have their case heard and decided by a jury.

## I. The County Defendants' motion for partial summary judgment is GRANTED in part and DENIED in part.

County Defendants move for partial summary judgment.  First, they move to dismiss the

"new" claims against Sheriff Sickler, Jackson County, and Deputy Kolkemo, as barred by the

statute of limitations. Second, Defendants move for summary judgment as to Plaintiff's ADA

and Rehabilitation Act claims, claiming that these are unsupported by the record.  Third,

Defendants claim they are entitled to summary judgment as to Plaintiff's *Monell* claims for the

same reason. Finally, Defendants assert that Plaintiff's battery and negligence claims are barred

by the Oregon Tort Claims Act.

### A. Defendant's motion as to the "new" claims against Sheriff Sickler, Jackson County, and Deputy Kolkemo, based on the statute of limitations, is DENIED.

In a prior ruling, Opinion and Order (#141), the Court determined that Plaintiff was

allowed to assert his claims against the County, the Sheriff, and Deputy Kolkemo, in a Second

Amended Complaint, notwithstanding Defendants' objections based on the statute of limitations.

In that prior ruling, the Court determined that Plaintiff's proposed amendments and additional

claims easily "related back" to a liberal construction of Plaintiff's original pleadings, which is

required in cases of self-representation. The new claims thus complied with Rule 15(c). The

Court also found that the County and Deputy Kolkemo had ample notice that Plaintiff intended

to pursue litigation based on his treatment at the Jail: Plaintiff lodged a formal complaint against

Jail staff, and an internal investigation was conducted regarding Deputy Kolkemo's use of force

against Plaintiff. Plaintiff also told Deputy Kolkemo many times during his incarceration that he

planned to file a lawsuit based on his treatment of Plaintiff.

    In the prior ruling, the Court noted that, after Plaintiff filed his original complaint, he

diligently pursued his claims despite the challenges of being a disabled, *pro se* litigant during a

global pandemic. Defendants moved to stay the case, while Plaintiff objected and preferred to

move forward with the case. The Court found that Plaintiff should not be punished by having his

claims precluded due, in significant part, to Defendants' own delay. The Court finds no reason to

reconsider these determinations or change the outcome of the prior ruling. This motion is denied.

### B. Defendants' motion for summary judgment as to Plaintiff's ADA claims is DENIED.

    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132; *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 608-10

(2015).[1] Plaintiff must show: (1) he is a "qualified individual with a disability"; (2) he was either

---

[1] There is no significant difference in the analysis of rights and obligations under the ADA and the Rehabilitation Act, and they may be interpreted and applied together. *McGary v. City of Portland*, 386 F.3d 1259, 1265 n. 7 (9th Cir. 2004); *Duvall*, 260 F.3d at 1136.

excluded from participation in or denied the benefits of the public entity's services, programs, or

activities, or was otherwise discriminated against by the public entity; and (3) such exclusion,

denial of benefits, or discrimination was by reason of his disability. *Duvall v. Cnty. Of Kitsap*,

260 F.3d 1124, 1135 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001).

"[C]ompensatory damages are not available under Title II or § 504 absent a showing of

discriminatory intent." *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998), as

amended (Oct. 8, 1998*); see Duvall* at 1138. To show intentional discrimination, the

plaintiff must show that a defendant acted with "deliberate indifference," which requires "both

knowledge that a harm to a federally protected right is substantially likely, and a failure to act

upon that ... likelihood." *Duvall*, 260 F.3d at 1139. These provisions extend to discrimination

against inmates detained in a county jail. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210

(1998). A public entity may be liable for damages under Title II of the ADA or § 504 of the

RHA "if it intentionally or with deliberate indifference fails to provide meaningful access or

reasonable accommodation to disabled persons." *Mark H. v. Lemahieu*, 513 F.3d 922, 937–38

(9th Cir. 2008). The "failure to provide reasonable accommodation can constitute

discrimination." *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).

Here, Defendants do not dispute that Plaintiff is a qualified individual with a disability

and the Jackson County Jail is an extension of a public entity that is subject to the ADA.

