**ALICIA LEDUC MONTGOMERY, OSB 173963**
Email: alicia@leducmontgomery.com
**LEDUC MONTGOMERY LLC**
2210 W Main Street, Suite 107-328
Battle Ground, Washington 98604
(704) 702-6934
www.leducmontgomery.com

**JOSEPH M. McMULLEN, CA BAR 246757**
*Admitted Pro Hac Vice*
Email: joe@jmm-legal.com
**LAW OFFICES OF JOSEPH M. MCMULLEN**
501 W Broadway, Suite 1510
San Diego, California 92101
(691) 501-2000
www.jmm-legal.com

*Attorneys for Plaintiff John Lee Malaer*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| **JOHN LEE MALAER**, <br><br> Plaintiff, <br><br> v. <br><br> **CITY OF MEDFORD**, a government agency, <br><br> Defendant. | Case No. 1:20-cv-00049-CL <br><br><br> **PLAINTIFF'S TRIAL BRIEF** |

**PLAINTIFF'S TRIAL BRIEF**

///

///

///

1 – **PLAINTIFF'S TRIAL BRIEF**

TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................................3

II.     PLAINTIFF'S DISABILITY CLAIM REMAINING FOR TRIAL.................................5

III.    PARTY LIABLE ..................................................................................................................5

IV.     LIABILITY ELEMENTS AND TRIAL STANDARDS ....................................................6

    A.  Element 1 is Admitted .................................................................................................7

    B.  Element 2 is Admitted .................................................................................................7

    C.  Element 3 is Disputed on Three Grounds...................................................................7

        1.  Arrest Due to Disability Manifestations ..............................................................8

        2.  Unsafe Transport .................................................................................................10

        3.  Separation from Medical Necessities ................................................................12

    D.  Element 4 Should Not Reasonably Be Disputed ......................................................15

V.      RELIEF ELEMENTS AND TRIAL STANDARDS ........................................................16

    A.  Plaintiff Meets the Standard to Obtain Injunctive Relief ........................................16

    B.  The Requested Relief is In Line with Equitable Relief Awarded by Courts.....................17

    C.  The Request Injunctive Relief is Appropriately Narrowly Tailored ................................19

    1.  Real and Immediate Threat of Repeated Injury.................................................20

    2.  Plaintiff Need Not Prove Deliberate Indifference to Prevail...........................22

3.      LIMITATIONS ON DEFENSES .........................................................................................23

    A.  Standard ADA Defenses Do Not Defeat Plaintiff's Claims....................................23

        1.  Fundamental Alteration ......................................................................................24

        2.  Undue Financial or Administrative Burden .......................................................25

        3.  Direct Threat.......................................................................................................26

        4.  Law Enforcement Exigency and Officer Safety................................................28

        5.  Lack of Reasonableness .....................................................................................29

    B.  Mootness Threshold is Not Met and the Court Retains Jurisdiction to Issue Injunctive ..30

    C.  The City's Affirmative Defenses Are Not Applicable or Controlling in This Case .........34

        1.  Failure to State a Claim for Injunctive Relief ..................................................34

        2.  Qualified and Discretionary Immunity Are Not Available to Municipalities...............40

        3.  Failure to Exhaust Administrative Remedies Does Not Apply Here ..........................42

4.      CONCLUSION ....................................................................................................................45

## I.    INTRODUCTION

This bench trial concerns Plaintiff John Lee Malaer's remaining claim against Defendant City of Medford under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act, arising from Medford police officers' July 11, 2019 detention, arrest, handling, transport, and transfer of Plaintiff to the Jackson County jail.

The interaction arose when Plaintiff's electric wheelchair ran out of battery on his way home, became stuck on the sidewalk outside of Lumpy's, and a verbal altercation with the Lumpy's manager ensued when Plaintiff began yelling and throwing bits of gravel at the building to get someone's attention for help. The Lumpy's manager yelled back and called Medford police instead. Officers arrived while Plaintiff was trying to board a public bus, but his wheelchair would not roll up onto the ramp. The situation deteriorated after Officer Esqueda called Mr. Malaer an "asshole" twice within the first 30 seconds of contact. Additional officers arrived and repeatedly mocked Mr. Malaer's disability, and told Mr. Malaer he would be arrested and taken to jail before they had conducted any investigation or spoken to any witnesses.

Mr. Malaer was arrested for disorderly conduct and menacing several minutes later, after he was told to leave but could not move, though all charges were later dropped. During the course of the arrest, officers bent his body in half while they handcuffed him behind his back (he has a partially severed spine), pulled him by his arms out of his wheelchair and dropped him toward the ground, then unsafely shoved and pulled his body up across the back seat of the police SUV.

Once at the jail, his backpack, containing his necessary catheters and medications, was removed from his wheelchair and placed into the police cruiser to be taken by Medford officers to police property. Before they left, arresting Medford officers McFall and Wulff observed jail staff bending Mr. Malaer in half while ignoring his screams to be taken to a hospital, observing blood

3 – **PLAINTIFF'S TRIAL BRIEF**

on his wheelchair, mocking his medical incontinence, and twisting Mr. Malaer's fingers until he complained they would break them. The officers stood by and did nothing to prevent the abuse, accommodate Mr. Malaer, or take his medical supplies out of their SUV and leave them at the jail for him to access.

The incident caused Mr. Malaer to resign from volunteer service on several public boards relating to disability rights and housing justice. He was also repeatedly targeted by Medford police, including an exclusion zone citation for charging his wheelchair and cell phone on an outdoor electrical outlet downtown, and being threatened with criminal trespass from the downtown transit center when his attorney filmed him being denied access to a Greyhound bus despite having a paid ticket. These incidents followed prior discriminatory, negative experiences with Medford Police, including being arrested and pulled from his wheelchair while covered in blood at the Providence hospital in December 2018. As a result, Mr. Malaer reasonably fears for his safety when being present and traveling in Medford, primarily because he relies on use of public sidewalks and public transportation services in downtown Medford to travel with his wheelchair, areas that are near the police station and regularly patrolled by Medford officers.

Following summary judgment the Court has narrowed the case to three ADA/RA theories: (1) whether City officers wrongfully arrested Plaintiff by misperceiving disability-related circumstances or symptoms as criminal activity; (2) whether the City failed to reasonably accommodate Plaintiff's paraplegia during arrest and transport; and (3) whether the City failed to ensure access to Plaintiff's disability-related medical devices and medications during transfer to the jail. The trial will address those issues under the Title II/§ 504 framework applicable to police encounters, including notice of disability-related needs, the reasonableness of available accommodations, causation, and the scope of appropriate declaratory and injunctive relief.

4 – **PLAINTIFF'S TRIAL BRIEF**

## II.    PLAINTIFF'S DISABILITY CLAIM REMAINING FOR TRIAL

The only claim remaining for trial is Plaintiff's Title II ADA and § 504 Rehabilitation Act claim against the City of Medford. ECF 353. The Court already held, and the Parties agree, that Plaintiff is a qualified individual with a disability, that the City is a public entity subject to Title II and § 504, and that the ADA applies to the police encounter.  ECF 273. Fact issues precluded summary judgment on Plaintiff's three remaining ADA theories: (1) wrongful arrest based on disability symptoms, (2) failure to reasonably accommodate Plaintiff's paraplegia during arrest and transport, and (3) failure to ensure post-arrest access to disability-related medical devices and medication he had with him at the time of arrest. ECF 273.

Through the operative Third Amended Complaint, Plaintiff withdrew his damages demand and now seeks only declaratory and prospective injunctive relief. The requested injunction is directed to three categories of future compliance measures tied to the remaining theories of liability: **(1)** ADA/RA training and policy measures concerning recognition of disability-related needs and reasonable accommodations during police investigations, detentions, and arrests; **(2)** training, procedures, and accountability measures for safe handling and transport of individuals with mobility impairments, including wheelchair users; and **(3)** procedures to preserve access to mobility devices, medical equipment, medications, and disability-related supplies during arrest, transport, and transfer to custodial facilities. ECF 353. Because only equitable relief remains, the case will proceed as a bench trial without a jury.

## III.    PARTY LIABLE

City of Medford is the only remaining Defendant and is vicariously liable for the acts of its employees. "When a plaintiff brings a direct suit under either the Rehabilitation Act or Title II of the ADA against a municipality (including a county), the public entity is liable for the vicarious

acts of its employees." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001). This includes claims regarding police officer conduct. *Sheehan v. City of San Francisco*, 743 F.3d 1211, 1231-32 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom., City of San Francisco v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015).

## IV.    LIABILITY ELEMENTS AND TRIAL STANDARDS

Plaintiff's claim against the City is under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. The two statutes are analyzed together because there is no material difference between the standards applicable to the ADA and Rehabilitation Act claims in this case. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135–36 (9th Cir. 2001); *McGary v. City of Portland*, 386 F.3d 1259, 1269 n.7 (9th Cir. 2004).

Here, to prove a violation of Title II and § 504, Plaintiff must show by a preponderance of the evidence four elements, including that: (1) Plaintiff is a qualified individual with a disability; (2) the City is a public entity under Title II, and a recipient of federal financial assistance under § 504; (3) Plaintiff was excluded from participation in, denied the benefits of, or otherwise discriminated against in the City's services, programs, or activities, by reason of one of the following: (a) wrongful arrest, where officers wrongly arrested Plaintiff because they misperceived the effects of a disability as criminal activity **(first theory)**; or (b) failure to provide a reasonable modification, where officers failed to reasonably modify their practices to accommodate Plaintiff's disability during the investigation, arrest, handling, or transport, causing greater injury or indignity than other arrestees, by reason of one of the following: (i) Failing to accommodate Plaintiff's paraplegia when removing him from his wheelchair, handcuffing him, loading him into a non-ADA equipped police SUV, transporting him without support, and transporting his wheelchair separately **(second theory)**; or (ii) failure to preserve access to disability-related medical devices

6 – **PLAINTIFF'S TRIAL BRIEF**

and medication, including officers failing to ensure that Plaintiff's catheter, medication, and disability-related items in his backpack remained available to him or were properly transferred to jail personnel **(third theory)**; and (4) the exclusion, denial of benefits, or discrimination occurred by reason of Plaintiff's disability. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794(a); *Duvall*, 260 F.3d at 1135; *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). The Court held that each of these theories presents triable ADA/RA issues. ECF 273.