Defendants argue, however, that Plaintiff cannot show that the Jail staff acted with deliberate

indifference, rather than "bureaucratic slippage that constitutes negligence rather than deliberate

action or inaction." *See Duvall*, 260 F.3d at 1139.

In support of this theory, Defendants point to the fact that "Plaintiff was placed in an

ADA compliant cell with handrails between the benches and toilet and around the sink," and that

"Defendants were unaware of any of Plaintiff's other alleged medical needs." Defendants also argue that the City of Medford and Medford Police officers were responsible for separating him from his medications and catheters by retaining his backpack upon arrest. Finally, Defendants assert that Plaintiff cannot show a concrete and particularized harm that was caused by the Defendants' actions. Plaintiff has raised a dispute of material fact as to each of these issues. Overall, he has raised a dispute of material fact regarding whether Defendants acted with deliberate indifference sufficient to deny summary judgment as to all of the ADA claims.

First, Plaintiff's placement in an ADA-compliant cell does not mean that he was able to adequately access the toilet or the sink, especially without a wheelchair. Plaintiff alleges that he requested assistance multiple times, demanding access to his wheelchair. He alleges that he was forced to drink water from the toilet and urinate onto the concrete floor, which he was forced to drag himself around upon, naked. The County contends that he was given a wheelchair after about five hours in the cell, and that during those five hours Plaintiff mostly slept and did not request assistance. The Court cannot resolve this factual dispute. Whether the County was deliberately indifferent to Plaintiff's needs and failed to accommodate him in these ways is a question for a jury.

Second, even if Medford Police officers, and not Jail staff, were responsible for separating Plaintiff from his medications and catheters, that does not necessarily relieve the County of any obligation to accommodate these medical needs. Plaintiff has alleged that he had been previously incarcerated at the Jackson County Jail, and that Jail staff knew that he needed a catheter. He also wrote, "cathider" on one of the Receiving Screening Questionnaires. A review of the video footage of the intake procedure does not resolve the question of whether he had a meaningful way to request accommodation or other medical assistance. A dispute of material

fact exists as to whether the Defendants knew or should have known about his medical needs and refused to accommodate them.

Finally, Defendants assert that Plaintiff has no concrete, particularized injury sufficient to have standing in this case. The idea is nonsensical.

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts ... [required] to establish standing depends considerably upon whether the plaintiff is himself an object of the action... at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62, 112 S. Ct. 2130, 2137 (1992). Plaintiff has alleged that he suffered the particularized injury of being subjected to Defendants' deliberate indifference, having his medical needs ignored and exacerbated, experiencing seizures and bladder spasms while naked on the floor of a concrete jail cell, without access to proper clothing, a toilet, or drinking water. His alleged injury in fact is actual, particularized, and caused by Defendants' actions or inactions. Plaintiff has standing to bring these claims.

### C. The County is entitled to summary judgment as to all of Plaintiff's *Monell* claims, except one; this motion is GRANTED in part and DENIED in part.

Civil rights plaintiffs suing a municipal or local governmental entity under 42 U.S.C. § 1983 must show that their injury was caused by a policy or informal custom. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018 (1978); *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 30–31, 131 S. Ct. 447, 449 (2010). A widespread "custom or practice" must be so "persistent" that it constitutes a "permanent and well settled [county] policy" and "constitutes the standard operating procedure of the local governmental entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). Allegations of an isolated or sporadic incident cannot form the basis for *Monell* liability. *Saved*

*Magazine v. Spokane Police Dept.*, 19 F.4th 1193, 1201 (9th Cir. 2021). If alleging liability

based on failure to train, a plaintiff must plead and prove "that the municipality had actual or

constructive notice that a particular omission in their training program will cause municipal

employees to violate citizens' constitutional rights." *Kirkpatrick v. Cty. Of Washoe*, 843 F.3d

784, 794 (9th Cir. 2016). The plaintiff must also show that the inadequate training was a

"moving force" behind the alleged constitutional violations. *Monell*, 436 U.S. at 694.