### A. Element 1 is Admitted

The City has admitted that Plaintiff is a qualified individual with a disability and this element will not be disputed at trial.

### B. Element 2 is Admitted

The City likewise admits it is a public entity subject to Title II, receives federal financial assistance within the meaning of § 504, and the City and its agents are required to comply with the ADA and RA, including on July 11, 2019.

The liability aspect of trial will therefore focus solely on whether Plaintiff was excluded, denied benefits, or discriminated against, and whether that exclusion, denial, or discrimination occurred by reason of his disability.

### C. Element 3 is Disputed on Three Grounds

As a threshold matter, a public entity is on notice of the need for accommodation when the need is obvious, when a plaintiff requests accommodation, or when circumstances known to the entity make the need for accommodation apparent. *Duvall*, 260 F.3d at 1139; *Updike v. Multnomah County*, 870 F.3d 939, 951–52 (9th Cir. 2017). Once the need for accommodation is known or obvious, the public entity must undertake a fact-specific inquiry and provide reasonable modifications unless it proves a recognized ADA defense, such as fundamental alteration, undue

7 – **PLAINTIFF'S TRIAL BRIEF**

financial or administrative burden, or direct threat. In the arrest context, officer safety, exigency, and operational realities may be considered when assessing reasonableness of modifications, but they do not create a categorical exemption from Title II or § 504. *Sheehan*, 743 F.3d at 1232; *Vos*, 892 F.3d at 1036–37; *Hyer*, 118 F.4th 1044; *Bell v. Williams*, 108 F.4th 809 (9th Cir. 2024).

At trial the evidence will show that the need for accommodation was obvious: Plaintiff was visibly in a wheelchair. Officers knew he could not stand. Bodycam videos show the officers knew Plaintiff's wheelchair battery had died, that officers observed and discussed his medical incontinence, that Plaintiff told officers he was trying to get home, said that if his wheelchair "could roll" he would leave, and he asked for help, that officers were told by the 911 caller that Plaintiff's wheelchair had become stuck in potholes in the sidewalk multiple times leading up to police arrival, and that passersby had had to help push his wheelchair out of the sidewalk cracks.

The City's duty to reasonably modify its policies, practices, and procedures to accommodate Plaintiff's disability was therefore triggered before Plaintiff was arrested, removed from his wheelchair and loaded into the patrol vehicle, and his wheelchair and backpack with medications and catheters separated from him at the scene and again at the jail. Because the City failed to provide reasonable modifications, Plaintiff will show the City violated the ADA/RA in three ways, discussed below.

### 1. Arrest Due to Disability Manifestations

Courts recognizes an ADA violation theory where officers wrongly arrest a person with a disability because they misperceive the effects of that disability as criminal activity. *Sheehan*, 743 F.3d at 1232. The theory is distinct from a Fourth Amendment false arrest claim. The ADA question is not simply whether officers had probable cause under criminal law, but whether

disability related circumstances or symptoms caused officers to treat Plaintiff as criminally noncompliant when reasonable disability-aware investigation or modification was required.

Courts applying this theory focus on what officers knew or should have known about the disability and whether the conduct being treated as criminal was reasonably attributable to that disability. In *Lawman v. City & County of San Francisco*, the court denied summary judgment on an ADA wrongful arrest theory where evidence supported a finding that officers arrested the plaintiff for public intoxication even though witness accounts contradicted intoxication and officers should have recognized that his strange behavior may have reflected a mental disability. 159 F. Supp. 3d 1130, 1147–49 (N.D. Cal. 2016). The court explained that a jury could find the officers "should have known that Lawman was disabled, and that they arrested him for legal conduct related to his disability." *Id.* at 1149.

The same principle applies here. Plaintiff was a paralyzed individual with PTSD in a wheelchair that had been getting stuck and running out of capacity to function, leaving Plaintiff stranded in public while incontinent and unable to get home. When the first officer arrived, Plaintiff was trying to board the bus. Before Esqueda confronted him from behind and called him an "asshole," Esqueda simply observed Plaintiff being frustrated while unable to board a bus, not engaging in criminal conduct. *Sheehan* recognized that Title II applies where officers fail to account for disability during an arrest and use tactics that escalate, rather than accommodate, a disability-related encounter. 743 F.3d at 1232–33.

The totality of objective facts known to officers also did not establish an objectively reasonable fear of imminent serious physical injury once the encounter with police was underway: the complainant said she was not afraid and threatened to beat Plaintiff up herself, reported that she had a gun, prevented Plaintiff from boarding the bus, and provided contradictory statements.

9 – **PLAINTIFF'S TRIAL BRIEF**

Bodycam footage contradicted the complainant's claim that Plaintiff's wheelchair battery was not dead, officers openly mocked Plaintiff while standing next to him, commented that Plaintiff didn't have the "means" and was just a talker, and officers never searched Plaintiff for weapons.

The evidence will therefore support Plaintiff's wrongful arrest theory under the ADA. Officers treated disability-related immobility, vocalization of frustration, incontinence, and inability to leave the scene as criminal behavior from the start, rather than investigating and accommodating a mobility crisis, beyond telling Plaintiff to get on the bus, and then telling him repeatedly to leave the area. Plaintiff could not leave the scene in the same way an able-bodied person could. He could not make his wheelchair roll onto the bus ramp, and could not comply with commands to leave without assistance or a functioning wheelchair. The ADA required officers to account for those disability-related circumstances before escalating the encounter into arrest.

### 2. Unsafe Transport

Police handling and transport of a wheelchair user is a covered public service under Title II and § 504. In *Gorman v. Bartch*, the Eighth Circuit held that transportation of an arrestee to the station house is a police service within the meaning of the ADA, and that the benefit sought by a paraplegic arrestee was to be "handled and transported in a safe and appropriate manner consistent with his disability." 152 F.3d 907, 912–13 (8th Cir. 1998). The Ninth Circuit has applied the same principle in custodial transport, recognizing that reasonable accommodation duties apply to inmate transportation and reversing summary judgment where a wheelchair user was denied wheelchair accessible transport and dragged and dropped onto a bus floor. *Weldeyohannes v. Washington*, 162 F.4th 972 (9th Cir. 2025). Likewise, *Bell v. Williams* confirms that even a single failure to accommodate a detainee's known mobility disability during movement within custody can support ADA and Rehabilitation Act liability. 108 F.4th 809, 825–27 (9th Cir. 2024).

Other courts reach the same conclusion where officers or custodial officials remove wheelchair users from their wheelchairs or transport them without disability-related safety accommodations. *See Dickinson v. York*, 2021 U.S. Dist. LEXIS 11960, at *9–32 (N.D.N.Y. Jan. 22, 2021) (denying summary judgment where paraplegic detainee was required to transfer between wheelchair and patrol car rather than receive wheelchair-accessible transport); *Morales v. City of New York*, 2016 U.S. Dist. LEXIS 121471, at *8–10 (S.D.N.Y. Sept. 7, 2016) (denying summary judgment where paraplegic arrestee was removed from wheelchair and transported on the floor of a police van without safety equipment); *Divine Allah v. Goord*, 405 F. Supp. 2d 265, 280–81 (S.D.N.Y. 2005) (wheelchair-bound prisoner stated ADA claim based on unsafe van transport to medical services). These cases show that a wheelchair user need not be wholly denied transportation; it is enough that *the method of transport and handling* denies safe, meaningful access because of the person's mobility disability.

The evidence at trial will show that Mr. Malaer was mishandled, suffered increased pain and indignity, and faced further disability-related injury because of how officers chose to remove, restrain, load, and transport him following the arrest. The bodycam video shows officers pulling him out of his electric wheelchair, dropping him nearly to the ground, lifting him with his back arched, shoving him down onto the floor of the SUV's backseat, and dragging him up onto the bench sideways, holding his body by his arms with no leg support. Even after buckling him in, officers left his hands cuffed behind his back, leaving him unable to readily hold himself upright. The video shows him falling to the side with the seatbelt tight against his throat. They then separated him from his wheelchair completely, put the wheelchair in a separate vehicle.

The officers' unsafe handling of Plaintiff's person was not incidental to disability-neutral policing. It occurred because officers removed a paraplegic man from his motorized wheelchair

11 – **PLAINTIFF'S TRIAL BRIEF**

and, despite his warnings that they did not know how to do it safely, shoved, dragged, and positioned him in a patrol SUV without accommodating the spinal cord-related limitations that made ordinary handling unsafe. They *never asked* him how to appropriately lift or handle his body out of the wheelchair, or *even if he was injured or disabled*. Reasonable modifications included asking how to transfer him safely, considering front handcuffing or other restraint modifications if safety permitted, using safer accessible transport if feasible, supporting his body during transport, and preserving the wheelchair as his primary mobility device. The unsafe lifting, dragging, and SUV transport created the disability-based barrier to safe police transport that Title II and § 504 prohibit.