> i. **Claims related to accommodating Plaintiff's disability are not constitutional claims and are more properly alleged as ADA violations.**

As a preliminary matter, all of Plaintiff's allegations regarding treatment of and

accommodations for disabled and medically fragile inmates are misplaced in this set of claims.

For instance, Plaintiff alleges that the County failed "to implement and enforce adequate policies

and procedures regarding the needs of disabled detainees in custody." This allegation and the

others like it fail to state a claim for a constitutional violation and are better suited to Plaintiff's

claims under the ADA. Therefore, the County is entitled to summary judgment as to all of the

disability-related allegations within Plaintiff's *Monell* claim, and these are dismissed.

> ii. **Plaintiff has raised a question of fact as to whether a County custom of allowing diversionary strikes against verbally resistant inmates was the driving force behind the alleged excessive force used against Plaintiff by Deputy Kolkemo.**

Plaintiff's Second Amended Complaint is somewhat confusing as to whether or not the

alleged excessive force enacted by Deputy Kolkemo arose due to a Jail policy or custom. One of

the allegations states:

> Sheriff Sickler has endorsed some, but not all, of the conduct shown
> in the videos of the treatment of Mr. Malaer. Sickler has officially
> noted that the "diversionary strikes" seen used by Defendant
> Kolkemo **are not within policy and do not comply with the use
> of force standards mandated by the Constitution.** The Sheriff has

> not acted to change policy within the jail on the use of "diversionary
> strikes," the use of pain compliance holds against verbally resistant
> prisoners, or use of positional holds against medically fragile
> inmates.

SAC ¶ 181 (emphasis added). The allegations seem to argue that Deputy Kolkemo's actions were both inappropriate and outside of Jail policy and also that the Jail policy allowed and encouraged Kolkemo's conduct. The distinction is important here. If the diversionary strikes are not within Jail policy, then the County cannot be liable for a *Monell* claim based on those strikes.

However, evidence submitted at summary judgment does raise a question regarding whether the County had an informal custom, if not a formal policy, allowing deputies to use diversionary strikes in the manner deployed by Deputy Kolkemo, such that his actions were within the bounds of customary conduct of the Jail. Plaintiff cites to the criminal investigation of Deputy Kolkemo, conducted by the Oregon State Police (OSP) regarding his use of force against Plaintiff. During the investigation hearing, Kolkemo's attorney Rhonda Fendrich testified at length that Jackson County trained deputies to use force and diversionary strikes in the manner used by Kolkemo, and she noted that all four deputies at the scene had similarly described the strike as a tactic the agency uses. Plf. MSJ Ex. 2, "Pre-disciplinary Hearing," pg. 5 (#258-2). This statement is also supported by the OSP Incident Report and notes of investigator Jeff Proulx from his interview with the other deputies. Plf. MSJ Ex. 13 (259-3) pg. 5-12. A reasonable jury could find that Jackson County's Jail policy or informal custom regarding the use of diversionary strikes was the moving force behind Deputy Kolkemo's alleged excessive use of force when striking Plaintiff.

Additionally, prior litigation regarding excessive force in the Jail put the County on notice as to such claims. *See Evans v. Jackson Cnty.*, No. 1:14-CV-145-CL, 2015 WL 2170114, at *6 (D. Or. May 7, 2015) (taking judicial notice of prior lawsuits alleging excessive use of

force by Jackson County Jail staff in a case regarding *Monell* claim). Defendants argue that

almost all of the prior cases have terminated in the County's favor, either on summary judgment

or after trial. Prior litigation need not have been successful to serve as evidence of a pattern and

practice. *See Adams v. City of Redding*, 2022 WL 16964025, at *4 (E.D. Cal. Nov. 16, 2022)

("Prior incidents involving lawsuits alone, even those which do not result in a finding or

admission of wrongdoing, can be sufficient for *Monell* liability purposes at the pleading stage").