### 3. Separation from Medical Necessities

The Ninth Circuit recognizes an ADA violation where officers fail to reasonably accommodate a person's disability during an investigation or arrest, causing the person to suffer greater injury or indignity than other arrestees. *Sheehan at* 1232–33; *Lawman*, 159 F. Supp. 3d at 1147–48. A public entity's duty to accommodate is triggered where the disability and need for accommodation are known or obvious; the ADA does not require a disabled arrestee to utter magic words when the need for modification is apparent. *See Robertson v. Las Animas County Sheriff's Department*, 500 F.3d 1185, 1196–97 (10th Cir. 2007) (public entity must provide accommodation when it knows of the disability and need, including when disability is obvious); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (deliberate indifference exists where the entity knows harm to a federally protected right is substantially likely and fails to act).

Here Plaintiff alleges the City, with obvious notice of disability-related needs, affirmatively separated Plaintiff from his wheelchair and then medical supplies in the backpack that was attached to his wheelchair that allowed him to function safely in custody, including catheters and prescribed

medications. Officer bodycam video shows the officers saw Plaintiff was in a wheelchair, knew he had urinated on himself, learned he could not stand or walk, and observed visible red medical catheters in the wheelchair backpack. Yet officers removed the backpack from the wheelchair and, after the jail deputy searched the backpack at the jail with Officer Scottow, Officer Scottow took the backpack, placed it in the patrol car trunk, and removed it to police property, leaving Plaintiff and his wheelchair at the jail. Officers Scottow and Wulff chose to take the backpack into City property even after observing Plaintiff in the jail pat down room having urinated-in pants marked "biohazard," jail deputies noting there was blood on Plaintiff's backside and wheelchair seat, and the officers heard Plaintiff screaming repeatedly, "Take me to a hospital!"

Plaintiff's distress, yelling, verbal threats while detained, or PTSD manifestations and trauma-related behavior did not make the requested modification less necessary. Those behaviors did not change the fact that officers knew Plaintiff was a paraplegic wheelchair user with visible catheter supplies, incontinence, and obvious mobility limitations. Nor did they make it reasonable to remove the backpack containing his disability-related medical necessities from the wheelchair and take it to police property while leaving Plaintiff at the jail, and even leaving the wheelchair the backpack was attached to at the jail. If anything, the escalating distress officers observed made a disability-informed transfer process more important, not less.

Under such circumstances, the Court can readily find that the necessary modification was simple: leave the backpack containing disability-related catheters and medications with Plaintiff at the jail and transfer it with him through booking, just as they did with the wheelchair the backpack had been attached to. Having chosen instead to take the bag away after seeing the catheters and knowing Plaintiff's mobility and continence limitations and cries for medical help, the officers denied Plaintiff meaningful access to jail custody and booking services on equal terms

13 – **PLAINTIFF'S TRIAL BRIEF**

with non-disabled arrestees and caused the type of greater injury or indignity prohibited by Title II and the RA.

Though the City may argue that Plaintiff's later seizures and pain caused by lack of access to his catheters and medications are merely complaints about inadequate medical treatment, that mischaracterizes the ADA/RA theory. Cases like *Tardif v. City of New York*, 991 F.3d 394, 407–09 (2d Cir. 2021), and *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (9th Cir. 2010), distinguish between medical treatment claims and disability-discrimination claims but do not immunize officers who, with actual notice of disability-related aids, remove those aids through ordinary custody and property procedures that could readily be modified. The relevant discrimination was the officers' failure to reasonably modify the property transfer and booking process for a wheelchair user with visible catheter supplies and medications. On the uncontroverted evidence that will be presented at trial, the deprivation of the backpack was not incidental medical negligence, but rather the mechanism by which Plaintiff was denied access to prescribed disability-related medical necessities to endure arrest, transport, and lodging in the jail safely.

The City disputes that it violated Title II or § 504 in any of the above three manners. Therefore, for trial, relevant reasonableness inquiries include:

1. Whether it was reasonable to continue escalating and detaining Plaintiff after officers knew he was in a wheelchair, trying to get home, exhibiting PTSD-triggered behavior, and unable to leave because his wheelchair was not functioning;

2. Whether it was reasonable to refuse help or fail to pursue available assistance or safe transport alternatives;

14 – **PLAINTIFF'S TRIAL BRIEF**

3. Whether it was reasonable to remove Plaintiff from his wheelchair, handcuff him behind his back, drag him by his elbows, place him sideways into a police SUV, and transport him without adequate support;

4. Whether it was reasonable not to ask Plaintiff how to safely transfer or transport him; and

5. Whether it was reasonable not to ask about or preserve access to catheterization supplies, medication, and other disability-related medical devices.

## D. Element 4 Should Not Reasonably Be Disputed

Plaintiff must show that the denial of benefits, discrimination, or failure to accommodate occurred *by reason of disability*. A public entity violates Title II and § 504 when disability is the reason the plaintiff needs a modification and the *entity's failure to provide that modification denies meaningful access or causes unequal treatment. See McGary*, 386 F.3d at 1265–67; *Crowder*, 81 F.3d at 1483–84. This does not require proof that disability was the City's sole motive, nor does it require proof of personal hostility toward disabled people.

These authorities support finding the causation element satisfied on the facts to be proven at trial. Indeed, Plaintiff's wheelchair dependence, dying wheelchair battery, inability to stand or walk, medical incontinence, need for catheterization and medication, and disability-related vulnerability during police handling are the very reasons reasonable modifications were necessary. Plaintiff could not comply with repeated directions to "go away" or "leave" in the same way an able-bodied person could; could not safely be handled, handcuffed, and placed into a patrol SUV in the same way an able-bodied arrestee could; and could not safely be separated from his catheter and medication in the same way a person without those disability-related needs might be. The causation requirement is satisfied where the evidence shows that Plaintiff suffered denial of

15 – **PLAINTIFF'S TRIAL BRIEF**

services, discrimination, greater injury, or greater indignity because the City failed to account for those disability-related needs, which the video evidence here shows it did.

## V.    RELIEF ELEMENTS AND TRIAL STANDARDS

Both the ADA and RA expressly authorize suits for injunctive and declaratory relief. *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 160 (2017) ("both statutes authorize individuals to seek redress for violations of their substantive guarantees by bringing suits for injunctive relief or money damages."); 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2); *Duvall*, 260 F.3d 1124; *Updike*, 870 F.3d 939. Courts possess broad equitable authority to fashion appropriate remedies to ensure compliance with federal disability law. *Armstrong v. Brown*, 768 F.3d 975, 980–81 (9th Cir. 2014) (affirming continuing remedial orders and compliance measures in ADA institutional reform litigation).

### A.  Plaintiff Meets the Standard to Obtain Injunctive Relief

To obtain injunctive relief, the plaintiff must establish standing by showing: (1) an injury-in-fact; (2) a causal connection between the injury and the defendant's conduct; (3) a likelihood that the injury will be redressed by a favorable decision; and (4) for prospective injunctive relief, a "real and immediate threat of repeated injury." *Chapman v. Pier 1 Imps. (U.S.), Inc.*, 631 F.3d 939 (2011), *Langer v. Kiser*, 57 F.4th 1085 (2023).

While traditional equitable principles (e.g., irreparable harm, inadequacy of legal remedies) are often applied, courts have noted that these requirements may not always be necessary when injunctive relief is sought to enforce a federal statute that specifically provides for such relief . *Antoninetti v. Chipotle Mexican Grill, Inc.*, 614 F.3d 971 (2010), J*osephine County v. Garnier*, 163 Ore. App. 333 (1999).

16 – **PLAINTIFF'S TRIAL BRIEF**

Injunctive relief under Title II of the ADA and 42 USCS § 504 of the Rehabilitation Act is tailored to remedy the specific statutory violations. Courts are required to ensure that the relief is no broader than necessary to address the proven violations. *Armstrong v. Davis*, 275 F.3d 849 (2001). System-wide injunctive relief may be granted if the violations are pervasive and attributable to policies or practices affecting a broad range of individuals. *Id*. Injunctive relief may include requiring the provision of auxiliary aids, services, or alternative methods to ensure compliance. 42 USC § 12188. Courts may also mandate changes to policies, practices, or procedures to prevent future violations. *Id*.

Here, Plaintiff seeks concrete operational reforms directly tied to the violations alleged in this case, including ADA compliance training, disability-informed crisis communication training, policy review, accountability measures, and compliance reporting related to the handling and transport of mobility-impaired individuals. ECF 353 (Third Amended Complaint).

### B.  The Requested Relief is In Line with Equitable Relief Awarded by Courts

The requested injunctive relief is of the type routinely imposed or approved in ADA institutional and law enforcement cases, including court approval of injunctions requiring public entities and law enforcement agencies to implement ADA compliance training and revise operational policies where systemic failures created a risk of recurring disability discrimination.

For example, in *Armstrong v. Brown*, the Ninth Circuit affirmed ongoing injunctive relief requiring California correctional officials to implement training, compliance procedures, monitoring, and reporting obligations to remedy ADA violations affecting disabled individuals in custody. 768 F.3d at 980–81. The Ninth Circuit recognized that district courts retain broad equitable authority to supervise implementation of institutional reforms necessary to remedy continuing disability-rights violations. *Id*.

17 – **PLAINTIFF'S TRIAL BRIEF**

Likewise, courts have approved remedial measures requiring public entities to revise policies and train personnel in order to ensure ADA compliance during detention and custodial interactions. See *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269–70 (D.D.C. 2015) (approving systemic ADA reforms involving detainee accommodations, transportation, policy revisions, and staff training).