At least one recent case did not end favorably for the County. In *Sancho v. Jackson County*, Case

No. 1:20-cv-01232-CL, this Court denied qualified immunity based on the Jail's allegedly

unconstitutional treatment of an inmate. The denial of qualified immunity is currently on

interlocutory appeal to the Ninth Circuit. Thus, the Jackson County Jail has been on notice that it

could be subjected to litigation for a pattern or practice of unconstitutional conduct under

*Monell*.

  To be clear, the surviving claim is a narrow one: a jury would have to find that Deputy

Kolkemo's strikes to Plaintiff constituted excessive force, and that the County's policy or custom

was a moving force behind this unconstitutional conduct.

   **iii.**  **The County is entitled to summary judgment as to Plaintiff's**
       **_Monell_ claim for "failure to train."**

  Plaintiff raises an alternative *Monell* claim through Deputy Kolkemo's alleged excessive

force, alleging a "failure to train" regarding the use of diversionary strikes in the specific context

of disabled or medically fragile inmates. However, there is no evidence that the County has a

policy or practice of using such strikes against disabled or medically fragile prisoners. Nor is

there any evidence that the County had actual or constructive notice that the failure to train

deputies as to using this level of force on disabled or medically fragile prisoners was an omission

that could lead to a violation of constitutional rights. Certainly, after this case, the County is on

notice that more training and better policies are needed to ensure that medically fragile and disabled detainees' needs are met and their rights are not violated. There is no indication that such notice existed prior to this case, however. Therefore, Plaintiff's *Monell* claim based on a "failure to train," cannot proceed.

        iv.      **Plaintiff's remaining *Monell* arguments are not successful.**

Plaintiff makes a few tangential arguments in support of his *Monell* claims, which the Court does not find persuasive. For instance, the Ninth Circuit has held that "a custom or practice can be supported by evidence of repeated constitutional violations which went uninvestigated and for which the errant municipal officers went unpunished." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1236 (9th Cir. 2011). However, in this case, it is undisputed that the County did investigate Deputy Kolkemo's use of force, and he was given a one-day suspension with loss of pay and benefits.

Plaintiff also points to evidence that Jackson County's Internal Affairs investigation uncovered that Deputy Kolkemo's act of striking Plaintiff in the face in the jail were Kolkemo's second and third times being caught engaging in a use of force incident and failing to file the required report or notify a supervisor. This allegation does not adequately encompass a constitutional violation, however, because whether Deputy Kolkemo used excessive force is not dependent on whether he filed a use of force report after the fact. In other words, Deputy Kolkemo's failure to file a use of force report does not impact Plaintiff's constitutional rights.

These arguments are therefore unhelpful in raising a question of fact as to either of Plaintiff theories of liability as to his *Monell* claims. The County is entitled to summary judgment on the *Monell* claims, except as to the policy or custom regarding the use of diversionary strikes against verbally resistant inmates.

**D. Defendants' motion for summary judgment based on the Oregon Tort Claims Notice requirements is DENIED.**

The County claims that the Oregon Tort Claims Act's ("OTCA") notice requirements bar

Plaintiff's claims for battery and negligence. The OTCA states:

> Actual notice of claim is any communication by which any individual to whom notice may be given as provided in subsection (5) of this section or any person responsible for administering tort claims on behalf of the public body acquires actual knowledge of the time, place and circumstances giving rise to the claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body or an officer, employee or agent of the public body.

ORS 30.275(6). Notice may be provided to "the public body at its principal administrative

office, to any member of the governing body of the public body, or to an attorney designated by

the governing body as its general counsel." ORS 30.275(5). Notice may also be provided to:

> a person who, acting within the scope of the person's responsibility, as an officer, employee or agent of a public body... engages in investigation, negotiation, adjustment or defense of claims within the scope of ORS 30.260...or in furnishing or accepting forms for claimants to provide claim information, **or in supervising any of those activities.**

ORS 30.275(6) (emphasis added).