The same type of relief is commonly required in DOJ enforcement actions and consent decrees involving municipal police departments. For example, in Oregon, the federal DOJ entered a consent decree with the City of Portland imposing comprehensive injunctive relief designed to protect individuals with actual or perceived mental illness during encounters with the Portland Police Bureau. Among other requirements, the decree mandated revisions to use of force policies to emphasize de-escalation, disengagement, and the use of the least amount of force reasonably necessary; required officers to consider known or perceived mental health conditions when making force decisions; expanded crisis intervention training and specialized responses for persons experiencing behavioral health crises; strengthened coordination with community-based mental health services; required enhanced reporting, supervisory review, investigation, auditing, and accountability for uses of force involving persons with mental illness; established data collection and outcome measurement systems concerning police interactions with individuals experiencing mental health crises; and subjected the City's compliance to independent monitoring and federal court oversight. Collectively, these measures were intended to ensure that police services are delivered in a constitutional manner and to reduce unnecessary or excessive force against persons with disabilities arising from mental illness. *See United States v. City of Portland*, No. 3:12-cv-02265-SI, 2013 U.S. Dist. LEXIS 188465 (D. Or. Feb. 19, 2013) (ECF 486) (Order entering Amended Settlement Agreement).

18 – **PLAINTIFF'S TRIAL BRIEF**

The relief Plaintiff requests here falls squarely within this well-established remedial framework. It is narrowly tailored injunctive relief of the type routinely used in ADA institutional reform litigation specifically to prevent recurring violations involving disabled detainees and wheelchair users.

Plaintiff's requested reporting, monitoring, and retention of jurisdiction provisions are likewise consistent with established institutional reform practice. Federal courts routinely retain jurisdiction over ADA injunctions to ensure meaningful compliance and prevent recurrence of unlawful conduct. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (recognizing broad equitable authority to implement and supervise institutional remedies); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381 (1992) (recognizing continuing judicial oversight of institutional reform decrees). The requested annual reporting requirements, policy-review provisions, and compliance-monitoring measures are narrowly tailored mechanisms designed to ensure the City's implementation of the remedial measures ordered by the Court. Courts routinely approve such provisions in ADA institutional litigation because training and policy reform are ineffective absent mechanisms ensuring actual implementation.

The requested injunctive relief here also imposes minimal burden on the City because it is the type of activities that the City has sporadically, albeit insufficiently, engaged in the past. For example, the City's ADA Self-Evaluation recommended additional City staff training, and also convened multiple ADA focus groups with disabled residents to inform the City's ADA policy and practices updates. *See* Americans with Disabilities Act (ADA) Self-Evaluation and Transition Plan, City of Medford (June 2020), https://www.medfordoregon.gov/files/assets/public/v/1/city-attorneys-office/ada-documents/20200618_medford_ada_setp_final_adopted.pdf.

### C.  The Request Injunctive Relief is Appropriately Narrowly Tailored

The requested injunction is also appropriately tailored to the specific risk of recurring harm that will be demonstrated by the evidence at trial. Plaintiff alleges and the evidence at trial will show that the involved officers lacked meaningful ADA training; the officers failed to use available accessible transport options; officers failed to appropriately communicate with or accommodate a paraplegic individual in crisis; officers mishandled Plaintiff during arrest and transport; and the City has failed to adequately implement corrective ADA-specific training even years after the incident.

The requested relief directly targets those deficiencies. Plaintiff seeks specific and limited measures designed to ensure ADA compliant treatment of mobility impaired individuals during future police interactions. Because the requested injunctive relief mirrors the type of operational reforms routinely imposed in ADA institutional and law-enforcement cases nationwide, the Court will, at the close of trial, be able to comfortably conclude that such relief is both legally authorized and well within traditional equitable practice.

### 1. Real and Immediate Threat of Repeated Injury

A plaintiff seeking prospective injunctive relief must show a real and immediate threat of repeated injury, not merely a past wrong. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–05 (1983). In ADA cases, that requirement is satisfied where past disability discrimination, ongoing public-entity practices, deterrence, or concrete plans for future use of the covered service make future exposure sufficiently likely. See *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946–50 (9th Cir. 2011) (en banc); *Armstrong v. Davis*, 275 F.3d 849, 861–64 (9th Cir. 2001).

The standing inquiry is practical and fact specific. *Lyons* bars injunctive relief where future injury depends only on speculation that the plaintiff will again be stopped, arrested, and subjected to the same unlawful practice. 461 U.S. at 105–11. *Updike v. Multnomah County* applies the same

principle in the ADA custodial context, holding that a speculative possibility of future arrest or detention is not enough. 870 F.3d 939, 948–50 (9th Cir. 2017). But *Armstrong* recognizes that future injury may be shown where the challenged harm stems from an ongoing written policy or an officially sanctioned pattern of disability discrimination likely to recur. 275 F.3d at 861–64. And *Chapman* and *Langer* confirm that ADA standing may rest on deterrence or intent to return where disability-related barriers or noncompliant practices remain. *Chapman*, 631 F.3d at 949–50; *Langer v. Kiser*, 57 F.4th 1085, 1093–94 (9th Cir. 2023).

Plaintiff's request for prospective relief is not based only on a completed past arrest. It is tied to the City's ongoing policing practices, training deficiencies, and accommodation procedures for wheelchair users during investigation, arrest, transport, and transfer of disability-related medical supplies. Plaintiff relies on public sidewalks, public transit, and public services in downtown Medford, including areas near the police station and regularly patrolled by MPD. He also alleges concrete future presence in Medford, including appearances connected to this litigation and continued use of the downtown transit system. Those facts distinguish this case from a speculative request for relief based only on the possibility of future arrest.

The evidence also supports a continuing risk because the challenged practices are not limited to a single officer's isolated act. Plaintiff alleges repeated negative encounters with Medford Police, including incidents prior to the July 2019 arrest, and later police contacts involving wheelchair charging and transit access downtown. The involved officers remain employed by MPD, and the pleadings and testimony reflect unresolved questions about whether MPD has provided meaningful, recurring, and enforceable ADA/RA training concerning communication with disabled people, safe handling and transport of wheelchair users, and

21 – **PLAINTIFF'S TRIAL BRIEF**

preservation of disability-related medical equipment. That ongoing institutional context supports prospective relief directed at preventing recurrence.

The requested injunction is tailored to that risk. Plaintiff does not seek an order controlling ordinary police discretion in every future encounter. He seeks ADA/RA compliance measures tied to the surviving trial theories: disability-aware communication, safe-transfer and transport procedures for mobility-impaired individuals, preservation of mobility devices and medical supplies, policy review, training, supervision, and accountability. If the Court finds that MPD's practices caused the July 2019 violations and remain insufficiently corrected, Plaintiff faces a real and immediate threat of repeated injury sufficient to support prospective declaratory and injunctive relief.

## 2. Plaintiff Need Not Prove Deliberate Indifference to Prevail

Under Title II of the ADA and Section 504 of the Rehabilitation Act private plaintiffs are limited to injunctive relief unless intentional discrimination is proven under a "deliberate indifference" standard. *Duvall*; 42 USCS § 12188; 29 USCS § 794. Plaintiff does not need to prove deliberate indifference in order to prevail at trial because he is solely pursuing equitable relief. To obtain prospective injunctive relief Plaintiff must show a real and immediate threat of future injury. Plaintiff's evidence satisfies that standard. Plaintiff remains subject to MPD jurisdiction when he returns to Medford–including for proceedings in this litigation. He relies on public transportation, public sidewalks, and public services in downtown Medford, areas heavily patrolled by Medford police. *Chapman* and *Langer* confirm that ADA standing may rest on deterrence or intent to return where disability-related barriers or noncompliant practices remain. *Chapman*, 631 F.3d at 949–50; *Langer v. Kiser*, 57 F.4th 1085, 1093–94 (9th Cir. 2023).

A declaration would resolve the parties' dispute regarding the legality of the City's conduct and provide the foundation for narrowly tailored prospective relief. Declaratory relief is appropriate if the Court finds that the City violated Plaintiff's rights under Title II or § 504. Plaintiff seeks measures directed to ADA/RA compliance in policing, safe handling and transport of people with mobility impairments, preservation of access to medical equipment and supplies, disability-oriented communication and de-escalation, policy review, compliance monitoring, and community listening sessions. The requested injunction is tailored to the ADA/RA violations at issue.

### 3.  LIMITATIONS ON DEFENSES

The ADA did not require officers to ignore crime, surrender custody, or compromise safety. It required reasonable modifications when known disability-related needs made modification necessary to avoid unequal treatment, exclusion, or greater injury and indignity. The standard Title II defenses — fundamental alteration, undue financial or administrative burden, direct threat, exigency, and lack of reasonableness — are narrow, fact-specific limits on that obligation. The Court should evaluate each defense by identifying the governing rule, the specific modification at issue, the law-enforcement interest asserted, and the evidence bearing on feasibility, safety, burden, and reasonableness.

The City's remaining defenses likewise do not change the trial framework. Mootness turns on whether any effective prospective relief remains available and whether the City has shown that the challenged conduct cannot reasonably recur. The City's pleaded affirmative defenses — failure to state a claim for injunctive relief, qualified or discretionary immunity, and failure to exhaust administrative remedies — are legal defenses to be evaluated separately from the merits of Plaintiff's three remaining ADA/RA theories.

### A.  Standard ADA Defenses Do Not Defeat Plaintiff's Claims

### 1. Fundamental Alteration

A public entity must make reasonable modifications in policies, practices, or procedures when necessary to avoid disability discrimination, unless the entity shows that the modification would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7). In the arrest context, that limitation preserves lawful enforcement, custody, and officer safety; it does not create a categorical exemption from Title II. *Sheehan*, 743 F.3d at 1232; *Mayfield v. City of Mesa*, 131 F.4th 1100, 1110–11 (9th Cir. 2025).