Oregon courts have held that a defendant receives actual notice under ORS 30.275(6)

when (1) a communication informs the defendant of the time, place, and circumstances of the

incident that gave rise to the claim that the plaintiff ultimately asserts and (2) the communication

would lead a reasonable person to conclude that the plaintiff intends to assert a claim. *Heng-*

*Nguyen v. Tigard-Tualatin Sch. Dist. 23J*, 275 Or. App. 724, 729, 365 P.3d 1173, 1176 (2015)

(*citing Flug v. University of Oregon*, 335 Or. 540, 73 P.3d 917 (2003)).

Here, Plaintiff claims that he gave a written notice to the Medford City Manager on July

27, 2019, describing the date and the nature of his allegations, stating, "I intend to sue the city

and the Jail for violating my constitutional rights." Plaintiff also submits evidence to show that this message must have been received by the Jackson County Sheriff because Sheriff Sickler referred the incident to Captain Aldrich, the jail commander, for investigation. After Captain Aldrich sent the Jail video of the incident, Sheriff Sickler contacted the Oregon State Police "with regards to conducting an investigation." In the message, dated July 30, 2019, Sheriff Sickler gave Plaintiff's name and address, the date of the incident, and the name of Deputy Kolkemo, and he stated that, "The incident involves a Use of Force and occurred while the deputy was on duty and acting in his capacity as a Sheriff's Deputy." Plf. MSJ Ex. 12 (#259-2).

The message from Sheriff Sickler to Lt. Jess Elzy at OSP provides sufficient evidence that Jackson County had actual and timely notice of Plaintiff's claims. The County Sheriff, if not "the public body" itself, or "a person who engages in investigation or negotiation of claims," certainly engages in supervising such tasks on behalf of the Jackson County Sheriff's Office. The message shows that the County had actual notice of Plaintiff's claims, within the proper time under the OTCA.

## II. Plaintiff's motion for partial summary judgment is DENIED.

Plaintiff moves for partial summary judgment as to his claims for ADA violations and his claims for battery against Deputy Kolkemo and the County. Questions of fact preclude summary judgment on these claims.

### A. Questions of fact preclude summary judgment as to Plaintiff's ADA claims.

For the same reasons discussed above in denying Defendants' motion, the Court cannot resolve the questions of fact raised as to these ADA claims. Namely, Defendants raise a question of fact as to whether Jail staff knew or should have known of Plaintiff's specific medical and disability-related needs, and whether Plaintiff actually requested accommodations that the Jail

staff should have been able to provide, such as catheters for urination. Defendants claim that Plaintiff did not indicate these needs at intake or on the intake forms, nor did he request them verbally. They also claim that staff provided Plaintiff with a wheelchair after five hours inside the cell, and that he did not need one prior to that because he was merely sleeping in the cell. The Court cannot resolve these factual issues. Plaintiff and Defendants are entitled to have the facts determined by a jury.

### B. Questions of fact preclude summary judgment as to Plaintiff's claims for battery.

"Battery" is a "voluntary act that is intended to cause the resulting harmful or offensive contact." *Walthers v. Gossett*, 148 Or.App. 548, 552 (1997). Plaintiff must show (1) the defendant acted "intending to cause a harmful or offensive touching" with Plaintiff, and (2) "a harmful or offensive contact" with Plaintiff directly or indirectly resulted. *McCrae v. City of Salem*, 6:20-cv-01489-MC, at *15 (D. Or. Mar. 21, 2022). "[T]he conduct which brings about the harm must be an act of volition on the actor's part, and the actor must have intended to bring about a harmful or offensive contact or put the other party in apprehension thereof. It is not necessary that the contact do actual physical harm-it is sufficient if the contact is offensive or insulting." *Johnson v. Jones*, 269 Or. App. 12, 17 (2015) (quoting *Bakker v. Baza'r, Inc.*, 275 Or. 245, 249 (1976)); *Aguirre v. Port of Portland*, 3:18-cv-01916-YY, at *5 (D. Or. Feb. 16, 2021).