Arrest and police operation cases apply the rule by preserving legitimate law-enforcement authority while rejecting categorical police exemptions. In *Gorman v. Bartch*, the Eighth Circuit held that post-arrest transportation of a paraplegic wheelchair user was a police service covered by Title II and § 504, leaving for further proceedings whether police reasonably accommodated his disability or could show undue burden. 152 F.3d 907, 912–13 (8th Cir. 1998). In *Woods v. City of Hayward*, the court denied summary judgment on ADA claims where officers allegedly failed to reasonably accommodate an elderly wheelchair user during execution of a search warrant. No. 19-cv-01350-JCS, 2021 LX 82654, at *37–42 (N.D. Cal. Sept. 7, 2021). Together with *Sheehan*, these cases show that Title II permits practical disability-related adjustments to police methods without requiring officers to abandon legitimate law enforcement objectives.

Where the requested modifications track MPD's own disability access, restraint, custody, and transfer policies, that alignment is evidence of ordinary police practice, not a fundamental alteration of policing. *Gorman*, 152 F.3d at 912–13; *Woods*, 2021 LX 82654, at *37–42; cf. *M.R. v. Dreyfus*, 697 F.3d 706, 734–35 (9th Cir. 2012). The City admitted that public policing services are covered by Title II, and MPD policies already required officers to provide disability-aware communication, consider apparent disability when using restraints, address disability, medical,

property, and transfer needs in custody, and never refuse assistance to a disabled person requesting help. MPD also provided courtesy transports and citizen assistance in appropriate circumstances, and Wulff testified that if Plaintiff's wheelchair was dead and he could not get home, MPD would have helped him get home rather than leave him on the roadside. A modification that follows those policies and practices does not change the essential nature of policing; it implements the way MPD itself defined reasonable police practice.

### 2. Undue Financial or Administrative Burden

Once Plaintiff identifies a denied accommodation, the City must prove undue burden in light of the specific modification, available resources, operational constraints, and less burdensome alternatives; generalized claims of cost, time, coordination, or routine practice are not enough. *Mayfield*, 131 F.4th at 1110; *Pierce v. County of Orange*, 526 F.3d 1190, 1217 (9th Cir. 2008); *Alexander v. Choate*, 469 U.S. 287, 300–01 (1985).

Police encounter cases evaluate undue burden by asking what modification of standard practice was required in the moment, what alternatives existed, and whether officers used a less burdensome effective option. In *Bircoll v. Miami-Dade County*, the Eleventh Circuit rejected an interpreter requirement during roadside DUI testing because waiting for an interpreter at 3:00 a.m. would delay a time-sensitive intoxication assessment, while the short field-sobriety instructions could be physically demonstrated. 480 F.3d 1072, 1086–87 (11th Cir. 2007). At the station, the court found communication effective because the officer read the short consent form aloud and gave the deaf arrestee a written copy. *Id.* In *Mayfield*, the Ninth Circuit likewise held that officers need not provide an ASL interpreter per se; the question is whether the communication method used allowed the arrestee to exchange information effectively in light of the method, complexity, duration, and context of the encounter. 131 F.4th at 1110–12. These cases focus the inquiry on

25 – **PLAINTIFF'S TRIAL BRIEF**

why the particular modification was impracticable, not merely whether accommodation required time, coordination, or departure from routine practice.

Many available modifications that officers did not provide carried little or no financial cost or administrative burden: asking how to transfer Plaintiff safely, asking whether lifting him could aggravate his spinal condition, asking about catheter and medication needs, preserving his backpack and medical devices, documenting disability-related needs, and avoiding disability-targeted provocation. MPD's own policies already provided ADA coordination, disability-communication procedures, and disability-related training. MPD also obtained a truck with an automated lift to transport Plaintiff's wheelchair, supporting a finding that disability-related logistics were feasible. The Court has already treated the feasibility of accessible transport as a factual question rather than a legal bar after the City argued that ADA-equipped vehicles were likely too expensive. Accessible transport may have required coordination or expense, but that question turns on evidence of actual burden, not assumption.

### 3. Direct Threat

A direct threat is a significant risk to the health or safety of others that cannot be eliminated by reasonable modification. 28 C.F.R. § 35.139. A public entity may deny participation in or benefits from its services only when the individual poses that kind of risk. 28 C.F.R. § 35.139(a). The regulation requires an individualized assessment based on reasonable judgment using current medical knowledge or the best available objective evidence, including the nature, duration, and severity of the risk, the probability that injury will occur, and whether reasonable modifications will mitigate the risk. 28 C.F.R. § 35.139(b). That objective, individualized inquiry reflects the Supreme Court's instruction that disability-based exclusion must rest on a particularized

assessment of risk, not generalized fear. *School Board of Nassau County v. Arline*, 480 U.S. 273, 287–88 (1987).

Police cases apply that rule by distinguishing generalized safety concerns from specific, evidence-based threats. In *Sheehan*, Title II applied even though officers confronted an armed, mentally ill person in an emergency aid arrest context. 743 F.3d at 1232. In *Vos*, the Ninth Circuit reversed summary judgment where factual disputes undercut the argument that an immediate threat automatically defeated ADA accommodation. 892 F.3d at 1037. In *Hainze v. Richards*, by contrast, the Fifth Circuit treated an active armed threat as limiting Title II obligations only until officers secured the scene. 207 F.3d 795, 801–02 (5th Cir. 2000). Together, these cases show that direct threat turns on objective, encounter-specific facts and available alternatives, not labels such as agitation, intoxication, noncompliance, verbal hostility, or "disorderly."

The dismissed menacing charge does not substitute for the individualized, objective assessment required by § 35.139. Menacing requires an objectively reasonable fear of imminent serious physical injury. ORS § 163.190(1); *State v. Anderson*, 56 Or. App. 12, 15, 641 P.2d 40 (1982); *State v. C.S. (In re C.S.)*, 275 Or. App. 126, 130, 365 P.3d 535 (2015). The objective facts cut against direct threat: Plaintiff was a paraplegic in a wheelchair with a dead or dying battery; the complainant said she was not afraid, reported that she had a gun, prevented Plaintiff from boarding the bus, said Plaintiff had caused no damage, and Plaintiff never attempted to physically touch anyone. Officer Esqueda told the complainant, "I don't think he has the means—he's just a talker," and the complainant responded that Plaintiff "didn't scare me, he just pissed me off." Officers' disability-targeted comments and taunts are not evidence of an individualized safety assessment. Those facts undercut any claim that Plaintiff posed an objective threat that reasonable modifications could not mitigate; the accommodations at issue—de-escalation,

nondiscriminatory communication, safe-transfer questions, safer handling and transport, and preserving medical devices—would have reduced risk rather than increased it.

### 4. Law Enforcement Exigency and Officer Safety

Exigency refers to circumstances requiring immediate police action to prevent physical harm, destruction of evidence, escape, or other consequences that would improperly frustrate legitimate law-enforcement efforts. *Mayfield*, 131 F.4th at 1110–11. Ninth Circuit authority treats exigency and officer safety as factors that shape what is reasonable under Title II during a police encounter, not as a standalone exemption from the duty to accommodate. *Sheehan*, 743 F.3d at 1232. Courts analyze the encounter in stages, recognizing that accommodations may be impracticable during rapidly evolving moments but may become feasible once officers have control, time, and safer options. The Court should examine what officers knew about the disability, what options were available at each phase — investigation, arrest, transport, and transfer — and whether asserted safety concerns genuinely foreclosed the requested modifications or merely reflected a preference for standard tactics.

Police cases apply that rule through a phase-specific inquiry. In *Hainze*, the Fifth Circuit held that Title II did not apply to officers' street response to an active armed threat "prior to the officer's securing the scene," but recognized that once the area was secure and no threat remained, officers would have a duty to reasonably accommodate disability in handling and transport. 207 F.3d at 801–02. In *Waller ex rel. Estate of Hunt v. City of Danville*, the Fourth Circuit held that "exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA," and that accommodations expected "when time is of no matter" may become unreasonable "when time is of the essence." 556 F.3d 171, 175 (4th Cir. 2009). In *Sheehan*, the Ninth Circuit

adopted that approach, holding that Title II applies to arrests while exigency informs the reasonableness analysis. 743 F.3d at 1232.

MPD Policy 370 reflects the same stage-specific approach: emergency conditions may shape the method of communication, but once the emergency ends, officers must reconsider the method and give primary consideration to the individual's preference.

Here, any initial law enforcement concern about safety did not foreclose later accommodations. Once officers had Plaintiff present, stationary, and under police control, feasible modifications included asking how to lift him safely, avoiding disability-based escalation, selecting safer transport, and preserving medical devices during transfer. Those decisions involved disability-related handling and transport with multiple officers and resources available, not split second scene security.

### 5. Lack of Reasonableness

Reasonableness is the central, fact-dependent inquiry in a Title II arrest accommodation claim. *Pierce*, 526 F.3d at 1217, instructs that determining whether an accommodation is reasonable requires a fact-specific, context-specific inquiry.

Arrest accommodation cases apply reasonableness by comparing the known disability need, available alternatives, law enforcement interests, and the stage of the encounter. In *Sheehan*, the Ninth Circuit recognized that Title II may require reasonable accommodation during arrest even where officers faced safety concerns. 743 F.3d at 1232. In *Vos*, factual disputes over police tactics and available accommodation precluded summary judgment on ADA/RA claims arising from a volatile encounter. 892 F.3d at 1036–37. In *Mayfield*, by contrast, dismissal was affirmed because bodycam footage showed officers used multiple effective communication methods and the requested interpreter was impracticable during the DUI stop and blood draw. 131 F.4th at

29 – **PLAINTIFF'S TRIAL BRIEF**

1110–12. Those cases ask whether reasonable modifications were actually available, not whether the encounter involved probable cause or officer discretion.