A law enforcement officer is only authorized to use force reasonably necessary under the circumstances to fulfill his lawful professional duties. *Ballard v. City of Albany*, 221 Or. App. 630, 640-41 (2008). "[T]he battery claim depends on the reasonableness of [the officer's] belief that the physical force used on [the arrestee] was necessary." *Elkins v. Washington Cty.*, Civ. No. 06-488-ST, 2007 WL 1342155, at *16 (D. Or. May 3, 2007). It is "contingent upon whether the use of force was excessive under the Fourth Amendment." *Williams v. Jackson Cnty.*, Civ. No.

1:13-cv-01190-CL, at *6 (D. Or. Dec. 3, 2014). "[T]he use of excessive force by a police officer

. . . can give rise to civil liability for battery." *Ballard v. City of Albany*, 221 Or. App. at 641.

Because questions of reasonableness are not well-suited to precise legal determination, the

propriety of a particular use of force is generally an issue for the jury. *Chew v. Gates*, 27 F.3d

1432, 1440–41 (9th Cir. 1994) (citing *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991),

cert. denied, 505 U.S. 1206, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992); *White by White v. Pierce*

*County*, 797 F.2d 812, 816 (9th Cir. 1986)).  Similarly, evaluating the intent of an officer to

cause harm is also a jury question.

 Here, the Defendants have proffered evidence that Deputy Kolkemo did not intend to

cause harm by striking Plaintiff: "I gave him a diversionary strike to get his attention, to bring

him back to us." Def. Ex. 2 at JC000105. Similarly, pain compliance techniques are alleged to

allow deputies to control a combative or resisting inmate without using a higher level of force.

Thus, Defendants have raised a question of fact as to Deputy Kolkemo's intent with regard to the

force used, and whether such force was necessary to try to prevent further escalation of

Plaintiff's combative behavior. Therefore, summary judgment on Plaintiff's claim for battery is

inappropriate. This motion is denied.

### III. Plaintiff's motion for judicial notice is DENIED.

 Plaintiff moves the Court to take judicial notice of a variety of government websites and

medical journal articles. This Court may judicially notice a fact that "is not subject to reasonable

dispute" because it "can be accurately and readily determined from sources whose accuracy

cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). A court must take judicial notice if a

party requests it, and the court is supplied with the necessary information. Fed. R. Evid.

201(c)(2).

First, the Court notes that this motion fails to comply with Local Rule 7-1, requiring certification that the parties made a good faith effort to confer and resolve the dispute and have been unable to do so, or stating that the motion is unopposed. "The Court may deny any motion that fails to meet this certification requirement." LR 7-1(A)(3).

Second, this motion fails on the merits as well. "Courts take judicial notice of publications "introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (quoting *Premier Growth Fund v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n. 15 (3d Cir. 2006)). Here, Plaintiff requests notice of the websites and articles, not to show the state of those websites and articles at the time of the incident, but to show the truth of their content as it relates to Plaintiff's medical conditions. However, Plaintiff does not offer any expert medical opinions regarding how or why the websites and articles relate to his medical conditions.

Plaintiff can certainly give testimony regarding his own first-hand experiences with his medical conditions and his medical needs, but any medical opinion offered as evidence must comply with the rules of evidence and expert opinions. *See, e.g.*, FRE 702, 703. The Court does not find any of the information provided in the motion helpful for resolving the motions for summary judgment. Therefore, the motion for judicial notice (#256) is DENIED.

## ORDER

For the reasons above, the County Defendants' motion for summary judgment (#253) is GRANTED in part and DENIED in part. Summary judgment is granted in favor of Defendants as to Plaintiff's *Monell* claims, except as to the claim based on the County's alleged policy or custom regarding diversionary strikes. Summary judgment is denied as to all other claims.

Plaintiff's partial motion for summary judgment (#255) is DENIED.

Plaintiff's motion for judicial notice (#256) is DENIED.

All remaining claims shall proceed to trial.

IT IS SO ORDERED and DATED this _19_ day of July, 2024.

MARK D. CLARKE
United States Magistrate Judge