Applied here, reasonableness begins with what officers knew: Plaintiff was wheelchair-dependent, his wheelchair battery was dead or dying, he was stuck, he was calling for help, and he was trying to leave by bus, that he was experiencing medical incontinence, could not leave, and was just trying to get home. Once officers chose arrest and transport, reasonable modifications, consistent with MPD policy, included asking how to transfer him safely, avoiding disability-based escalation, using safer transport if feasible, and preserving his backpack containing medications, catheter, and disability accommodations. Plaintiff's anger or verbal hostility does not make those modifications unreasonable, especially where officers' own comments foreseeably escalated the encounter. The question is not whether officers could enforce the law; they could. The question is whether they reasonably modified ordinary police practices to account for a known mobility disability during investigation, arrest, transport, and transfer.

The above defenses guide the Court's ADA and RA analysis, but they do not change the governing reasonable modification framework. The Court should evaluate what disability-related needs officers knew or should have known, what modifications were available, whether legitimate law enforcement interests could be preserved, and whether the failure to accommodate caused Plaintiff unequal treatment, greater injury, or greater indignity because of disability. Governing law does not permit the City to treat policing as categorically exempt from Title II, rely on speculative burden, equate verbal hostility with direct threat, or let probable cause answer the distinct ADA question.

**B. Mootness Threshold is Not Met and the Court Retains Jurisdiction to Issue Injunctive**

The City may argue that Plaintiff's request for injunctive relief is moot because the City has implemented some changes to its ADA policy and offered some ADA training to its officers since Plaintiff filed suit. But it must prove both that the challenged violations cannot reasonably be expected to recur and that no effective prospective relief remains for the Court to order. If Mr. Malaer's requested injunctive measures would still reduce a real risk of recurring ADA/RA violations in Medford policing, the case is not moot. The City bears a high burden in making such an argument, and as Plaintiff's evidence at trial will show, it cannot meet this burden.

Article III requires a live controversy. A case becomes moot only when it is impossible for the Court to grant any effectual relief. The burden rests with the party asserting mootness. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 862 (9th Cir. 2017); *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). A case remains live if the Court can still grant meaningful relief, even partial relief. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12–13 (1992).

A defendant's voluntary cessation does not moot a case unless it is "absolutely clear" the challenged conduct cannot reasonably be expected to recur. *Laidlaw*, 528 U.S. at 189; *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). That rule applies to government defendants, even with the presumption of good faith. *Rosebrock v. Mathis*, 745 F.3d 963, 971–72 (9th Cir. 2014); *Fikre v. FBI*, 904 F.3d 1033, 1037–39 (9th Cir. 2018). Courts examine practical durability: whether the change is broad, unequivocal, binding, implemented, addresses the challenged conduct, has prevented recurrence, and cannot easily be abandoned. *Rosebrock*, 745 F.3d at 971–72; *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1152–53 (9th Cir. 2019); *Bell v. City of Boise*, 709 F.3d 890, 900–01 (9th Cir. 2013).

31 – **PLAINTIFF'S TRIAL BRIEF**

The City's proof must be measured against the actual ADA/RA failures alleged, not the existence of a paper policy. Title II requires reasonable modifications unless the public entity proves a fundamental alteration. 28 C.F.R. § 35.130(b)(7). In police encounters, officer safety informs reasonableness but does not create categorical immunity from ADA compliance. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036–37 (9th Cir. 2018); *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1062–63 (9th Cir. 2024); *Mayfield v. City of Mesa*, 131 F.4th 1100, 1108–11 (9th Cir. 2025); cf. *Bell v. Williams*, 108 F.4th 809, 828–29 (9th Cir. 2024).

The relevant questions are whether the City's current policy and training address the field-level failures at issue: arrests, handcuffing, physical handling, wheelchair separation, accessible transport, medical-device preservation, medication and catheter supplies, and disability-related communication; whether training is mandatory, recurring, documented, tested, supervised, and enforced; and whether officers can apply those requirements in the field.

The current record confirms that risk. The involved officers remained employed by MPD; they could not recall meaningful ADA training in deposition; and evidence will show that, as of March 2026, the City still had not adequately trained patrol officers on ADA/RA compliance, safe arrest and transport of disabled people, or communication with disabled people in crisis.

*American Diabetes* shows that what is missing here is a formal replacement policy that directly addressed the challenged practice. 938 F.3d at 1152–53. General policy edits or sporadic training do not establish durable correction of field-level failures, especially without implementation, testing, supervision, discipline, accessible transport procedures, medical device protocols, and compliance monitoring. *Fikre*, 904 F.3d at 1037–39; *Bell*, 709 F.3d at 900–01.

Plaintiff's continued exposure to Medford policing when in Medford keeps prospective relief live. He alleges that he uses downtown Medford sidewalks, transit, and public services in

areas heavily patrolled by MPD and plans to return to Medford. He also alleges later MPD contacts after suit was filed, including a downtown "theft of services" citation for charging a phone and his wheelchair, and a January 2023 transit center incident.

The City's post-suit training and policy change evidence does not automatically moot the claim. Mootness asks whether any effective relief remains, and remedy tailoring asks what relief is necessary to address the proven violation and remaining risk. *See Milliken v. Bradley*, 433 U.S. 267, 280–82 (1977); *Melendres v. Maricopa Cnty.*, 897 F.3d 1217, 1221–22 (9th Cir. 2018). Plaintiff does not ask the Court to order the City to abandon law enforcement, ignore crime, or compromise officer safety. The requested measures require ordinary ADA-compliant policing: effective communication, disability-informed de-escalation, safe transfer questions, feasible accessible transport, preservation of mobility and medical equipment, training, supervision, and accountability through engagement with the disability community in Medford.

Feasibility evidence reinforces that relief would not fundamentally alter policing. MPD provided courtesy transports, and Wulff testified that if Plaintiff's wheelchair was dead and he could not get home, MPD would have helped him get home rather than leave him on the roadside. Officers also could have used low-cost accommodations, such as refraining from disability-targeted insults, asking safe transfer and medical device questions, preserving catheter and medication access, documenting disability needs, and de-escalating.

Accordingly, the City cannot moot this case by pointing to a policy update or sporadic training. The Court should resolve mootness through findings on what policies existed, what changed, what training was provided, whether officers and supervisors can apply it, whether field-level procedures exist for accessible arrest and transport, whether medical device preservation is operationalized, whether compliance is supervised and enforced, and whether the changes are

33 – **PLAINTIFF'S TRIAL BRIEF**

permanent. Unless the City proves that its reforms are comprehensive, implemented, durable, and effective enough to make recurrence not reasonably expected, Plaintiff's request for prospective injunctive relief remains live.

For findings and conclusions, the Court should evaluate the challenged conduct at the correct level of generality, which is not just the single July 2019 transport, but the City's alleged failure to provide ADA/RA-compliant policing to a wheelchair user during investigation, arrest, transport, and transfer of disability-related medical equipment, together with its failure to train and supervise sufficiently to prevent recurrence. If the City's measures remain incomplete, discretionary, or unenforced, the remedy should be tailored to the remaining risk, not dismissed.

### C. The City's Affirmative Defenses Are Not Applicable or Controlling in This Case

#### 1. Failure to State a Claim for Injunctive Relief

The City alleges that, "Plaintiff has failed to identify and allege sufficient facts in support of his claim that, if true, would entitle him to the relief requested. Specifically, Plaintiff has not alleged facts showing that he has no adequate remedy at law or will suffer irreparable harm if injunctive relief is denied. To the contrary, Plaintiff has alleged that he no longer lives in or near the City of Medford. He is unlikely to suffer any harm if the injunctive relief is denied. To that same end, he has not alleged facts showing monetary relief would not be an adequate remedy given his relocation. Further, the relief sought is beyond the boundary of reasonable injunctive relief."

The City's asserted defense conflates Article III standing requirements and the factors courts may assess in evaluating issuance of a permanent injunction after liability is found, and is not on point with how injunctive relief is analyzed and awarded in ADA violation cases. It is not a bar to Plaintiff's claims at trial, as Plaintiff has sufficiently pled the ADA/RA claims.

#### a. Article III Standing: "Real and Immediate Threat"

Plaintiff's request for prospective injunctive relief is governed principally by Article III standing principles applicable to forward-looking equitable relief in ADA cases, not by a categorical requirement that Plaintiff prove the complete absence of any monetary remedy. The Supreme Court has explained that the relevant inquiry for prospective relief is whether there exists a "real and immediate threat" of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–05 (1983). In the ADA context, the Ninth Circuit recognizes standing for injunctive relief where ongoing policies, practices, or barriers create a continuing risk of discrimination or deterrence. *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946–50 (9th Cir. 2011) (en banc); *Fortyune v. American Multi–Cinema, Inc.*, 364 F.3d 1075, 1081–82 (9th Cir. 2004). Thus, for standing purposes, the relevant question is whether there remains a live controversy concerning the City's ongoing ADA-related practices and a sufficient likelihood of future exposure to those practices. Plaintiff need not prove certainty of future harm, but under *Updike v. Multnomah County*, 870 F.3d 939 (9th Cir. 2017), a theory based only on the speculative possibility of future arrest or detention is vulnerable unless tied to concrete future encounters and ongoing City practices.

Courts find "a real and immediate threat" sufficient for Title II/§ 504 prospective relief where the plaintiff shows past exposure to disability discrimination plus a concrete likelihood of future exposure, often through intent to return, concrete future use or continuing use of public services, deterrence, ongoing public entity policies, systemic practices, or present deterrence from using public services.

In *Armstrong*, the Ninth Circuit held that future injury may be shown where the harm is traceable to an ongoing written policy or an officially sanctioned pattern of ADA/RA violations. *Armstrong v. Davis*, 275 F.3d 849, 861–64 (9th Cir. 2001). In *Kirola*, the Ninth Circuit held that a wheelchair user had standing to seek injunctive relief against San Francisco where she

personally encountered access barriers in city sidewalks, libraries, pools, and parks and was deterred from returning; the court emphasized that standing requires encountering a barrier that interferes with access plus intent to return or deterrence, not proof of the entire merits theory at the standing stage. *Kirola ex rel. Persons with Disabilities v. City & County of San Francisco*, 860 F.3d 1164, 1174–76 (9th Cir. 2017).

Other circuits apply the same practical framework. *Frame* held that disabled plaintiffs may challenge inaccessible public sidewalks where they have actual, concrete plans to use them, *Frame v. City of Arlington*, 657 F.3d 215, 235–38 (5th Cir. 2011), and *Hamer* held that a public entity's ongoing failure to remedy noncompliant sidewalks and curb cuts creates recurring ADA/RA injury so long as the plaintiff remains aware of the barriers and deterred from using the public service. *Hamer v. City of Trinidad*, 924 F.3d 1093, 1104–09 (10th Cir. 2019).

Like the cases above, Mr. Malaer's requested prospective relief is tied to alleged ongoing City policies, training deficiencies, and police practices, Plaintiff's concrete plans for future presence in Medford and continued exposure to Medford police authority and services, and his continued deterrence from freely living in or traveling in Medford and using City services, particularly in regards to traveling in his wheelchair on sidewalks in the downtown core where the ADA-accessible transit center and major public services are located. He has a reasonable fear of repeated disability discrimination based on his multiple prior experiences and the City's ongoing failure to adequately train its officers.

Plaintiff's relocation from Medford – expressly to escape ongoing targeting and harassment by Medford police – may be relevant to the standing inquiry, but it is not dispositive. *See Chapman*, 631 F.3d at 950. Title II applies broadly to "all services, programs, or activities" of public entities, including police encounters, arrests, and transportation practices. *Pennsylvania Dep't of Corr. v.*

36 – **PLAINTIFF'S TRIAL BRIEF**

*Yeskey*, 524 U.S. 206, 210 (1998); *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014). Plaintiff remains a wheelchair user alleging ongoing concern regarding the City's accommodation practices toward mobility-disabled individuals during detention and transport, regardless of his current city of residence in Southern Oregon, and the Front Street transit center in downtown Medford is a primary Greyhound system connection point for disabled people in Southern Oregon who rely on bus service as their primary means of transportation.

Plaintiff has pleaded and will prove more than past harm at trial. He alleges that he relies on public transportation, sidewalks, and public services in downtown Medford, that those areas are heavily patrolled by Medford police, and that he has plans to return to Medford multiple times, including for weeks in 2026, where he will again be subject to Medford Police Department jurisdiction and services. These allegations satisfy the standing requirement that prospective relief be tied to a real and immediate threat of future injury, not merely a completed past wrong. *See City of Los Angeles v. Lyon*s, 461 U.S. 95, 102–11 (1983); *Updike v. Multnomah County*, 870 F.3d 939, 948–50 (9th Cir. 2017). The City's failure to state a claim defense is thus meritless and will have no bearing on the trial outcome.

> **b. Equitable Considerations for a Permanent Injunction: ADA Plaintiff Need Not Prove Lack of Remedy at Law or Insufficiency of Monetary Damages**

The City's affirmative defense appears to conflate the constitutional standing inquiry with the traditional equitable considerations courts may apply to issuance of a permanent injunction after liability is established. A plaintiff alleging Title II ADA or § 504 discrimination does not have to plead nor prove no adequate remedy at law or irreparable harm as part of stating the statutory claim. Plaintiffs' entitlement to an injunction is a question distinct from standing, and the court engages in the equitable relief analysis only after addressing the ADA violation and

liability determination. *G. v. Hawaii*, Civ. No. 08-00551 ACK-BMK, Civ. No. 09-00044 ACK-BMK (D. Haw. Jan. 7, 2011); *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165 (9th Cir. 2010) (describing the district court's use of the traditional equitable test as part of deciding whether injunctive relief should issue, not as stemming from the ADA violation itself); *Kalani v. Starbucks Corp.*, 117 F. Supp. 3d 1078 (N.D. Cal. 2015) (applying the same structural separation to distinguish standing requirements from equitable requirements). Thus, Plaintiff is not required to allege irreparable harm or inadequate legal remedy to plead a viable statutory cause of action, they are remedial concepts rather than substantive elements of ADA/RA discrimination.

In terms of issuing Plaintiff's requested injunctive relief upon finding an ADA violation in this case, Ninth Circuit jurisdiction authorities support that a prevailing ADA/RA plaintiff seeking a permanent injunction need not additionally prove the traditional permanent injunction factors of irreparable injury, insufficiency of monetary damages, and the lack of an adequate legal remedy. This position rests on the fact that Congress has already authorized injunctive relief in disability discrimination cases by statute. 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2); *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 160 (2017).

Under this line of reasoning, once Plaintiff establishes a statutory violation and has standing to seek forward-looking relief, the injunction follows under the statutory scheme without a separate showing that legal remedies are inadequate or that irreparable harm will occur absent the injunction. The leading statement is *Silver Sage Partners v. City of Desert Hot Springs*, 251 F.3d 814 (9th Cir. 2001). District courts applying that principle in ADA cases include *Enyart v. National Conference of Bar Examiners, Inc.*, 823 F. Supp. 2d 995 (N.D. Cal. 2011), *Johnson v. Fernandez*, No. 5:21-cv-04114-EJD, 2022 LX 120591 (N.D. Cal. July 20, 2022), and *Kalani v. Starbucks Corp.*, 117 F. Supp. 3d 1078 (N.D. Cal. 2015); *but see Antoninetti v. Chipotle Mexican*

*Grill, Inc.*, 643 F.3d 1165 (9th Cir. 2010) (declining to decide whether the ADA forecloses ordinary equitable discretion after a violation is found).

Here, Plaintiff seeks limited prospective relief directed toward the City's alleged failure to implement adequate ADA accommodation, transport, and training practices for mobility-disabled individuals during law enforcement encounters. The Third Amended Complaint alleges systemic deficiencies in accommodation procedures, handling of medical devices, transport methods, and officer training. The Court has already held that triable issues exist concerning whether Plaintiff's paraplegia was reasonably accommodated during arrest and transport, and whether Plaintiff suffered "greater injury or indignity" because of disability-related treatment during those encounters. Those allegations concern operational practices that, if proven, remain capable of repetition absent policy modification or training. Courts within the Ninth Circuit have repeatedly recognized that prospective equitable relief may be appropriate to remedy ongoing governmental practices under the ADA and other civil-rights statutes. *See Armstrong v. Davis*, 275 F.3d 849, 870–79 (9th Cir. 2001); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

Finally, while courts considering permanent injunctive relief generally evaluate traditional equitable principles, including the adequacy of legal remedies, civil rights and ADA cases routinely recognize that damages alone may not fully remedy ongoing discriminatory governmental practices. *See Milliken v. Bradley*, 433 U.S. 267, 281–82 (1977); *Armstrong*, 275 F.3d at 870–79. The availability of compensatory damages for past disability discrimination does not foreclose prospective ADA relief directed toward preventing future violations by a public entity.

In any event, monetary relief is not an adequate substitute for the prospective relief sought here. Damages may compensate past physical pain, humiliation, and loss of dignity, but they

cannot ensure that Plaintiff will receive safe, nondiscriminatory access to City policing services, public transit areas, sidewalks, and other public services when he returns to Medford. The complaint alleges continuing concerns: the officers involved in the July 2019 arrest still work for the Medford Police Department, the officers could not recall meaningful ADA training in deposition, and the City still has not adequately trained patrol officers regarding ADA/RA compliance, arrest and transport of disabled people, or communication with disabled people in crisis. The requested injunction is therefore tailored to the federal violation alleged. *See* 28 C.F.R. § 35.130(b)(7); *Duvall* at 1139–40; *Updike*, 870 F.3d at 951–58. Accordingly, the City's asserted defense should be rejected, or at minimum treated only as a disputed issue bearing on the scope of equitable relief, not as a basis to preclude Plaintiff's ADA/RA claim.

### 2. Qualified and Discretionary Immunity Are Not Available to Municipalities

The City alleges the affirmative defenses of qualified and discretionary immunity, stating "the Defendant City used lawful discretion in police decision-making for the safety of the public, the police and Plaintiff. Therefore, the City Defendants are entitled to immunity pursuant to the doctrine of qualified immunity and/or discretionary immunity."

Qualified immunity is unavailable to the City on Plaintiff's Title II ADA and Rehabilitation Act claims because qualified immunity is not a municipal defense, it is a personal defense for individual officials sued for damages. Municipalities do not enjoy qualified or good faith immunity from federal civil rights liability. *Owen v. City of Independence*, 445 U.S. 622, 638, 657 (1980). As the Supreme Court explained, "there is no tradition of immunity for municipal corporations," and neither history nor policy supports municipal qualified immunity. *Id*. at 638.

The Ninth Circuit applies the same distinction between individual capacity liability and public entity liability. Qualified immunity is "a defense available only to government officials sued

in their individual capacities" and "is not available to those sued only in their official capacities." *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 965 (9th Cir. 2010). Title II and § 504 claims are statutory public entity/funding recipient claims, not individual capacity claims subject to qualified immunity. *See Vinson v. Thomas*, 288 F.3d 1145, 1156–57 (9th Cir. 2002) (holding that "a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA or section 504 of the Rehabilitation Act").

Consistent with that rule, the Ninth Circuit has separately applied qualified immunity to individual officers on § 1983 claims while allowing ADA/RA claims against public entity defendants to proceed. In *Vos*, the court granted qualified immunity to individual officers on § 1983 claims but reversed summary judgment on the ADA and Rehabilitation Act claims because accommodation reasonableness presented separate factual questions. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036–37 (9th Cir. 2018). In *Bell*, the court sustained ADA and Rehabilitation Act liability against the City and County of San Francisco arising from a failure to accommodate a disabled pretrial detainee during a cell movement, while treating any individual qualified immunity issue separately. *Bell v. Williams*, 108 F.4th 809, 825–27 (9th Cir. 2024). Therefore, qualified immunity is not avaiable and has no bearing on Plaintiff's case or the trial outcome.

The City's asserted "discretionary immunity" is likewise not available on Plaintiff's federal Title II ADA and Rehabilitation Act failure to accommodate claims. Title II and § 504 impose independent federal obligations on public entities to make reasonable modifications necessary to avoid disability discrimination, unless the public entity proves a recognized federal ADA defense such as fundamental alteration, undue financial or administrative burden, direct threat, or lack of

41 – **PLAINTIFF'S TRIAL BRIEF**

reasonableness under the circumstances. *See* 42 U.S.C. § 12132; 29 U.S.C. § 794; 28 C.F.R. §§ 35.130(b)(7), 35.139, 35.164.

No federal doctrine grants a municipality "discretionary immunity" from ADA/RA liability merely because the challenged conduct occurred in the course of law enforcement decision making. In the Ninth Circuit, police and custodial discretion is considered, if at all, as part of the fact-specific reasonableness analysis, not as an immunity bar. *See Hyer v. City & County of Honolulu*, 118 F.4th 1044, (9th Cir. 2024) (reaffirming that "Title II applies to arrests" and reversing summary judgment where evidence created disputes over disability, notice, and reasonable accommodations); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1036–37 (9th Cir. 2018) (holding that accommodation reasonableness during a police encounter presented a separate factual question from constitutional qualified immunity); *Bell v. Williams*, 108 F.4th 809 (9th Cir. 2024) (holding that a single failure to reasonably accommodate a disabled detainee can support ADA/RA liability even where legitimate jail security interests are considered).

Nor may the City import state law discretionary immunity into Plaintiff's federal statutory claims. Municipal defenses to federal rights of action are controlled by federal law, *Owen v. City of Independence*, 445 U.S. 622, 647 n.30 (1980), and state immunity rules cannot defeat federal civil rights law. *Howlett v. Rose*, 496 U.S. 356, 375-76, 383 (1990). Accordingly, while the City may argue that a particular accommodation was not reasonable or feasible in light of safety or operational concerns, it cannot avoid trial or liability on Plaintiff's ADA/RA claims by invoking discretionary immunity. Therefore, the asserted discretionary immunity is not available and has no bearing on Plaintiff's case or the trial outcome.

### 3. Failure to Exhaust Administrative Remedies Does Not Apply Here

The City also alleges a failure to exhaust administrative remedies defense, stating "Plaintiff did not exhaust administrative remedies with Defendant City before pursuing a civil action under the Americans with Disabilities Act and the Rehabilitation Act, including filing an ADA grievance with the City of Medford's ADA Coordinator on this issue, despite repeated correspondence and making several ADA requests to the City on other matters."

This defense does not preclude Plaintiff's Title II ADA or Rehabilitation Act claims. This is a direct federal disability discrimination action against a municipal public entity for failure to accommodate Plaintiff during police detention, arrest, handling, and transport. Title II provides that "no qualified individual with a disability" may be excluded from, denied the benefits of, or subjected to discrimination by a public entity because of disability, 42 U.S.C. § 12132. Title II's enforcement provision authorizes private suit through the remedies incorporated in 42 U.S.C. § 12133. Section 504 likewise prohibits disability discrimination by recipients of federal financial assistance. 29 U.S.C. § 794(a).

Neither Title II nor § 504 requires a non-prisoner plaintiff to exhaust a city's internal ADA grievance process before filing suit. The Ninth Circuit has recognized that "neither Title II of the ADA nor section 504 of the Rehabilitation Act generally requires administrative exhaustion before filing suit." *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1061 (9th Cir. 2007). *O'Guinn* required exhaustion only because the plaintiff was a prisoner challenging prison conditions and the PLRA separately required exhaustion for such suits. *Id*. at 1061–62.

*Duvall* confirms that direct Title II and § 504 claims against counties and municipalities are analyzed through the statutory merits framework (disability, denial of equal access or reasonable accommodation, notice, reasonableness, deliberate indifference for damages, and public entity liability), not through a local grievance exhaustion prerequisite. *Duvall v. County of*

43 – **PLAINTIFF'S TRIAL BRIEF**

*Kitsap*, 260 F.3d 1124, 1135–41 (9th Cir. 2001) (analyzing direct Title II and § 504 claims against county for failure to accommodate through notice, reasonableness, deliberate indifference, and public entity liability, not local grievance exhaustion).

The exhaustion doctrines that sometimes apply in ADA/RA cases arise from separate statutes not applicable here. The PLRA requires exhaustion for prisoner suits challenging prison conditions, *O'Guinn*, 502 F.3d at 1061–62. The IDEA requires exhaustion only when the gravamen of the action seeks relief for denial of a free appropriate public education. *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 165–68 (2017); *McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 911–18 (9th Cir. 2020). Title I employment claims have their own administrative-exhaustion regime. Plaintiff's claims do not fall into any of those categories. They arise from police detention, arrest, handling, accommodation, and transport. The City therefore cannot convert its internal ADA grievance procedure into a mandatory precondition to federal court.

At most, the existence or non-use of an internal grievance process would be relevant, if at all, to notice, deliberate indifference, or damages, not as a jurisdictional, procedural, or claim-preclusive exhaustion bar. But this is not a case where the City lacked notice of Plaintiff's disability-related complaints. After being released from jail, Plaintiff, made multiple complaints to the City of Medford about abuse and rights violations arising from his arrest, transport, and jailing; spoke with a Medford Police sergeant; participated in a video recorded interview with Sergeant Budreau; and submitted a formal written administrative complaint to the Medford Police Department. Plaintiff also advised City Manager Sjothun that the officers' conduct "conflicted" with his ADA and constitutional rights, and Sjothun forwarded the email to the Medford Chief of Police with the expectation that the incident would be investigated. The City's contention that Plaintiff did not file a separate ADA Coordinator grievance is not an exhaustion bar. Because Title

44 – **PLAINTIFF'S TRIAL BRIEF**

II and § 504 provide direct private rights of action and do not require a local ADA Coordinator grievance before suit, the City's failure-to-exhaust defense has no bearing on Plaintiff's claims or trial outcome and should be rejected.

In sum, all three of the City's asserted defenses do not apply and have no bearing on the claim or outcome at trial. The trial will be about whether Plaintiff meets his burden of demonstrating by a preponderance of the evidence that the City violated his ADA rights in the course of the stop, arrest, detention, or transport, and that the requested injunctive relief is merited.

Trial should therefore focus on the merits: whether Plaintiff has shown by a preponderance of the evidence that the City violated Title II and § 504 by wrongfully arresting him based on disability symptoms, failing to reasonably accommodate his paraplegia during arrest and transport, and failing to preserve access to disability-related medical devices and medications, and whether declaratory and injunctive relief is warranted.

### 4.  CONCLUSION

This case has been ongoing for 6.5 years. During the pendency of the case Plaintiff has experienced repeated targeting, harassment, and discrimination by Medford Police Department officers. Plaintiff was also denied his scheduled opportunity to present to the Jackson County Continuum of Care Board about his lived experience with policing in Medford as a disabled person, due to being too ill after the abuse he suffered as a result of the arrest and jailing in this case. The trial will provide the opportunity for the Court to hear his firsthand account and experience on how the City of Medford's policing, policies, practices, and staff affect the lives of disabled people in the community, including himself. Plaintiff is confident the evidence will show that, under the preponderance of the evidence standard, the City violated Title II of the ADA and

§ 504 of the Rehabilitation Act and that the requested equitable relief is warranted and appropriately tailored to prevent future recurrences of these violations.

Dated: May 30, 2026.

Respectfully submitted,

**LEDUC MONTGOMERY LLC**

By: */s/ Alicia LeDuc Montgomery*
    **Alicia LeDuc Montgomery, OSB 173963**
    alicia@leducmontgomery.com
    (704) 702-6934

    **LAW OFFICES OF JOSEPH M. MCMULLEN**
    **Joseph M. McMullen, CA Bar No. 246757**
    *Admitted Pro Hac Vice*
    joe@jmm-legal.com
    (691) 501 - 2000

    *Attorneys for Plaintiff John Lee Malaer*

46 – **PLAINTIFF'S TRIAL BRIEF**

## CERTIFICATE OF SERVICE

I certify that a true copy of **PLAINTIFF'S TRIAL BRIEF** was served on the following

parties on May 30, 2026 through the Court's Electronic Case File System:

Andrea D. Coit
Emily Perkins
Hutchinson Cox
PO Box 10886, Eugene, OR 97440
541-686-9160
acoit@eugenelaw.com
eperkins@eugenelaw.com
*Attorneys for Defendant City of Medford*

Eric B. Mitton
City of Medford
411 W 8th St, Room 260, Medford, OR 97501
541-774-2020
eric.mitton@cityofmedford.org
*Attorneys for Defendants City of Medford, Geoffrey Kirkpatrick, Michael Wulff, Omar Esqueda,
and Ashlee McFall*

DATED: May 30, 2026          Respectfully submitted,

**LEDUC MONTGOMERY LLC**

By: */s/ Alicia LeDuc Montgomery*
**Alicia LeDuc Montgomery, OSB 173963**
Email: alicia@leducmontgomery.com

*Attorney for Plaintiff John Lee Malaer*

47 – **PLAINTIFF'S TRIAL BRIEF**